# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE:

KINGDOM OF BELGIUM,
FEDERAL PUBLIC SERVICE FINANCE
PENSION PLAN LITIGATION

Lead Case: No. 21 Civ. 6392 (JGK)
Member Cases:
    No. 21 Civ. 6392 (JGK)
    No. 21 Civ. 6399 (JGK)
    No. 21 Civ. 6402 (JGK)
    No. 21 Civ. 6404 (JGK)
    No. 21 Civ. 6405 (JGK)
    No. 21 Civ. 6407 (JGK)
    No. 21 Civ. 6408 (JGK)

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...........................................................................................1

STATEMENT OF FACTS ................................................................................................1

    A.    Belgian Dividend Withholding Tax Refund System ...............................................1

    B.    The Tax Refunds At Issue........................................................................................6

    C.    Public Litigation And Media Reports Concerning The Alleged Fraud ..................7

    D.    Procedural Posture ................................................................................................11

ARGUMENT.................................................................................................................11

I.     Under The Revenue Rule, The Court Lacks Subject Matter Jurisdiction Because This Is An Action By A Foreign Sovereign To Enforce Foreign Tax Law ...................................11

    A.    The Revenue Rule Is A Fundamental Constraint On Jurisdiction That Protects Important Interests .............................................................................................12

    B.    FPSF's Claims Seek Direct Enforcement Of Belgian Tax Law ............................14

    C.    FPSF's Claims Seek At Least Indirect Enforcement Of Belgian Tax Law ...........17

    D.    Any Reliance On In re SKAT Is Misplaced .........................................................21

II.    FPSF's Claims Are Time Barred ...........................................................................27

    A.    New York's Statute Of Limitations Governs These Actions................................28

    B.    FPSF's Claims Are Time-Barred Under New York's Six-Year Accrual Rule .....30

    C.    FPSF's Claims Are Also Time-Barred Under New York's Two-Year Discovery Rule ....................................................................................................................33

          1.    The two-year limitations period began to run when FPSF was put on inquiry notice of the alleged fraud in November 2015. ...........................33

          2.    FPSF's unsubstantiated allegation that it conducted an investigation is insufficient to extend the two-year limitations period. ..............................34

          3.    Alternatively, any reasonably diligent investigation would have discovered the fraud after Denmark began suing Defendants for the same conduct in May 2018. ..........................................................................................36

III.   FPSF Fails To Plead Fraud With Particularity As To Alicia Colodner ............................39

    A.    The Xiphias And MI Complaints Fail To Adequately Plead That Ms. Colodner Aided And Abetted Fraud......................................................................................40

    B.    The Delvian Complaint Fails To Adequately Allege That Ms. Colodner Engaged In Fraud..................................................................................................................43

IV.   FPSF Should Not Be Permitted To Amend Its Complaints Again....................................47

CONCLUSION.............................................................................................................48

# TABLE OF AUTHORITIES

Page(s)

## CASES

*AIM Int'l Trading, L.L.C. v. Valcucine S.P.A.*,
  2003 WL 21203503 (S.D.N.Y. May 22, 2003) ...................................................2

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..............................................................................31, 35

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
  268 F.3d 103 (2d Cir. 2001) ..................................................................*passim*

*Baker v. 40 Wall Street Holding Corp.*,
  --- N.Y.S.3d --, 2022 N.Y. Slip. Op. 22002 (Sup. Ct. Kings Cnty. Jan. 5, 2022) .............32

*Brash v. Richards*,
  149 N.Y.S. 3d 560 (2d Dep't 2021) ................................................................32

*Butala v. Agashiwala*,
  916 F. Supp. 314 (S.D.N.Y. 1996) (Koeltl, J.) ...................................................35

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) ..........................................................................1

*Colpitts v. Blue Diamond Growers*,
  527 F. Supp. 3d 562 (S.D.N.Y. 2021) .............................................................43

*De Sole v. Knoedler Gallery, LLC*,
  139 F. Supp. 3d 618 (S.D.N.Y. 2015) .............................................................41

*EED Holdings v. Palmer Johnson Acquisition Corp.*,
  228 F.R.D. 508 (S.D.N.Y. 2005) ...................................................................47

*European Community v. RJR Nabisco, Inc.*,
  355 F.3d 123 (2d Cir. 2004), *cert. granted*, *judgment vacated*, 544 U.S.
  1012 (2005), *reinstated*, 424 F.3d 175 (2d Cir. 2005) ..................................*passim*

*European Community v. RJR Nabisco, Inc.*,
  424 F.3d 175 (2d Cir. 2005) .............................................................13, 18, 24

*Filler v. Hanvit Bank*,
  156 F. App'x 413 (2d Cir. 2005) ....................................................................39

*Fisher v. APP Pharmaceuticals, LLC*,
  783 F. Supp. 2d 424 (S.D.N.Y. 2011) .............................................................40

*Global Financial Corp. v. Triarc Corp.,*
 715 N.E.2d 482 (N.Y. 1999)...................................................28

*Graham v. HSBC Mortgage Co.,*
 2021 WL 4392522 (S.D.N.Y. Sept. 24, 2021)...........................35, 36

*Grasso v. United Group of Cos.,*
 806 F. App'x 69 (2d Cir. 2020) ...........................................29, 30

*Guilbert v. Gardner,*
 480 F.3d 140 (2d Cir. 2007)..................................................34

*Heinert v. Bank of America N.A.,*
 835 F. App'x 627 (2d Cir. 2020) ...........................................40, 41

*IDT Corp. v. Morgan Stanley & Co.,*
 907 N.E.2d 268 (N.Y. 2009)...................................................30

*IKB Deutsche Industriebank AG v. McGraw Hill Financial, Inc.,*
 634 F. App'x 19 (2d Cir. 2015) ...............................................28

*In re Fyre Festival Litigation,*
 399 F. Supp. 3d 203 (S.D.N.Y. 2019).....................................42, 45

*In re Jeweled Objects LLC,*
 2012 WL 3638006 (Bankr. S.D.N.Y. Aug. 22, 2012)......................42

*In re LIBOR-Based Financial Instruments Antitrust Litigation,*
 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015).................................8

*In re Merrill, BofA, & Morgan Stanley Spoofing Litigation,*
 2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) .................................36

*In re SKAT Tax Refund Scheme Litigation,*
 356 F. Supp. 3d 300 (S.D.N.Y. 2019).................................*passim*

*Koch v. Christie's Int'l PLC,*
 699 F.3d 141 (2d Cir. 2012)..........................................33, 34, 36

*Kramer v. Time Warner Inc.,*
 937 F.2d 767 (2d Cir. 1991)...................................................9

*Krys v. Pigott,*
 749 F.3d 117 (2d Cir. 2014)..........................................40, 41, 47

*Landow v. Wachovia Securities, LLC,*
 966 F. Supp. 2d 106 (E.D.N.Y. 2013) .....................................38

*LC Capital Partners, LP v. Frontier Insurance Group, Inc.*,
    318 F.3d 148 (2d Cir. 2003)............................................................................36

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)............................................................................33

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006)........................................................................39, 44

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
    797 F.3d 160 (2d Cir. 2015)............................................................................46

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000)..............................................................................1

*Marketxt Holdings Corp. v. Engel & Reiman, P.C.*,
    693 F. Supp. 2d 387 (S.D.N.Y. 2010).............................................................29

*Meimaris v. Royce*,
    2021 WL 5170725 (2d Cir. Nov. 8, 2021)......................................................30

*Moody v. Morris*,
    608 F. Supp. 2d 575 (S.D.N.Y. 2009), *aff'd*, 407 F. App'x 434 (Fed. Cir. 2011)............47

*Moore v. Mitchell*,
    30 F.2d 600 (2d Cir. 1929) (Hand, J., concurring) ........................................13

*Morrison v. National Australia Bank Ltd.*,
    547 F.3d 167 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010) ...............................11

*Muller-Paisner v. TIAA*,
    289 F. App'x 461 (2d Cir. 2008) ....................................................................45

*National Cable Television Ass'n, Inc. v. United States*,
    415 U.S. 336 (1974)........................................................................................15

*Park Avenue Aesthetic Surgery, P.C. v. Empire Blue Cross Blue Shield*,
    2021 WL 665045 (S.D.N.Y. Feb. 19, 2021).....................................................5

*Pasquantino v. United States*,
    544 U.S. 349 (2005)..........................................................................13, 20, 21

*PetEdge, Inc. v. Garg*,
    234 F. Supp. 3d 477 (S.D.N.Y. 2017).............................................................45

*Polar Int'l Brokerage Corp. v. Reeve*,
    108 F. Supp. 2d 225 (S.D.N.Y. 2000).............................................................42

*Republic of Colombia v. Diageo North America Inc.*,
    531 F. Supp. 2d 365 (E.D.N.Y. 2007) ........................................................................11, 14

*Republic of Honduras v. Philip Morris Cos.*,
    341 F.3d 1253 (11th Cir. 2003) ...................................................................................12

*Reynolds-Sitzer v. EISAI, Inc.*,
    2022 WL 471530 (N.D.N.Y. Feb. 16, 2022) ..........................................................31, 32

*Rosner v. Bank of China*,
    2008 WL 5416380 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009)....41

*Ryan v. Hunton & Williams*,
    2000 WL 1375265 (E.D.N.Y. Sept. 20, 2000) ............................................................41

*Saudi Arabia v. Nelson*,
    507 U.S. 349 (1993) ...................................................................................................15

*Sejin Precision Industry Co. v. Citibank, N.A.*,
    726 F. App'x 27 (2d Cir. 2018) ..................................................................................31

*Silvercreek Management, Inc. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017) ........................................................................40

*Staehr v. Hartford Financial Services Group, Inc.*,
    547 F.3d 406 (2d Cir. 2008) ....................................................................................1, 8

*Stern v. Leucadia National Corp.*,
    844 F.2d 997 (2d Cir. 1988) ........................................................................39, 43, 44

*Stuart v. American Cyanamid Co.*,
    158 F.3d 622 (2d Cir. 1998) ......................................................................................28

*United States ex rel. Levine v. Vascular Access Centers L.P.*,
    2020 WL 5534670 (S.D.N.Y. Sept. 15, 2020) .............................................................45

*Wexner v. First Manhattan Co.*,
    902 F.2d 169 (2d Cir. 1990) ......................................................................................47

*Zirvi v. Flatley*,
    433 F. Supp. 3d 448 (S.D.N.Y. 2020), *aff'd*, 838 F. App'x 582 (2d Cir. 2020) ...............38

## DOCKETED CASES

*SKAT v. Raubritter LLC Pension Plan et al.*, No. 18 Civ. 4833 (S.D.N.Y.) .......................9, 10, 37

# STATUTES, RULES, AND REGULATIONS

26 C.F.R.
      § 1.1441-1(b)(1) .................................................................................4
      § 1.1473-1(d) ....................................................................................4

28 U.S.C. § 1332(a)(4) ......................................................................40

Fed. R. Civ. P.
      12(b)(1) .............................................................................................1
      12(b)(6) .......................................................................................1, 11
      12(h)(3) ............................................................................................12

Fed. R. Evid.
      201 .....................................................................................................9
      201(b) ................................................................................................1

N.Y. C.P.L.R.
      § 202 ...............................................................................................28
      § 213(8) ...........................................................................................29

N.Y. Exec. Law
      § 29-a ........................................................................................31, 32
      § 29-a(1) ..........................................................................................32

N.Y. Exec. Order No. 202.38 (June 6, 2020) ....................................31

N.Y. Exec. Order No. 202.48 (July 6, 2020) .....................................31

N.Y. Exec. Order No. 202.55 (Aug. 5, 2020) ....................................31

N.Y. Exec. Order No. 202.55.1 (Aug. 6, 2020) .................................31

N.Y. Exec. Order No. 202.60 (Sept. 4, 2020) ...................................31

U.C.C. 8-501(b)(1) ............................................................................26

# OTHER AUTHORITIES

*Convention Between the Government of the United States of America and the*
      *Government of the Kingdom of Belgium for the Avoidance of Double*
      *Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on*
      *Income*, U.S.-Belg., Nov. 27, 2006, S. Treaty Doc. No. 110......................................*passim*

Iwersen & Votsmeier, *Robber knights with limited liability*, Handelsblatt
      Dusselldorf, May 5, 2018.......................................................................10, 38

Keszei, *The Federal Police are investigating the 350 million fraud*, L'Echo, Mar. 11, 2016 ........8

