# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE:

KINGDOM OF BELGIUM,
FEDERAL PUBLIC SERVICE FINANCE
PENSION PLAN LITIGATION

Lead Case: No. 21 Civ. 6392 (JGK)

Member Cases:
   No. 21 Civ. 6392 (JGK)
   No. 21 Civ. 6399 (JGK)
   No. 21 Civ. 6402 (JGK)
   No. 21 Civ. 6404 (JGK)
   No. 21 Civ. 6405 (JGK)
   No. 21 Civ. 6407 (JGK)
   No. 21 Civ. 6408 (JGK)

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTIONS TO DISMISS

Dated: March 25, 2022

Jeff E. Butler
John P. Alexander
Meredith George
Rob Price
CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019

*Attorneys for Plaintiff Kingdom of Belgium, Federal Public Service Finance*

# TABLE OF CONTENTS

Page

Introduction...................................................................................................................1

Factual Background .......................................................................................................2

Argument ......................................................................................................................6

I.      THE REVENUE RULE DOES NOT BAR THIS ACTION...................................7

        A.      This Action Alleges a Garden Variety Fraud. ............................................7

        B.      This Action Does Not Involve Direct or Indirect Enforcement
                of Belgian Tax Laws...................................................................................9

        C.      The Purposes of the Revenue Rule Are Not Implicated Here. .................14

        D.      The Court's Subject Matter Jurisdiction Is Not in Question.....................16

II.     THE CLAIMS IN THIS ACTION ARE NOT TIME BARRED. .........................17

        A.      The Claims Are Timely Under New York's Two-Year
                Discovery Rule.........................................................................................17

                1.      The Amended Complaints Do Not Establish Inquiry Notice
                        as of November 2015. ...................................................................18

                2.      The Amended Complaints Allege a Reasonable Investigation
                        by FPSF Belgium Beginning in November 2015. .........................19

                3.      Defendants Have Not Established the Date on Which FPSF
                        Belgium Should Have Discovered the Fraud.................................22

        B.      The Claims May Also Be Timely Under New York's Six-Year
                Statute of Limitations................................................................................23

        C.      The Claims Are Timely Under Belgian Law. ...........................................25

III.    FPSF  BELGIUM  HAS  ADEQUATELY  PLEADED  CLAIMS
        AGAINST  DEFENDANTS  COLODNER,  FGC  SECURITIES
        AND WHEELER.................................................................................................26

        A.      FPSF Belgium Has Adequately Pleaded Claims for Fraud
                Against Colodner. ......................................................................................27

B.     FPSF Belgium Has Adequately Pleaded Claims for Aiding and Abetting Fraud Against Colodner, FGC Securities and Wheeler...................................................................................32

       1.     The Aiding and Abetting Allegations Against Colodner Are Sufficient..............................................................32

       2.     The Aiding and Abetting Allegations Against FGC Securities and Wheeler Are Sufficient. ...........................................35

Conclusion ............................................................................................38

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbas v. Dixon*,
480 F.3d 636 (2d Cir. 2007).................................................................................... 17

*Amusement Indus., Inc. v. Stern*,
693 F. Supp. 2d 327 (S.D.N.Y. 2010)...................................................................... 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................... 6, 20

*Attorney Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*,
268 F.3d 103 (2d Cir. 2001)................................................................................. 7, 9

*Bell Atl. Corp. v.* Twombly,
550 U.S. 544 (2007)................................................................................................ 20

*Blue Angel Realty, Inc. v. United States*,
No. 20 Civ. 8220, 2022 WL 94599 (S.D.N.Y. Jan. 8, 2022).................................. 28

*Brash v. Richards*,
195 A.D.3d 582 (2d Dep't 2021) ............................................................................ 25

*Butala v. Agashiwala*,
916 F. Supp. 314 (S.D.N.Y. 1996).......................................................................... 20

*Carter v. HealthPort Tech., LLC*,
822 F.3d 47 (2d Cir. 2016)........................................................................................ 6

*Cohen v. S.A.C. Trading Corp.*,
711 F.3d 353 (2d Cir. 2013)..................................................................................... 22

*Cosgrove v. Oregon Chai, Inc.*,
520 F. Supp. 3d 562 (S.D.N.Y. 2021)........................................................................ 6

*Doe v. Columbia Univ.*,
831 F.3d 46 (2d Cir. 2016)..................................................................................... 6, 8

*Erbe v. Lincoln Rochester Tr. Co.*,
3 N.Y.2d 321 (1957) ............................................................................................... 18

*European Community v. RJR Nabisco, Inc.*,
   355 F.3d 123 (2004), *vacated*, 544 U.S. 1012 (2005) *and reaff'd*,
   *Eur. Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175 (2d Cir. 2005) ...................................... 9, 10, 16

*Eur. Cmty. v. RJR Nabisco, Inc.*,
   424 F.3d 175 (2d Cir. 2005).................................................................................. 10, 13, 14-15

*Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*,
   No. 04 Civ. 4971, 2006 WL 2802092 (E.D.N.Y. Sept. 28, 2006)........................................... 29

*Glob. Intellicom, Inc. v. Thomson Kernaghan & Co.*,
   No. 99 Civ. 342, 1999 WL 544708 (S.D.N.Y. July 27, 1999) ................................................. 33

*Graham v. HSBC Mortg. Corp.*,
   No. 18 Civ. 4196, 2021 WL 4392522 (S.D.N.Y. Sept. 24, 2021)..................................... 20, 21

*Great W. Ins. Co. v. Graham*,
   No. 18 Civ. 6249, 2020 WL 3415026 (S.D.N.Y. June 22, 2020)............................................ 29

*Guandong Enters. (N. Am.) Fur Holdings Ltd. v. Hennessy*,
   No. 01 Civ. 0620, 2002 WL 1000953 (S.D.N.Y. May 15, 2002)............................................ 30

*Gutkin v. Siegal*,
   85 A.D.3d 687 (1st Dep't 2011) .......................................................................................... 18

*In re Merrill, Bofa, & Morgan Stanley Spoofing Litigation*,
   No. 19 Civ. 6002, 2021 WL 827190, at *8-9 (S.D.N.Y. Mar. 4, 2021) ................................. 21

*In re SKAT Tax Refund Scheme Litig.*,
   356 F. Supp. 3d 300 (S.D.N.Y. 2019)............................................................................ 8, 13, 16

*Ingrami v. Rovner*,
   45 A.D. 3d 806 (2d Dep't 2007) .......................................................................................... 24

*Iowa Pub. Emps.' Ret. Sys. v. Deloitte & Touche LLP*,
   919 F. Supp. 2d 321 (S.D.N.Y. 2013).................................................................................. 27

*JP Morgan Chase Bank v. Winnick*,
   406 F. Supp. 2d 247 (S.D.N.Y. 2005).................................................................................. 34

*Kelly-Brown v. Winfrey*,
   717 F.3d 295 (2d Cir. 2013)................................................................................................ 17

*Koch v. Christie's Int'l PLC*,
   699 F.3d 141 (2d Cir. 2012)................................................................................................ 17

*Kronos, Inc. v. AVX Corp.*,
    81 N.Y.2d 90 (1993) ................................................................................................. 24

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011)................................................................................... 28

*Landow v. Wachovia Securities, LLC*,
    996 F. Supp. 2d 106 (E.D.N.Y. 2013) ................................................................. 23

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*,
    318 F.3d 148 (2d Cir. 2003)................................................................................... 18

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d Cir. 2005)................................................................................... 18

*Lerner v. Fleet Bank, N.A.*,
    459 F.3d 273 (2d Cir. 2006).................................................................... 29, 32, 34

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015).................................................................... 26, 27, 29

*Marks v. CDW Computer Centers, Inc.*,
    122 F.3d 363 (7th Cir. 1997) ................................................................................ 18

*Martinek v. AmTrust Fin. Servs., Inc.*,
    No. 19 Civ. 8030, 2020 WL 4735189 (S.D.N.Y. Aug. 14, 2020) ........................... 30

*McGuinness v. Standard Drywall Corp.*,
    193 A.D.2d 518 (1st Dep't 1993) ........................................................................ 22

*McKenna v. Wright*,
    386 F.3d 432 (2d Cir. 2004)................................................................................... 17

*Milwaukee Cnty. v. M.E. White Co.*,
    296 U.S. 268 (1935)............................................................................................... 16

*Minnie Rose LLC v. Yu*,
    169 F. Supp. 3d 504 (S.D.N.Y. 2016)................................................................... 31

*Moses v. Martin*,
    360 F. Supp. 2d 533 (S.D.N.Y. 2004)................................................................... 32

*Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*,
    No. 11 Civ. 2939, 2013 WL 1197857 (S.D.N.Y. Mar. 19, 2013) ........................... 31

*Pasquantino v. United States*,
   544 U.S. 349 (2005) ................................................................................................ 14, 15

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
   652 F. Supp. 2d 495 (S.D.N.Y. 2009) ............................................................................ 34

*Republic of Colombia v. Diageo North America Inc.*,
   531 F. Supp. 2d 365 (E.D.N.Y. 2007) .................................................................... 11, 16

*Reynolds-Sitzer v. EISAI, Inc.*,
   No. 21 Civ. 0145, 2022 WL 471530 (N.D.N.Y. Feb. 16, 2022) .................................... 25

*Saphir Int'l, SA v. UBS PaineWebber Inc.*,
   25 A.D.3d 315 (1st Dep't 2006) ...................................................................................... 18

*Sargiss v. Magarelli*,
   12 N.Y.3d 527 (2009) ...................................................................................................... 18

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
   346 F. Supp. 3d 473 (S.D.N.Y. 2018) ................................................................. 32, 33, 34

