**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

IN RE:

KINGDOM OF BELGIUM,
FEDERAL PUBLIC SERVICE FINANCE
PENSION PLAN LITIGATION

Lead Case: No. 21 Civ. 6392 (JGK)
Member Cases:
    No. 21 Civ. 6392 (JGK)
    No. 21 Civ. 6399 (JGK)
    No. 21 Civ. 6402 (JGK)
    No. 21 Civ. 6404 (JGK)
    No. 21 Civ. 6405 (JGK)
    No. 21 Civ. 6407 (JGK)
    No. 21 Civ. 6408 (JGK)

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

## TABLE OF CONTENTS

I.     The Revenue Rule Bars FPSF's Claims ................................................................1

     A.     Resolving This Case Will Require The Court To Enforce Belgian Tax Law .........1

     B.     FPSF's Remaining Counterarguments Are Meritless.............................................9

II.    FPSF's Claims Are Time Barred ....................................................................12

     A.     FPSF's Duty To Inquire Was Triggered When It Was Alerted To The Belgian Federal Police Investigation In November 2015 ....................................................15

     B.     The Amended Complaints Do Not Plausibly Allege A Reasonable Investigation Beginning In November 2015..................................................................................18

     C.     Any Reasonable Investigation Would Have Identified The Alleged Fraud By At Least 2018........................................................................................................20

     D.     FPSF Has Not Established That Any Of Its Claims Are Timely Under The Six-Year Accrual Rule ...........................................................................................23

III.   FPSF Has Failed To Demonstrate That Its Allegations Against Ms. Colodner Satisfy Rule 9(b)...................................................................................................................24

     A.     FPSF Does Not Adequately Allege That Ms. Colodner Committed Fraud..........24

     B.     FPSF Does Not Adequately Allege That Ms. Colodner Aided And Abetted Fraud ............................................................................................................................29

CONCLUSION....................................................................................................32

# TABLE OF AUTHORITIES

Page(s)

## CASES

*7 West 57th Street Realty Corp., LLC v. Citigroup, Inc.*,
    2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) .................................................................15

*421-A Tenants Ass'n, Inc., v. 125 Court Street LLC*,
    760 F. App'x 44 (2d Cir. 2019) .....................................................................................21

*Adams v. Resolution Trust Corp.*,
    927 F.2d 348 (8th Cir. 1991) .........................................................................................12

*Attorney General of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*,
    268 F.3d 103 (2d Cir. 2001)....................................................................................... *passim*

*Ayers v. Piaker & Lyons, P.C.*,
    748 F. App'x 368 (2d Cir. 2018) ...................................................................................19

*Certain Underwriters at Lloyd's v. Milberg LLP*,
    2009 WL 3241489 (S.D.N.Y. Sept. 30, 2009).................................................................16

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002)...........................................................................................20

*Dodds v. Cigna Securities, Inc.*,
    12 F.3d 346 (2d Cir. 1993).............................................................................................23

*Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*,
    375 F.3d 168 (2d Cir. 2004)...........................................................................................27

*European Community v. RJR Nabisco, Inc.*,
    355 F.3d 123 (2d Cir. 2004), *cert. granted, judgment vacated*, 544 U.S. 1012
    (2005), *reinstated*, 424 F.3d 175 (2d Cir. 2005) .............................................................10

*Fezzani v. Bear, Stearns & Co.*,
    384 F. Supp. 2d 618 (S.D.N.Y. 2004)............................................................................22

*Filler v. Hanvit Bank*,
    2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003)..............................................................32

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.*,
    1999 WL 544708 (S.D.N.Y. July 27, 1999) ...................................................................30

*Golden Trade, S.r.L. v. Lee Apparel Co.*,
    143 F.R.D. 514 (S.D.N.Y. 1992) .....................................................................................1

*IKB Int'l S.A. v. Bank of America Corp.*,
  584 F. App'x 26 (2d Cir. 2014) ...................................................................25

*In re Merrill, BofA, & Morgan Stanley Spoofing Litigation*,
  2021 WL 827190 (S.D.N.Y. Mar. 4, 2021) .......................................19, 22

*In re Nine West LBO Securities Litigation*,
  482 F. Supp. 3d 187 (S.D.N.Y. 2020)...........................................................18

*In re Refco Securities Litigation*,
  759 F. Supp. 2d 301 (S.D.N.Y. 2010)...........................................................31

*In re SKAT Tax Refund Scheme Litigation*,
  356 F. Supp. 3d 300 (S.D.N.Y. 2019)...............................................1, 8, 10

*Koch v. Christie's Int'l PLC*,
  699 F.3d 141 (2d Cir. 2012)...........................................................15, 16, 18

*Krys v. Pigott*,
  749 F.3d 117 (2d Cir. 2014)....................................................................30, 31

*LC Capital Partners, LP v. Frontier Insurance Group*,
  318 F.3d 148 (2d Cir. 2003).........................................................................14

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
  797 F.3d 160 (2d Cir. 2015).........................................................................26

*Martinek v. AmTrust Financial Services, Inc.*,
  2020 WL 4735189 (S.D.N.Y. Aug. 14, 2020)..............................................26

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993).........................................................................25

*Nguyen v. FXCM Inc.*,
  364 F. Supp. 3d 227 (S.D.N.Y. 2019)...........................................................27

*Ningbo Products Import & Export Co. v. Eliau*,
  2011 WL 5142756 (S.D.N.Y. Oct. 31, 2011) ................................................29

*Oliva v. Town of Greece*,
  630 F. App'x 43 (2d Cir. 2015) ...................................................................16

*Pasquantino v. United States*,
  544 U.S. 349 (2005)...................................................................................7, 8

*Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*,
  652 F. Supp. 2d 495 (S.D.N.Y. 2009)...........................................................31

*Republic of Colombia v. Diageo North America*,
  531 F. Supp. 2d 365 (E.D.N.Y. 2007) .............................................................1

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007)........................................................................29

*Silvercreek Management, Inc. v. Citigroup, Inc.*,
  346 F. Supp. 3d 473 (S.D.N.Y. 2018)......................................................30, 31

*StrucSure Home Warranty, LLC v. Sulzbach*,
  2021 WL 3516242 (S.D. Tex. Aug. 10, 2021) ...............................................12

*Tulczynska v. Queens Hospital Center*,
  2019 WL 6330473 (S.D.N.Y. Feb. 12, 2019)...............................................18

*Tutor Perini Building Corp. v. New York City Regional Center, LLC*,
  525 F. Supp. 3d 482 (S.D.N.Y. 2021)..........................................................27

*United States v. Wardell*,
  218 F. App'x 695 (10th Cir. 2007) .................................................................8

*Universe Sales Co. v. Silver Castle, Ltd.*,
  182 F.3d 1036 (9th Cir. 1999) .......................................................................2

## DOCKETED CASES

*SKAT v. Raubritter LLC Pension Plan et al.*, No. 18 Civ. 4833 (S.D.N.Y.) ................................13

## STATUTES, RULES, AND REGULATIONS

5 U.S.C. § 704.......................................................................................................12

26 U.S.C.
  § 401(a) ...........................................................................................................11
  § 501(a) ...........................................................................................................11

Fed. R. Civ. P.
  9(b)......................................................................................................24, 27, 32
  12(b) ...................................................................................................................1

N.Y. C.P.L.R. § 213(8) .........................................................................................13

U.C.C. 8-501(b)(1).................................................................................................2

# OTHER AUTHORITIES

*Convention Between the Government of the United States of America and the
Government of the Kingdom of Belgium for the Avoidance of Double
Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on
Income*, U.S.-Belg., Nov. 27, 2006, S. Treaty Doc. No. 110...................................*passim*

*Convention Between the Government of the United States of America and the
Government of the Kingdom of Denmark for the Avoidance of Double
Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on
Income*, U.S.-Den., Aug. 19, 1999, T.I.A.S. 13056.......................................................6, 7

*Protocol Amending the Convention Between the Government of the United States of
America and the Government of Japan for the Avoidance of Double Taxation and
the Prevention of Fiscal Evasion with Respect to Taxes on Income*, art. XIII,
Japan-U.S., art. XIII, Nov. 6, 2003, T.I.A.S. 19-830 (2019)..........................................6, 7

**I.      The Revenue Rule Bars FPSF's Claims[1]**

**A.      Resolving This Case Will Require The Court To Enforce Belgian Tax Law**

Defendants showed in their opening brief that under Belgian tax law, they were the beneficial owners of the dividends in Belgian companies, and so were entitled to the withholding tax amounts those companies overpaid. Under Belgian tax law, a binding agreement to purchase shares, reflected by trade confirmations and book entries in the purchaser's account, is sufficient to establish beneficial ownership. The documentation Defendants submitted to FPSF proved their beneficial ownership of the relevant dividends. FPSF disputes none of this, nor could it.