Nassau Cnty., Nassau County Land Records, https://i2f.uslandrecords.com/NY/
        Nassau/D/Default.aspx (last viewed Feb. 18, 2022).........................................................46

*Protocol Amending the Convention Between the Government of the United States of
        America and the Government of Japan for the Avoidance of Double Taxation
        and the Prevention of Fiscal Evasion with Respect to Taxes on Income*, art. XIII,
        Japan-U.S., art. XIII, Nov. 6, 2003, T.I.A.S. 19-830 (2019)................................19, 20, 25

Segal, *Where in the World is Denmark's $2 Billion?*, N.Y. Times, Oct. 5, 2018 ....................9, 38

U.S. Department of the Treasury, 2007 Technical Explanation to the U.S.-Belgium
        Taxation Treaty, https://www.irs.gov/pub/irs-trty/belgiumte07.pdf (last accessed
        Feb. 25, 2022) ..............................................................................................................3, 26

*U.S. Withholding Agent Frequently Asked Question*, Internal Revenue Serv.,
        https://www.irs.gov/businesses/international-businesses/us-withholding-
        agent-frequently-asked-question (last accessed Feb. 23, 2022)...........................................4

## PRELIMINARY STATEMENT

The Federal Public Service Finance of the Kingdom of Belgium ("FPSF")—the equivalent of the United States Department of the Treasury—asserts common-law fraud claims in a United States District Court to recover tax refunds that it paid after approving reclaim applications between 2012 and 2015, based on its application of Belgian tax law. This Court should dismiss all of FPSF's claims. *First*, this Court lacks subject matter jurisdiction over the claims (or should dismiss them for failure to state a claim) based on the common-law principle—the Revenue Rule—that courts may neither directly nor indirectly enforce the tax law of another sovereign. *Second*, even if this Court does not apply the Revenue Rule, FPSF's claims are barred by the applicable statute of limitations. *Third*, because FPSF alleges fraud, it must meet the stringent particularity requirements of Rule 9(b), but its allegations as to Alicia Colodner fall short.

## STATEMENT OF FACTS

Defendants (as defined in the Notice of Motion) move to dismiss under the Revenue Rule pursuant to Rule 12(b)(1), or, in the alternative, Rule 12(b)(6). In considering a motion to dismiss under Rule 12(b)(1), the Court "may refer to evidence outside the pleadings." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). On a motion brought under Rule 12(b)(6), the Court may consider documents incorporated by reference in—or integral to—the Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). The Court also may "consider matters of which judicial notice may be taken." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (cleaned up); *see also* Fed. R. Evid. 201(b). All the facts in this Statement are properly before the Court on this motion.

### A.      Belgian Dividend Withholding Tax Refund System

The government of Belgium taxes dividends paid by Belgian companies. Am. Compl., *In re Kingdom of Belgium, Fed. Pub. Serv. Fin. Pension Plan Litig.*, No. 21 Civ. 6392 (S.D.N.Y. Jan.

21, 2022), Dkt. 48 ("Xiphias Am. Compl.") ¶ 27.[1]  During the relevant period—2012 to 2015—the dividend tax rate increased from 21% to 25%.  *See* Declaration of Bernard Peeters ("Peeters Decl.") ¶ 20.[2]  Belgium collects these taxes through a withholding system:  when a Belgian company pays a dividend, it withholds the required amount (*e.g.*, 25%) and transfers that amount to FPSF, the agency of the Belgian government responsible for the assessment and collection of Belgian taxes.  Xiphias Am. Compl. ¶ 27.  The dividend-issuing company pays the net amount (the dividend minus the withheld tax) to shareholders.  *Id.*  Belgian corporations thus pre-pay withholding tax on dividend income at a 25% rate, regardless of who owns the dividends, or where that person or entity resides around the globe.

Belgium and the United States have entered into a taxation treaty that governs the Belgian government's taxation of dividends paid by Belgian corporations to shareholders who are residents of the United States. Xiphias Am. Compl. ¶ 28; *Convention Between the Government of the United States of America and the Government of the Kingdom of Belgium for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income*, U.S.-Belg., art.

---

[1] Except as otherwise indicated, the complaints filed in these cases do not differ in material ways relevant to the arguments presented in this motion.  Citations to the Xiphias Amended Complaint are accordingly meant to be exemplary, and the arguments apply equally to all of the amended complaints filed in these actions.

[2] The Court may consider the Peeters Declaration under Federal Rule of Civil Procedure 44.1; *see, e.g.*, *AIM Int'l Trading, L.L.C. v. Valcucine S.P.A.*, 2003 WL 21203503, at *5 (S.D.N.Y. May 22, 2003).

10, ¶ 4(b), Nov. 27, 2006, S. Treaty Doc. No. 110 ("Treaty").  The government of Belgium ratified the Treaty, and it is now part of Belgian tax law.  Peeters Decl. ¶ 14.

The Treaty limits the amount of tax on dividend income Belgium can impose on a non-resident taxpayer and provides that Belgium must refund some or all of the Belgian withholding tax to a non-resident person who is the "beneficial owner" of a dividend in an amount that exceeds the person's tax obligation under the Treaty.  Peeters Decl. ¶¶ 18-20.  Belgian "tax laws" define what constitutes a "beneficial owner" of the relevant Belgian dividend.  Treaty, art. 3, ¶ 2; Peeters Decl. ¶ 37; *see* U.S. Department of the Treasury, 2007 Technical Explanation to the Treaty at 33 ("U.S. Technical Explanation").  The limitations applicable under the Treaty depend on what type of individual or entity the non-resident taxpayer is.  An individual, for example, is subject to a maximum allowable tax rate of 15%.  *See* Peeters Decl. ¶ 20.  And a United States pension fund that is exempt from tax in the United States is not subject to taxes on dividends paid by Belgian companies if the pension fund is the "beneficial owner" of the dividends.  *Id.* ¶ 18.

Belgian tax law thus establishes a dividend withholding tax regime under which dividends paid by Belgian companies to shareholders that are U.S. residents are subject to a reduced level of withholding tax.  But the reduction of that dividend withholding tax takes place on the "back end"—only after the relevant Belgian companies have pre-paid the full amount of dividend

3

withholding tax (*e.g.*, 25%) to FPSF.[3]  *See* Peeters Decl. ¶¶ 16, 18-20.  As a matter of Belgian tax law, some dividend recipients—including United States pension plans that are the beneficial owners under Belgian tax law of the relevant dividends—are not subject to taxation on these dividends. *See id.* ¶¶ 18-20.  Applying Belgian tax law, FPSF decides how much of a refund is due.

During the relevant period, a U.S. pension fund wishing to be taxed at the Treaty rate (0%) rather than the standard Belgian withholding rate of 25% would submit an application to FPSF with proof of its tax-exempt status and its beneficial ownership of a dividend. Xiphias Am. Compl.

---

[3] Contrast Belgium's policy decision to structure its withholding tax system this way with the policy decision made by the United States.  Rather than forcing corporations to withhold a flat percentage of dividend withholding tax and then directing non-resident shareholders to apply to the governmental tax collection agency to recover over-withheld dividend withholding tax (as Belgium has done), the United States requires "withholding agents"—often companies paying dividends on their shares or financial institutions—to *themselves* assess non-resident shareholders' claims to reduced levels of dividend withholding tax pursuant to a relevant treaty.  *See* 26 C.F.R. § 1.1441-1(b)(1); *id.* § 1.1473-1(d) (defining "withholding agent"); *see generally U.S. Withholding Agent Frequently Asked Question*, Internal Revenue Serv., https://www.irs.gov/businesses/international-businesses/us-withholding-agent-frequently-asked-question (last accessed Feb. 23, 2022).  The United States' system puts the primary onus on withholding agents, rather than the government, to ensure compliance.  In any event, how a country chooses to administer its dividend withholding tax system is only a matter of administration:  It does not change what is being taxed or the amount of tax due.

¶ 28; Declaration of Nicholas Bahnsen ("Bahnsen Decl."), Ex. A.[4]  This application could only be made to FPSF (and not to the dividend-issuing corporation, the corporation's bank, or any other entity).   Peeters Decl. ¶ 24.   Upon submission of the application, FPSF was required, as the responsible Belgian government authority, to verify whether the applicant was the beneficial owner of Belgian dividends and whether the applicant was otherwise qualified to receive a reimbursement benefit—and, if so, how much.  *Id.* ¶ 28.

One portion of the application was a form 276 Div, which required an applicant, among other things, to provide a description of the income, including the name of the Belgian company in which the applicant purchased shares, the issue date of the dividend, the payment date of the dividend, the number of shares, and the total net dividend.  *See* Peeters Decl. ¶ 25; *see also* Bahnsen Decl. Ex. A at 3.  This information enabled FPSF to determine what level of taxation the applicant was subject to under Belgian tax law—*i.e.*, whether the applicant was a beneficial owner U.S. resident pension fund (in which case it was subject to a 0% dividend withholding tax) or was simply a beneficial owner U.S. resident (in which case it was subject to a 15% dividend withholding tax).  Treaty, art. 10, ¶¶ 2, 4(b).  If necessary to determine whether the applicant was eligible for a full or partial reclaim under Belgian tax law, FPSF could solicit additional materials

---

[4] This Court may consider the reclaim application attached as Exhibit A to the Bahnsen Declaration because it is incorporated by reference in, and integral to, the amended complaints. *See Park Ave. Aesthetic Surgery, P.C. v. Empire Blue Cross Blue Shield*, 2021 WL 665045, at *1 (S.D.N.Y. Feb. 19, 2021) (Koeltl, J.); *see also* Xiphias Am. Compl. ¶ 40 (referring to nearly all the individual aspects of a refund application); *id.* ¶¶ 6, 31, 33-35, 37, 40-43, 46-50, 52, 55-56, 58-60, 65 (making allegations based on the reclaim applications).

or information from the applicant.  *See* Peeters Decl. ¶ 29.  If, after conducting its review, FPSF determined that an applicant was the beneficial owner of dividends entitled to tax relief, it would issue an affirmative, written decision assigning a registration number to the applicant and approving the amount of the reclaim.  Peeters Decl. ¶¶ 29-30.  The assignment of a registration number indicated that FPSF was treating the plans as participants in the Belgian tax system, to facilitate the processing of claims for refunds of dividend withholding tax.  *Id.* ¶ 30.  FPSF then paid the withheld taxes.  *Id.* ¶ 29.

### B.    The Tax Refunds At Issue

The pension plans named as defendants in these cases applied for and obtained dividend withholding tax refunds from FPSF.  Xiphias Am. Compl. ¶¶ 31, 40.

As required by Belgian tax law, FPSF reviewed the pension funds' applications.  Peeters Decl. ¶¶ 24, 26-27.  Applying Belgian tax law, FPSF concluded that the submitted documentation—among other things, forms 276 Div, trade confirmations showing the details of the share purchases by the pension plans, dividend credit advices, and IRS Forms 6166 certifying the plans' tax residency in the United States—established that the plans were beneficial owners of the dividends under Belgian tax law and otherwise qualified for the full withholding tax refund.  Xiphias Am. Compl. ¶¶ 40, 47, 49-50.  And FPSF issued decisions embodying its reasoned assessment that the plans received income subject to taxation in Belgium, were subject to taxation at a lower rate than the withheld 25%, and were entitled to tax refunds.  *Id.* ¶¶ 8, 52.  As a result, FPSF granted tax relief equal to the amount of withholding tax on the dividends received by the plans—in other words, the plans received full tax refunds from FPSF.  *Id.*

In the exhibits attached to its amended complaints, FPSF identified 336 refund applications that Defendants allegedly submitted:

| Year | 2012 | 2013 | 2014 | Undated | Total |
|---|---|---|---|---|---|
| **Number of alleged refund applications** | 16 | 187 | 131 | 2 | **<u>336</u>** |

The earliest refund application identified by FPSF was submitted on August 13, 2012. *See* Am. Compl., *In re Kingdom of Belgium, Fed. Pub. Serv. Fin. Pension Plan Litig.*, No. 21 Civ. 6392 (S.D.N.Y. Jan. 21, 2022), Dkt. 52 Ex. A.  More than half of the refund applications identified in FPSF's amended complaints were submitted in 2013.  The last refund application identified by FPSF in its pleadings was submitted on November 13, 2014. *See* Xiphias Am. Compl. Ex. B.  The refund applications were generally paid "several months" after they were submitted, *see id.* ¶ 52, though FPSF opted not to include in its amended complaints the dates on which it paid the refund applications.