*St. John's Univ., N.Y. v. Bolton*,
   757 F. Supp. 2d 144 (E.D.N.Y. 2010) ............................................................................ 17

*State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.*,
   589 F. Supp. 2d 221 (E.D.N.Y. 2008) ............................................................................ 36

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................................................ 27

*Trepuk v. Frank*,
   44 N.Y.2d 723 (1978) ...................................................................................................... 18

*United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*,
   865 F.3d 71 (2d Cir. 2017) .............................................................................................. 26

*Ventilla v. Pac. Indem. Co.*,
   No. 20 Civ. 8462, 2021 WL 5234404 (S.D.N.Y. Nov. 10, 2021) .................................. 25

*Zirvi v. Flatley*,
   433 F. Supp. 3d 448 (S.D.N.Y. 2020) ............................................................................. 23

**Other Authorities**

Fed. R. Civ. P. 9 ................................................................................................................... 26, 27

Fed. R. Civ. P. 12 ..................................................................................................................... 6

Fed. R. Civ. P. 12 ..................................................................................................................... 6

N.Y. C.P.L.R. 202 ................................................................................................................... 25

N.Y. C.P.L.R. 213 ............................................................................................................. 17, 23

FINRA Rule 2020 ................................................................................................................... 37

Order Approving FINRA Proposed Rule Changes,
     S.E.C. Release No. 34-58643 (Sept. 25, 2008) ........................................................... 37

Plaintiff Kingdom of Belgium, Federal Public Service Finance ("FPSF Belgium") submits this Memorandum of Law in opposition to Defendants' motions to dismiss.  This opposition is also supported by the accompanying Declaration of Jeff E. Butler dated March 25, 2022 ("Butler Decl.").

## Introduction

The Amended Complaints in this consolidated action describe an extensive and sophisticated scheme to obtain payments from FPSF Belgium over the course of several years.  It is alleged that Defendants cooperated in creating, obtaining and assembling documents that, considered together, created the false appearance that Defendants were owed "refunds" of dividend taxes previously collected by the Belgium tax authority.  In fact, such taxes were never paid on behalf of Defendants, and the "refunds" obtained were nothing more than monies stolen from the Belgian treasury.

Defendants seek dismissal of these claims on three legal grounds:  the revenue rule, the statute of limitations and Rule 9(b) particularity.  Dismissal is not appropriate on any of these grounds.

*First*, the revenue rule does not bar the claims in this action.  The revenue rule holds that courts in the United States will not assist a foreign sovereign in collecting foreign taxes.  This case, however, is not about collecting taxes.  In fact, the Amended Complaints allege that Defendants did not owe or pay any dividend taxes because they did not own shares of Belgian companies.  This action is, in substance, a case of ordinary fraud.  There is no support in the case law for applying the revenue rule to a case of ordinary fraud just because the victim of the fraud happens to be a foreign state.

*Second*, the facts alleged in the Amended Complaints do not establish that claims are barred by the statute of limitations.  Inquiry notice of the alleged fraud is not established by the

facts alleged in the Amended Complaints and, in any event, the Amended Complaints allege a reasonable investigation of possible fraud by FPSF Belgium.  For these reasons, Defendants have failed to rule out application of the two-year discovery rule under New York law.  Defendants have not even established that the claims in this action would be barred by the alternative six-year statute of limitations.

*Finally*, the Amended Complaints contain sufficient particularity to satisfy Rule 9(b), both with respect to claims for fraud and claims for aiding and abetting fraud.  The Amended Complaints allege "who, what, when and where" facts with respect to the refund claims at issue, and allege that such refund claims were fraudulent both because the "pension funds" submitting the claims did not exist and because such entities did not own the shares or dividends that might have justified the refund claims.  The Amended Complaints also allege facts which, accepted as true, give rise to a strong inference of fraudulent intent.  In addition, the roles of specific Defendants—including Alicia Colodner, FGC Securities and Steven Wheeler—are set forth in detail.  For these reasons, there can be no serious question that Defendants are on notice of the particular claims against them in this case.

## **Factual Background**

Beginning in or about 2012, Defendants participated in a scheme to submit fraudulent tax refund claims to FPSF Belgium.  The scheme was based on a tax treaty between the United States and Belgium that allows tax-exempt residents of the United States, including pension plans, to obtain refunds of withholding tax on dividends paid by Belgian corporations.  (*See* Butler Decl. Ex. 1.)  To obtain such a refund, a pension plan must submit an application to FPSF Belgium with proof of its tax-exempt status and ownership of a dividend payment that resulted in

withholding.  (*See* Doc. 48, Xiphias Am. Compl. ¶ 28.)[1]

Defendants' fraudulent scheme involved the creation of fictitious pension plans that were registered as tax residents in the United States (the "Refund Claimants").  These fictitious entities represented to FPSF Belgium that they were legitimate, tax-exempt pension plans and, using misleading documentation, falsely claimed that they owned shares and dividends from Belgian companies, thereby justifying payment from FPSF Belgium of amounts supposedly withheld as dividend taxes.  (*Id.* ¶ 31.)

In fact, the Refund Claimants were not pension plans at all.  They were not associated with any legitimate employer, they were not funded by employer or employee contributions and they do not exist for the exclusive benefit of employees and their beneficiaries.  (*Id.* ¶ 32.) Instead, they were mere fictions used for the benefit of the participants in the fraud.  (*Id.*)  The individual Defendants dominated and controlled these entities and caused them to submit fraudulent refund claims to FPSF Belgium.  (*Id.*)

In addition to creating the appearance that the Refund Claimants were legitimate pension plans, the scheme also depended on creating the appearance that the Refund Claimants owned shares of Belgian companies and received related dividends.  To accomplish this, Defendants worked with certain share custodians and securities brokers to obtain the false and misleading documentation.  (*Id.* ¶ 36.)  For example, Defendants FGC Securities LLC ("FGC Securities")

---

[1] "Doc." refers to the document number on the docket for the lead case in these consolidated actions, *In re: Kingdom of Belgium, Federal Public Service Finance Pension Plan Litigation*, No. 21 Civ. 6392 (JGK).  Throughout this brief, the Xiphias Amended Complaint, Doc. 48, is used as an example of the contents of all the Amended Complaints.

and Stephen Wheeler, its head of operations, provided false and misleading trade confirmations used by many of the Refund Claimants.  (*Id.* ¶ 37.)

Finally, to submit the required paperwork to FPSF Belgium, the Refund Claimants used the services of tax reclaim agents, including Acupay System LLC ("Acupay") and Goal Taxback Ltd. ("Goal Taxback").  To formalize this role, various Defendants signed "powers of attorney" on behalf of the fictitious Refund Claimants that authorized Acupay or Goal Taxback to provide tax services, including requesting and collecting tax refunds from foreign tax authorities on behalf of the Refund Claimants.  (*Id.* ¶¶ 38-39.)

From 2012 to 2015, Defendants carried out their scheme to defraud FPSF Belgium by submitting tax refund claims through Acupay or Goal Taxback on behalf of each of the Refund Claimants.  Each refund claim included a cover letter from Acupay or Goal Taxback, a tax refund claim form, documentation purporting to show the Refund Claimant's share ownership and receipt of dividends, a power of attorney signed by one or more of the Defendants, and a statement from the IRS purporting to certify that each Refund Claimant was a tax-exempt pension plan under U.S. law.  (*Id.* ¶ 40.)

Charts identifying the refund claims made by each of the Refund Claimants are attached as exhibits to the Amended Complaints.  Each chart shows the date of the application, the Belgian company in which the Refund Claimant supposedly owned shares and the requested refund amount.  (*See id.* ¶ 41 & Exs. A-L.)

Each refund claim represented that a Refund Claimant was a legitimate pension plan that qualified for tax-exempt status under U.S. law.  (*See id.* ¶¶ 43-45.)  This was false.  These entities were not pension plans because, among other reasons, they were not associated with any legitimate employer, they were not funded by employer or employee contributions and they did

not exist for the exclusive benefit of employees and their beneficiaries.  (*See id.* ¶ 46.)

Each fraudulent refund claim also represented that a Refund Claimant owned shares of a Belgian company and received dividends in connection with such shareholding.  This was also false.  In fact, the Refund Claimants did not purchase or own the shares of Belgian companies, and did not receive dividends from such companies.  (*See id.* ¶¶ 47-51.)

In reasonable reliance on the false statements made in the refund requests, as described above, FPSF Belgium paid the requested refund amounts to the Refund Claimants.  These payments generally were made several months after the relevant refund request.  (*Id.* ¶ 52.)  The total amount paid to the Refund Claimants was approximately €124 million.  Amounts received by the Refund Claimants were promptly distributed to other Defendants and other participants in the fraud.  (*Id.* ¶ 53.)

Defendants' scheme to defraud FPSF Belgium continued until at least November 2015. At that time, FPSF Belgium was informed by the Belgian Federal Police of an international criminal investigation concerning refund claims associated with certain reclaim agents, including Acupay and Goal Taxback.  (*Id.* ¶ 54.)  As a precautionary measure, FPSF Belgium suspended payment of refund requests involving those reclaim agents.  (*Id.*)

From November 2015 through 2020, FPSF Belgium knew that the Belgian Federal Police were investigating possible fraud with respect to refund requests made to FPSF Belgium.  During this time, FPSF Belgium acted with reasonable diligence to investigate the facts, including by cooperating with the investigation by the Belgian Federal Police, providing extensive files to the Belgian Federal Police and liaising with the Belgian Federal Police concerning the investigation on a regular basis.  (*Id.* ¶ 55.)  While the investigation was underway, FPSF Belgium was aware that it may have been defrauded by some persons that had requested refunds, but it did not know

which specific transactions were fraudulent or which claimants or individuals were involved. (*Id.* ¶ 55.)