During the relevant time period, shares of Belgian companies were dematerialized, and so were "represented by a book entry on a named account." Peeters Decl. ¶ 44.[2] Under Belgian law,

---

[1] The Court should analyze this motion under Rule 12(b)(1). In arguing otherwise, FPSF cites an old case that is not about the Revenue Rule. Opp. 16. But recent, on-point case law confirms that courts may properly evaluate Revenue Rule arguments under Rule 12(b)(1). *See Republic of Colombia v. Diageo N. Am.*, 531 F. Supp. 2d 365, 381 (E.D.N.Y. 2007); *In re SKAT Tax Refund Scheme Litig.*, 356 F. Supp. 3d 300, 309 n.24 (S.D.N.Y. 2019). In any event, Defendants should prevail even if the Court analyzes this motion under Rule 12(b)(6). Mot. 1, 11-12 & n.9.

[2] Defendants employ the same abbreviations as in their opening brief. Peeters' unrebutted explication of Belgian tax law, supported by citation to the relevant authorities and his own expertise, should be taken as dispositive of the relevant foreign law issues. *See, e.g.*, *Golden Trade, S.r.L. v. Lee Apparel Co.*, 143 F.R.D. 514, 524 & n.5 (S.D.N.Y. 1992) (declining "to question … uncontradicted testimony as to [] the state of Norwegian law" because "defendants were free to

"legal (and thus beneficial) ownership" transfers upon "a binding agreement between two parties involving the purchase of a fixed quantity of shares at a specific price." *Id.* ¶ 45.  Thus, "legal ownership of the dematerialized shares … transfer[s] upon the book entry." *Id.* ¶ 46.  Under Belgian tax law, "[a]t the time of the book entry … the buyer is also the beneficial owner of any dividends associated with those shares." *Id.*  In sum, "book entry is sufficient to demonstrate beneficial ownership under Belgian tax law." *Id.* ¶ 48.  Both Belgian law and bedrock principles of U.S. law, then, establish that book entry ownership suffices to establish beneficial ownership of dividends associated with relevant stock purchases.  Mot. 25-26 (citing Peeters Decl. ¶¶ 42-48; U.C.C. 8-501(b)(1)).  And, as Defendants explained, their submissions to FPSF—which FPSF does not dispute are properly before the Court (Mot. 5 n.4)—proved their beneficial ownership under this law:  Defendants' applications provided trade confirmations showing the dates they entered into binding agreements to purchase the shares, and dividend credit advices showing entry of the dividends on the books and records of their accounts.  Bahnsen Decl., Ex. A ("Reclaim Application") at 8-9.

FPSF refutes none of this—not the Belgian tax law definition of beneficial ownership, not whether and how book entry establishes beneficial ownership, and not whether trade confirmations like the ones Defendants attached to their applications suffice to show beneficial ownership.  *See* Xiphias Am. Compl. ¶ 40 (acknowledging that applications included third-party documentation

---

proffer their own version of Norwegian law" if they had a basis for disagreement, but did not do so); *Universe Sales Co. v. Silver Castle, Ltd.*, 182 F.3d 1036, 1038-39 (9th Cir. 1999) ("it is neither novel nor remarkable for a court to accept the uncontradicted testimony of an expert to establish the relevant foreign law").

"purporting to show the Refund Claimant[s'] share ownership and receipt of dividends").  It queries whether beneficial ownership is the type of ownership at issue (Opp. 12), but it plainly is: The plans were entitled to refunds of withheld tax if they were "beneficial owners" under the Treaty (Treaty, art. 10), and FPSF explicitly required each plan seeking a reclaim to declare that it was "*the beneficial owner* of the dividends," Reclaim Application at 3 (section II.1) (emphasis added).  And it questions whether Belgian tax law applies, as opposed to some other kind of law (Opp. 12).  Again, the concern is misplaced.  The Treaty provides that "beneficial owner" shall take its meaning from Belgian law, with "any meaning under" Belgium's "applicable tax laws … prevailing over a meaning given to the term under other [Belgian] laws."  Treaty, art. 3, ¶ 2.  There are not competing meanings of beneficial ownership under Belgian law, and so under the Treaty it is Belgian tax law that gives meaning to "beneficial ownership."  Peeters Decl. ¶¶ 39-48. Although Peeters cites to the Belgian Company Code at times, he repeatedly explains why Belgian tax law—which is not necessarily limited to the "Belgian Income Tax Code," as FPSF asserts— furnishes the meaning of the term beneficial ownership.  *See, e.g.*, *id.* ¶¶ 37, 39-42.

The thrust of FPSF's Revenue Rule argument is that the Defendants' securities trades— evidenced by trade confirmations that establish ownership as a matter of Belgian tax law—were "shams designed to create the false appearance that the Refund Claimants owned the shares, received dividends, and/or were entitled to a refund."  Xiphias Am. Compl. ¶ 51; *see also* Opp. 8. On that theory, FPSF says, there is no Belgian tax law to apply, and so the Revenue Rule is irrelevant.  That is wrong for three reasons.

First, as discussed further below (*see infra* at 7-8), there is nothing to distinguish this case from the prototypical Revenue Rule case.  Although this case involves allegedly fraudulent claims for tax refunds, rather than tax evasion, that difference merely reflects the choices Belgium has

made in how to administer its tax system.  *See* Peeters Decl. ¶ 16 (describing Belgium's tax reclaim withholding system).  But the application of the Revenue Rule does not depend on the manner or methods by which a foreign sovereign's tax system is harmed; to the contrary, the Rule respects the choices sovereigns make and insulates them from foreign court review.

Second, even accepting FPSF's allegations as true, Defendants still proved that they were the beneficial owners of the shares and so were entitled to the tax benefits.  FPSF faults the trading for being contrived, but does not dispute that Defendants entered into binding contracts to purchase shares before the Belgian companies' dividend record date and provided those agreements to FPSF.  Those agreements establish their beneficial ownership under Belgian tax law and entitle them to the benefits they claimed.  FPSF issued decisions reflecting its view that these requirements were met when it approved Defendants' claims between 2012 and 2015 and sent official notices of its decisions to the plans as taxpayers (*see* Peeters Decl. ¶ 30), and FPSF has not formally rescinded those decisions.  FPSF obviously takes a different view in this litigation of what is required than it did previously.  The result has significant implications for the Revenue Rule:  To vindicate FPSF's claims in this litigation, this Court will be required to countermand a foreign sovereign's previous decisions applying Belgian tax law to approve those claims, to essentially itself administer a foreign sovereign's tax system, and to confirm FPSF's current view that fraudulent or sham submissions eviscerate entitlement and displace ordinary Belgian tax rules about book entry and what establishes beneficial ownership.

Third, even accepting FPSF's characterization of its claims as fraud claims, they still fall within the Revenue Rule's prohibition on recognizing foreign tax claims in U.S. courts and enforcing foreign tax law here.  And recognizing FPSF's claims in this case gravely undermines the precise separation of powers concerns that animate the Revenue Rule.

As the Second Circuit has explained, the political branches play the "leading role" in "the domestic collection of foreign taxes and the enforcement of United States taxes abroad." *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 115 (2d Cir. 2001). They fulfill that role "through the medium of negotiated tax treaties providing for mutual cooperation." *Id.* The Revenue Rule plays a critical role in backstopping this function, ensuring that the political branches' primacy in foreign collection assistance is not undermined by foreign sovereigns' recourse to U.S. courts.