FPSF now claims that the plans were not entitled to the tax refunds because, among other things, the IRS-qualified plans were not "bona fide" and "did not own the shares they claimed to own." Xiphias Am. Compl. ¶ 6.  FPSF claims that, in fact, the pension plans "did not purchase or own the shares in question," and "did not receive dividends" in connection with those shares.  *Id.* ¶ 51.  Now, FPSF seeks to recover as damages the tax refunds it determined—after its own review of the plans' application materials—to pay.  *Id.* ¶ 52.  Each of FPSF's claims thus requires it to prove that the applicants did not receive dividend income under Belgian law and/or that the applicants should be taxed at a different rate than FPSF originally assessed.

### C.    Public Litigation And Media Reports Concerning The Alleged Fraud

In November 2015, FPSF learned that the Belgian Federal Police were participating in an "international criminal investigation" into "possible fraud" involving refund applications submitted by two reclaim agents that FPSF has identified as Acupay and Goal Taxback.  Xiphias

Am. Compl. ¶ 55.   According to FPSF, Defendants used those reclaim agents to submit the necessary paperwork for each refund application. *Id.* ¶ 38.  Upon being alerted to the investigation into Acupay and Goal Taxback, FPSF "suspended payment of refund requests involving those reclaim agents." *Id.* ¶ 54.

The existence of the cross-border criminal investigation was no secret—a possible fraud involving dividend tax reclaims was publicly reported as early as 2016 in Belgian media reports that discussed the central involvement of a U.K.-based businessman named Sanjay Shah.[5]  Shah's company Solo Capital, a non-party U.K.-licensed broker-dealer identified in FPSF's amended complaints, *see* Xiphias Am. Compl. ¶¶ 37, 50, has subsequently been linked to hundreds of

---

[5]  *See, e.g.*, Keszei, *The Federal Police are investigating the 350 million fraud*, L'Echo, Mar. 11, 2016 (reporting that the country's federal police were investigating tax fraud in connection with Sanjay Shah and his affiliated company, Solo Capital Partners) (attached to the Bahnsen Declaration as Exhibit B).  The Court may consider this news article—and the others cited in this brief—for the limited purpose of evaluating when FPSF was on notice of the alleged fraud at issue in this case. *See Staehr*, 547 F.3d at 425 ("[I]t is proper to take judicial notice of the fact that press coverage … contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice[.]"); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2015 WL 6243526, at *40 (S.D.N.Y. Oct. 20, 2015) ("[W]e take judicial notice of LIBOR-related news articles … , not for the truth of the articles, but for the existence of the articles and their content.").

contested dividend tax refund applications submitted to Belgium, Denmark, and other countries.[6] *See, e.g.*, Segal, *Where in the World is Denmark's $2 Billion?*, N.Y. Times, Oct. 5, 2018 (reporting on the central role that Shah and Solo Capital played in organizing dividend tax refund applications citing, among other details, a whistleblower letter submitted to Her Majesty's Revenue and Customs office in the United Kingdom that alleged "Solo had created fictitious client accounts and trading records in order to defraud the tax authorities in Denmark and Belgium"); *see also* Bahnsen Decl. Ex. D.

In May 2018, the government agency tasked with enforcing Denmark's revenue and tax laws—known as SKAT—filed suit against nearly three hundred U.S. pension plans and related parties in this Court. *See, e.g.*, Compl., *SKAT v. Raubritter LLC Pension Plan et al.*, No. 18 Civ. 4833 (S.D.N.Y. May 31, 2018), Dkt. 1 ("SKAT Raubritter Compl."); *see also* Bahnsen Decl. Ex. E.[7]  Among the parties SKAT sued were individuals and pension plans that FPSF has named in

---

[6] In its original complaints, FPSF alleged that it "suspended payments on refund claims involving Solo Capital" in November 2015. Compl., *In re Kingdom of Belgium, Fed. Pub. Serv. Fin. Pension Plan Litig.*, No. 21 Civ. 6392 (S.D.N.Y. July 27, 2021), Dkt. 1 ¶ 44. After Defendants explained in their pre-motion letter that the reference to Solo Capital was relevant to a possible statute of limitations argument, *see* Dkt. 41 at 2-3, FPSF dropped any allegation connecting Solo Capital to FPSF's decision to suspend refund application payments. The tax authority now alleges that it suspended reclaims involving Acupay and Goal Taxback. *See* Xiphias Am. Compl. ¶ 54.

[7] Judicial notice of documents filed in this court is sanctioned by Fed. R. Evid. 201. *See, e.g.*, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (affirming Rule 12(b)(6)

this litigation.  *See* SKAT Raubritter Compl. (Adam LaRosa and Raubritter Pension Plan).
SKAT's complaints alleged essentially the same facts involving key non-parties such as Acupay
and Solo Capital.  *Compare* SKAT Raubritter Compl. ¶¶ 26, 48 (identifying Acupay's role in
submitting refund applications to Denmark and Solo Capital's role in providing purportedly
fraudulent dividend credit advices to support the alleged scheme) *with* Am. Compl., *In re Kingdom
of Belgium, Fed. Pub. Serv. Fin. Pension Plan Litig.*, No. 21 Civ. 6392 (S.D.N.Y. Jan. 21, 2022),
Dkt. 49 ("FPSF Traden Am. Compl.") ¶¶ 44-47 (same).  Indeed, the allegations are so similar that
in some places the language of FPSF's complaints is almost indistinguishable from SKAT's
pleadings.  *Compare, e.g.*, SKAT Raubritter Compl. ¶ 4 ("These [refund] applications were
fraudulent because the claimants did not own the shares that they claimed to own, they did not
earn the dividends they claimed to have earned, and they were not entitled to the tax refunds they
claimed."), *with* FPSF Traden Am. Compl. ¶ 6 ("These refund applications were fraudulent
because these plans were not bona fide pension plans, they did not own the shares they claimed to
own and they did not earn the dividends they claimed to have earned.").  Mr. LaRosa and Raubritter
Pension Plan were the subject of reports in the press.[8]  In February 2019, SKAT sued additional
groups of defendants named in FPSF's amended complaints, again alleging the same underlying

_____

dismissal after noting that "courts routinely take judicial notice of documents filed in other courts
[] to establish the fact of such litigation and related filings").

    [8] *See* Iwersen & Votsmeier, *Robber knights with limited liability*, Handelsblatt Dusseldorf,
May 9, 2018 (describing in detail defendant Adam LaRosa's alleged role in helping 24 pension
plans, including Raubritter Pension Plan, obtain "more than two billion euros in Denmark and
Belgium alone") (attached to Bahnsen Declaration as Exhibit C).

scheme involving Acupay and Solo Capital. *See* Compl., *Skatteforvaltningen v. Xiphias LLC Pension Plan et al.*, No. 19 Civ. 1924 (S.D.N.Y. Feb. 28, 2019), Dkt. 1; *see also* Bahnsen Decl. Ex. F.

### D.    Procedural Posture

FPSF filed its original complaints in this action on July 27, 2021. Dkt. 1. On November 1, 2021, Defendants filed a pre-motion letter seeking leave to move to dismiss the original complaints. Dkt. 41. Pursuant to the joint scheduling order submitted by the parties that was so-ordered by the Court on December 13, 2021, Dkt. 45, FPSF filed its amended complaints on January 21, 2022, in which it added 24 additional defendants and increased its alleged damages from €44,891,595 to €177,839,246.

## ARGUMENT

### I.    Under The Revenue Rule, The Court Lacks Subject Matter Jurisdiction Because This Is An Action By A Foreign Sovereign To Enforce Foreign Tax Law

Defendants move to dismiss for lack of subject matter jurisdiction because FPSF's claims are barred by the Revenue Rule. *See Republic of Colombia v. Diageo N. Am. Inc.*, 531 F. Supp. 2d 365, 381 (E.D.N.Y. 2007) ("*Colombia*").[9] As a plaintiff asserting subject matter jurisdiction, FPSF "has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010). The Court may thus consider evidence outside the pleadings, and FPSF must show jurisdiction affirmatively—not merely "by drawing from the pleadings inferences favorable to the party

---

[9] In the alternative, Defendants move to dismiss on Revenue Rule grounds under Rule 12(b)(6) because FPSF fails to state a claim upon which relief may be granted.

asserting it." *Id.* FPSF cannot make this showing, and dismissal is required. *See* Fed. R. Civ. P. 12(h)(3).

### A.    The Revenue Rule Is A Fundamental Constraint On Jurisdiction That Protects Important Interests

Through its common-law claims, Belgium seeks to recover dividend withholding tax that its sovereign tax authority previously determined should be refunded and did refund to the defendant pension plans. FPSF considered those defendants' submissions, which necessarily included the agency's application of Belgian tax law. And, applying Belgian tax law, FPSF concluded that the pension plans were subject to taxation at a rate lower than the 25% that the dividend-issuing company had pre-paid. FPSF then paid the resulting overpayments to those defendants. FPSF has now changed its mind and wants its tax money back. But Belgium's tax claim is not for this Court to address. The Revenue Rule bars this Court from engaging in this sort of tax determination and judicial tax collection assistance.

The Revenue Rule prohibits courts from hearing claims by foreign sovereigns that seek direct or indirect enforcement of their tax laws. *See Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 130-31 (2d Cir. 2001) ("*Canada*"). In evaluating whether a claim is barred by the Revenue Rule, "[w]hat matters is not the form of the action, but the substance of the claim." *Id*. Otherwise, plaintiffs could circumvent the Revenue Rule "by bringing tax claims under the guise of non-tax-related causes of action." *Republic of Honduras v. Philip Morris Cos.,* 341 F.3d 1253, 1256 (11th Cir. 2003).

The Revenue Rule safeguards two important objectives: (1) respecting sovereignty by avoiding embroiling the judiciary in the decision-making of foreign sovereigns, and (2) respecting the separation of powers by preserving for the legislative and executive branches the realm of foreign relations. With respect to the first objective, the Supreme Court has explained that "the

principal evil" against which the Revenue Rule guards is "judicial evaluation of the policy-laden enactments of other sovereigns." *Pasquantino v. United States*, 544 U.S. 349, 368 (2005) (citing *Moore v. Mitchell*, 30 F.2d 600, 604 (2d Cir. 1929) (Hand, J., concurring)).   As the Second Circuit put it, "policy complications and embarrassment may follow when one nation's courts analyze the validity of another nation's tax laws." *Eur. Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175, 180 (2d Cir. 2005) ("*EC II*").   When domestic courts try to interpret and decide whether to enforce foreign law, there is a risk that they will reach conclusions that would frustrate or embarrass a foreign sovereign. The Revenue Rule sensibly acts as a prophylactic against these risks—whether or not they would materialize in any individual case.

The Revenue Rule also protects the separation of powers because "the conduct of foreign relations is primarily the realm of the legislative and executive branches."   *Eur. Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123, 131 (2d Cir. 2004) ("*EC I*"), *cert. granted*, *judgment vacated*, 544 U.S. 1012 (2005), *reinstated*, 424 F.3d 175 (2d Cir. 2005).   As the court of appeals has explained, "judicial examination and enforcement of foreign tax laws at the behest of foreign nations may conflict with the other branches' policy choices with respect to cooperation in tax enforcement, and create the risk that the judiciary will be drawn into issues and disputes of foreign relations policy that are assigned to—and better handled by—the political branches of government." *EC I*, 355 F.3d at 131 (cleaned up).   "In our system of government, the Executive is 'the sole organ of the federal government in the field of international relations.'" *Pasquantino*, 544 U.S. at 369.   As with the objective of respecting sovereignty, then, the Revenue Rule also acts as a bar to avoid the *risk* of courts' interfering in diplomacy related to international tax enforcement.   For these reasons, the Revenue Rule is not "discretionary," and courts must refuse jurisdiction where the rule applies. *EC I*, 355 F.3d at 138.

**B.      FPSF's Claims Seek Direct Enforcement Of Belgian Tax Law**

The Revenue Rule bars as "direct enforcement" of foreign tax law claims (1) by a foreign sovereign (2) that seek damages that the sovereign sustained in its capacity as a sovereign and (3) that were caused by alleged violations of that sovereign's tax laws. *See EC I*, 355 F.3d at 131; *Colombia*, 531 F. Supp. 2d at 385. All three conditions are met here.

*First*, these claims are indisputably brought by a foreign sovereign. Xiphias Am. Compl. ¶ 9 ("FPSF Belgium is an agency of a foreign state under the U.S. Foreign Sovereign Immunities Act.").