In late 2020, FPSF Belgium was given access to portions of the confidential investigation file of the Belgian Federal Police.  (*Id.* ¶ 56.)  Through analysis of these records, FPSF Belgium was able to conclude, for the first time, that refund claims made by the particular Defendants in this consolidated action were fraudulent.  (*Id.*)

## Argument

A complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  On a Rule 12(b)(6) motion to dismiss for failure to state a claim, "the only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor, in deciding whether the complaint alleges sufficient facts to survive."  *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

On a Rule 12(b)(1) motion to dismiss, the court must determine whether the complaint "alleges facts that affirmatively and plausibly suggest" that there is subject matter jurisdiction, generally "accepting as true all material factual allegations of the complaint and drawing all reasonable inferences in favor of the plaintiff."  *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 56-67 (2d Cir. 2016) (internal quotation marks and alterations omitted); *see also Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 572 (S.D.N.Y. 2021).  A plaintiff normally has "no evidentiary burden" unless a defendant offers evidence to controvert the allegations of the pleadings.  *Carter*, 822 F.3d at 56-57.  Even then, a plaintiff is "entitled to rely on the allegations in the Pleading if the evidence proffered by the defendant is immaterial because it does not contradict plausible allegations that are themselves sufficient" to show jurisdiction.  *Id.* at 57.

## I.      THE REVENUE RULE DOES NOT BAR THIS ACTION.

"The revenue rule is a longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns." *Attorney Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.* ("*Canada*"), 268 F.3d 103, 109 (2d Cir. 2001). "It has been defended on several grounds, including respect for sovereignty, concern for judicial role and competence, and separation of powers." *Id.*  Although the exact scope of the revenue rule has not been defined, its "continuing vitality" is not in question. *Id.*

### A.      This Action Alleges a Garden Variety Fraud.

The fraudulent scheme alleged in this action is sophisticated in nature and sweeping in scope, but still falls within the category of "garden variety" fraud.  As alleged in the Amended Complaints, Defendants created fictitious pension plans and assembled false and misleading documents for submission to FPSF Belgium in order to obtain "refunds" of taxes that had never been paid (at least, not on behalf of the Refund Claimants).  (*See* Doc. 48, Xiphias Am. Compl. ¶¶ 40-42.)  These refund claim documents gave the false impression that the Refund Claimants (1) were bona fide pension plans in the United States, (2) owned large quantities of shares of various Belgian corporations and (3) received millions of dollars in dividends from those Belgian corporations.  (*See id.* ¶¶ 43-51.)  In reliance on the false and misleading information submitted by Defendants, FPSF Belgium made large payments to Refund Claimants.  Unlike legitimate pension plans, which hold assets for the benefit of retirees, the Refund Claimants promptly distributed these funds to other Defendants and other participants in the fraud.  (*See id.* ¶¶ 52-53.)  The Amended Complaints collectively allege more than 300 false claim submissions by Defendants, which resulted in payments by FPSF Belgium totaling more than €124 million.  (*See id.* Exs. A-L.)  As damages, FPSF Belgium seeks the return of all such payments.

For purposes of this motion to dismiss, the factual allegations in the Amended Complaints must be accepted as true. *See, e.g., Doe*, 831 F.3d at 48. Defendants, however, ask the Court to consider alternative facts not set forth in the Amended Complaints. For example, after acknowledging allegations that the pension plans were not bona fide and "did not own the shares they claimed to own," Defendants go on to state: "But the plans maintain that they owned those shares and received dividend income in the amount specified in their obligations." (Doc. 79, Defs.' Br. 16.) As "evidence" for this statement, Defendants point to the trade confirmations submitted to FPSF Belgium that FPSF Belgium has alleged were false and misleading. (*See id.*; Doc. 81, Bahnsen Decl. Ex. A.) Although these trade confirmations are referenced in the Amended Complaints and, therefore, may be considered by the Court, the fact that these documents are alleged to be false and misleading cannot be ignored. Defendants have not submitted any evidence—by affidavit from a person with knowledge or otherwise—to suggest that the transactions documented in these trade confirmations actually occurred as described. Accordingly, the Court should accept as true the allegations in the Amended Complaints that these share transactions did *not* take place.

The fact pattern alleged in the Amended Complaints makes this action similar to cases brought by the Danish tax authority, SKAT, against some of the same Defendants. In the SKAT litigation, Judge Kaplan declined to dismiss the cases based on the revenue rule, finding that those cases did not seek enforcement of Danish tax law. *See In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 310-20 (S.D.N.Y. 2019). In doing so, Judge Kaplan considered and rejected many of the same arguments advanced by Defendants here. Judge Kaplan's decision, of course, is not binding on this Court, but it is the only court decision cited by Defendants that analyzes the revenue rule in the context of an alleged fraud perpetrated against a foreign tax

authority.  In contrast, Defendants have not cited a single case involving a similar alleged fraud in which the revenue rule was held to bar a foreign sovereign's claims.

> **B.**  **This Action Does Not Involve Direct or Indirect Enforcement of Belgian Tax Laws.**

The allegations in this action do not resemble the fact patterns in cases recognized by the Second Circuit as being barred by the revenue rule.  Second Circuit cases discussing the revenue rule have considered both "direct" and "indirect" enforcement of foreign tax laws.  The leading case is *Canada*, 268 F.3d 103, which involved civil RICO claims brought by the Canadian government to recover, as damages, Canadian cigarette taxes allegedly avoided by a cigarette smuggling ring.  In *Canada*, the court observed:

> When presented with such a request which potentially implicates the revenue rule, a court must examine whether the substance of the claim is, either directly or indirectly, one for tax revenues.  What matters is not the form of the action, but the substance of the claim.

*Id.* at 130.  The court held that the revenue rule applied because "Canada's object is clearly to recover allegedly unpaid taxes."  *Id.* at 131.  The court also considered whether Canada's claim for law enforcement costs—as opposed to lost tax revenue—would be similarly barred.  The court recognized the law enforcement cost claim as an example of indirect enforcement of foreign tax laws:

> We also conclude that Canada's claim for damages based on law enforcement costs is in essence an indirect attempt to have a United States court enforce Canadian revenue laws, an exercise barred by the revenue rule.

*Id.*  *Canada* thus holds that the revenue rule bars actions by foreign sovereigns seeking (1) reimbursement for unpaid foreign taxes and (2) reimbursement for costs associated with enforcing foreign tax laws.

The Second Circuit reaffirmed these holdings in *European Community v. RJR Nabisco, Inc.* ("*EC I*"), 355 F.3d 123 (2004), *vacated*, 544 U.S. 1012 (2005), *and reaff'd*, *Eur. Cmty. v.*

*RJR Nabisco, Inc.* ("*EC II*"), 424 F.3d 175 (2d Cir. 2005).  That was another RICO action, this time brought by the European Community and its member states, alleging a scheme to smuggle contraband cigarettes into Europe and asserting "economic harm in the form of lost tax revenues and law enforcement costs."  *EC I*, 355 F.3d at 127.  In *EC I*, the court described the distinction between direct and indirect enforcement as follows:

> A suit directly seeks to enforce foreign tax laws when a judgment in favor of the plaintiffs would require the defendants to reimburse them for lost tax revenues.  In contrast, indirect enforcement occurs when a foreign state seeks a remedy that would give extraterritorial effect to its tax laws; for instance, a suit seeking damages based on law enforcement costs is an attempt to shift the cost of enforcing tax laws onto the defendants, and would therefore require the court indirectly to enforce the tax laws.

*Id.* at 131.  Adhering to the principles set forth in *Canada*, the court ruled that the revenue rule barred the RICO claims by the European Community seeking to recover unpaid taxes and law enforcement costs.

In contrast to *Canada* and *EC I*, this action does not allege a scheme to evade foreign taxes.  The Refund Claimants in this action have never owed dividend taxes to Belgium because, as alleged in the Amended Complaints, the Refund Claimants did not own shares of Belgian corporations and did not receive dividends from Belgian corporations.  (*See* Doc. 48, Xiphias Am. Compl. ¶ 51.)  Alternatively, to the extent the Refund Claimants did owe taxes on dividends paid by Belgian corporations, such taxes were previously collected in Belgium by way of withholding directly from the companies.  (*See id.* ¶ 27.)  Hence, this action cannot be viewed, in form or substance, as an action to collect unpaid taxes.

Consistent with this, FPSF Belgium's claim for damages will not require the calculation of taxes under Belgian law or any other interpretation of Belgian tax law.  FPSF Belgium seeks as damages the specific amounts stolen by Defendants through fraudulent refund requests.  Determining these amounts will not require any calculation of Belgian tax.  The amounts are set

forth in the refund requests themselves, as well as in wire transfer confirmations and other

records maintained by FPSF Belgium and, presumably, some of the Defendants.  Thus, unlike

the damages sought in *Canada* and *EC I*—which would have involved some calculation of

foreign taxes—determining the damages in this case will not require any calculation of foreign

tax.

Defendants argue for a revenue rule that is much broader than the prohibition applied by

the Second Circuit in *Canada* and *EC I*.  Citing *EC I* and a district court case from the Eastern

District, *Republic of Colombia v. Diageo North America Inc.* ("*Colombia*"), 531 F. Supp. 2d 365

(E.D.N.Y. 2007), Defendants put forward the following three-part test for application of the

revenue rule:

> The Revenue Rule bars as "direct enforcement" of foreign tax law claims (1) by a
> foreign sovereign (2) that seek damages that the sovereign sustained in its
> capacity as a sovereign and (3) that were caused by the alleged violations of that
> sovereign's tax laws.