Many bilateral tax treaties negotiated by the U.S. provide for some form of mutual collection assistance. Importantly, none of those treaties precludes such assistance in cases where a fraudulent request for a refund has been alleged (even when no tax revenue has been paid or collected). For example, the Treaty provides limited collection assistance to the extent necessary to ensure that treaty benefits are enjoyed by persons entitled to those benefits under the terms of the Treaty. Treaty, art. 26, ¶ 1. But the Treaty does not obligate the U.S. to carry out administrative measures that are different from those used in the collection of its own taxes or that would be contrary to its sovereignty, security, or public policy. *Id.* ¶ 2.[3]

Other treaties negotiated by the U.S. allow broader collection assistance relating to revenue claims of the foreign sovereign. Those treaties include carefully negotiated limits on the provision

---

[3] FPSF claims that Article 26 amounts to the executive's "*impliedly* endors[ing] the type of recovery sought by FPSF Belgium in this action." Opp. 13-14. That is incorrect. Reading Article 26 as FPSF wishes would make a mockery of the U.S.'s positions in other bilateral treaties that provide for more specific collection assistance, which couple that assistance with strict procedural safeguards.

of such collection assistance.  In those treaties where collection assistance is broader, there are stricter conditions, including requirements that such claims be fully and finally adjudicated in the foreign country before any assistance is provided.  Mot. 20 n.12 (for example, under Japanese Protocol, revenue claim must be "finally determined"); *see also, e.g.*, U.S.-Denmark Treaty, art. 27, ¶ 2, U.S.-Den., Aug. 19, 1999, T.I.A.S. 13056.

This account of the United States' treatymaking proves two points critical to this Court's Revenue Rule analysis.

First, permitting collection assistance in U.S. courts—against U.S. nationals in particular[4]—is a decision clearly reserved to the political branches, and one that they undertake with great care and reservation.  Entertaining these cases will undermine the delicate balance the political branches have struck by creating an unwarranted asymmetry in international tax collection assistance.  Belgium would receive collection assistance in U.S. courts, even though the Treaty does not grant the U.S. the same benefit in Belgian courts (or through administrative channels).  *See Canada*, 268 F.3d at 122.  Indeed, the Treaty guarantees that the collection assistance it allows shall not "be construed so as to impose upon" either State "the obligation to carry out administrative measures at variance with" each State's "regulations and practices" in tax collection.  Treaty, art. 26, ¶ 2.  In asking this Court to hear its "fraud" claims for collection of tax

---

[4] In the Japanese Protocol—the only treaty in which the U.S. has agreed to provide collection assistance against its own nationals, including nationals who submit fraudulent claims for refund to the Japanese treasury—the U.S. established specific rules governing Japan's ability to seek that assistance, and Japan made the reciprocal concessions.  *See* Japanese Protocol, art. XIII.

revenue, FPSF seeks to bypass the U.S.'s administrative measures entirely.  Like Japan did in the Japanese Protocol, Belgium could negotiate an addition to the Treaty to allow for collection assistance in this case.  This Court should respect the considered judgment of the political branches and refuse to hear FPSF's claims in the courts.

Second, contrary to FPSF's view that fraud claims fall outside the Revenue Rule, they are treated just like any other revenue claim as to which foreign sovereigns negotiate for collection assistance—and so are equally subject to the Revenue Rule's prohibition on judicial collection assistance.  In the few treaties where the U.S. has agreed to provide broad collection assistance, it has not distinguished between ordinary tax revenue claims and claims relating to the fraudulent submission of tax returns or claims for refunds.  To the contrary, the U.S. executive branch has made clear its concluded view that "a fraudulent claim for refund" is a "revenue claim."  *See* Japanese Protocol, art. XIII (referring to "revenue claims with respect to which" a U.S. or Japanese national "has filed a fraudulent tax return or a fraudulent claim for refund").[5]  And where it has deemed it appropriate to provide for collection assistance with respect to such revenue claims (including fraud claims), the U.S. has decided to contract for such assistance with foreign sovereigns in an exercise of its treaty power.  Because the executive branch is the "sole organ of the federal government in the field of international relations," *Pasquantino v. United States*, 544 U.S. 349, 369 (2005) (cleaned up), and because the U.S. has definitively construed ordinary revenue claims to include claims relating to the submission of a fraudulent claim for refund, this

---

[5] Although the U.S.'s other in-force bilateral treaties are not as explicit as the Japanese Protocol, they also support the same understanding because they nowhere distinguish between fraudulent claims for refunds and "revenue claims."  *See, e.g.*, U.S.-Denmark Treaty, art. 27.

Court should defer to the United States' judgment and apply the Revenue Rule to bar "the enforcement of the revenue claims of foreign States" in U.S. courts, *Canada*, 268 F.3d at 112 (cleaned up).[6]

That approach makes particular sense here.  Everyone agrees that the Revenue Rule would bar a foreign sovereign's claims to enforce alleged tax evasion in U.S. court.  *See In re SKAT Tax Refund Scheme Litigation*, 356 F. Supp. 3d 300, 311 n.42 (S.D.N.Y. 2019).  But the distinction between applying the Revenue Rule to bar a foreign sovereign's claims based on (1) alleged tax evasion—*i.e.*, the avoidance of paying tax revenue on the front end—rather than, as is the case here, (2) a dispute over the rightful owner of repaid dividend withholding tax on the back end is illusory.  The Revenue Rule does not depend on how a foreign sovereign designs and administers its tax system.  In a tax reclaim withholding system like Belgium's, a claim to recoup an allegedly incorrect tax refund is functionally indistinguishable from a claim for underpaid tax in a relief at source withholding tax system like the United States.  For purposes of tax enforcement, there is no relevant difference between the two.  *Cf. United States v. Wardell*, 218 F. App'x 695, 696-98 (10th Cir. 2007) (affirming sentence of defendant convicted of "tax fraud" even though defendant paid no tax and merely submitted "false returns" seeking tax refunds to which he was not entitled).

---

[6] FPSF's remaining argument regarding the executive branch's alleged "consent" to this lawsuit also misses the mark.  Citing *Pasquantino*, FPSF posits that "there is no reason to believe the executive branch would countenance acts of fraud, carried out by United States citizens within the United States, merely because the victim of the fraud was a foreign tax authority."  Opp. 15. *Pasquantino* is of no use to FPSF:  There, the executive branch not only "consented"—it was the prosecuting authority.  *See* 544 U.S. at 369.

Application of the Revenue Rule likewise serves the sovereignty concerns that Defendants raised in their opening brief.  Mot. 21-26.  Those arguments go unrebutted.  Instead, FPSF simply asserts that "the Court will not be required to pass judgment on the validity of Belgian tax laws or the social policies underlying such laws."  Opp. 15.  But that is not true.  To adjudicate this case, the Court will have to decide the meaning of "beneficial ownership" as a matter of Belgian tax law, and then *enforce* that law by applying it to the facts of this case.  And if it sides with FPSF, the Court's determination will conflict with decisions FPSF made and has not reversed.

### B.      FPSF's Remaining Counterarguments Are Meritless

*1.  This is not a "garden variety fraud."*  According to FPSF, this is a "garden variety fraud," in which it just so happens that FPSF was the (allegedly) defrauded party.  Opp. 1, 7, 15.  Whatever "garden variety fraud" may be, this is not it, and it is not a coincidence that FPSF is involved.  This is a case in which Defendants proceeded through official government channels, obtained the necessary certification from their own government, and submitted tax reclaim applications to the Belgian government in the only way possible for Defendants to obtain the refunds to which they believed they were entitled.  If there was any fraud, it was tax fraud.

*2.  Defendants' test for "direct enforcement" is correct.*  FPSF challenges Defendants' three-part test for "direct enforcement" as "conveniently-broad."  Opp. 11; *see* Mot. 14. Defendants' test accurately summarizes the law.[7]  In asking the Court to focus on "the narrower

---

[7] Regarding element (1), the Revenue Rule bars certain "claims of another sovereign." *Canada*, 268 F.3d at 106.  As to element (2), the Revenue Rule bars only claims regarding sovereign acts (like administering a taxation system) and not commercial acts.  *See id.* at 132 & n.41.  Regarding element (3), the Second Circuit itself characterized *Canada* as "holding that claims by foreign sovereigns that were premised on violations of foreign tax laws are barred by

9

principles articulated by the Second Circuit in *Canada* and *EC I*," Opp. 11, FPSF appears to suggest that the Revenue Rule should apply only to "bar[] actions by foreign sovereigns seeking (1) reimbursement for unpaid foreign taxes and (2) reimbursement for costs associated with enforcing foreign tax laws," Opp. 9.  The Court should reject FPSF's invitation to narrow the scope of the Revenue Rule.  As even FPSF acknowledges, the outer boundaries of the Revenue Rule are undefined.  Opp. 7; *see also SKAT*, 356 F. Supp. 3d at 311 n.42.[8]

   *3.  This case will involve more than mere recognition of Belgian tax law.*  FPSF argues that "interpreting the term 'beneficial ownership' under Belgian tax law" would not amount to "enforcing Belgian tax laws."  Opp. 13.  That is incorrect.  If this Court concludes that the plans were not beneficial owners of dividends under Belgian tax law, it will award FPSF a money judgment based on that determination.  By allowing this case to proceed, the Court runs the risk that it will enforce Belgian tax law.  Mot. 26-27.  Indeed, even if this Court concluded that it need only "recognize," rather than "enforce," Belgian tax law, the separation of powers and sovereignty concerns described elsewhere advise applying the Revenue Rule to bar FPSF's claims.  *See SKAT*, 356 F. Supp. 3d at 317 (noting that, even if it had only to recognize or apply Danish tax law, the

---

the revenue rule."  *Eur. Cmty. v. RJR Nabisco, Inc.*, 355 F.3d 123, 129 (2d Cir. 2004) ("*EC I*"), *cert. granted, judgment vacated*, 544 U.S. 1012 (2005), *reinstated*, 424 F.3d 175 (2d Cir. 2005).