*Second*, FPSF seeks damages that it sustained in its capacity as a sovereign. The Revenue Rule bars claims seeking damages suffered through "acts that are '*jure imperii*,' that is, that are expressions of a foreign sovereign's will or are carried out by virtue of that sovereign authority." *Canada*, 268 F.3d at 132. Acts that are *jure imperii* contrast with acts that are carried out by a sovereign but are *jure gestionis*—private or commercial in character. "An example of a private, '*jure gestionis'* act is operating a business[, while in] addition to the *enforcement of revenue laws*, a classic example of '*jure imperii*' acts is the enforcement of penal laws." *Id.* at 132 n.41 (emphasis added); *see also Colombia*, 531 F. Supp. 2d at 385. Ultimately, "[a] sovereign suffers harms in its sovereign capacity when its injury concerns activity undertaken by the government by virtue of its sovereign authority." *Colombia*, 531 F. Supp. 2d at 391 (cleaned up).

At minimum, FPSF's injury "concerns" activity it undertook by virtue of its sovereign authority. Only a sovereign could establish a tax system—and then a tax refund system—to

implement its tax laws.[10]   Only a sovereign could determine the amount of income received and resulting tax owed by residents and non-residents, including the determination that no taxes are due.  Belgium elected to delegate the authority to evaluate tax refund claims to its sovereign tax agency, FPSF.  The reclaims at issue here could *only* be made as against Belgium's tax system; they were not available from any other source.  *See* Peeters Decl. ¶ 24.

If FPSF suffered any damage, it did so in a sovereign capacity.  That is because FPSF necessarily alleges fraud in connection with acts carried out by virtue of its sovereign authority.  Belgium organized its tax system around withholding at source, requiring corporations to withhold and pre-pay dividend tax to the government, and taxpayers who are subject under Belgian tax law to lower tax rates than the withholding rate to apply for return of some or all of those pre-paid amounts.  The plans submitted tax refund claims to FPSF, FPSF evaluated the claims to decide whether to pay the tax refunds, and, based on its judgment, FPSF paid the tax refunds to the plans.  *See* Xiphias Am. Compl. ¶¶ 9, 40, 52.  And FPSF decided to treat the tax refund applicants as

---

[10] Courts' treatment of the "commercial activity" exception to foreign sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA") also lends support to Defendants' position that FPSF's effort to recoup tax refunds is a sovereign activity.  Under that exception, "a state engages in commercial activity … where it exercises 'only those powers that can also be exercised by private citizens,' as distinct from those 'powers peculiar to sovereigns.'"  *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993).  The power to levy taxes and to recoup them is a power that only the sovereign can undertake.  *Cf. Nat'l Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340 (1974).  If the pension funds sued FPSF in U.S. court to recover claimed but unpaid refunds, FPSF would likely invoke its immunity under the FSIA and prevail.

participants in its tax system and to refund the withholding tax.  *See* Xiphias Am. Compl. ¶ 52 (alleging that FPSF "reli[ed] on" the Defendants' tax form submissions in deciding to "pa[y out] the requested refund amounts").  The alleged fraudulent acts—submitting misrepresentations to FPSF via its refund administration—occurred through the sovereign's refund system, a fact unaltered by FPSF's decision to style its claims as ones sounding in common-law fraud.

*Third*, FPSF's claims are barred as direct enforcement because FPSF is seeking damages caused by alleged violations of foreign tax law.  To prevail on its fraud claims, FPSF must show either that the pension plans were not subject to taxation because they were not the "beneficial owner" of the dividends under Belgian tax law, or that they were not "bona fide" pension plans and so were subject to different limitations on the amount of tax Belgium could impose.  With respect to the first theory, FPSF alleges that the plans "did not own the shares they claimed to own." Xiphias Am. Compl. ¶ 6.  But the plans maintain that they owned those shares and received dividend income in the amounts specified in their applications.  The plans entered into binding commitments to purchase shares, and trade confirmations provided by the plans' brokers state that they purchased the shares.  Xiphias Am. Compl. ¶ 49; Bahnsen Decl. Ex. A at 9.  The purchase of shares entitled the plans to the receipt of dividends (net of withholding taxes paid by the applicable company issuing the dividend).  *See* Peeters Decl. ¶ 16; Bahnsen Decl. Ex. A at 8.  Dividend credit advices provided by custodians state that the plans' accounts were credited with amounts equal to the dividend payment net of withholding tax.  Xiphias Am. Compl. ¶ 50; Bahnsen Decl. Ex. A at 8; *see* Peeters Decl. ¶ 25.  Whether this evidence suffices to establish beneficial ownership of the amount of dividend income stated is a question of Belgian tax law—one which FPSF previously resolved in the pension funds' favor.  In asking this Court to unwind that determination, FPSF is asking this Court to do the same work, but to reach the opposite conclusion based on the allegation

that the submissions were false—in other words, that they misrepresented the funds' status as beneficial owners of the amounts of dividend income. Just as FPSF did in the first instance, this Court will be required to enforce Belgian tax law in adjudicating those allegations. And as to FPSF's second theory, it requires a determination under Belgian tax law about the amount of tax to be imposed. Each question of Belgian tax law in that connection begets another: how much income sourced in Belgium the plans received, then whether that income is subject to taxation and if so, how much, then whether the plans are entitled to a refund of some or all of that taxation and if so, how much, and so on.

On either theory, the *ultimate* question—whether the plans were subject to taxation by the Kingdom of Belgium—can only be answered by Belgian tax law. And if the Court were to determine that the pension plan defendants were not eligible for reduced taxation (or were only eligible for so much reduced taxation) under Belgian tax law, the Court would then "*enforce*" Belgian tax law "by awarding damages" to FPSF. *EC I*, 355 F.3d at 132 (emphasis added). That is, this Court would require Defendants to return some or all of the tax refunds via the money judgment FPSF seeks. *See* Xiphias Am. Compl. Req. for Relief (a). Such analysis and enforcement of foreign tax law are what the Revenue Rule aims to prevent.

FPSF thus seeks direct enforcement of foreign tax law because it is a sovereign entity pursuing claims based on alleged violations of Belgian tax law that caused alleged damage by virtue of FPSF's sovereign acts in administering Belgium's tax refund system.

## C.    FPSF's Claims Seek At Least *Indirect* Enforcement Of Belgian Tax Law

The Revenue Rule also bars any claims that seek even *indirect* enforcement of foreign tax law. *See Canada*, 268 F.3d at 131. "Indirect enforcement occurs where a foreign State (or its nominee) in form seeks a remedy, not based on the foreign rule in question, but which in substance

is designed to give it extra-territorial effect." *Id.*; *see also EC I*, 355 F.3d at 131. At minimum, then, FPSF seeks indirect enforcement of Belgian tax law.

Put simply, the Revenue Rule bars FPSF's claims because they seek a remedy (a money judgment) that would give extraterritorial effect through a United States federal court judgment to Belgian tax law, which FPSF asserts entitles it to repayment of the plans' tax refunds. FPSF is thus using generic causes of action to enforce indirectly Belgian tax law. And, again, "[w]hat matters is not the form of the action, but the substance of the claim." *Canada*, 268 F.3d at 130-31.

Considering the purposes that animate the Revenue Rule confirms that the Rule is implicated here. *First*, the United States executive branch—the department of the federal government tasked primarily in the constitutional scheme with carrying out foreign relations—has not provided its consent for these claims. The executive branch might consent in various ways. For example, and especially relevant here, a court might deduce the executive branch's consent "where the treaties between the United States and the sovereigns at issue provide for broad, reciprocal tax enforcement assistance." *EC I*, 355 F.3d at 132. "The executive might also indicate its consent to the suit by other means, such as submitting a statement from the State Department or filing an amicus brief." *Id.* But here, the executive branch has given no "signal that it consents to this litigation," *EC II*, 424 F.3d at 181, which suggests that this Article III court should not intervene and entertain this foreign tax suit. "[P]ermitting such a claim to go forward … would be ignoring and undermining the treaty negotiation process and the clearly expressed views of the

political branches of the United States government and instead engaging in ad hoc judicial policymaking in the delicate realm of foreign affairs." *Canada*, 268 F.3d at 122.[11]

Some sovereigns, in fact, have negotiated for treaty provisions that would allow them to receive direct assistance from the U.S. (through the IRS) to recover allegedly fraudulent tax refunds, as Belgium seeks to do here. For example, the equivalent treaty with Japan provides that the United States would provide collection assistance (in the United States and against United States citizens or nationals) to Japan related to "a fraudulent claim for refund." *Protocol Amending the Convention Between the Government of the United States of America and the Government of Japan for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income*, Japan-U.S., art. XIII, Nov. 6, 2003, T.I.A.S. 19-830 (2019) ("Japanese Protocol"). The Japanese Protocol establishes that the United States executive branch both (1) is capable of (and interested in) negotiating for bilateral collections assistance and (2) regards as "a revenue claim" a claim concerning "a fraudulent claim for *refund*." *Id.* (emphasis added).

Permitting FPSF's claims to proceed in this case would create an unwarranted asymmetry in international tax collection assistance. Belgium would receive collection assistance in United States courts to recover tax refunds, but it would not necessarily grant the United States the same

---

[11] For example, the Treaty between Belgium and the United States comprises a careful balance of bargained-for benefits for both sovereigns. *See, e.g.*, Treaty, art. 14 (delineating how Belgian and United States residents' employment income might be taxed when the resident earns income in the other State). To allow one party to the Treaty (Belgium) to engage in unilateral collection assistance would invade the realm of the executive and interfere with the diplomacy surrounding international tax enforcement.

benefit in Belgian courts.  As the Japanese Protocol makes clear, that reciprocal assurance is valuable—it is something for which the executive branch has elsewhere seen fit to negotiate.[12] For the judiciary to entertain a tax collection action brought by Belgium before the executive branch can extract the reciprocal benefit (and potentially other benefits) from Belgium would improperly hamstring the executive branch, particularly because "[i]n our system of government, the Executive is 'the sole organ of the federal government in the field of international relations.'" *Pasquantino*, 544 U.S. at 369.

---

[12] The Japanese Protocol is instructive here by analogy.  Under that Protocol, it is a prerequisite of most collection assistance cases that "under the laws of the applicant State, the revenue claim has been finally determined," which means that the "applicant State has the right under its domestic law to collect the revenue claim and all applicable administrative and judicial rights of the taxpayer to dispute or appeal the revenue claim have lapsed or been exhausted." Japanese Protocol, art. XIII, ¶ 5; *see also id.* ¶ 15(a) ("In no case shall the provisions of this Article be construed so as to impose on the requested State an obligation to accept an application of the applicant State … if the applicant State has not pursued all appropriate measures to collect the revenue claim … available under its laws or administrative practices.").  Here, FPSF does not allege that its claim regarding the money it seeks through its "fraud" claim—which is really a revenue claim—has been finally determined in Belgium.  It would be contrary to the negotiated position of the United States in an analogous treaty for this Court to entertain this suit and possibly award damages to FPSF.  If Belgium wants assistance from the United States to collect tax revenue through fraud claims, the proper way to pursue that end is through diplomacy.

*Second*, if this Court does not apply the Revenue Rule to bar FPSF's claims, this Court will be asked to determine the "extent of liability []under" Belgian tax law, which could entangle the Court in an assessment of the decision-making of a foreign state. *Canada*, 268 F.3d at 124. The Revenue Rule seeks to guard against exactly this sort of "judicial evaluation of the policy-laden enactments of other sovereigns." *Pasquantino*, 544 U.S. at 368.

Because a "court will not recognize those [liabilities] arising in a foreign state, if they run counter to the 'settled public policy' of its own," then "scrutiny of the liability is necessarily always in reserve" along with "the possibility that it will be found not to accord with the policy of the domestic state." *Canada*, 268 F.3d at 112. Under the Revenue Rule, "[n]o court ought to undertake an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper." *Id.* Defendants thus need not show that they would prevail on an argument that enforcement of Belgian tax law would violate domestic public policy, nor even that they intend to raise such an argument, because the mere possibility is barred by the Revenue Rule. This makes good sense: otherwise, when courts do decline jurisdiction based on the Revenue Rule, it would be apparent that the foreign tax law likely violated domestic public policy.