(Doc. 79, Defs.' Br. 14.)  This three-part test, however, is not set forth in either *EC I* or

*Colombia*.  Indeed, we are not aware of any reported case formulating the appropriate test in this

particular way.  For this reason alone, Defendants' conveniently-broad test should be disregarded

in favor of the narrower principles articulated by the Second Circuit in *Canada* and *EC I*.  Even

if Defendants' three-part test is deemed to apply, the third element—alleged violations of a

foreign sovereign's tax laws—is not present here.  The Amended Complaints do not allege, in

form or substance, violations of Belgian tax law.  They allege fraud.

Defendants assert that this action will require "a determination under Belgian tax law

about the amount of tax to be imposed."  (Doc. 79, Defs.' Br. 17.)  That is not true.  As alleged in

the Amended Complaints, FPSF Belgium is seeking to recover specific amounts stolen from the

Belgian treasury by fraud.  The exact amounts stolen are set forth in exhibits to the Amended

Complaints.  Thus, assessing damages in this case will not involve a determination of any tax due under Belgian law.  By the same token, this case will not involve any reassessment of the refund amount due under Belgian tax law.  If a refund was procured by fraud, then FPSF Belgium's damages are equal to the full amount of the refund.  There is no "alternative" refund rate that would apply to fraudulent refund claims.

Defendants also argue that this action will require an interpretation of the term "beneficial ownership" under Belgian law, and that this will involve an inquiry into Belgian *tax* law.  (*See* Doc. 79, Defs.' Br. 25-27.)  This argument should be rejected for several reasons. *First*, the Amended Complaints allege that the Refund Claimants did not have *any* ownership of the shares or dividends claimed.  Thus, it is not apparent from the Amended Complaints that "beneficial ownership" will be a significant issue in this action.  *Second*, Defendants have not established that beneficial ownership must be assessed according to Belgian *tax* law, as opposed to other areas of Belgian law which may be enforced without triggering the revenue rule. Significantly, the tax treaty between the United States and Belgium gives priority to tax laws only if there is a difference between the tax laws and other laws.  The treaty states, in relevant part:

> [A]ny term not defined therein shall . . . have the meaning which it has at that time under the law of that State for the purpose of the taxes to which the Convention applies, any meaning under the applicable tax laws of that State prevailing over a meaning given to the term under other laws of that State.

(Butler Decl. Ex. 1, art. 3, ¶ 2.)  Defendants have not established that the term "beneficial owner" has a different meaning under Belgian *tax* laws as opposed to under other Belgian laws.  Indeed, in discussing this term, Defendants' Belgian law expert, Bernard Peeters, cites the Belgian Company Code, and not the Belgian Income Tax Code.  (*See* Doc. 82, Peeters Decl. ¶¶ 42-46 & nn. 20-22.)  For this reason, inquiry into the meaning of "beneficial owner" will not necessarily

require an inquiry into Belgian tax law.  *Third*, while the revenue rule bars enforcement of foreign tax laws, it does not necessarily prohibit the recognition or interpretation of foreign tax laws.  *See In re SKAT*, 356 F. Supp. 3d at 318 ("Mere recognition or even application of foreign tax law is not the same as enforcement.").  Defendants have not established that interpreting the term "beneficial ownership" under Belgian tax law would be equivalent to enforcing Belgian tax laws.  *Finally*, even if Defendants' argument had merit, it would apply only to part of FPSF Belgium's claims.  The Amended Complaints also allege that Defendants misrepresented the pension plan status of the Refund Claimants.  (*See* Doc. 48, Xiphias Am. Compl. ¶¶ 43-46.)  Resolving this aspect of the alleged fraud will not require any analysis of share ownership under Belgian tax law.  To the contrary, whether the Refund Claimants qualify as pension plans will depend on whether they are "exempt from tax *in the United States*."  (*See* Butler Decl. Ex. 1, art. 3, ¶ 1(k) (emphasis added).)

Finally, Defendants argue that the revenue rule should be applied because the executive branch of the United States has not given express consent to this litigation.  (*See* Doc. 79, Defs.' Br. 18.)  However, Defendants do not cite any case holding that express consent from the executive branch is *required* to avoid application of the revenue rule.  The only case cited by Defendants does not state such a general rule.  *See EC II*, 424 F.3d at 181.  And, to the contrary, the court in *In re SKAT* declined to apply the revenue rule even though there was no indication of approval or consent from the executive branch in that case.  356 F. Supp. 3d at 310-20.

Moreover, Defendants fail to mention that the executive branch has at least *impliedly* endorsed the type of recovery sought by FPSF Belgium in this action.  Article 26 of the tax treaty between the United States and Belgium is titled "Assistance in Collection."  It provides, in relevant part, as follows:

> Each of the Contracting States shall endeavor to collect on behalf of the other Contracting State such taxes imposed by that other Contracting State as will ensure that any exemption or reduced rate of tax granted under this Convention by that other Contracting State shall not be enjoyed by persons not entitled to such benefits.

(Butler Decl. Ex. 1, art. 26.)  This treaty provision is not directly applicable to this action because, as discussed herein, FPSF Belgium is not seeking to collect taxes from the Defendants. The language does, however, express a policy preference that benefits under the tax treaty "shall not be enjoyed by persons not entitled to such benefits."  This language—contained in a solemn instrument signed by the State Department—is at least an implied endorsement by the executive branch of the relief FPSF Belgium seeks in this action.

Defendants argue that a different tax treaty between the United States and Japan—the Japanese Protocol—is instructive by analogy because it contains more detailed language concerning reciprocal collection assistance.  (*See* Doc. 79, Defs.' Br. 19-20 & nn. 11-12.)  This separate tax treaty is irrelevant to the application of the revenue rule here.  There is simply no way to glean from the language of the Japanese Protocol any indication of the State Department's position, if any, with respect to the revenue rule or the recovery sought by FPSF Belgium in this action.

### C. The Purposes of the Revenue Rule Are Not Implicated Here.

The Supreme Court has recognized that the "principal evil against which the revenue rule was traditionally thought to guard" is the "judicial evaluation of the policy-laden enactments of other sovereigns."  *Pasquantino v. United States*, 544 U.S. 349, 368 (2005).  Along similar lines, the Second Circuit has observed that the revenue rule addresses the concern "that policy complications and embarrassment may follow when one nation's courts analyze the validity of another nation's tax laws."  *EC II*, 424 F.3d at 180.

This action does not raise concern over interference with a foreign sovereign's tax laws. In this fraud action, the Court will be called upon to determine whether the Defendants, acting in the United States, created, obtained and assembled false and misleading documentation for submission in refund claims to FPSF Belgium. The Court will also be called upon to assess whether Defendants acted with the requisite level of scienter. These are typical of the factual issues to be determined in any fraud case. In contrast, the Court will not be required to pass judgment on the validity of Belgian tax laws or the social policies underlying such laws. As discussed in Section I.B above, this action will not even require calculation of any tax due under Belgian law. For these reasons, the main purpose of the revenue rule—avoiding interference with the tax laws of another sovereign—is not implicated here.

The Second Circuit has recognized a second concern underlying the revenue rule: separation of powers. The concern is "that the executive branch, not the judicial branch, should decide when our nation will aid others in enforcing their tax laws." *EC II*, 424 F.3d at 180. Once again, this concern is not present here because FPSF Belgium is not seeking to enforce Belgian tax laws. Moreover, there is no reason to believe the executive branch would countenance acts of fraud, carried out by United States citizens within the United States, merely because the victim of the fraud was a foreign tax authority. The executive branch devotes tremendous resources to the investigation and punishment of fraud carried out within the United States, even in cases where the victim is a foreign sovereign. This is evident from the case of *Pasquantino v. United States*, 544 U.S. 349, which involved prosecution under the federal wire fraud statute of a fraudulent scheme carried out in the United States to deprive Canada of excise tax revenue. Accordingly, there is no reason to believe the executive branch would disapprove of this action to recover damages arising from a fraud committed in the United States.

### D.      The Court's Subject Matter Jurisdiction Is Not in Question.

Defendants assert that the revenue rule argument goes to the Court's subject matter jurisdiction.  (Doc. 79, Defs.' Br. 11.)  However, neither the Second Circuit nor the Supreme Court has held that the revenue rule raises a question of subject matter jurisdiction.  Indeed, the Supreme Court has suggested otherwise in a case involving domestic state tax law:

> The objection that the courts in one state will not entertain a suit to recover taxes due to another or upon a judgment for such taxes is not rightly addressed to any want of judicial power in courts which are authorized to entertain civil suits at law.  It goes not to the jurisdiction, but to the merits, and raises a question which District Courts are competent to decide.

*Milwaukee Cnty. v. M.E. White Co.*, 296 U.S. 268, 272 (1935).  Consistent with this, the court in *In re SKAT* observed that it was "not convinced" that "the revenue rule ousts federal district courts of jurisdiction to entertain cases that are within the rule's prohibitions."  356 F. Supp. 3d at 309 n.24.

Defendants cite no authority to the contrary.  In *EC I*, the Second Circuit rejected the notion that the doctrine is "discretionary" once the "sovereignty and separation of powers concerns that inform the rule are implicated by the substance of a plaintiff's claims," but did not address whether it is a question of subject matter jurisdiction.  355 F.3d at 138.  Similarly, the court in *Colombia* did not rule on whether the revenue rule is a question of subject matter jurisdiction.  Instead, the court found only that Rule 12(b)(1) was the appropriate basis for a motion to dismiss based on the revenue rule "irrespective of whether the revenue and penal rules are characterized as limitations on subject-matter jurisdiction or abstention doctrines."  531 F. Supp. 2d at 381.