   [8] Relatedly, FPSF clings to the notion that, unlike in *Canada* and *EC I*, this case will not "require the calculation of taxes under Belgian law."  Opp. 10-11.  Even if FPSF were correct, the point does not counsel against dismissing the case under the Revenue Rule.  The question of foreign tax law here is much more fundamental:  It regards Defendants' *entitlement* to tax refunds in the first place.

Court might be barred from considering the case if separation of powers and sovereignty concerns were strong).

    ***4. The plans were "pension funds," but that argument is a red herring.***  In an attempt to avoid the Revenue Rule's bar, FPSF attacks the plans' status as "pension funds" under the Treaty. Xiphias Am. Compl. ¶ 6; Opp. 13.

    The plans were "pension funds" within the meaning of the Treaty.  The Treaty defines a pension fund as:

> … any person established in a Contracting State that is … operated principally … to administer or provide pension or retirement benefits; or … to earn income for the benefit of one or more arrangements described [above]; and … is … in the case of the United States, exempt from tax in the United States with respect to the activities described [above].

Treaty, art. 3, ¶ 1(k).  The plans were established in the U.S.  Xiphias Am. Compl. ¶ 11.  And, as FPSF concedes, the IRS formally acknowledged that the plans qualified as tax-exempt pension plans pursuant to 26 U.S.C. §§ 401(a), 501(a).  *Id.* ¶¶ 29, 45; Reclaim Application at 10 (Form 6166).  In certifying the plans' tax-exempt status, the IRS confirmed that the plans were "qualified under section 401(a) of the U.S. Internal Revenue Code."  Reclaim Application at 10.  The plans satisfy the Treaty's definition of "pension funds."

    No doubt recognizing that the IRS's certification establishes the plans' status as "pension funds" under the Treaty, FPSF seems to allege that Defendants defrauded the IRS.  Xiphias Am. Compl. ¶ 45.  But FPSF has no standing to make that argument.  In certifying the plans, the IRS made an administrative determination that the plans met the requirements for tax-exempt status pursuant to 26 U.S.C. §§ 401(a) and 501(a).  Civil litigants may not collaterally attack such

determinations—final agency actions[9]—through private civil litigation.  *Cf., e.g.*, *StrucSure Home Warranty, LLC v. Sulzbach*, 2021 WL 3516242, at *3 (S.D. Tex. Aug. 10, 2021) (defendants' challenge was "really an argument that HUD's approval of the warranty agreement was erroneous," which "amounts to an improper collateral attack on an agency determination"); *Adams v. Resol. Tr. Corp.*, 927 F.2d 348, 354 & n.15 (8th Cir. 1991) (worthlessness determination was "not subject to collateral attack through discovery or other means in individual lawsuits against the receiver") (cleaned up).  There may be proper ways for FPSF to raise this challenge against the IRS, but this case is not one of them.

Even if this Court entertained FPSF's argument (it should not) and determined the plans were not "pension funds" (they were), it would only be back at square one.  The Court would still have to decide whether Defendants were "beneficial owners" of dividends under Belgian tax law.  That is because U.S. residents that are "beneficial owners" of dividends—even if not tax-exempt—are entitled to partial refunds of Belgium's dividend withholding tax.  *See* Treaty, art. 10, ¶ 2; *see also* Peeters Decl. ¶¶ 19-20; Mot. 3, 17.  FPSF's "pension fund" argument is thus a red herring.

## II.    FPSF's Claims Are Time Barred

FPSF stresses that a statute of limitations defense at this stage must be "evident on the face of the complaint."  *See, e.g.*, Opp. 17.  Defendants do not disagree.  Mot. 27.  The problem for FPSF is that the untimeliness of its complaints *is* evident on their face, as is clear from the following undisputed timeline:

- **<u>August 2012</u>**: The first reclaim applications were submitted, almost nine years before FPSF filed these actions*.  See, e.g.*, Xiphias Am. Compl., Ex. D.

---

[9] If the issuances of Forms 6166 were not "final agency actions," that is even more reason for this Court not to allow FPSF to collaterally attack them.  *See* 5 U.S.C. § 704.

- **November 2014**:  The last reclaim applications at issue were submitted, approximately six years and nine months before FPSF initiated these litigations.  *Id.*, Ex. B.

- **November 2015**: The Belgian Federal Police alerted FPSF to "an international criminal investigation concerning refund claims" associated with the reclaim agents at issue in these lawsuits, Acupay and Goal Taxback.  *Id.* ¶ 54.  That same month, FPSF "suspended payment of refund requests involving those reclaim agents." *Id.*  Five years and nine months passed before FPSF sued.

- **May 2018**:  Denmark's equivalent to FPSF sued several hundred U.S. pension plans and related parties in this Court, including individuals and pension plans that FPSF has sued in this litigation.  *See, e.g.*, *SKAT v. Raubritter LLC Pension Plan et al.*, No. 18 Civ. 4833 (S.D.N.Y. May 31, 2018), Dkt. 1; *see also* Butler Decl., Ex. 3, Dkt. 86-3.  SKAT's lawsuits received worldwide media attention.  Mot. 38.  More than three years went by before FPSF brought its own actions.

- **July 27, 2021**:  FPSF filed its original complaints.

These complaints are time-barred under New York law.  FPSF filed suit more than six years after the putative tort claim for each refund application accrued, one-by-one, over a period stretching from late 2012 to early 2015.  *See* N.Y. C.P.L.R. § 213(8); Mot. 30-32.  And FPSF's claims are also untimely under the two-year discovery rule because FPSF sued many years after its duty to inquire was triggered by its communications with the Belgian Federal Police in November 2015, and more than two years after any reasonable investigation would have uncovered the alleged fraud—particularly given the investigative tools at FPSF's disposal, contemporaneous documents showing FPSF's knowledge, and Denmark's filing essentially identical lawsuits against several of the same parties in May 2018.  *See* N.Y. C.P.L.R. § 213(8); Mot. 33-38.

In the face of the dismissal-mandating timeline apparent from its own pleadings, FPSF's opposition cobbles together a series of unpersuasive arguments.  It begins with the outlandish claim that FPSF's receipt of a direct alert as to an international criminal investigation into potential fraud involving the very same reclaim agents at issue here was "not sufficient" to trigger a duty to

inquire, even though it was sufficient cause for FPSF to suspend payment on relevant refund applications.  Opp. 18-19.  That position cannot be reconciled with the law, common sense, or even FPSF's own pleadings.

Next, without a single citation in support, FPSF advances the puzzling notion that reactively cooperating with a years-long police investigation somehow satisfies a plaintiff's duty to inquire.  Opp. 19-20.  As an alternative, FPSF misapplies the applicable legal standard in arguing that its paper-thin, conclusory allegations are sufficient to raise a *possibility* that it engaged in some yet-undisclosed investigation.  *Id.* at 21.  And finally, after failing to explain why Denmark's nearly identical suits against the same defendants (along with the widespread media attention paid to those actions) are anything other than dispositive of FPSF's lack of diligence in pursuing its claims, *id.* at 22-23, FPSF doubles down on its decision to withhold the dates on which it paid the refund applications, *id.* at 23-25, thereby needlessly complicating the Court's ability to evaluate whether some small subset of its claims *might* be timely under the six-year accrual rule when the vast majority clearly are not.[10]

In the end, FPSF's gamesmanship is all for naught:  The tax authority has not posited any plausible basis for applying the two-year discovery rule to these complaints, and has otherwise failed to plead allegations sufficient to show that its claims as to any of the applications are timely under the six-year accrual rule.  For these reasons, and as explained in further detail below, FPSF's lawsuits should be dismissed with prejudice.  *See LC Cap. Partners, LP v. Frontier Ins. Grp.*, 318

---

[10] FPSF also argues that the lawsuits are timely under Belgian law.  Opp. 25-26.  The Court need not consider that argument.  Both sides agree that New York's borrowing statute requires that the actions be timely under Belgian *and* New York law.  *Id.* at 25.