### D.   Any Reliance On *In re SKAT* Is Misplaced

In May 2018, the Danish tax authority, SKAT, sued certain U.S. pension plans and related entities arguing that it paid erroneous dividend withholding tax refunds to the plans. In January 2019, the district court (Kaplan, J.) ruled on several defendants' motion to dismiss on Revenue Rule grounds, holding that at the motion to dismiss stage, the defendants had not met their burden, reserving that "[w]hether in light of discovery and a fuller presentation, the revenue rule will be of greater aid to the defendants must await developments." *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 308 (S.D.N.Y. 2019). In our respectful view, Judge Kaplan erred. However,

even on Judge Kaplan's reasoning, Defendants here should prevail because any deficiencies in the SKAT defendants' motion to dismiss are not present here.

1. The court in *SKAT* proceeded from the erroneous premise that "fraud" is an exception to the Revenue Rule.  356 F. Supp. 3d at 308, 311.  This holding conflicts with direct Second Circuit precedent.  Both *Canada* and *EC I* held that the Revenue Rule barred fraud claims.  *See Canada*, 268 F.3d at 107 (mail and wire fraud); *EC I*, 355 F.3d at 127 (mail fraud, wire fraud, and money laundering).  Indeed, a fraud exception to the Revenue Rule would swallow the entire rule. In nearly any case with an underlying alleged violation of foreign tax law, the foreign tax authority could merely allege that the defendant had intentionally misrepresented its tax status or taxable income in some fashion—*i.e.*, fraud—and then circumvent the Revenue Rule.  The sovereignty concerns that animate the Revenue Rule are also implicated whether or not fraud is alleged because, in either case, the Court will need to analyze Belgian tax law and its prudence.

That is not to say all types of fraud would be barred by the Revenue Rule—Defendants acknowledge otherwise.  For instance, fraud bearing no connection at all to a foreign sovereign's tax system—a true "garden variety commercial fraud," *In re SKAT*, 356 F. Supp. 3d at 308—would not be barred.  A U.S. computer vendor that absconded with funds paid by a foreign tax authority for an IT system that was never delivered could likely be sued in U.S. court.

Here, however, even if there were a fraud (there was not), it would be a non-justiciable *tax* fraud.  As described above, this alleged fraud involved the Defendants' (1) purchasing shares of Belgian corporations that issue dividends, (2) collecting dividend payments net of withholding tax, (3) obtaining a tax form from the IRS (Form 6166), (4) declaring, to the Belgian tax authority, net income subject to taxation in Belgium (on the Form 276 Div), (5) requesting a deduction for the tax pre-payment on the dividend income from the Belgian tax authority (again on the FPSF-issued

form), and (6) securing approval for tax refunds from the Belgian tax authority. *See* Xiphias Am. Compl. ¶¶ 40, 52; Peeters Decl. ¶¶ 24-33. It is simply incorrect to say that this case can ever be about "garden variety commercial fraud." Instead, this case is inescapably about one of Belgium's quintessential sovereign powers: the power to tax, including the power to decide who is liable for tax, and how much tax liability exists. The pension plans submitted tax "refund applications," Xiphias Am. Compl. ¶ 6, to FPSF, which FPSF approved after making a discretionary, technical judgment to refund the withheld tax. *See* Peeters Decl. ¶¶ 27-29; Xiphias Am. Compl. ¶ 52 (alleging that FPSF "reasonabl[y] reli[ed]" on the tax refund applications). FPSF contends that decision was wrong; the plans say it was correct. To resolve that dispute, the Court will be required to apply Belgian tax law. Allowing this case to proceed would directly implicate the public policy concerns the Revenue Rule exists to prevent.[13]

    **2.** The court in *SKAT* understood defendants to be arguing that SKAT's claims were barred as "an attempt to recover lost tax revenue," and the court rejected that argument. 356 F. Supp. 3d at 311. Here, FPSF's claims *are* an attempt to recover tax revenue. There is no functional difference between the collection of an under-withheld tax amount and the recovery of an incorrect

---

[13] The court in *SKAT* also appeared to credit SKAT's argument that the defendants did not have a "legitimate connection" to the Danish tax system. 356 F. Supp. 3d at 311. But whatever a "legitimate" connection would be, that is not required by the Revenue Rule. Indeed, determining whether the "connection" is legitimate is itself precisely what the Revenue Rule bars. FPSF inherently asks this Court to rule that the plans' refund requests violated Belgian tax law—the only way that the connection may not be legitimate—and this amounts to proscribed enforcement of Belgian tax law.

withholding tax refund—only the sequence is different.  In any event, the Revenue Rule does not require that the claim at issue be one to recover tax revenue per se.  For the Revenue Rule to bar claims, the claims need only be "claims by foreign sovereigns that [a]re premised on violations of foreign tax laws."  *EC I*, 355 F.3d at 129.  Courts may sometimes use the shorthand "claims for tax revenue" to refer to claims barred by the Revenue Rule, but this narrow description is used only because it describes the common variety of claims that the Revenue Rule bars.  This makes sense as a matter of ordinary phrasing but does not constrain the protective sweep of the rule.  As the Second Circuit has explained, the Revenue Rule not only bars claims for "tax revenue" but also bars, for instance, a "claim for damages based on law enforcement costs" related to investigating alleged contraband smuggling because such a claim seeks "the enforcement of a tax law."  *Canada*, 268 F.3d at 130-32; *see also EC II*, 424 F.3d at 178 (explaining that the Revenue Rule barred "claims for recovery of lost tax revenue and," separately, "law enforcement costs").

The broader sweep of the Revenue Rule to cover claims based on violations of foreign tax law—not merely claims to recoup tax revenue—makes sense because the separation of powers and sovereignty concerns motivating the Revenue Rule apply similarly to the broader class.  Accordingly, even if FPSF's claims seeking return of the tax refunds were not claims for tax "revenue"—though, as explained below, they are—they would still be barred by the Revenue Rule because they are "claims by foreign sovereigns that [a]re premised on violations of foreign tax laws."  *EC I*, 355 F.3d at 129.

Even though the Revenue Rule is not meant to be analyzed in a formalistic manner— "[w]hat matters is not the form of the action, but the substance of the claim"—FPSF's claims are, in any event, claims for tax revenue.  *Canada*, 268 F.3d at 130-31.  When FPSF decided to recognize income earned by the plans as being subject to taxation in Belgium and to pay tax

24

refunds to the plans, it decided to treat the plans *as taxpayers* that were entitled to a refund of dividend withholding *tax*. FPSF seeks the return of what it deemed to be—and was—tax revenue. And, in practice, the executive branch has established through double taxation treaties that a claim concerning "a *fraudulent* claim for *refund*" is "a *revenue* claim." Japanese Protocol, art. XIII (emphasis added).[14]

**3.** The court in *SKAT* appeared to believe that defendants there needed to offer evidence that the plans were beneficial owners or put the fact of ownership in dispute. 356 F. Supp. 3d at 313-16. No such thing is required; the Revenue Rule bars determining whether the plans were beneficial owners (because that is a question governed by Belgian tax law). In any event, the pension plan defendants here *do* offer evidence that the plans were beneficial owners. FPSF alleges that each time those defendants submitted a package of materials to FPSF seeking reimbursement, that package contained information demonstrating that the plans had purchased shares in Belgian companies and received dividends net of withholding tax. *See* Xiphias Am. Compl. ¶¶ 48-50. Under Belgian law, the book entries in the plans' bank accounts would suffice to establish beneficial ownership, even if their custodians did not themselves hold the financial

---

[14] It is worth noting that the Japanese Protocol entered into force after the court issued its decision in *SKAT*. And, although the Protocol had been negotiated some time earlier, the parties did not mention it in their briefs. The court in *SKAT* thus did not have the benefit of the Protocol underscoring how U.S. courts' recognizing foreign tax fraud claims undermines the United States' treaty negotiation position, as foreign sovereigns can avoid the tradeoffs necessary to secure U.S. tax collection assistance for fraud claims, secure in the knowledge that they can vindicate the same interests in U.S. court.

assets.  *See* Peeters Decl. ¶¶ 42-48; *compare* U.C.C. 8-501(b)(1) (a "person acquires a security entitlement if a securities intermediary … indicates by book entry that a financial asset has been credited to the person's securities account").

FPSF appears to contend that this evidence does not suffice to establish beneficial ownership.  But to resolve the dispute in this case—whether the plans were the "beneficial owners" of the shares at issue—the Court will necessarily have to administer and enforce Belgian tax law.

**4.** The court in *SKAT* also wrote that defendants there failed to explain why, if Danish law governed beneficial ownership, that law was *tax* law and not some other body of Danish law.  356 F. Supp. 3d at 314-15.  Here, beneficial ownership is a question of Belgian *tax* law because the Treaty explicitly states that undefined terms, such as "beneficial owner," are defined by "the applicable *tax laws*" of the State "for the purposes of the taxes to which the Convention applies," which here is Belgium.  Treaty, art. 3, ¶ 2 (emphasis added); U.S. Technical Explanation at 33.  Defendants' Rule 44.1 foreign law declaration also makes clear that, in this case, Belgian *tax* law governs the meaning of "beneficial owner."  Peeters Decl. ¶¶ 37, 42.

**5.** The court in *SKAT* stated that the Revenue Rule did not bar the claims because the court would only need to "recognize"—rather than "enforce"—foreign law.  356 F. Supp. 3d at 316-18.  But ruling that the plans were not entitled to the refunds and then giving that ruling legal effect through a money judgment *is* enforcement.  As the Second Circuit explained, a court that recognized foreign tax laws might then "*enforce* them by awarding damages" (if not barred by the Revenue Rule).  *EC I*, 355 F.3d at 132 (emphasis added).  Therefore, a foreign sovereign's claims are barred by the Revenue Rule when the sovereign would call on a U.S. court to interpret foreign tax law provisions and then "enforce them by awarding damages."  *Id.*

That is what FPSF requests.  Here, the Court would have to analyze and apply Belgian tax law to determine that the plans were not entitled to the tax refunds.  FPSF also asks the court to compel Defendants to repay those tax refunds via a money judgment awarding FPSF damages—pure enforcement.  Even if this Court viewed FPSF as seeking only recognition, that alone is barred by the Revenue Rule because the substantive (not formalist) effect of FPSF's complaints is to raise separation of powers and sovereignty concerns, as discussed above.

## II.    FPSF's Claims Are Time Barred

In addition to being barred by the Revenue Rule, the amended complaints are also time barred.  FPSF's own allegations make clear that it has known about the alleged fraud in this case since at least November 2015 when the Belgian Federal Police informed FPSF that it was "investigating possible fraud" involving the reclaim agents that submitted the refund applications identified in FPSF's amended complaints.  Xiphias Am. Compl. ¶¶ 54-55.  In response, that same month, FPSF suspended payment on refund applications associated with the reclaim agents that were under investigation.  *Id.* ¶ 54.

And then in May 2018, FPSF's Danish counterpart, SKAT, began suing defendants that FPSF has named in these actions on allegations that are nearly identical to those set forth in FPSF's amended complaints.  *See supra* pp.9-11.  But FPSF did not engage in any investigative efforts in 2015.  Nor did it sue in 2018 like its Danish counterpart, nor even in 2019 or 2020.  Instead, it waited more than three years after SKAT acted before belatedly bringing these actions on July 27, 2021.

On their face, FPSF's original complaints—and now its amended pleadings, which for the first time named certain additional defendants—make clear that these actions are untimely under the applicable law, even when construed in the light most favorable to FPSF.  Its filings on July 27, 2021, occurred more than six-and-a-half years after the last fraudulent act alleged in the

amended complaints (the last reclaim application was filed in November 2014), *see* Xiphias Am. Compl. Ex. A, and more than five-and-a-half years after FPSF was, by its own admission, put on notice of the alleged fraud (November 2015). *Id.* ¶ 54. FPSF's inexplicable delay is fatal to its claims here, and the amended complaints should be dismissed as time-barred.

### A.    New York's Statute Of Limitations Governs These Actions

The dispositive question of timeliness in this fraud action is governed by New York law. A New York federal court sitting in diversity jurisdiction applies New York's choice of law rules. *See Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626-27 (2d Cir. 1998). Here, the pertinent choice of law rule—New York's borrowing statute[15]—provides that the action must be timely under *both* New York's and Belgium's statutes of limitations. *See* N.Y. C.P.L.R. § 202. If an action on its face is untimely under New York's statute of limitations, it should be dismissed.