For these reasons, the Court should not accept Defendants' conclusory assertion that the revenue rule should be adjudicated as an issue of subject matter jurisdiction.

## II.      THE CLAIMS IN THIS ACTION ARE NOT TIME BARRED.

Defendants argue that FPSF Belgium's claims should be dismissed under the applicable statute of limitations.  Because the statute of limitations is an affirmative defense, it can only be adjudicated on a motion to dismiss if "the facts necessary to establish the defense are evident on the face of the complaint."  *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013); *see also Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) ("The pleading requirements in the Federal Rules of Civil Procedure . . . do not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses."); *St. John's Univ., N.Y. v. Bolton*, 757 F. Supp. 2d 144, 157 (E.D.N.Y. 2010) ("For a defendant's statute of limitations arguments to succeed, the plaintiff must plead itself out of court." (internal quotation marks and alterations omitted)).  Indeed, a motion to dismiss on statute of limitations grounds "may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief."  *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004).  And, as is usual on a motion to dismiss, the plaintiff "is entitled to all reasonable inferences from the facts alleged."  *Id.*

Applying these legal standards, Defendants fall well short of demonstrating that this action should be dismissed based on the statute of limitations.

### A.      The Claims Are Timely Under New York's Two-Year Discovery Rule.

Under New York law, a cause of action for fraud must be brought within two years from the time the plaintiff "discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. 213(8).  Thus, a fraud claim is timely if brought "within two years of the date the fraud was discovered or could have been discovered with reasonable diligence."  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 154 (2d Cir. 2012).  In addition, New York law recognizes that "a plaintiff may be put on inquiry notice, which can trigger the running of the statute of

limitations if the plaintiff does not pursue a reasonable investigation." *Id.* at 155 (citing *Gutkin v. Siegal*, 85 A.D.3d 687, 688 (1st Dep't 2011)). If, on the other hand, some inquiry is made, the statute of limitations begins to run only when a diligent investigation would have revealed the fraud. *See Erbe v. Lincoln Rochester Tr. Co.*, 3 N.Y.2d 321, 326 (1957) ("Generally, knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute."); *Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009) (same); *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005) (discussing inquiry notice as applied to the statute of limitations for securities fraud, and noting that plaintiffs need not file suit "before they can discover with the exercise of reasonable diligence the necessary facts to support their claims"). This is normally a question of fact to be resolved at trial. *See Trepuk v. Frank*, 44 N.Y.2d 723, 725 (1978) ("Where it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts."); *Saphir Int'l, SA v. UBS PaineWebber Inc.*, 25 A.D.3d 315, 316 (1st Dep't 2006) ("[W]hether a person had sufficient knowledge to discover a fraud necessarily involves a dispute over state of mind and conflicting interpretations of perceived events." (internal quotation marks and alterations omitted)).

### 1.    The Amended Complaints Do Not Establish Inquiry Notice as of November 2015.

Defendants assert that, based on allegations in the Amended Complaints, FPSF Belgium was on inquiry notice of the fraud in November 2015. (*See* Doc. 79, Defs.' Br. 27.) The Second Circuit has recognized that "whether a plaintiff had sufficient facts to place it on inquiry notice is 'often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6).'" *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003) (quoting *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 367 (7th Cir. 1997)).

Here, the allegations in the Amended Complaints do not conclusively establish inquiry notice of the alleged fraud in November 2015.  The Amended Complaints allege only that FPSF Belgium "was informed by the Belgian Federal Police of an international criminal investigation concerning refund claims associated with certain reclaim agents, including Acupay and Goal Taxback."  (Doc. 48, Xiphias Am. Compl. ¶ 54.)  They also allege that "as a precautionary measure, FPSF Belgium suspended payment of refund requests involving those reclaim agents." (*Id.*)  These allegations are not sufficient to establish inquiry notice of the fraud alleged in this case.  For example, the Amended Complaints do not indicate with any detail what information was conveyed to FPSF Belgium by the Belgian Federal Police in November 2015.  On such a sparse record, it is difficult to reach any conclusion about inquiry notice.  To the contrary, drawing all reasonable inferences in its favor, it is possible that FPSF Belgium learned nothing at all in November 2015 about the nature of the fraudulent scheme at issue in this action.  Without more, the Court should not make any determination on the issue of inquiry notice at this time.

> **2.    The Amended Complaints Allege a Reasonable Investigation by FPSF Belgium Beginning in November 2015.**

Assuming, for purposes of argument, that FPSF Belgium *was* on inquiry notice of the alleged fraud in November 2015, the Amended Complaints indicate that FPSF Belgium acted with reasonable diligence to investigate the facts.  Among other things, FPSF Belgium cooperated in the investigation being conducted by the Belgian Federal Police, provided extensive files to the Belgian Federal Police to support the investigation and monitored the investigation as it continued.  (*See* Doc. 48, Xiphias Am. Compl. ¶ 55.)  Accepting these factual allegations as true, this is not a case where the plaintiff failed to conduct *any* investigation, or otherwise "shut its eyes" to the facts.  To the contrary, the Amended Complaints allege that

FPSF Belgium met any duty of inquiry by cooperating with an active criminal investigation by the Belgian Federal Police.

Defendants contend that FPSF Belgium must plead facts concerning the investigation with particularity, and that the allegations in the Amended Complaints fall short under that standard. (Doc. 79, Defs.' Br. 35). Defendants are wrong about applying a particularity standard to these facts. The main case cited by Defendants deals with the doctrine of fraudulent concealment, which may toll certain statutes of limitations under federal law. *See Butala v. Agashiwala*, 916 F. Supp. 314, 320 (S.D.N.Y. 1996) (applying Rule 9(b) to the elements of fraudulent concealment with respect to a RICO claim). Here, FPSF Belgium is not relying on the doctrine of fraudulent concealment and, accordingly, there is no duty to plead facts concerning the investigation with particularity. The other case cited by Defendants does not apply a particularity standard at all, but instead applies the ordinary pleading standard that a complaint must state a plausible claim for relief. *See Graham v. HSBC Mortg. Corp.*, No. 18 Civ. 4196, 2021 WL 4392522, at *3 (S.D.N.Y. Sept. 24, 2021) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and *Iqbal*, 556 U.S. at 678). Defendants do not argue, however, that FPSF Belgium's allegations about cooperating with an ongoing investigation by the Belgian Federal Police are implausible.

Defendants also ask the Court to infer that FPSF Belgium did not conduct its "own" investigation of the facts. This turns on its head the normal practice of drawing all reasonable inferences in favor of the plaintiff. The Amended Complaints allege that FPSF Belgium actively cooperated with an investigation underway by the Belgian Federal Police. The approach taken by FPSF Belgium was equivalent to hiring a private investigator or a law firm to investigate possible fraud. Although FPSF Belgium did not do all the work itself, FPSF Belgium knew that

the facts were being investigated by the proper authorities, and actively assisted and monitored such investigation. Defendants seem to be suggesting that FPSF Belgium had a duty to conduct a separate, independent investigation in addition to the work being done by the police. (*See* Doc. 79, Defs.' Br. 36.) Defendants, however, cite no case holding that an independent investigation is required, and they offer no rationale for believing such an investigation would have been reasonable under the circumstances in this case.[2]

Finally, Defendants cite certain investigative measures that FPSF Belgium could have taken, but which are not mentioned in the Amended Complaints. (*See* Doc. 79, Defs.' Br. 35-36; Doc. 83, Waeterinckx Decl. ¶¶ 12-16.) Again, Defendants ask the Court to draw impermissible inferences in their favor. FPSF Belgium is not under an obligation to allege every single action taken (or considered to be taken) to investigate the facts of this case. To the extent FPSF

---

[2] The cases Defendants do cite are not to the contrary. In *Graham v. HSBC Mortgage Corp.*, 2021 WL 4392522, at *5-6, the court dismissed claims as untimely where plaintiffs did not conduct *any* investigation within two years of receiving inquiry notice. The court also noted that plaintiffs' later investigation—*i.e.*, "consulting" with "knowledgeable parties"—could not have been reasonable because a "standard review" of a government-issued notice would have revealed the alleged fraud. *Id.* at *6. In *In re Merrill, Bofa, & Morgan Stanley Spoofing Litigation*, No. 19 Civ. 6002, 2021 WL 827190, at *8-9 (S.D.N.Y. Mar. 4, 2021), the claims were time barred because, although plaintiffs were on inquiry notice, they "did not investigate" and instead simply waited for the outcome of civil and criminal proceedings. By contrast, FPSF Belgium did not merely await the outcome of proceedings, but actively cooperated with an investigation by the police.

Belgium had "investigative tools" available in addition to the Belgian Federal Police, no conclusion should be drawn concerning the use or non-use of such tools just because they are not described in the Amended Complaints. The full story of the investigation of the possible fraud by FPSF Belgium has not been told and, if necessary, FPSF Belgium can and will provide additional detail concerning its investigation at the appropriate time in this proceeding.

### 3. Defendants Have Not Established the Date on Which FPSF Belgium Should Have Discovered the Fraud.

Defendants contend that FPSF Belgium should have been able to discover the fraud on or about May 31, 2018, when the government of Denmark filed an action in the Southern District of New York based on fraudulent tax refund requests similar to those made to FPSF Belgium. (Doc. 79, Defs.' Br. 36.) Specifically, Defendants cite the complaint filed on May 31, 2018 in *SKAT v. Raubritter LLC Pension Plan*, No. 18 Civ. 04883 (S.D.N.Y.) (the "SKAT Raubritter Complaint"). According to Defendants, the allegations of fraud in that document should have been sufficient to allow FPSF Belgium to make similar allegations of fraud, at least with reference to Defendants Raubritter LLC Pension Plan ("Raubritter") and Adam LaRosa.