F.3d 148, 156 (2d Cir. 2003) ("Where [] the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers … resolution of the [statute of limitations] issue on a motion to dismiss is appropriate, and we have done so in a vast number of cases.") (cleaned up).

### A.   FPSF's Duty To Inquire Was Triggered When It Was Alerted To The Belgian Federal Police Investigation In November 2015

FPSF begins by asserting that the information it received from the Belgian Federal Police in November 2015, which concerned an international criminal fraud probe involving refund applications submitted by the reclaim agents in this case, was "not sufficient" to put it on inquiry notice.[11]  Opp. 18-19.  FPSF is wrong on both the law and the facts.

The question before the Court is whether in November 2015 there were "circumstances [that] would suggest to [a plaintiff] of ordinary intelligence the probability that she has been defrauded," thus triggering FPSF's duty to inquire further by conducting a reasonably diligent investigation.  *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 151, 155 (2d Cir. 2012).  Here, there undoubtedly were.  Learning *directly* from Belgium's own federal police that an international criminal probe was investigating the same transactions involving the very reclaim agents FPSF identifies in its pleadings is more than sufficient to have triggered FPSF's duty to inquire under New York law.  *See, e.g.*, *7 W. 57th St. Realty Corp., LLC v. Citigroup, Inc.*, 2015 WL 1514539, at *29 (S.D.N.Y. Mar. 31, 2015) (news articles reporting that defendant banks had received

---

[11]  Notably, in its original complaints, FPSF did not acknowledge its November 2015 communications with the Belgian Federal Police.  Instead, it simply alleged that FPSF "discovered the facts set forth above concerning Xiphias in or about January 2021."  Xiphias Compl., No. 21 Civ. 6392 (S.D.N.Y. July 27, 2021), Dkt. 1, ¶ 27.

subpoenas from U.S. authorities put plaintiff on inquiry notice); *Certain Underwriters at Lloyd's v. Milberg LLP*, 2009 WL 3241489, at *9 (S.D.N.Y. Sept. 30, 2009) (receipt of notice that defendants were being criminally investigated by the government imposed a duty to inquire as to potential fraud).  If the direct, credible knowledge of a criminal investigation FPSF received here could fail to trigger the duty of inquiry, it is difficult to imagine what information could.  Under New York law, FPSF was on inquiry notice as of November 2015; because FPSF failed to investigate once its duty to inquire was triggered, it is imputed with full knowledge of the fraud as of that date.  *See Koch*, 699 F.3d at 153 ("Because the duty to inquire had arisen and been unmet for more than four years, the District Court correctly imputed to Koch knowledge of the injury as of the date the duty arose.").

FPSF tries to distract from the implausibility of its claims by repeatedly invoking the general principle that all inferences should be drawn in its favor.  *See, e.g.*, Opp. 19.  But that is a red herring; no one is disputing that black-letter law.  Here, FPSF is not actually asking for reasonable inferences.  Rather, it asks the Court to adopt speculative counterfactuals that might be *possible*, but which are not *plausible*, which is the standard that must be applied.  *See Oliva v. Town of Greece*, 630 F. App'x 43, 44 (2d Cir. 2015) ("Ultimately, the inquiry in a motion to dismiss is a 'context-specific' examination of whether a plaintiff has alleged a 'plausible,' and not just a possible, claim for relief.").  FPSF's suggestion that "it is possible that FPSF Belgium learned nothing at all in November 2015 about the nature of the fraudulent scheme," Opp. 19, contradicts its own pleadings, which concede that FPSF was alerted to the particular reclaim agents allegedly involved, Acupay and Goal Taxback.  Those reclaim agents, according to FPSF itself, were central to the putative fraud that FPSF has alleged.  Xiphias Am. Compl. ¶¶ 38-40, 44-45.  Indeed, the information was specific and significant enough that FPSF suspended payment on any reclaim

applications involving those agents.  *Id.* ¶ 54.  FPSF's speculative musings to the contrary in its brief do not alter what FPSF has pled.  Based on the facts FPSF itself alleged, its duty to inquire was triggered in November 2015.

Documents cognizable on this motion to dismiss confirm that FPSF was on notice of the fraud by November 2015, and call into serious doubt the basis for FPSF's allegations and arguments to the contrary.  In particular, on December 17, 2015, FPSF's General Administrator sent a letter to the Belgian Public Prosecutor's Office describing itself as "the victim of international fraud," and outlining the allegedly fraudulent scheme that it pleads in these cases. Second Declaration of Nicholas Bahnsen, Ex. A at 2.  Indeed, FPSF identifies in the letter the *specific* tax reclaim applications that it believed were fraudulent.  *Id.* n.1 (referring to "626 cases of highly suspicious reimbursements … totaling 217 million euros").  Given that FPSF was able in 2015 to formulate the view that it was a victim, specify the factual basis and specific fraudulent reclaims that victimized it, and communicate that information to the Belgian prosecutor, it cannot be heard to argue in this Court that it was somehow unable to file suit in the nearly six following

years or that it is "possible [FPSF] learned nothing at all in November 2015 about the nature of the fraudulent scheme[.]"[12]  Opp. 19.

### B.       The Amended Complaints Do Not Plausibly Allege A Reasonable Investigation Beginning In November 2015

Once FPSF's duty to inquire was triggered in November 2015, it had two years to sue under the discovery rule unless it engaged in a reasonably diligent investigation that required more time to discover the fraud.  *See Koch*, 699 F.3d at 153.  FPSF essentially concedes it did not conduct its own reasonably diligent investigation.  Instead, it baldly asserts, without citing any authority in support, that "FPSF Belgium met any duty of inquiry by cooperating with an active criminal investigation by the Belgian Federal Police."  Opp. 19-20.  But that is not the law.  Rather, the inquiry notice test focuses on what *the plaintiff* did to investigate.  *See, e.g.*, *Koch*, 699 F.3d at 151

---

[12] The Court may properly consider this letter because it is incorporated by reference, *see* Xiphias Am. Compl. ¶ 55 (discussing FPSF's communications with the Belgian Federal police and referencing the "extensive files" FPSF provided to them), and integral to the amended complaints given that FPSF, which provided it, "clearly relied on [it]—even if only to get around it—while drafting the Complaint."  *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 196 (S.D.N.Y. 2020); *see also id.* at 194-96 (considering document referred to just once (not by name) in pleading when relevant to affirmative defense); *Tulczynska v. Queens Hosp. Ctr.*, 2019 WL 6330473, at *4 (S.D.N.Y. Feb. 12, 2019) ("Courts may also consider documents that the plaintiff either possessed or knew about and relied upon in bringing the suit.  Artful pleading by the plaintiff is exemplified by the failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid; this will not forestall a district court's decision on a motion to dismiss.") (cleaned up).

("[I]f the investor [*i.e.*, the plaintiff] makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose."); *see also Ayers v. Piaker & Lyons, P.C.*, 748 F. App'x 368, 370 (2d Cir. 2018) (same). The suggestion that a plaintiff's duty to inquire can be satisfied by merely "cooperating" and "liaising" with criminal authorities conducting their own investigation, Xiphias Am. Compl. ¶ 55, is so peculiar that Defendants have been unable to identify a single other case advancing it. The absence of such case law is particularly compelling given that long-lasting criminal investigations are routinely conducted in parallel to civil fraud actions. If plaintiffs could toll statutes of limitations by responding to law enforcement inquiries and waiting for the completion of criminal investigations, the case law would surely so reflect. Instead, it reflects the opposite. *See In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *9 (S.D.N.Y. Mar. 4, 2021) (plaintiffs could not wait to sue until parallel class actions and government investigation were resolved).[13]

FPSF tries to salvage its untenable position by asserting—again, without citation—that the Belgian Federal Police should be treated like a private investigator or law firm hired by FPSF. Opp. 20. This argument is spurious. FPSF does not allege any facts to suggest that the Belgian Federal Police was its agent, like an attorney or investigator would be. Its allegations that the Belgian Federal Police "informed" FPSF of the police's already-commenced investigation in 2015, Xiphias Am. Compl. ¶ 54, and that five years later FPSF "was given access to portions of the confidential investigation file of the Belgian Federal Police," *id.* ¶ 56, suggest the type of arms-length relationship that is typical between law enforcement and putative victims, but that is not

---

[13] FPSF's attempt to distinguish *Merrill* on the basis that those plaintiffs "did not investigate," Opp. 21 n.2, assumes the conclusion. Here, FPSF did *not* investigate—despite having robust investigative tools far beyond those available to everyday plaintiffs.

even close to the agency relationship FPSF tries to construct in its opposition. And FPSF's suggestion of an agency relationship between itself and the Belgian Federal Police is especially implausible here given the tax authority's independent duty to investigate potential tax fraud under Belgian law and its broad investigative powers, *see* Waeterinckx Decl. ¶¶ 9-16.