New York law requires that a plaintiff must sue for fraud within the longer of: (1) six years from the date the cause of action accrued, or (2) two years from the date the plaintiff discovered,

---

[15] New York's borrowing statute applies where, as here, the plaintiff (i) is a non-New York resident and (ii) is suing on a cause of action that accrued outside of New York's borders. *See* N.Y. C.P.L.R. § 202. Because FPSF is a Belgian plaintiff suing over an alleged economic injury suffered in Belgium (*i.e.*, payment of the refunds), its claim accrued in Belgium. *See IKB Deutsche Industriebank AG v. McGraw Hill Fin., Inc.*, 634 F. App'x 19, 21 (2d Cir. 2015) (holding that German bank's fraud claim accrued in Germany for purposes of New York's borrowing statute); *see also Glob. Fin. Corp. v. Triarc Corp.,* 715 N.E.2d 482, 485 (N.Y. 1999) ("When an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.").

or "with reasonable diligence" could have discovered, the alleged fraud.[16] N.Y.C.P.L.R. § 213(8); *see also Grasso v. United Grp. of Cos.*, 806 F. App'x 69, 71 (2d Cir. 2020) (applying New York's statute of limitations for fraud). Here, the last reclaims were paid within "several months" of November 2014. *See* Xiphias Am. Compl. ¶ 52; *id.* Exs. A-H. Under New York's six-year period, therefore, FPSF had until early 2021 (at the latest) to sue. And under the discovery rule, FPSF's two-year window expired either in November 2017—two years after FPSF learned of the criminal investigation in November 2015—or in May 2020, two years after any reasonable investigation would have identified Denmark's May 2018 suits that asserted identical claims involving Acupay and Solo Capital against some of the exact same defendants. *See infra* Section II.C. Either way, the two-year discovery period expired before FPSF brought its claims in late July 2021. Because these actions are barred by New York's statute of limitations, they should be dismissed.[17] *See*

---

[16] New York's statute of limitations for fraud applies to FPSF's aiding and abetting claims. *See Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (aiding and abetting fraud claims subject to same limitations period as fraud).

[17] As FPSF's actions are time-barred under New York's statute of limitations, a review of Belgium's statute of limitations is not required to decide Defendants' motion. However, for additional context and to support the Court's consideration of these matters, Defendants submit the accompanying declaration of Patrick Waeterinckx. *See supra* n.2 (explaining that Rule 44.1 declarations are cognizable on this motion to dismiss). As explained in Mr. Waeterinckx's declaration, Belgium's statute of limitations runs for at least five years from the date the plaintiff knew both the injury and the identity of the person causing the injury. Waeterinckx Decl. ¶¶ 21-22.

*Grasso*, 806 F. App'x at 71 (affirming Rule 12(b)(6) dismissal of fraud claim as untimely under New York's statute of limitations).

### B.    FPSF's Claims Are Time-Barred Under New York's Six-Year Accrual Rule

FPSF's claims are untimely under New York's six-year limitations period that runs from the date of accrual.  In New York, "a fraud claim accrues when a claim becomes enforceable, *i.e.*, when all elements of the tort can be truthfully alleged in a complaint."  *Meimaris v. Royce*, 2021 WL 5170725, at *3 (2d Cir. Nov. 8, 2021) (citing *IDT Corp. v. Morgan Stanley & Co.*, 907 N.E.2d 268, 273 (N.Y. 2009)) (cleaned up).

Here, FPSF's claims accrued before July 27, 2015—that is, more than six years before the original complaints were filed on July 27, 2021.  The amended complaints allege that Defendants submitted fraudulent tax refund applications and that FPSF suffered injury when it paid those tax refunds.  *See* Xiphias Am. Compl. ¶ 52.  FPSF attaches exhibits making clear that the purportedly fraudulent applications at issue were submitted beginning in 2012, and no later than November 13, 2014.  *Id.* Exs. A-H.

But FPSF makes no allegation that it paid those claims, or otherwise incurred injury, after July 27, 2015.  Although FPSF must know the dates on which it paid the reclaims, it omits that information from its amended complaints, instead merely alleging that payments "generally were made several months after the relevant refund request."  Xiphias Am. Compl. ¶ 52.  That vague allegation fails to adequately plead that FPSF suffered injury after July 27, 2015, which was more than eight months after the final "refund request" was submitted.  Indeed, had FPSF provided the dates of payment on the alleged refund claims in its amended pleadings, the accrual analysis would be straightforward.  Instead, FPSF has opted to exclude that information, perhaps aware that it bars many, if not all, of its claims in this action.  Because FPSF fails to allege any specific act taken or injury suffered within six years of its original complaints, FPSF's claims are time barred on their

face and should be dismissed.[18]   *See Sejin Precision Indus. Co. v. Citibank, N.A.*, 726 F. App'x 27, 30 (2d Cir. 2018) (affirming dismissal of fraud claim as untimely under New York law where economic injury suffered by plaintiff occurred more than six years before filing).

In an attempt to save its untimely claims, FPSF may point to the executive orders issued by former Governor Andrew Cuomo in the early months of the COVID-19 pandemic, which purported to extend limitations periods from March 20, 2020 until November 3, 2020 pursuant to emergency powers authorized by New York Executive Law § 29-a.[19]   But Governor Cuomo's orders do not save FPSF's claims.   *First*, there is considerable debate over whether Governor Cuomo's orders tolled, or instead merely suspended, all statutes of limitations in the state. *Compare, e.g.*, *Reynolds-Sitzer v. EISAI, Inc.*, 2022 WL 471530, at *5 (N.D.N.Y. Feb. 16, 2022) (concluding that New York's statutes of limitations were tolled during the pendency of the

---

[18] FPSF's conclusory allegation that "the scheme to defraud FPSF Belgium continued until at least November 2015," Xiphias Am. Compl. ¶ 54, offered without any explanation or support, does not alter the analysis.   *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (complaint requires more than "naked assertions devoid of further factual enhancement" to survive a motion to dismiss (cleaned up)).

[19] The first order issued on March 7, 2020, extended all deadlines under state law until March 20, 2020.   The Governor subsequently extended the deadline in a series of additional executive orders.   *See* Exec. Order No. 202.38 (June 6, 2020); Exec. Order No. 202.48 (July 6, 2020); Exec. Order No. 202.55 (Aug. 5, 2020); Exec. Order No. 202.55.1 (Aug. 6, 2020); Exec. Order No. 202.60 (Sept. 4, 2020).   In the last order, the Governor set a final deadline of November 3.

executive orders) *and Brash v. Richards*, 149 N.Y.S. 3d 560, 563 (2d Dep't 2021) (same) *with Baker v. 40 Wall St. Holding Corp.*, --- N.Y.S.3d ---, 2022 N.Y. Slip. Op. 22002, at *2 (Sup. Ct. Kings Cnty. Jan. 5, 2022) (holding that the executive orders merely suspended, and did not toll, the running of applicable limitations periods).

*Second*, even if Governor Cuomo did intend to toll—instead of merely suspend—all limitations periods, Defendants submit that he lacked the power to do so under New York Executive Law § 29-a, which authorizes New York's governor to "*temporarily suspend* … any statute … if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster or if necessary to assist or aid in coping with such disaster." N.Y. Exec. Law § 29-a(1) (emphasis added); *cf. Reynolds-Sitzer*, 2022 WL 471530 at *5 n.5 (noting "disagreement" in the case law over the Governor's authority to toll limitations periods and observing that the issue "has yet to be 'highly litigated' in New York state courts"). Because the Governor could only suspend, not toll, deadlines under state law, the period from March 20, 2020 to November 3, 2020 (228 days) should not be excluded from the calculation of the limitations periods in this case, and FPSF's claims are untimely. *See Baker*, 2022 N.Y. Slip. Op. 22002, at *2.[20]

---

[20] Even if the six-year limitations period were tolled during the pendency of Governor Cuomo's executive orders, for its suits to be timely, FPSF's claims would have had to accrue on or after December 11, 2014 (six years and 228 days before the filing of the original complaints). However, as explained above, the amended complaints do not allege any specific conduct, nor injury suffered, on or after that date.

### C.     FPSF's Claims Are Also Time-Barred Under New York's Two-Year Discovery Rule

These actions are also untimely under New York's two-year discovery rule.  It is well settled that a plaintiff has a duty to inquire "when the circumstances would suggest to a [plaintiff] of ordinary intelligence the probability that he has been defrauded." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151 (2d Cir. 2012) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d Cir. 2005)).  Once the duty to inquire arises, a plaintiff's two-year window for bringing suit is measured in one of two ways.  If a plaintiff makes no effort to investigate, the two-year period runs from the date plaintiff was put on inquiry notice.  *Id.* at 155.  If a plaintiff does investigate, the two-year period begins to run from the date when a "reasonably diligent investigation would have revealed the injury."  *Id.* at 153; *see also id.* at 155.  For the reasons set forth below, FPSF's claims are untimely under either test.

### 1.     The two-year limitations period began to run when FPSF was put on inquiry notice of the alleged fraud in November 2015.

By its own admission, FPSF was on inquiry notice as early as November 2015.  FPSF alleges that, beginning in November 2015, "FPSF Belgium knew that the Belgian Federal Police were investigating possible fraud with respect to refund requests made to FPSF."  Xiphias Am. Compl. ¶ 55.  FPSF admits knowing in November 2015 that the "international criminal investigation" in which the Belgian Federal Police were participating "concern[ed] refund claims associated with certain reclaim agents, including Acupay and Goal Taxback," the two reclaim agents through which Defendants submitted all of the reclaims at issue.  *Id.* ¶ 54; *see also id.* ¶ 38 (alleging Defendants submitted the contested reclaims through Acupay and Goal Taxback).  The concern was sufficiently clear, specific, and serious that FPSF "suspended payment of refund requests" involving Acupay and Goal Taxback at that time.  *Id.* ¶ 54.

Taking these allegations as true—as the Court must—there can be no dispute that FPSF was on "inquiry notice" of the alleged fraud in November 2015 and thus had a duty to inquire further. *See Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007) ("Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises." (cleaned up)).

### 2.     FPSF's unsubstantiated allegation that it conducted an investigation is insufficient to extend the two-year limitations period.

Once FPSF's duty to inquire was triggered in November 2015, unless the tax authority engaged in a "reasonably diligent investigation," the two-year limitations period began to run and expired in November 2017—more than three and a half years before FPSF brought the instant actions. *Koch*, 699 F.3d at 153; *see also id.* at 155. Here, FPSF does not allege that it engaged in any meaningful investigation, much less the reasonably diligent kind required to extend the limitations period under New York law.

In its original complaints, FPSF summarily alleged, without any explanation or support, that it "discovered" all the facts set forth in its pleadings "in or about January 2021." Compl., *In re Kingdom of Belgium, Fed. Pub. Serv. Fin. Pension Plan Litig.*, No. 21 Civ. 6392 (S.D.N.Y. July 27, 2021), Dkt. 1 ¶ 27. In response, Defendants filed a pre-motion letter to the Court, which previewed the reasons why this one-line allegation was inadequate to extend the limitations period, especially in light of the extensive, publicly available, and widely known facts concerning the alleged conduct that put FPSF on inquiry notice (if not actual notice) well before July 27, 2019. *See* Dkt. 41 at 2; *see also infra* at Section II.C.3 (detailing the significant publicly available information alerting FPSF as to both Defendants' identities as well as the facts underlying FPSF's claims).

To avoid dismissal, FPSF changed its story. FPSF now alleges (for the first time) that it began an "investigation" into the alleged fraud beginning in November 2015. Xiphias Am. Compl. ¶¶ 54-55. FPSF summarily asserts that it "acted with reasonable diligence to investigate the facts." *Id.* ¶ 55. FPSF insists that despite this "reasonable" investigation, it was not capable of identifying "which specific transactions were fraudulent or which claimants or individuals were involved" until it received the Belgian Federal Police's investigation file *five years later*. *Id.* ¶¶ 55-56. But that bare and conclusory allegation is not enough to survive a motion to dismiss—FPSF "bear[s] the burden of pleading [its] own diligence with particularity." *Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996) (Koeltl, J.) (holding fraud claims untimely where plaintiffs' complaint was "utterly lacking in the details of what steps [they] took to investigate the condition of their investment once they were on inquiry notice of the probability they had been defrauded"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Simply alleging that an investigation was "reasonable" and "diligent" does not satisfy that burden. *See Graham v. HSBC Mortg. Co.*, 2021 WL 4392522, at *6 (S.D.N.Y. Sept. 24, 2021) (holding fraud claims time-barred under two-year discovery rule where plaintiffs "ha[d] not explained with any specificity what [their] investigation entailed, and thus cannot demonstrate that this 'investigation' constituted reasonable diligence").