This argument should be rejected for multiple reasons. As an initial matter, it is not obvious that a reasonable investigation of possible fraud by a person in Belgium would include monitoring court filings in the United States. Defendants are therefore asking the Court to assume that a reasonable investigation by FPSF Belgium would have included discovery of the SKAT Raubritter Complaint at the time it was filed. This is an issue of fact, however, that should not be taken for granted on a motion to dismiss. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 362-63 (2d Cir. 2013) ("[I]t does not follow that reasonable diligence will in all circumstances result in discovery of any lawsuit."); *McGuinness v. Standard Drywall Corp.*, 193

A.D.2d 518, 518 (1st Dep't 1993) (noting that "the failure of plaintiffs to ascertain the truth by inspecting public records is not determinative").

Even assuming that FPSF Belgium should have learned about the SKAT Raubritter Complaint on May 31, 2018, the SKAT Raubritter Complaint does not contain any facts concerning refund claims in Belgium. It alleges instead that Raubritter submitted refund claims in Denmark that falsely represented ownership of dividends from Danish listed companies. (Butler Decl. Ex. 3, ¶ 36.) Importantly, the SKAT Raubritter Complaint does *not* allege that Raubritter itself was a fraudulent entity. That allegation was made for the first time in the SKAT litigation almost two years later, in an amended complaint filed on April 27, 2020. (*See* Butler Decl. Ex. 4, ¶ 42 (calling Raubritter a "sham entity").) Thus, the SKAT Raubritter Complaint filed on May 31, 2018 did not provide enough information for FPSF Belgium to conclude that *all* refund claims made by Raubritter were fraudulent.

These facts make it easy to distinguish the cases cited by Defendants. For example, in *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459-60 (S.D.N.Y. 2020), the court found that earlier legal proceedings disclosing the same acts of misappropriation triggered the statute of limitations for a misappropriation claim. In contrast, here, the SKAT Raubritter Complaint does not disclose the same acts of fraud alleged in this action. Another case cited by Defendants, *Landow v. Wachovia Securities, LLC*, 996 F. Supp. 2d 106, 127-30 (E.D.N.Y. 2013), is even less apposite, as that case addressed inquiry notice, not constructive discovery of the fraud. Here, Defendants do not rely on the SKAT Raubritter Complaint to demonstrate inquiry notice.

### B. The Claims May Also Be Timely Under New York's Six-Year Statute of Limitations.

Defendants have also failed to establish that FPSF Belgium's claims are untimely under the normal six-year statute of limitations for fraud. *See* N.Y. C.P.L.R. 213(8) ("six years from

the date the cause of action accrued").  These actions were filed on July 27, 2021, so any claim

would be timely if it accrued after July 27, 2015.  Defendants agree with this date in their brief.

(Doc. 79, Defs.' Br. 30.)

Drawing all inferences in favor of FPSF Belgium, the facts alleged in the Amended

Complaint indicate that some of the claims in this action accrued after July 27, 2015.  A claim

accrues when "the claim becomes enforceable, *i.e.*, when all elements of the tort can be truthfully

alleged in a complaint."  *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993).  If damages are an

essential element of the claim, then the claim is "not enforceable until damages are sustained."

*Id.; see also Ingrami v. Rovner*, 45 A.D.3d 806, 808 (2d Dep't 2007) (holding that the statute of

limitations in a fraud case began to accrue when the plaintiff suffered the injury, not when the

defendant made the misrepresentations themselves).  Here, damages form an essential element of

FPSF Belgium's claims for fraud, so each claim accrued no earlier than the time FPSF Belgium

made a payment based on a fraudulent refund claim.

The Amended Complaints do not allege the date of payment associated with each

successful refund claim.  Instead, exhibits to the Amended Complaints show the date of each

refund claim, and the Amended Complaints allege that payments were generally made several

months after the refund claims.  (*See* Doc. 48, Xiphias Am. Compl. ¶ 52.)  Defendants criticize

FPSF Belgium for not including the dates of payment in the Amended Complaints, but FPSF

Belgium was not under any obligation to include this data in its pleadings.  Moreover,

Defendants presumably know the dates of payments from their own records.

Instead of alleging the individual dates of payments, the Amended Complaints allege that

FPSF Belgium suspended payments for refund requests made by Acupay and Goal Taxback in

November 2015.  (*See id.* ¶ 54.)  Based on this allegation, it can reasonably be inferred that at

least some payments were made to Defendants during the time period from July 27, 2015 to November 2015.  For the refund claims giving rise to such payments, FPSF Belgium's claims would be timely under the six-year statute of limitations.

This conclusion can be reached even before taking into account tolling of the statute of limitations during the COVID-19 pandemic.  As Defendants recognize, beginning in March 2020, New York's governor issued executive orders tolling the statutes of limitations in New York for a total of 228 days.  (*See* Doc. 79, Defs.' Br. 32.)  There is some debate over whether these executive orders really *tolled* the limitations periods or merely *suspended* their expiration during the 228-day period.  Most courts, however, have concluded that the limitations periods were tolled such that all limitations periods running during this time have been extended by 228 days.  *See Ventilla v. Pac. Indem. Co.*, No. 20 Civ. 8462, 2021 WL 5234404, at *2 (S.D.N.Y. Nov. 10, 2021) ("There can be no doubt that the plain text of the Executive Order tolled . . . 'time limits' as prescribed by the procedural laws of the state . . . ."); *Reynolds-Sitzer v. EISAI, Inc.*, No. 21 Civ. 0145, 2022 WL 471530, at *5 (N.D.N.Y. Feb. 16, 2022) (finding statutes of limitations were tolled during the pendency of the executive orders); *Brash v. Richards*, 195 A.D.3d 582, 582-85 (2d Dep't 2021) (same).  The Court need not weigh in on this debate for purposes of this motion.  It is enough to recognize that these pandemic-related executive orders may mean that even more of FPSF Belgium's claims are timely under the six-year statute of limitations.

### C.    The Claims Are Timely Under Belgian Law.

The parties agree that the claims at issue in this action accrued in Belgium, where FPSF Belgium suffered economic injury from the fraud.  (Doc. 79, Defs.' Br. 28 n.15.)  Therefore, under New York's borrowing statute, the claims in this action must be timely under both New York and Belgium law.  *See* N.Y. C.P.L.R. 202.

Defendants have not argued that the claims in this action are untimely under Belgium law.  To the contrary, the Defendants' own expert, Patrick Waeterinckx, opines that Belgium's statute of limitations runs for at least five years from the date the plaintiff knew both the injury and the identity of the person causing the injury.  (*See* Doc. 83, Waeterinckx Decl. ¶¶ 21-22.)  As alleged in the Amended Complaints, FPSF Belgium did not know which specific refund requests were fraudulent before it gained access to the confidential files of the Belgian Federal Police in late 2020.  (*See* Doc. 48, Xiphias Am. Compl. ¶ 56.)  Accepting this allegation as true, the claims in this action are obviously timely under Belgian law.

In addition, Mr. Waeterinckx states that the statute of limitations may be further extended during the pendency of a criminal investigation.  (*See* Doc. 83, Waeterinckx Decl. ¶¶ 30-31.)  The Amended Complaints allege that the Belgian Federal Police investigation remains ongoing.  (*See* Doc. 48, Xiphias Am. Compl. ¶ 56.)  This further indicates the timeliness of this action under Belgian law.

## III.    FPSF BELGIUM HAS ADEQUATELY PLEADED CLAIMS AGAINST DEFENDANTS COLODNER, FGC SECURITIES AND WHEELER.

When pleading fraud, a party must "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This generally means that a pleading must: "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent."  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015).  However, where the underlying facts are "peculiarly within the opposing party's knowledge," a plaintiff may plead on information and belief so long as there are "specific facts supporting a strong inference of fraud."  *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 82 (2d Cir. 2017)

(internal quotation marks omitted).  Moreover, courts "should not demand a level of specificity in fraud pleadings that can only be achieved through discovery."  *Iowa Pub. Emps.' Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 332 (S.D.N.Y. 2013) (internal quotation marks omitted).

A defendant's state of mind "may be alleged generally."  Fed. R. Civ. P. 9(b).  Still, the factual allegations must support a "strong inference" of fraudulent intent, meaning an inference that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007); *Loreley*, 797 F.3d at 176-77.  In evaluating the strength of the inference, a court should "consider the complaint in its entirety and take into account plausible opposing inferences."  *Loreley*, 797 F.3d at 177 (internal quotation marks omitted).

A.    **FPSF Belgium Has Adequately Pleaded Claims for Fraud Against Colodner.**

FPSF Belgium has pleaded with particularity claims for fraud against Alicia Colodner arising from the refund applications for Delvian LLC Pension Plan ("Delvian") and DFL Investments Pension Plan ("DFL").  It is alleged that Delvian and DFL were fictitious pension plans.  (*See* Doc. 51, Delvian Am. Compl. ¶¶ 24-25.)  These purported plans were not associated with any legitimate employer, they were not funded by employer contributions and they did not exist for the exclusive benefit of employees and their beneficiaries.  (*Id.* ¶¶ 4, 24-25.)  In submissions to FPSF Belgium, Colodner and her co-defendants, Richard Markowitz and John Van Merkensteijn, falsely "created the appearance that Delvian and DFL were bona fide pension plans that owned shares in one or more Belgian companies for which dividends had been paid and dividend taxes had been withheld."  (*Id.* ¶ 5.)  The dates and amounts of the fraudulent refund claims at issue are detailed in exhibits to the Delvian Amended Complaint.