Finally, FPSF argues in the alternative that "the full story of the investigation of the possible fraud by FPSF Belgium has not been told." Opp. 21-22. But there is a difference between drawing favorable inferences and asking the Court to conjure up a reasonably diligent investigation that is implausible on the face of FPSF's amended complaints. FPSF is not entitled to the latter. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (plaintiff seeking to avoid dismissal is entitled only to "reasonable inferences" in its favor). Once FPSF pled facts indicating that its duty to inquire was triggered more than two years before it sued (five years and nine months before, to be precise), FPSF was required to allege facts sufficient to show its own reasonably diligent investigation, rendering its entitlement to the two-year discovery rule *plausible*, not just possible. Because it has failed to do so here, its claims are untimely.

### C.    Any Reasonable Investigation Would Have Identified The Alleged Fraud By At Least 2018

Ultimately, even were the Court to entertain FPSF's invitation to guess as to what investigation FPSF might have conducted and whether it was reasonably diligent, that would not help FPSF. Any reasonably diligent investigation would have discovered the fraud no later than FPSF's Danish equivalent, SKAT, filed virtually identical suits in May 2018. Mot. 36-38.

FPSF emphasizes that the alleged victim of the fraud in the two cases is different—*i.e.*, that Belgium is not Denmark. Opp. 22-23. But that is the whole point: A parallel legal action initiated by one plaintiff puts *other* potential plaintiffs on notice of their claims against particular defendants, which, in this case, is the last piece of the puzzle that FPSF supposedly lacked until it

"was given access to portions of the confidential Belgian Federal Police file." Xiphias Am. Compl. ¶ 56. Instructive in this regard is the Second Circuit's decision in *421-A Tenants Ass'n, Inc., v. 125 Court St. LLC*, 760 F. App'x 44 (2d Cir. 2019). A group of tenants alleged a scheme to unlawfully deregulate apartments subject to New York's rent-stabilization laws. *Id.* at 47. In affirming dismissal for untimeliness, the court cited a prior state-court lawsuit filed by different tenants against the same defendants alleging a scheme that "was in sum and substance similar to the claims brought in [the later] lawsuit" and that had received press coverage. *Id.* at 49. Even though the suits concerned different underlying acts (*i.e.*, rent increases involving different apartments affecting different tenants), "the combination of that local news coverage and the strikingly similar lawsuit leave little doubt that the tenants here were on notice of the alleged fraud." *Id.*

The same analysis applies here. SKAT's lawsuits, which allege the same dividend tax refund scheme, involving the same defendants and key non-parties, during the same time period, provided notice of an alleged scheme perpetrated by Defendants that is "in sum and substance similar" to that which FPSF alleges here. And FPSF's argument that a sophisticated plaintiff already alerted to a cross-border fraud investigations has no duty to monitor court filings in the very jurisdiction in which it now brings suit is unavailing. As in *421-A Tenants Association*, the European press brought the matter to FPSF's doorstep by reporting the fact of Denmark's investigation and its connection to Belgium in news articles from 2018. *See, e.g.*, Bahnsen Decl., Ex. C (May 9, 2018 *Handelsblatt* article describing defendant Adam LaRosa's alleged role in helping 24 pension plans, including Raubritter, obtain "more than two billion euros in Denmark and Belgium alone"). Here, news reports, an international criminal investigation, and a civil action

in this very court render FPSF's delay plainly unreasonable.[14]  Had FPSF conducted a reasonably diligent investigation, it would have picked up the totality of circumstances identified in Defendants' papers, leading it to discover SKAT's lawsuits and the roadmap to FPSF's nearly identical claims.[15]  Because FPSF has not pled any plausible set of circumstances to explain why

---

[14]  FPSF incorrectly suggests that "Defendants do not rely on the SKAT Raubritter Complaint to demonstrate inquiry notice."  Opp. 23.  To the extent FPSF maintains that its duty to inquire was not triggered in November 2015 when it was notified of the Belgian Federal Police investigation, Defendants submit that FPSF was on inquiry notice of its claims no later than May 31, 2018, the date SKAT filed its lawsuit.  *See, e.g.*, *Merrill*, 2021 WL 827190, at *8 ("These lawsuits and the accompanying attention paid by the media to the lawsuits and regulatory investigations of market manipulation were sufficient to put a reasonable investor of ordinary intelligence on, at least, inquiry notice."); *Fezzani v. Bear, Stearns & Co.*, 384 F. Supp. 2d 618, 635 (S.D.N.Y. 2004) (same).  Using May 31, 2018 as the start date, and even accounting for the possibility of 228 days of tolling on account of certain pandemic-related executive orders (see *infra* at II.D.), the deadline for FPSF's suits would be January 14, 2021, over six months before FPSF filed its complaints on July 27, 2021.  Mot. 38 n.22.

[15]  Indeed, it seems probable that SKAT's suits were, in fact, a roadmap on which FPSF has relied, as evidenced by the striking similarity of allegations and language in FPSF's complaints to SKAT's pleadings, to the point of being nearly indistinguishable in places.  Mot. 10.  As FPSF concedes, SKAT's May 2018 complaint alleged the core theory of the instant complaints.  Opp. 23.  That SKAT later supplemented its complaint to further allege that Raubritter was a fraudulent entity is of little consequence—a plaintiff "does not have to have notice of the entire fraud being

it sued more than five years and nine months after first learning of the putative fraud alleged in this case, and more than three years after SKAT filed virtually identical suits, its claims are untimely and must be dismissed with prejudice.

**D.     FPSF Has Not Established That Any Of Its Claims Are Timely Under The Six-Year Accrual Rule**

Finally, FPSF posits that "some" of its claims might be timely under New York's six-year accrual period to the extent FPSF made payments to Defendants "during the time period from July 27, 2015 to November 2015." Opp. 25.  But FPSF does not allege that it made any payments after July 27, 2015, nor does FPSF make any other allegations from which that conclusion can be reasonably inferred, despite its own admission that its damages calculations are based on "wire transfer confirmations and other records maintained by FPSF," Opp. 11, records which would provide the relevant dates that FPSF has elected to withhold.   The last reclaim application identified in the Amended Complaints was submitted on November 13, 2014, *see* Xiphias Am. Compl. Ex. B, and despite knowing the dates on which payments were made, FPSF has coyly chosen to allege only that it paid the reclaim applications "several months" after their submission, *see id.* ¶ 52.  The July 27, 2015 cut-off date for FPSF's claims was not "several" months, but rather "many" months after the last reclaim applications were submitted on November 13, 2014—8 months and 14 days later, to be precise.  On the face of the pleadings, therefore, none of FPSF's claims is timely.

To aid the Court's consideration of these matters and out of an abundance of caution, Defendants noted in their moving papers the possibility that certain executive orders issued by

---

perpetrated" to be deemed as having received notice.  *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 352 (2d Cir. 1993).

Governor Cuomo might be construed as having tolled, as opposed to merely suspended, statutes of limitations in New York for 228 days during the early months of the COVID-19 pandemic. Mot. 31-32.  FPSF does not devote significant attention to this issue, and Defendants' position remains that (i) the executive orders are properly read as suspensions of limitations periods, and (ii) even if Governor Cuomo did intend to toll limitations periods, he lacked the power to do so under New York law.  *Id.*  Thus, FPSF's claims are time barred under the six-year limitations period, and should be dismissed with prejudice.[16]

## III.  FPSF Has Failed To Demonstrate That Its Allegations Against Ms. Colodner Satisfy Rule 9(b)

FPSF's opposition highlights what is already evident from its amended complaints:  FPSF has committed nearly every pleading "don't."  Conclusory pleading, group pleading, pleading on information and belief without supporting facts, non-specific pleading—FPSF does them all in its claims against Ms. Colodner.  FPSF's claims that Ms. Colodner committed fraud (in Delvian) and aided and abetted fraud (in Xiphias and MI) should be dismissed.