The only detail FPSF provides regarding its "investigation" is that FPSF "cooperat[ed] with the investigation by the Belgian Federal Police, provid[ed] extensive files to the Belgian Federal Police and liais[ed] with the Belgian Federal Police concerning the [Belgian Federal Police's] investigation on a regular basis." Xiphias Am. Compl. ¶ 55. But FPSF says nothing about the investigative steps that *FPSF* took to ascertain the facts underlying its claims. FPSF had significant investigative tools at its disposal, including broad powers to demand that the pension plans provide "any information"—including all books and records—necessary to evaluate the tax

position taken in the refund applications. *See* Waeterinckx Decl. ¶ 14. Its investigative powers also extended to relevant third parties: It had the authority to obtain relevant records from the reclaim agents under investigation as well as from any financial institutions identified as potentially relevant during an investigation. *See id.* And FPSF's ability to independently investigate the underlying facts was not in any way hindered by the Belgian Federal Police's efforts. *Id.* ¶ 16. If anything, FPSF's recital of the ways in which it passively responded to another entity's investigation reinforces the conclusion that FPSF did not engage in any investigation of its own. FPSF was not entitled to simply sit back and wait for the Belgian Federal Police to do the work for FPSF; "the discovery rule does not stop the statute of limitations and permit a party to wait until its claim is served up on a silver platter." *Graham*, 2021 WL 4392522, at *6 n.4; *see also In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *9 (S.D.N.Y. Mar. 4, 2021) (plaintiffs could not wait for parallel class actions and government investigation to run their course, and then sue).

Because FPSF has failed to plead any allegations about *its own* diligent investigation, knowledge of the fraud is imputed to FPSF as of November 2015, and its claims are time-barred under the two-year discovery rule. *See Koch*, 699 F.3d at 155-56 (dismissal appropriate "pursuant to the two-year discovery rule when the alleged facts do establish that a duty of inquiry existed and that an inquiry was not pursued").

### 3. Alternatively, any reasonably diligent investigation would have discovered the fraud after Denmark began suing Defendants for the same conduct in May 2018.

Even if FPSF had undertaken a reasonable investigation—something it has failed to allege—FPSF's claims are time barred for the separate reason that any reasonable investigation would have uncovered the alleged fraud no later than May 31, 2018. *See LC Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (explaining that, on a motion to dismiss,

the district court may "impute knowledge of what [a plaintiff] in the exercise of reasonable diligence, should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud" (cleaned up)).  On May 31, 2018, FPSF's counterpart tax agency in Denmark, SKAT, began suing the defendants that FPSF has named in the instant actions before this Court, alleging essentially the same facts and asserting the same claims for relief as FPSF.  *See* SKAT Raubritter Compl.; *see supra* pp.7-11 (detailing similarities between SKAT's and FPSF's pleadings).   Indeed, SKAT's complaints identified Acupay, one of the very same reclaim agents cited in FPSF's amended complaints and which FPSF knew was being investigated by the Belgian Federal Police as far back as November 2015.  *Compare* SKAT Raubritter Compl. ¶ 26 ("The claimants submitted fraudulent claims to SKAT through … Acupay Systems LLC") *with* Xiphias Am. Compl. ¶ 38 ("[T]he Refund Claimants used the services of [a] tax reclaim agent[] called Acupay System LLC[.]"); *see also* Xiphias Am. Compl. ¶ 54 (alleging that the Belgian Federal Police were investigating reclaims associated with Acupay and another identified reclaim agent).

FPSF cannot—and tellingly, does not—allege that it was ignorant of the SKAT actions, which were widely reported in the media at the time, both in the United States and in Europe.[21] The filing of these lawsuits on May 31, 2018 therefore constitutes the date by which any reasonable investigation should have discovered the alleged fraud as a matter of law—and these actions are plainly untimely.[22]  *See Zirvi v. Flatley*, 433 F. Supp. 3d 448, 460 (S.D.N.Y. 2020) (Koeltl, J.) (holding that the two-year discovery limitations period began to run "no later than" the commencement of litigation involving overlapping parties and issues), *aff'd*, 838 F. App'x 582 (2d Cir. 2020) (summary order); *see also Landow v. Wachovia Sec., LLC*, 966 F. Supp. 2d 106, 127, 129-30 (E.D.N.Y. 2013) (holding that public litigation involving similar claims and parties was sufficient to trigger the date by which "a timely and reasonable inquiry would have revealed not only the fraud … but also defendants' purported role in the fraud").  Because FPSF's claims are

---

[21] *See, e.g.*, Segal, *supra* (reporting on SKAT's lawsuits filed against American-based pension plans in May 2018 (like its suit against Raubritter and Adam LaRosa)).  In addition to contemporaneous media reports covering SKAT's complaints, the public record includes news articles from the period that reported on the alleged fraud with references to particular Defendants named in FPSF's actions. *See, e.g.*, Iwersen & Votsmeier, *Robber knights with limited liability*, Handelsblatt Dusselldorf, May 9, 2018 (describing in detail defendant Adam LaRosa's alleged role in helping 24 pension plans, including Raubritter Pension Plan, obtain "more than two billion euros in Denmark and Belgium alone").

[22] Even if 228 days are added to the two-year limitations period to account for Governor Cuomo's executive orders, the deadline for FPSF's suits would be January 14, 2021, more than six months before FPSF filed on July 27, 2021.

untimely under both New York's six-year accrual rule and the two-year discovery rule, the amended complaints are time-barred and should be dismissed.

## III.    FPSF Fails To Plead Fraud With Particularity As To Alicia Colodner

FPSF was put on notice of the deficiencies in its complaints as to Alicia Colodner; yet FPSF's bare-bones amended complaints still fail to adequately plead Ms. Colodner's knowing participation in a fraud. Accordingly, Ms. Colodner seeks to dismiss, with prejudice, the three amended complaints that name her: those in *Xiphias*, *Michelle Investments* (No. 21 Civ. 6405, Dkt. 44, "MI Am. Compl."), and *Delvian* (No. 21 Civ. 6404, Dkt. 44, "Delvian Am. Compl."). The *Xiphias* and *MI* pleadings allege that Ms. Colodner aided and abetted fraud, and the *Delvian* pleading alleges that Ms. Colodner engaged in fraud as a principal.

Pleadings alleging fraud must "state *with particularity* the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b) (emphasis added); *see also, e.g.*, *Filler v. Hanvit Bank*, 156 F. App'x 413, 417 (2d Cir. 2005) ("[T]he particularity requirements of Rule 9(b) apply to claims of aiding and abetting fraud no less than to direct fraud claims."). "[F]raud pleadings generally cannot be based on information and belief … [unless the] facts [are] peculiarly within the opposing party's knowledge" *and* are "accompanied by a statement of facts upon which the belief is founded." *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1003 (2d Cir. 1988) (collecting cases).

Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), this "relaxation of Rule 9(b)'s specificity requirement" is not "a license to base claims of fraud on speculation and conclusory allegations," *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (cleaned up). To avoid dismissal, "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." *Id.* (cleaned up). "An inference is strong if it is cogent and at least as compelling as any opposing inference one could

draw from the facts alleged." *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 438-39 (S.D.N.Y. 2017) (cleaned up).

Even after amending its complaints in each of these actions, FPSF has not pled facts sufficient to meet the high bar set by the applicable pleading rules.

### A.    The Xiphias And MI Complaints Fail To Adequately Plead That Ms. Colodner Aided And Abetted Fraud

To state a claim of aiding and abetting fraud under New York law,[23] a plaintiff "must adequately allege:  (1) the existence of a fraudulent scheme; (2) that the defendant had actual knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraudulent scheme." *Heinert v. Bank of Am. N.A.*, 835 F. App'x 627, 630 (2d Cir. 2020). Actual, rather than constructive, knowledge of the fraudulent scheme is essential in satisfying the knowledge element of an aiding and abetting offense. *See Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014).  A defendant provides substantial assistance in the commission of a tort, another required element of an aiding and abetting claim, where: "(1) [he or she] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed; and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability

---

[23] Because FPSF has asserted that this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(4), *see, e.g.*, Xiphias Am. Compl. ¶ 24, New York choice of law principles govern.  "In a diversity action, the Court applies the choice of law rules of the state in which it sits[, and i]n general, under New York choice of law principles the law of the place of the tort governs." *Fisher v. APP Pharms., LLC*, 783 F. Supp. 2d 424, 428 (S.D.N.Y. 2011) (cleaned up).  FPSF has asserted that these cases involve the commission of torts in New York. *See, e.g.*, Delvian Am. Compl. ¶ 18. Accordingly, this motion discusses New York substantive law.

is predicated." *Rosner v. Bank of China*, 2008 WL 5416380, at *5 (S.D.N.Y. Dec. 18, 2008), *aff'd*, 349 F. App'x 637 (2d Cir. 2009) (cleaned up).

The Xiphias and MI amended complaints allege that Ms. Colodner aided and abetted fraud based on a single concrete fact: that she witnessed the signing of powers of attorney, which were in turn used to authorize tax reclaim agents, Acupay and Goal Taxback, to provide tax services. Xiphias Am. Compl. ¶¶ 38-39, 65; MI Am. Compl. ¶¶ 28, 54. This allegation falls far short of alleging actual knowledge or substantial assistance to a fraud.

Taking the element of knowledge first, witnessing another's signature on a document does not suggest that Ms. Colodner actually knew of the alleged fraud. *See Ryan v. Hunton & Williams*, 2000 WL 1375265, at *9 (E.D.N.Y. Sept. 20, 2000) (defendant's employee's "authorization of transfers between [accounts did] … not create an inference of knowledge of the [fraudulent] scheme."). The complete absence of other facts supporting an inference that Ms. Colodner was aware of the alleged fraud warrants dismissal. *See, e.g.*, *Krys*, 749 F.3d at 130 (dismissing case "because the Amended Complaint lack[ed] any [non-conclusory] allegation that [defendants] had actual knowledge of certain key facts … that could give rise to a reasonable inference of … knowledge and agreement" to aid and abet a fraud); *accord Heinert*, 835 F. App'x at 630.

FPSF similarly fails to allege that Ms. Colodner provided substantial assistance to a fraud. Witnessing the signing of a power of attorney does not amount to affirmative assistance, and there is no indication in the amended complaints that the authorization provided to Acupay or Goal Taxback, which Ms. Colodner only witnessed, in any event, was a direct or proximate cause of FPSF's alleged losses. *Cf. De Sole v. Knoedler Gallery, LLC*, 139 F. Supp. 3d 618, 658 (S.D.N.Y. 2015) ("Awareness and approval, standing alone, do not constitute substantial assistance." (cleaned up)). FPSF's failure to adequately allege Ms. Colodner's knowledge also dooms its

ability to establish substantial assistance because "one cannot affirmatively [assist] … the commission of a tort that one knows nothing about." *In re Jeweled Objects LLC*, 2012 WL 3638006, at \*11 (Bankr. S.D.N.Y. Aug. 22, 2012). FPSF is thus unable to satisfy at least two of the three required elements of aiding and abetting liability based on its one substantive allegation against Ms. Colodner.

The remainder of the allegations concerning Ms. Colodner in these amended complaints are so conclusory that they do not meet the liberal pleading standard of Rule 8(a), let alone that applicable under Rule 9(b). These allegations either lump Ms. Colodner with other defendants, *see, e.g.*, Xiphias Am. Compl. ¶¶ 7, 53; MI Am. Compl. ¶¶ 7, 29, 42, or make patently conclusory allegations in an attempt to track the elements of aiding and abetting liability, Xiphias Am. Compl. ¶¶ 66-68; MI Am. Compl. ¶¶ 55-56, neither of which is sufficient under Rule 8(a) or 9(b). *See, e.g.*, *Polar Int'l Brokerage Corp. v. Reeve*, 108 F. Supp. 2d 225, 237 (S.D.N.Y. 2000) ("The requirements of Rule 9(b) are not satisfied by a complaint in which defendants are clumped together in vague allegations." (cleaned up)); *accord In re Fyre Festival Litig.*, 399 F. Supp. 3d 203, 213 (S.D.N.Y. 2019).