Details concerning Colodner's specific role in this scheme are set forth in the Delvian Amended Complaint.  With respect to Delvian, Colodner signed a power of attorney as the "trustee" of Delvian, which authorized Goal Taxback to make tax refund claims on behalf of Delvian.  (*Id.* ¶¶ 30-31.) The address used for Delvian was 40 West 57th Street, New York, NY. (*See id.* ¶ 26.)  This was the address of Colodner's employer, Argre Management LLC.  (*Id.*) With respect to DFL, the address given for DFL in refund claims to FPSF Belgium was 11 Hughes Street, Rockville Centre, NY.  This was the residential address of a home owned by Colodner's close relatives.  (*See* Doc. 51, Delvian Am. Compl. ¶ 27; *see also* Doc. 85, Letter dated Mar. 4, 2022.)[3]  Refund claims submitted by DFL using this address included a power of attorney signed by Defendant Adam LaRosa as DFL's "authorised signer" and signed by Colodner as a "witness."  (*See* Doc. 51, Delvian Am. Compl. ¶¶ 30-31; *see also* Butler Decl. Ex. 2.)[4]

---

[3] The Delvian Amended Complaint alleges that the home was owned by Colodner.  As stated in a letter to the Court dated March 4, 2022, we have since learned that the home was actually owned by Colodner's husband's parents.  (*See* Doc. 85, Letter dated Mar. 3, 2022.)

[4] The Court may consider the power of attorney witnessed by Colodner.  On a motion to dismiss, a complaint is "deemed to include" documents that are "incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint."  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (internal quotation marks and alterations omitted); *see also Blue Angel Realty, Inc. v. United States*, No. 20 Civ. 8220, 2022 WL 94599, at *1 n.1 (S.D.N.Y. Jan. 8, 2022) (considering documents submitted by plaintiff in opposition to motion to dismiss).  Here, the power of attorney document is repeatedly referenced

Colodner argues that the Delvian Amended Complaint fails to allege with particularity that she acted with scienter.  (*See* Doc. 79, Defs.' Br. 44-47.)  A "strong inference" of fraudulent intent may be established by "alleging facts to show that defendants had both motive and opportunity to commit fraud" or "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290–91 (2d Cir. 2006).  The Delvian Amended Complaint meets each of these standards.

The Amended Complaints allege that Delvian and DFL were fictitious entities.  In other words, these "entities" did not exist at all—and they certainly were not "pension plans" created and existing for the benefit of employees of "Delvian LLC" or "DFL Investments."  Nevertheless, Colodner signed a power of attorney as the "trustee" of Delvian, and allowed the address of close relatives to be used as the official address of DFL.  These facts provide strong circumstantial evidence of Colodner's fraudulent intent.  With respect to Delvian, it is plausible to infer that Colodner *knew* she was not the trustee of a non-existent pension plan.  With respect to DFL, it is plausible to infer that Colodner *knew* DFL was not a bona fide pension plan based at her mother-in-law's house.  *See, e.g., Loreley*, 797 F.3d at 178 (finding that it was "reasonable to infer" that "high-level employees" of company "knew or should have known that the disclosures in the offering documents were misleading"); *Great W. Ins. Co. v. Graham*, No. 18 Civ. 6249, 2020 WL 3415026, at *23 (S.D.N.Y. June 22, 2020) (denying motion to dismiss where it was "reasonable to infer that [defendant] knew the value of a trust solely owned by him"); *Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp.*, No. 04 Civ. 4971, 2006 WL 2802092, at *5 (E.D.N.Y.

---

in and is integral to the Delvian Amended Complaint.  (*See* Doc. 51, Delvian Am. Compl. ¶¶ 30-32.)

Sept. 28, 2006) (same, where "the fraud permeated every aspect of" business of which defendant was president).

Tellingly, Colodner does not offer any plausible opposing inference from these facts. She does not contend, for example, that a person might innocently believe she is the trustee of a pension plan that does not exist, or that her in-laws might have operated a pension plan for a company called "DFL Investments" from their home.  Without a plausible alternative inference to draw from these facts, the inference of fraudulent intent is compelling.

Colodner also had motive and opportunity to commit fraud.  The Delvian Amended Complaint alleges that payments made by FPSF Belgium were distributed to participants in the fraud, including Colodner.  (Doc. 51, Delvian Am. Compl. ¶ 45.)  Ultimately, FPSF Belgium paid more than €10 million to Delvian and DFL in connection with the fraud.  (*See id.* ¶¶ 25, 44-45.)  This opportunity for personal profit gave Colodner a strong motive to engage in the fraud. *See, e.g., Martinek v. AmTrust Fin. Servs., Inc.*, No. 19 Civ. 8030, 2020 WL 4735189, at *17 (S.D.N.Y. Aug. 14, 2020) (denying motion to dismiss where complaint alleged defendants were "benefiting in a concrete and personal way" from the fraud).

Colodner also argues that she was not the "speaker" of the fraudulent statements because the tax reclaim agents—not Colodner—transmitted the refund requests to FPSF Belgium. (Doc. 79, Defs.' Br. 44.)  This argument has no merit.  It is well-settled that:

> [A] claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to [the plaintiff].

*Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 327, 348 (S.D.N.Y. 2010) (rejecting argument that statements "should not be considered because they were not made to [plaintiff] directly");

*see also Guandong Enters. (N. Am.) Fur Holdings Ltd. v. Hennessy*, No. 01 Civ. 0620, 2002 WL

1000953, at *19 (S.D.N.Y. May 15, 2002) ("It is sufficient that [defendant] made false representations to a third-party with the intention or expectation that plaintiffs might act thereon."). Here, the complaint expressly alleges that Colodner submitted the refund claims "*through* Acupay and Goal Taxback." (*See* Doc. 51, Delvian Am. Compl. ¶ 32 (emphasis added); *see also id.* ¶¶ 5, 30, 37, 50, 52.) While the tax reclaim agents may have physically delivered the refund claims to FPSF Belgium, the false information about Delvian and DFL necessarily came from Defendants.

Colodner contends that the allegations of her involvement are insufficient because they are made on information and belief and do not specifically "delineate the roles" played by each Defendant. (*See* Doc. 79, Defs.' Br. 44-45.) This is incorrect. The Delvian Amended Complaint alleges that Colodner acted as Delvian's trustee, allowed DFL to use her relatives' house as its purported address and was personally involved in authorizing tax reclaim agents to make refund requests for each of Delvian and DFL. This is sufficient to show an active role in the alleged fraud. Prior to discovery, FPSF Belgium cannot be expected to plead exhaustive detail concerning Colodner's role in the fraud. *See Nielsen Co. (U.S.), LLC v. Success Sys., Inc.*, No. 11 Civ. 2939, 2013 WL 1197857, at *7 n.2 (S.D.N.Y. Mar. 19, 2013) (denying motion to dismiss where "the precise degree and extent of [defendant's] contributions to the Proposal are peculiarly within Defendants' knowledge" and plaintiff "has plead facts relating to [defendant's] role"); *see also Minnie Rose LLC v. Yu*, 169 F. Supp. 3d 504, 518 (S.D.N.Y. 2016) ("[T]here is no genuine question regarding which allegations of fraud involved which Defendants because Plaintiff claims that Elva Green was a single purposed entity that was closely held by Yu and both engaged in the same fraudulent conduct."). Here, the Amended Complaints allege sufficient facts with respect to Colodner to defeat a motion to dismiss.

Coldoner also is alleged to be liable for making the statements as the alter ego of Delvian and DFL.  Colodner argues that the "alter ego" allegations are insufficient.  (Doc. 79, Defs.' Br. 46-47.)  It is alleged, however, that Delvian and DFL were fictitious entities with no legitimate business or employee beneficiaries.  (*See* Doc. 51, Delvian Am. Compl. ¶¶ 24-25.)  As such, they could *only* have been instrumentalities of one or more of Colodner and her co-Defendants.  *See, e.g., Moses v. Martin*, 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004) (denying motion to dismiss fraud claims where fraudulent entity "acted as the alter-ego, business conduit and instrumentality of defendant").  Based on the allegations against Colodner with respect to Delvian and DFL, it is reasonable to infer that these entities were alter egos of Colodner and, on this basis, she is fully responsible for the refund claims made by these entities.

### B.  FPSF Belgium Has Adequately Pleaded Claims for Aiding and Abetting Fraud Against Colodner, FGC Securities and Wheeler.

Defendants Colodner, FGC Securities and Wheeler argue that FPSF Belgium fails to allege claims against them for aiding and abetting fraud.  Under New York law, a claim for aiding and abetting fraud requires allegations as to "(1) the existence of a fraud; (2) [the] defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."  *Lerner*, 459 F.3d at 292.  "Actual knowledge" of the fraud is required, but "circumstantial evidence can be sufficient to support a finding of actual knowledge."  *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 487 (S.D.N.Y. 2018).  As discussed below, the Amended Complaints filed by FPSF Belgium meet these requirements.

#### 1.  The Aiding and Abetting Allegations Against Colodner Are Sufficient.

FPSF Belgium alleges that Colodner aided and abetted fraud in connection with the refund claims of several purported pension plans.  For example, Defendant Xiphias LLC Pension

Plan ("Xiphias") is alleged to be a fictitious entity that made false and misleading refund claims to FPSF Belgium.  (Doc. 48, Xiphias Am. Compl. ¶¶ 31-33.)  These refund claims included a power of attorney for Xiphias signed by Defendant Van Merkensteijn as an "authorised signer," and by Colodner as a "witness."  (*See id.* ¶ 39.)  Colodner similarly signed as a "witness" on the powers of attorney for several other purported pension plans, including Defendants Bernina Pension Plan Trust, Next Level Pension Plan Trust, Spirit on the Water Pension Plan, Rajan Investments LLC Pension Plan, Laegeler Asset Management Pension Plan Trust, Davin Investments Pension Plan and Michelle Investments LLC Pension Plan.  (*See id.* ¶¶ 38, 65-66; Doc. 49, Traden Am. Compl. ¶¶ 45, 47, 65-69; Doc. 52, Michelle Am. Compl. ¶ 28.)