### A.    FPSF Does Not Adequately Allege That Ms. Colodner Committed Fraud

Defendants' opening brief pointed out two failings in the Delvian amended complaint: FPSF had not sufficiently alleged that Ms. Colodner (1) made a material misstatement, and (2) had

---

[16] Even if the six-year limitations period was tolled by the orders, for FPSF's suits to be timely, its claims would have had to accrue on or after December 11, 2014 (six years and 228 days before the filing of the original complaints).  The refund applications filed in 2012, in 2013, and before July 2014, would remain well outside any applicable limitations period, and dismissal of FPSF's claims as to those applications would still be required, leaving only a small subset of the identified refund applications at issue.

24

the requisite knowledge and intent.  Mot. 44.  FPSF's arguments to the contrary rely on either a misunderstanding of Ms. Colodner's arguments and the relevant law, or on the generalized group pleading that plagues the amended complaint.

*First*, as to the material misstatement element, FPSF recites the unremarkable proposition that a defendant who makes a false statement to a third party with the intent that it be received by plaintiff may be liable for fraud (Opp. 30-31), while ignoring Ms. Colodner's point that FPSF has failed to allege she made a misstatement at all (Mot. 44-46).  Where FPSF purports to cite to a misstatement by Ms. Colodner—Opp. 31 (arguing that "the complaint expressly alleges that Colodner submitted the refund claims" through tax reclaim agents)—the citation is in fact to a general allegation that *unspecified defendants* submitted those claims through the agents.  *See* Delvian Am. Compl. ¶ 32.  FPSF never grapples with the fact that it has not alleged a falsehood by Ms. Colodner in anything but the most conclusory terms.[17]  *See, e.g.*, *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).

*Second*, as to scienter, FPSF's argument boils down to the idea that FPSF has said that Delvian and non-party DFL "did not exist at all," and so Ms. Colodner's signing a document on behalf of Delvian or witnessing the signature of someone signing for DFL makes it "plausible to infer" that Ms. Colodner knowingly and intentionally engaged in fraud.  Opp. 29.  As a preliminary matter, FPSF misstates the applicable legal standard; the Second Circuit has "repeatedly required plaintiffs to plead [a] factual basis which gives rise to a *strong* inference of fraudulent intent," *IKB*

---

[17] FPSF also nowhere addresses the case law Defendants cited concerning the inadequacy of the allegation that multiple defendants directed the IRS to include a false statement in the refund applications.  Mot. 44-45.

*Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27 (2d Cir. 2014) (emphasis added; cleaned up), not merely a plausible one.  Moreover, this entire house of cards rests on the unsupported assumption that, by signing a power of attorney or by witnessing another's signature, as a notary public might, Ms. Colodner would have insight into whether these entities were fictitious.  As discussed further below, FPSF has not pled *facts* about Ms. Colodner's role vis-à-vis these pension plans that would lead to a strong inference that she knew they were, as FPSF alleges, making misstatements to Belgium.[18]

FPSF argues, alternatively, that Ms. Colodner's scienter can be inferred from the fact that she had the "opportunity for personal profit" based on the payments made by Belgium to Delvian and DFL.  Opp. 30.  But that allegation is not in the Delvian amended complaint.  Instead, FPSF alleges only—"[o]n information and belief"—that "amounts received by the Refund Claimants were promptly distributed to other participants in the fraud."  Delvian Am. Compl. ¶ 45.  The pleading does not identify which "other participants" received funds and whether that group includes Ms. Colodner.  The requirement that a defendant's alleged motive be "particular[ and] unique," *Martinek v. AmTrust Financial Services, Inc.*, 2020 WL 4735189, at *17 (S.D.N.Y. Aug.

---

[18] The cases FPSF cites are easily distinguishable because they stand merely for the proposition that, in particular circumstances, it is reasonable to assume that high-level employees were aware of corporate wrongdoing.  Opp. 29-30; *see, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 178 (2d Cir. 2015) (strong inference of *corporate* scienter where, based on email correspondence and the way in which a collateralized debt obligation was structured, the managing director of one entity and the principal and owner of another should have known about a material omission in offering documents).

14, 2020), is not met by FPSF's vague allegation of possible monetary gains by unnamed persons. The allegation is also defective because it does not state on what facts FPSF bases its conclusory statement.  Under Rule 9(b), "allegations pleaded upon information and belief must involve facts that are peculiarly within the opposing party's knowledge and must be accompanied by a statement of facts upon which the belief is founded." *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 238 (S.D.N.Y. 2019) (cleaned up).

In an attempt to rescue its deficient allegations as to whether Ms. Colodner made a fraudulent statement or acted with scienter, FPSF claims that it has "set forth" "[d]etails concerning Colodner's specific role in this scheme," but points only to paltry allegations that do no such thing: (1) that Ms. Colodner signed a power of attorney as trustee of Delvian; (2) that someone registered Delvian to the address of Ms. Colodner's employer and DFL to the address of her then in-laws; and (3) that Ms. Colodner witnessed the DFL power of attorney.  Opp. 28, 31.  None of these allegations elucidates Ms. Colodner's role in the alleged scheme, or indicates that she made a false statement to FPSF,[19] let alone that she did so knowingly and with the intent to deceive.  FPSF alleges nothing about what Ms. Colodner's role in Delvian or DFL involved beyond the signing or witnessing of the power of attorney documents, or whether she had any responsibility for the creation or submission of the allegedly false refund applications.  *See Tutor Perini Bldg. Corp. v. New York City Reg'l Ctr., LLC*, 525 F. Supp. 3d 482, 516 (S.D.N.Y. 2021) ("Where multiple

---

[19] The Second Circuit requires that, under Rule 9(b), FPSF identify the speaker of the allegedly fraudulent statements.  *See, e.g.*, *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004).

defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation." (cleaned up)).

FPSF's focus on the DFL power of attorney illustrates this point.  FPSF attaches this document to its opposition—Butler Decl., Ex. 2—apparently to show that Ms. Colodner "allowed DFL to use her relatives' house as its purported address and was personally involved in authorizing tax reclaim agents to make refund requests for … DFL."[20]  Opp. 31.  FPSF stretches the document beyond recognition.  There is nothing in that power of attorney or in the amended complaint to support the allegation that Ms. Colodner had anything to do with the designation of the address (much less "allowed" it to be used), nor is there any indication that Ms. Colodner did anything more than witness another person's signature.  Tellingly, the separate complaint in which DFL is named as a defendant makes no mention of Ms. Colodner.  *See* Traden Am. Compl., No. 21 Civ. 6392 (S.D.N.Y. Jan. 21, 2022), Dkt. 49.

For the same reasons, FPSF's claim that the allegations in the Delvian pleading give rise to a reasonable inference that "one or more of Colodner and her co-Defendants" dominated and controlled Delvian and DFL falls short.  Opp. 32.  FPSF's lack of precision about who controlled these entities is reflected in the Delvian amended complaint, which alleges that "these plans were nothing more than alter egos of Colodner, Markowitz *and/or* Van Merkensteijn."  Delvian Am.

---

[20] As FPSF notes, the Delvian amended complaint incorrectly alleged that the address of DFL was Ms. Colodner's residence.  Delvian Am. Compl. ¶ 27.  Following the filing of Defendants' motion to dismiss, FPSF filed a letter acknowledging the error and stating that "it would be more accurate … to state that the … address is 'the residential address of a home owned at the time by relatives of Colodner.'"  Letter, Dkt. 85; *see also* Opp. 28 n.3.

Compl. ¶ 6 (emphasis added).  Again, these allegations lack the particularity required under the Federal Rules.  *See, e.g.*, *Ningbo Prods. Imp. & Exp. Co. v. Eliau*, 2011 WL 5142756, at *6 (S.D.N.Y. Oct. 31, 2011) (conclusory allegations that individuals "exercised such control over [corporation] that the corporation became a[n] … instrumentality of the owners" were insufficient to allege alter ego liability).

### B.   FPSF Does Not Adequately Allege That Ms. Colodner Aided And Abetted Fraud

In Defendants' opening brief, Ms. Colodner argued that, because the only non-conclusory allegation as to Ms. Colodner in the Xiphias and MI pleadings was that she had witnessed the signing of certain powers of attorney, FPSF had not adequately alleged two of the essential elements of aiding and abetting liability:  actual knowledge and substantial assistance.  Mot. 40-43.  FPSF fails to meaningfully challenge that argument.