A prime example of these inadequacies is the assertion, present in both the Xiphias and MI amended complaints, that multiple "[d]efendants [including Ms. Colodner] … aided and abetted this fraud. They knowingly provided substantial assistance by, among other things, creating false and misleading documentation in connection with the refund claims." Xiphias Am. Compl. ¶ 7; MI Am. Compl. ¶ 7. Ms. Colodner's supposed role in this fraud is nowhere delineated in this allegation, nor is the basis for FPSF's allegation of "knowing[]" "substantial assistance" anywhere provided. Nor is the specific "false … documentation" that Ms. Colodner is alleged to have created anywhere identified.

Similarly problematic allegations, devoid of specificity or factual basis, are located at:

- Xiphias Amended Complaint paragraph 53 and MI Amended Complaint paragraph 42, alleging "[o]n information and belief," that "amounts received by [certain pension plans] were promptly distributed to other participants in the fraud;"

- Xiphias paragraph 67 and MI paragraph 55, alleging "[o]n information and belief," that multiple defendants, including Ms. Colodner, "had actual knowledge of the fraudulent scheme;" and

- Xiphias paragraph 68 and MI paragraph 56, alleging, without support, that FPSF's damages are "a direct and natural cause of the Defendants' aiding and abetting of the fraudulent scheme."

Notably, several of these allegations are made on information and belief, but, like all the allegations made on information and belief in these pleadings, do not provide the requisite statement of facts supporting that belief, which is fatal to all such allegations. *See Stern*, 844 F.2d at 1003.

Because the threadbare allegations against Ms. Colodner fail, among other things, to allege with particularity that she actually knew of or provided substantial assistance to the fraudulent scheme described in the amended complaints, those claims against her should be dismissed.

### B. The Delvian Complaint Fails To Adequately Allege That Ms. Colodner Engaged In Fraud

The amended complaint in the Delvian action fares no better in its allegations that Ms. Colodner acted as a principal in a fraudulent scheme. Under New York law, to state a claim of common law fraud, a plaintiff must allege: "(1) a material misstatement, (2) known by the perpetrator to be false, (3) made with an intent to deceive, (4) upon which the plaintiff reasonably relies, and (5) damages." *Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 585 (S.D.N.Y. 2021) (cleaned up). To comply with Rule 9(b), the complaint must: "(1) specify the statements

that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner*, 459 F.3d at 290 (cleaned up).

The amended Delvian complaint fails to make *any* non-conclusory allegation that Ms. Colodner made a material misstatement, that she knew any such misstatement to be false, or that she intended any misstatement to deceive FPSF.  FPSF alleges that the defendants in this case made false representations about two issues:  (1) that Delvian LLC Pension Plan ("Delvian") and non-party DFL were legitimate pension plans, Delvian Am. Compl. ¶¶ 35-38, and (2) that Delvian or DFL "owned shares in a Belgian company and had received dividends in connection with its shareholding," *id.* ¶¶ 39-43.  Tellingly, none of these purported misstatements is attributed specifically to Ms. Colodner.

*First*, FPSF alleges that Goal Taxback, the tax reclaim agent, falsely stated that Delvian was a pension plan, but does not allege that Goal Taxback received that information from Ms. Colodner and does not otherwise attribute the statement to any defendant. *See id.* ¶¶ 35-36.  These allegations fail to identify a defendant as the "speaker" of the alleged misstatement, as required by Rule 9(b). *See, e.g.*, *Frei v. Taro Pharm. U.S.A.*, Inc., 844 F. App'x 444, 447 (2d Cir. 2021).

FPSF's attempt to link Ms. Colodner to this purported misrepresentation is not rescued by its allegation, "[o]n information and belief," that Delvian, DFL, "Colodner, Markowitz and Van Merkensteijn procured … statements [from the IRS about Delvian and DFL's pension plan status] by providing the IRS with false and misleading information" and then "caused Acupay or Goal Taxback to include these IRS statements in the tax refund requests."  Delvian Am. Compl. ¶ 37. This allegation fails because it is made on information and belief but provides no basis for that belief, *see Stern*, 844 F.2d at 1003, and because it does not delineate the roles played by the four

defendants and one non-party listed in this paragraph, *see, e.g.*, *Fyre Festival*, 399 F. Supp. 3d at 213; *United States ex rel. Levine v. Vascular Access Ctrs. L.P.*, 2020 WL 5534670, at *7 (S.D.N.Y. Sept. 15, 2020).[24]   The allegation is also deficient in its reliance on the assertion, made without any supporting facts, that the IRS's statement was made at Ms. Colodner's, and others', direction. *See PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) ("[C]onclusory assertions that" an act was done "at [a defendant's] direction" or "with his knowledge and approval" do not state a claim for fraud).

*Second*, as to the alleged misrepresentation that the pension plans owned shares and received dividends from them, the amended complaint wholly fails to attribute any such statement to Ms. Colodner.  Instead, the pleading discusses "documentation from one or more brokers" and from non-party Solo Capital.  Delvian Am. Compl. ¶¶ 41-42.  Nothing in the pleading suggests a misstatement by Ms. Coloder concerning share ownership.

In fact, the sole concrete allegation made against Ms. Colodner individually—that she signed a power of attorney in 2012 as Delvian's trustee that permitted tax reclaim agents to act on behalf of Delvian—does not allege that she made a false statement at all. *Id.* ¶¶ 30-31.  FPSF does not, for example, allege that the power of attorney contained any fraudulent or misleading content. This is fatal to FPSF's fraud claim. *Muller-Paisner v. TIAA*, 289 F. App'x 461, 463 (2d Cir. 2008) (affirming dismissal of fraud claim because of lack of allegation that defendant made a material misstatement or omission).  Nor does signing a power of attorney that authorizes a tax reclaim

---

[24] Other, similarly undifferentiated references to multiple defendants in paragraphs 4-5, 24-25, 28, 32 and 52 of the Delvian Amended Complaint are deficient for the same reason.

agent to act create an inference that Ms. Colodner was aware of the alleged fraudulent scheme or intended to deceive FPSF, as is required to state a claim for fraud.

Equally unavailing are the allegations that Ms. Colodner was an employee of non-party Argre Management LLC, and that she was a "business associate"—a vague and meaningless term—of two other defendants. Delvian Am. Compl. ¶¶ 12, 26. These allegations do nothing to elucidate Ms. Colodner's role in either non-party Argre or in any pension plan. FPSF's allegation regarding the purported registration of non-party DFL to Ms. Colodner's address also does not advance its case. *Id.* ¶ 27. The allegation concerning the DFL registration address is demonstrably untrue. Publicly available records for the last approximately thirty years demonstrate that Ms. Colodner has never been the owner of the property at that address in that period. *See* Nassau Cnty., Nassau County Land Records, https://i2f.uslandrecords.com/NY/Nassau/D/Default.aspx (last viewed Feb. 18, 2022).[25]

Even if accepted as true, these allegations do not indicate that Ms. Colodner made any particular statement to FPSF at all. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176 (2d Cir. 2015) (allegations that defendant SAI "shared premises with [other defendant] Wachovia … and worked closely with Wachovia" were not sufficient to allege SAI engaged in fraud, even though fraud allegations against Wachovia were adequately pled).

The remaining allegations against Ms. Colodner are also entirely conclusory. There is no factual support for the assertion that she "controlled" Delvian or that the pension plan was her alter ego, Delvian Am. Compl. ¶¶ 6, 25. Similarly unsupported are the allegations that Ms. Colodner

---

[25] Counsel to Ms. Colodner so informed FPSF's counsel on February 22, 2022, and asked that, as an officer of the court, he withdraw the allegation.

"caused the [pension] plans to submit fraudulent refund claims," and was "involved" in DFL and Delvian refund claims, *id.* ¶¶ 25, 50.  FPSF cannot state a claim for fraud by relying on these conclusory assertions.  *See, e.g.*, *Wexner v. First Manhattan Co.*, 902 F.2d 169, 173 (2d Cir. 1990) (dismissing complaint because allegations were "conclusory and unsupported" and because "an inference that the defendants knew their statements to be false cannot be based on allegations which are themselves speculative"); *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 512 (S.D.N.Y. 2005) (conclusory allegations that an individual's "domination of and under-capitalization of [defendant] has caused a wrong to be committed against [plaintiff]" failed to satisfy Rule 9(b)).

For all of these reasons, the fraud claims against Ms. Colodner should be dismissed.

## IV.  FPSF Should Not Be Permitted To Amend Its Complaints Again

FPSF has had one opportunity to amend its complaints and has failed to address the fatal deficiencies in its pleadings—including the jurisdictional deficiency under the Revenue Rule. Having made its amendments after receiving defendants' pre-motion conference letters (*see, e.g.*, Xiphias Dkt. 41), which discussed the Rule 8 and 9 deficiencies in the initial complaints, FPSF was unable to muster a non-Revenue Rule-barred legal theory or sufficient facts in its amended complaints.  Because amending the pleadings further would be futile, the motion to dismiss should be granted with prejudice.  *See Moody v. Morris*, 608 F. Supp. 2d 575, 582 (S.D.N.Y. 2009) ("[S]ince the plaintiffs were on notice of this defect [under Rule 9(b)] when they amended their complaint and still were unable to cure it, the dismissal of these claims must be with prejudice."), *aff'd*, 407 F. App'x 434 (Fed. Cir. 2011); *see also Krys*, 749 F.3d at 135 (affirming dismissal of aiding and abetting fraud claim without leave to amend where it was clear that "further amendment … could not cure the absence of factual allegations as to the actual knowledge on the part of [defendants]").

47

## CONCLUSION

The amended complaints should be dismissed in their entirety under the Revenue Rule and the applicable statutes of limitations.   In addition, all claims should be dismissed as against Alicia Colodner for failure to plead with the requisite specificity.   All dismissals should be with prejudice.

Dated: February 25, 2022        Respectfully submitted,

*/s/ Alan Schoenfeld*
Alan Schoenfeld
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel. (212) 230-8800
Fax: (212) 230-8888
alan.schoenfeld@wilmerhale.com

*Attorney for Defendants Batavia Capital Pension Plan, Calypso Investments Pension Plan, Richard Markowitz, and RJM Capital Pension Plan*

*/s/ Sharon L. McCarthy*
Sharon L. McCarthy
Nicholas S. Bahnsen
KOSTELANETZ & FINK, LLP
7 World Trade Center, 34th Fl.
New York, NY 10007
Tel. (347) 613-0829
smccarthy@kflaw.com

*Attorneys for Defendants Azalea Pension Plan, Bernina Pension Plan Trust, John van Merkensteijn, Michelle Investments LLC Pension Plan, Remece Investments LLC Pension Plan, Tarvos Pension Plan, and Xiphias LLC Pension Plan*

*/s/ Marshall L. Miller*
Marshall L. Miller
KAPLAN HECKER & FINK LLP
350 Fifth Avenue, 63rd Fl.
New York, NY 10118
Tel. (212) 763-0883
mmiller@kaplanhecker.com

*Attorney for Defendants Alden Investments Pension Plan, AOI Pension Plan, Carrick Holdings Pension Plan, Ganesha Industries Pension Plan, Jerome Lhôte, Matthew Stein, Mazagran Pension Plan, and Pleasant Lake Productions Pension Plan*

*/s/ Linda Imes*
Linda Imes
Reed M. Keefe
SPEARS & IMES LLP
51 Madison Avenue
New York, NY 10010
Tel. (212) 213-6659
Fax: (212) 213-0849
limes@spearsimes.com

*Attorneys for Defendants Alicia Colodner and Delvian LLC Pension Plan*

*/s/ Edward M. Spiro*
Edward M. Spiro
Richard D. Weinberg
MORVILLO ABRAMOWITZ GRAND
   IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
Tel. (212) 856-9600
espiro@maglaw.com

*Attorneys for Defendants Adam LaRosa and Traden Investments Pension Plan*

*/s/ Robert H. Pees*
Robert H. Pees
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Tel. (212) 872-1000
Fax: (212) 872-1002
rpees@akingump.com

50

*Attorney for Defendants 2321 Capital Pension Plan, Bowline Management Pension Plan, Lion Advisory Inc. Pension Plan, and Luke McGee*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations in Your Honor's Individual Rules of Practice, as modified by the Court's February 22 order granting the parties' joint request for a modification of the word limit. Exclusive of the exempted portions of the brief, the brief contains 14,888 words. The brief has been prepared in proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font. The undersigned has relied on the word-count feature of this word-processing system in preparing this certificate.

/s/ Alan Schoenfeld
Alan Schoenfeld

February 25, 2022