Colodner contends that the Amended Complaints do not adequately allege that she acted with scienter.  (*See* Doc. 79, Defs.' Br. 41-42.)  To the contrary, the facts alleged in the Amended Complaints, considered as a whole, give rise to a strong inference that Colodner acted with actual knowledge of the fraudulent scheme.  As discussed in Section III.A above, the facts concerning Delvian and DFL raise a strong inference of fraudulent intent on the part of Colodner.  There is no other way to explain signing a document as the "trustee" of one non-existent pension plan and using a family home address for another fictitious pension plan.  From these facts, it is also plausible to infer that Colodner was sufficiently involved in the scheme to know that other pension plans were fraudulent, including those for which she signed powers of attorney as a witness.  *See Silvercreek*, 346 F. Supp. 3d at 491 ("A party's contribution to 'atypical financing transactions' where that party 'devised the marketing and financing scheme' may provide a circumstantial basis for inferring actual knowledge and substantial assistance when that scheme is subsequently put to fraudulent use by a primary tortfeasor, regardless of whether that party's role itself involved wrongdoing."); *Glob. Intellicom, Inc. v. Thomson*

*Kernaghan & Co.*, No. 99 Civ. 342, 1999 WL 544708, at *9 (S.D.N.Y. July 27, 1999) (denying motion to dismiss where allegations of scienter included defendant's "pattern" of behavior at other companies).

In addition to challenging the scienter allegations, Colodner makes the conclusory assertion that signing powers of attorney "does not amount to affirmative assistance" and that her doing so was not a "direct or proximate cause" of FPSF Belgium's damages.  (Doc. 79, Defs.' Br. 41.)  These arguments should be rejected.  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."  *Lerner*, 459 F.3d at 295 (internal quotation marks omitted).  Even acts that are in some sense "clerical" or "ministerial" may qualify as substantial assistance if they make a "substantial contribution" to the fraud.  *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 511 (S.D.N.Y. 2009).  Also, whether a particular act "proximately causes" the plaintiff's injury is usually a "fact-intensive analysis."  *Silvercreek*, 346 F. Supp. 3d at 495.

Here, Colodner made a substantial contribution to the fraud by witnessing powers of attorney for fictitious pension plans.  This was an integral part of the scheme because the powers of attorney witnessed by Colodner were included in refund claims submitted to FPSF Belgium.  (*See* Doc. 48, Xiphias Am. Compl. ¶¶ 38-40, 65.)  It is possible, of course, that discovery in this case will reveal that Colodner had a larger role in the fraudulent scheme, but this is not yet evident from the limited information currently available to FPSF Belgium.  At the pleading stage, however, the allegation that Colodner signed some of the documents submitted to FPSF Belgium is sufficient to establish substantial assistance.  *See, e.g., JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 258–59 (S.D.N.Y. 2005) ("[O]n a motion to dismiss, it is

sufficient that [plaintiffs] have set forth with particularity actions they allege constitute [defendant's] substantial assistance to the fraud, and that these actions—assisting in the transactions at the core of the fraudulent scheme—are reasonably alleged to be a proximate cause of [plaintiffs'] losses.").

> ### 2.  The Aiding and Abetting Allegations Against FGC Securities and Wheeler Are Sufficient.

As set forth in the Amended Complaints, FGC Securities is a broker-dealer based in New York.  (*See* Doc. 48, Xiphias Am. Compl. ¶ 21; Doc. 75, FGC's Br. 4.)  Stephen Wheeler was the head of operations at FGC Securities at all relevant times.  (*See* Doc. 48, Xiphias Am. Compl. ¶ 23.)  The Amended Complaints allege that FGC Securities and Wheeler "provided false and misleading documentation in connection with refund applications" for numerous pension plan Defendants.  (*Id.* ¶ 37.)  In particular, FGC Securities provided "cash equity" confirmations purporting to show purchases of shares in Belgian companies by the Refund Claimants.  (*Id.* ¶ 49.)  Wheeler signed these documents as a principal of FGC Securities.  (*Id.*)  The Amended Complaints allege that these trade confirmations were false.  In fact, "the Refund Claimants did not purchase or own the shares in question."  (*Id.* ¶ 51.)

FGC Securities and Wheeler argue that FPSF Belgium has failed to allege their involvement in the fraud, but rather has lumped them in with "undifferentiated" Defendants.  (Doc. 75, FGC's Br. 8.)  This is incorrect.  The Amended Complaints allege exactly what FGC Securities and Wheeler did to advance the fraud's commission.  Specifically, they provided false and misleading trade confirmations purporting to document share purchases that did not actually take place.  (*See* Doc. 48, Xiphias Am. Compl. ¶¶ 37, 49, 51, 65.)  Moreover, they did so in connection with refund claims for 22 different Refund Claimants.  (*See id.* ¶ 65 & Exs. A-C, E-F, H, K; Doc. 49, Traden Am. Compl. ¶ 72 & Exs. A-B, D-E, H-J; Doc. 50, Lion Advisory Am.

Compl. ¶ 58 & Exs. A-B; Doc. 51, Delvian Am. Compl. ¶ 57 & Exs. A-B; Doc. 52, Michelle

Am. Compl. ¶ 54 & Ex. A; Doc. 53, Ganesha Am. Compl. ¶ 56 & Ex. A; Doc. 54, AOI Am.

Compl. ¶ 57 & Ex. A.)

      FGC Securities and Wheeler complain that their involvement is not alleged with

"temporal specificity." (Doc. 75, FGC's Br. 8.) However, in cases involving ongoing fraud, a

plaintiff need not provide the date of each specific misstatement. *See State Farm Mut. Auto. Ins.

Co. v. James M. Liguori, M.D., P.C.*, 589 F. Supp. 2d 221, 237 (E.D.N.Y. 2008) (noting that

even though the "time and place" of each misrepresentation was not "clearly stated," "Rule 9(b)

does not require that each specific misrepresentation be identified where an ongoing fraudulent

scheme is alleged"). FGC Securities and Wheeler clearly have notice of which transactions are

at issue. Indeed, they had no trouble attaching to their opposition papers samples of the trade

confirmations that were used in fraudulent refund claims. (*See* Doc. 75, FGC's Br. Ex. A.)

      FGC Securities and Wheeler next argue that FPSF Belgium has failed to allege that they

acted with actual knowledge of the fraud. This argument overlooks the facts alleged. As set

forth in the Amended Complaints, the supposed share purchases that FGC Securities and

Wheeler documented in trade confirmations did not actually take place. (*See* Doc. 48, Xiphias

Am. Compl. ¶ 51.) Accepting this allegation as true, it is plausible to infer that the securities

broker confirming these trades knew the trades did not take place. After all, a securities broker is

the person responsible for executing stock trades, and for maintaining accurate records for its

clients. Moreover, FGC Securities and Wheeler present no plausible set of facts in which a

securities broker might unwittingly or innocently confirm a stock trade that did not take place.

In addition, the trade confirmations provided by FGC Securities and Wheeler were not isolated

events. It is alleged that FGC Securities and Wheeler provided numerous trade confirmations for

trades that did not occur.  From the scope of their involvement, it is easy to infer that FGC Securities and Wheeler had actual knowledge of the fraudulent scheme.

FGC Securities and Wheeler assert that they were "required by law" to issue trade confirmations.  (*See* Doc. 75, FGC's Br. 1-2, 4, 15.)  They argue that providing these documents therefore cannot possibly support an inference of knowledge of the fraud.  This does not follow. FGC Securities and Wheeler point to no regulation or rule that would require them to document a transaction that had not taken place.  On the contrary, FINRA rules provide that "[n]o member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."  FINRA Rule 2020; *see also* Order Approving FINRA Proposed Rule Changes, S.E.C. Release No. 34-58643 (Sept. 25, 2008).

Finally, FGC Securities and Wheeler argue that the pleadings are insufficient because the Amended Complaints do not say whether FGC Securities was acting as an introducing broker or some other kind of broker.  (*See* Doc. 75, FGC's Br. 15.)  This is a red herring.  It is alleged that FGC Securities and Wheeler provided false and misleading trade confirmations, and that they knew that the "confirmed" transactions did not take place.  It is also alleged that these trade confirmations were an important component of refund claims to FPSF Belgium.  (*See* Doc. 48, Xiphias Am. Compl. ¶¶ 36-37, 49, 65, 67.)  Regardless of the category of securities broker applicable to FGC Securities, these facts are sufficient to plead a claim for aiding and abetting fraud.

## <u>Conclusion</u>

For the reasons set forth herein, Defendants' motions to dismiss should be denied.

Dated: March 25, 2022
      New York, New York

                                  Respectfully submitted,


                                   s/ Jeff E. Butler

                                  Jeff E. Butler
                                  John P. Alexander
                                  Meredith George
                                  Rob Price
                                  CLIFFORD CHANCE US LLP
                                  31 West 52nd Street
                                  New York, New York 10019

                                  *Attorneys for Plaintiff Kingdom of Belgium,*
                                  *Federal Public Service Finance*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word-count limit and formatting rules in Your Honor's Individual Practices, as modified by the Court's February 22, 2022 Order.  This brief contains 11,617 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Your Honor's Individual Practices.

Dated:  March 25, 2022

 s/ Jeff E. Butler_____

Jeff E. Butler