*First*, FPSF attempts to use the allegations in the Delvian pleading to bolster its allegations in the separate Xiphias and MI complaints concerning Ms. Colodner's purported knowledge of a fraud.  Regarding the Xiphias and MI complaints, FPSF states:  "[a]s discussed … above, the facts concerning Delvian and DFL raise a strong inference of fraudulent intent on the part of Colodner."  Opp. 33.

The Court should reject FPSF's attempt at bootstrapping.  For one, it is procedurally improper.  The Delvian amended complaint is not "attached to," "incorporated in" or "integral to" the Xiphias and MI pleadings, such that it can be relied upon on a motion to dismiss.  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (cleaned up).  Nor can the allegations in it be taken as true.  *Id.*  And, even if it were appropriate to consider the allegations in the Delvian pleading when assessing the Xiphias and MI allegations—and it is not—the Delvian amended complaint, as discussed above, relies upon allegations too conclusory to sustain that action, let alone others.

In any event, FPSF points to the Delvian complaint merely as support for the notion that Ms. Colodner *should* have known about the purported fraud alleged in the Xiphias and MI cases. This does not satisfy the actual knowledge requirement of an aiding and abetting claim. *See, e.g.*, *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014) ("[U]nder New York law, a complaint adequately alleges the knowledge element of an aiding and abetting claim when it pleads not … constructive knowledge, but actual knowledge of the fraud" (cleaned up)).

FPSF's cited cases on this point are distinguishable. They do not involve a court's resorting to allegations in a related complaint to establish the adequacy of aiding and abetting allegations. They are also inapposite in other ways. For example, the cited portion of *Global Intellicom, Inc. v. Thomson Kernaghan & Co.* (Opp. 33-34) deals with the scienter required for a fraud claim, not an aiding and abetting cause of action. 1999 WL 544708, at *9 (S.D.N.Y. July 27, 1999). Moreover, the court was not analyzing defendants' "'pattern' of behavior at other companies," as FPSF says (Opp. 34), but rather whether defendants' investments and the resulting changes in stock prices suggested intentional short-selling. *Id.* This has nothing to do with the unsupported inference of actual knowledge that FPSF attempts to draw from Ms. Colodner's witnessing certain powers of attorney.

Similarly, FPSF's citation to *Silvercreek* (Opp. 33) does little to support its claims. FPSF quotes that court's analysis of Credit Suisse's motion for summary judgment on aiding and abetting fraud claims. The court found that evidence submitted by plaintiff tended to show that Credit Suisse had "extensive involvement" in "a number of specific Enron deals," including one set of deals where bank employees had "admitted awareness of problems" with those deals. *Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 346 F. Supp. 3d 473, 490-92 (S.D.N.Y. 2018). Not only

is *Silvercreek* procedurally inapposite, FPSF also has not alleged any facts suggesting that Ms. Colodner had "extensive involvement" in the refund claims at issue.

In addition to failing to plead actual knowledge, FPSF has also failed to allege that Ms. Colodner substantially assisted a fraud—which dooms its aiding and abetting claims. FPSF tries to analogize this case to ones where a defendant's actions, though routine, substantially contributed to a fraud. Opp. 34.[21] Ms. Colodner's alleged actions—witnessing signatures—are not just clerical; they also cannot be considered to have made a substantial contribution to the alleged scheme to convince FPSF that the pension plan defendants were owed monies they were not. *See, e.g.*, *Krys*, 749 F.3d at 127 ("There must … be a nexus between the primary fraud … and what the alleged aider and abettor did with the intention of advancing the fraud's commission." (cleaned up)).

Moreover, contrary to FPSF's suggestion (Opp. 34-35), courts can determine on a motion to dismiss that a plaintiff has failed to allege that a defendant proximately caused the injury complained of, a necessary component of the substantial assistance element. *See, e.g.*, *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 337 (S.D.N.Y. 2010). Where, as here, "the injury was not a direct

---

[21] The case FPSF relies upon involves allegations different in quality and kind than those in these amended complaints. *See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 511 (S.D.N.Y. 2009) (rejecting defendant's argument that its role in recording inflated stock prices, transmitting statements including those inflated figures, and making statements to third parties that concealed the fraud was too "clerical" to be considered substantial assistance).

or reasonably foreseeable result of the defendant's conduct," *Filler v. Hanvit Bank*, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003), the aiding and abetting claim should be dismissed.

*     *     *

In a tell-tale acknowledgement of the weakness of its allegations against Ms. Colodner, FPSF emphasizes that it has not yet engaged in discovery in these cases.  Opp. 31, 34.  Yet, in the same breath, FPSF admits that it has had access to the Belgian Federal Police's investigative file for at least a year.  Delvian Am. Compl. ¶ 48.  The hope of finding evidence during discovery that the Belgian Federal Police apparently did not does not excuse FPSF's failure to make particularized, non-conclusory allegations concerning Ms. Colodner's supposed involvement in fraud or aiding and abetting fraud.  *See, e.g.*, *Filler*, 2003 WL 22110773, at *2 ("The 'particularity requirement' contained in Rule 9(b) is substantial.").  The claims against Ms. Colodner should be dismissed.

## CONCLUSION

The amended complaints should be dismissed in their entirety under the Revenue Rule and the applicable statutes of limitations.  In addition, all claims against Alicia Colodner should be dismissed for failure to meet the heightened pleading standard for alleging fraud.  Because further amendment would be futile, Mot. 47, dismissal should be with prejudice.

Dated: April 18, 2022                    Respectfully submitted,


                                         /s/ Alan Schoenfeld
                                         Alan Schoenfeld
                                         WILMER CUTLER PICKERING
                                            HALE AND DORR LLP
                                         7 World Trade Center
                                         250 Greenwich Street
                                         New York, NY 10007
                                         Tel. (212) 230-8800
                                         Fax: (212) 230-8888
                                         alan.schoenfeld@wilmerhale.com


                                         *Attorney for Defendants Batavia Capital Pension
                                         Plan, Calypso Investments Pension Plan, Richard
                                         Markowitz, and RJM Capital Pension Plan*


                                         /s/ Sharon L. McCarthy
                                         Sharon L. McCarthy
                                         Nicholas S. Bahnsen
                                         KOSTELANETZ & FINK, LLP
                                         7 World Trade Center, 34th Fl.
                                         New York, NY 10007
                                         Tel. (347) 613-0829
                                         smccarthy@kflaw.com


                                         *Attorneys for Defendants Azalea Pension Plan,
                                         Bernina Pension Plan Trust, John van
                                         Merkensteijn, Michelle Investments LLC Pension
                                         Plan, Remece Investments LLC Pension Plan,
                                         Tarvos Pension Plan, and Xiphias LLC Pension
                                         Plan*


                                         /s/ Marshall L. Miller
                                         Marshall L. Miller
                                         KAPLAN HECKER & FINK LLP
                                         350 Fifth Avenue, 63rd Fl.
                                         New York, NY 10118
                                         Tel. (212) 763-0883
                                         mmiller@kaplanhecker.com

33

*Attorney for Defendants Alden Investments Pension Plan, AOI Pension Plan, Carrick Holdings Pension Plan, Ganesha Industries Pension Plan, Jerome Lhôte, Matthew Stein, Mazagran Pension Plan, and Pleasant Lake Productions Pension Plan*

/s/ Linda Imes
Linda Imes
Reed M. Keefe
SPEARS & IMES LLP
51 Madison Avenue
New York, NY 10010
Tel. (212) 213-6659
Fax: (212) 213-0849
limes@spearsimes.com

*Attorneys for Defendants Alicia Colodner and Delvian LLC Pension Plan*

/s/ Edward M. Spiro
Edward M. Spiro
Richard D. Weinberg
MORVILLO ABRAMOWITZ GRAND
    IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
Tel. (212) 856-9600
espiro@maglaw.com

*Attorneys for Defendants Adam LaRosa, Clove Pension Plan, Mill River Capital Management Pension Plan, and Traden Investments Pension Plan*

/s/ Robert H. Pees
Robert H. Pees
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Tel. (212) 872-1000
Fax: (212) 872-1002
rpees@akingump.com

34

*Attorney for Defendants 2321 Capital Pension Plan, Bowline Management Pension Plan, Lion Advisory Inc. Pension Plan, and Luke McGee*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations in Your Honor's Individual Rules of Practice, as modified by the Court's February 22 order granting the parties' joint request for a modification of the word limit.  Exclusive of the exempted portions of the brief, the brief contains 9,988 words.  The brief has been prepared in proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.  The undersigned has relied on the word-count feature of this word-processing system in preparing this certificate.

/s/ Alan Schoenfeld
Alan Schoenfeld

April 18, 2022