UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: KINGDOM OF BELGIUM, FEDERAL
PUBLIC SERVICE FINANCE PENSION PLAN          21-cv-6392  (JGK)
LITIGATION

OPINION AND ORDER

JOHN G. KOELTL, District Judge:

The plaintiff, the Kingdom of Belgium, Federal Public
Service Finance ("FPSF" or "Belgium"), brings this consolidated
action against the defendants, several purported pension plans
(the "Pension Plan Defendants"), and individuals associated with
those pension plans, including Richard Markowitz, Matthew Stein,
John van Merkensteijn, Alicia Colodner, Stephen Wheeler, Adam
LaRosa, Luke McGee, and Jerome L'Hote. The plaintiff alleges
that the defendants fraudulently induced it to pay tax refunds
to the defendants relating to the defendants' alleged falsified
ownership of Belgian corporate dividends. The defendants have
filed two motions to dismiss the Amended Complaint in these
actions. The first motion to dismiss, the primary motion at
issue, seeks dismissal pursuant to Federal Rules of Civil
Procedure 12(b)(1) and 12(b)(6) and was filed by the Pension
Plan Defendants. All the defendants in the actions have joined
in that motion to dismiss. Defendants FGC Securities LLC and
Stephen Wheeler have also filed a separate motion to dismiss

pursuant to Rule 12(b)(6) arguing that the plaintiff has not alleged its claims against them with sufficient particularity.

For the following reasons, both motions to dismiss are **denied.**

## I.

Unless otherwise noted, the following facts are taken from the Xiphias Amended Complaint ("Xiphias Complaint"), ECF No. 48, and are accepted as true for purposes of these motions. Although the plaintiff has filed several amended complaints, the parties agree that the Xiphias Complaint may act as the operative complaint because the amended complaints "do not differ in material ways relevant to the arguments presented" on these motions to dismiss. Defs.' Memo., ECF No. 79, at 2 n.1.

The plaintiff, FPSF, is the agency of the Belgian government responsible for "the assessment and collection of Belgian taxes," and is the Belgian equivalent of the United States Treasury Department. Xiphias Compl. ¶ 1. The Pension Plan Defendants are several purported pension plans recognized as United States tax residents by the Internal Revenue Service ("IRS"). See, e.g., id. ¶¶ 2, 10-16.[1]

---

[1] The allegations in paragraphs 10 through 16 of the Xiphias Complaint refer only to seven of the pension plans represented in this case. The other pension plans are included in their own respective amended complaints, but for the reasons explained above, the allegations in the Xiphias Complaint also encompass their claims.

Under Belgian law, the Belgian government taxes dividends paid by Belgian companies at a rate of 25% and collects these dividend taxes through a withholding system. Id. ¶ 27. When each dividend is paid, the Belgian company withholds 25% of the dividend payment and transfers that amount to FPSF, before paying the net remaining 75% of the divided to its shareholders. Id. Pursuant to a tax treaty between the United States and Belgium, certain tax-exempt residents of the United States, such as pension plans, are entitled to a refund of the amount of tax withheld on divided payments. Id. ¶ 28. To receive this tax refund, a pension plan must submit an application to FPSF with proof of its tax-exempt status and proof of ownership of a dividend payment that was withheld. Id. To qualify as a tax-exempt pension plan, the plan must be for the "exclusive benefit" of an entity's employees or their beneficiaries and must be funded by contributions from the employer or employees. Id. ¶ 29.

In 2012, individual defendants Markowitz, Stein, and Van Merkensteijn are alleged to have "participated in a scheme to submit fraudulent tax refund claims to FPSF Belgium." Id. ¶ 31. The scheme allegedly "involved the registration of U.S. tax residents that would pose as qualified U.S. pension plans," which plans allegedly would "represent to FPSF Belgium that they were tax-exempt pension plans and, using misleading

documentation, would represent that they owned shares in and received dividends from Belgian companies." Id. These plans would then seek a tax refund from FPSF for amounts withheld from their purported divided payments. Id.

FPSF alleges that the Pension Plan Defendants "were purported pension plans used in this scheme," and that those plans "were not associated with any legitimate employer," "were not funded by employer or employee contributions," and "do not exist for the exclusive benefit of employees and their beneficiaries." Id. ¶ 32. For example, defendant Xiphias LLC Pension Plan ("Xiphias") listed as its address one that belonged to Argre Management LLC, a non-party financial services firm which Markowitz and Van Merkensteijn founded and served as directors, and of which defendants Colodner and Stein were employees. Id. ¶ 33. Xiphias's listed address also was allegedly "used for other sham pension plans in connection with other fraudulent tax refund requests to FPSF Belgium" and other tax authorities. Id. The other Pension Plan Defendants similarly used addresses that allegedly did not belong to those pension plans, but instead were addresses in some way related to properties owned by several of the individual defendants. See, e.g., id. ¶¶ 34-35 (noting that the addresses listed were the residential addresses of homes owned by Markowitz and Van Merkensteijn).

In addition to providing allegedly false addresses, the defendants also "creat[ed] the appearance that [they] owned shares in Belgian companies and received related dividends" by "work[ing] with various share custodians and brokers to obtain . . . false and misleading documentation." Id. ¶ 36. The defendants allegedly received this documentation from defendants FGC Securities and Stephen Wheeler, FGC Securities's head of operations. Id. ¶ 37. To submit the allegedly fraudulent paperwork to FPSF, the defendants used the services of tax reclaim agents Acupay System LLC ("Acupay") and Goal Taxback Ltd. ("Goal Taxback"). Markowitz, Van Merkensteijn and LaRosa allegedly "signed powers of attorney that authorized Acupay or Goal Taxback to . . . request[] and collect[] tax refunds from foreign tax authorities on behalf of" the Pension Plan Defendants. Id. These powers of attorney were also allegedly signed by Colodner or Stein as witnesses. Id. For example, for the Delvian Pension Plan, Colodner signed a power of attorney dated August 3, 2012 as "trustee" of Delvian authorizing Goal Taxback to act on Delvian's behalf. Delvian Am. Compl., ECF No. 51, ¶ 31.

FPSF alleges that, from 2012 to 2015, the defendants "carried out their scheme to defraud FPSF Belgium" by submitting false tax refund claims. Xiphias Compl. ¶ 40. Each refund claim "included a cover letter from Acupay or Goal Taxback, a tax

refund claim form, documentation purporting to show the [pension plan's] share ownership and receipt of dividends, a power of attorney signed by one of Markowitz, Van Merkensteijn or . . . LaRosa, and a statement from the IRS purporting to certify that each [pension plan] was a tax-exempt U.S. pension plan and/or a U.S. resident." Id. Each pension plan represented on its respective refund claim that it was a "legitimate pension plan[] that qualified for tax exempt status under U.S. law." Id. ¶ 43. For example, Xiphias's claim "included express statements by Acupay that Xiphias was a U.S. pension plan, and that it was seeking a full refund on that basis." Id. ¶ 44. Each claim also included a statement from the IRS, called a Form 6166, which certified that each pension plan was qualified as tax-exempt under the relevant tax regulation. Id. ¶ 45. FPSF alleges that the Form 6166 statements were procured "by providing the IRS with false and misleading information," and that Markowitz, Stein and Van Merkensteijn "caused Acupay or Goal Taxback to include these IRS statements in the tax refund requests." Id.

Each refund claim by the Pension Plan Defendants represented that the pension plans owned shares in a Belgian company and received dividends as a result of their share ownership, and identified specifically "the Belgian company in which the [pension plan] supposedly own[ed] shares, state[d] the number of shares and state[d] the net dividend that each

6

[pension plan] supposedly received." Id. ¶ 48. The claims also "include[d] documentation from one or more brokers supposedly showing the [pension plan's] purchase of the relevant shares." Id. ¶ 49. For example, Xiphias's refund claim included "cash equity confirmations," signed by Wheeler and provided by FGC Securities, that allegedly demonstrated Xiphias's share purchases. Id. The claims further included a "dividend credit advice" provided by Solo Capital, a document that allegedly detailed "the company in which the [pension plan] supposedly owned shares, the number of shares and their international securities identification number (or 'ISIN'), the gross dividend amount, the tax withheld and the net dividend." Id. ¶ 50. FPSF alleges that each pension plan submitted false statements of share and dividend ownership because the pension plans never purchased or owned the relevant shares, were never paid dividends as a result of any share ownership, and were not entitled to any tax refund because of dividend tax withholding. Id. ¶ 51.

Relying on the defendants' alleged misrepresentations, FPSF alleges that it paid the requested refund amount to each pension plan. Id. ¶ 52. The payments "generally were made several months after the relevant refund request." Id. FPSF alleges that the payments received by the Pension Plan Defendants were "promptly distributed to other participants in the [alleged] fraud." Id. ¶

53. FPSF alleges that this scheme continued until at least November 2015. Id. ¶ 54.

In November 2015, the Belgian Federal Police informed FPSF "of an international criminal investigation concerning refund claims associated with certain reclaim agents, including Acupay and Goal Taxback." Id. This prompted FPSF to suspend its payment of refund requests involving Acupay and Goal Taxback. Id.

From November 2015 to November 2020, the Belgian Federal Police investigated the possibility of fraud with respect to the tax refund claims made to FPSF. Id. ¶ 55. During that time period, FPSF allegedly "acted with reasonable diligence to investigate the facts, including by cooperating with the investigation by the Belgian Federal Police, providing extensive files to the Belgian Federal Police and liaising with the Belgian Federal Police concerning the investigation on a regular basis." Id. Although FPSF "was aware that it may have been defrauded by some tax refund claimants," it "did not know which specific transactions were fraudulent or which claimants or individuals were involved." Id.

In late 2020, the Belgian Federal Police provided FPSF with access to portions of their confidential investigation file. After analyzing the investigation file, FPSF "was able to conclude, for the first time, that [the] refund claims made by the [Pension Plan Defendants] were fraudulent." Id. ¶ 56. The

criminal investigation by the Belgian Federal Police allegedly "remains ongoing and no charges have yet been filed." Id.

FPSF alleges that the Pension Plan Defendants and individual defendants Markowitz, Stein, and Van Merkensteijn committed fraud by submitting the allegedly false tax refund claims to FPSF. FPSF also alleges that FGC Securities, in addition to individual defendants Colodner, Stein, and Wheeler, aided and abetted the Pension Plan Defendants' fraud by providing the pension plans with the "purported share purchase documentation" ultimately submitted to FPSF, and because Colodner and Stein witnessed the signing of the powers of attorney documents for the Pension Plan Defendants. Id. ¶ 65.

## II.

When presented with motions under Rule 12(b)(1) to dismiss for lack of subject matter jurisdiction and Rule 12(b)(6) to dismiss for failure to state a claim upon which relief can be granted, the Court should consider the jurisdictional challenge first. See Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n, 896 F.2d 674, 678 (2d Cir. 1990).[2]

To prevail against a motion to dismiss for lack of subject matter jurisdiction, the plaintiff bears the burden of proving

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

the Court's jurisdiction by a preponderance of the evidence.
Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). In
considering such a motion, the Court generally must accept the
material factual allegations in the complaint as true. See J.S.
ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir.
2004). However, the Court does not draw all reasonable
inferences in the plaintiff's favor. Id. Indeed, where
jurisdictional facts are disputed, the Court has the power and
the obligation to consider matters outside the pleadings to
determine whether jurisdiction exists. See Kamen v. Am. Tel. &
Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986). In so doing, the
Court is guided by that body of decisional law that has
developed under Rule 56. See id.

### III.

The defendants argue that the "revenue rule" precludes this
Court's subject-matter jurisdiction over this action. The
revenue rule bars foreign sovereigns from seeking direct or
indirect enforcement of their tax laws in the courts of the
United States. See, e.g., Att'y Gen. of Can. v. R.J. Reynolds
Tobacco Holdings, Inc., 268 F.3d 103, 106, 130-31 (2d Cir. 2001)
("Canada"). The defendants contend that FPSF's claim is a simple
tax claim to recover the dividend tax refunds it paid to the
Pension Plan Defendants, and that resolving this claim would

require direct enforcement or interpretation of Belgian tax law in violation of the revenue rule.

The revenue rule is a "longstanding common law doctrine providing that courts of one sovereign will not enforce final tax judgments or unadjudicated tax claims of other sovereigns," Id. at 109. The rule acts as a bar on the Court's subject-matter jurisdiction. See Republic of Colom. v. Diageo N. Am. Inc., 531 F. Supp. 2d 365, 381 (E.D.N.Y. 2007) ("Colombia") ("[I]rrespective of whether the revenue . . . rule[] [is] characterized as [a] limitation on subject-matter jurisdiction or abstention doctrine[], Rule 12(b)(1) is an appropriate basis on which to make [a motion to dismiss based on the revenue rule."). Principal concerns animating the revenue rule include "respect for sovereignty, concern for judicial role and competence, and separation of powers." Canada, 268 F.3d at 109. This is because "policy complications and embarrassment may follow when one nation's courts analyze the validity of another nation's tax laws," and because "the executive branch, not the judicial branch, should decide when our nation will aid others in enforcing their tax laws." Eur. Cmty. v. RJR Nabisco, Inc., 424 F.3d 175, 180 (2d Cir. 2005) ("EC II"). In cases where the revenue rule may be "potentially implicate[d]," "the substance of the claim" must be examined to determine whether the claim is "directly or indirectly[] one for tax revenues." Canada, 268

11

F.3d at 130. A claim is direct "when a judgment in favor of the plaintiffs would require the defendants to reimburse them for lost tax revenues," and indirect when it seeks "a remedy that would give extraterritorial effect" to a foreign sovereign's tax laws. Eur. Cmty. v. RJR Nabisco, Inc., 355 F.3d 123, 131 (2d Cir. 2004) ("EC I").[3] "What matters is not the form of the action, but the substance of the claim." Canada, 268 F.3d at at 130.

## A.

In this case, the revenue rule does not apply. First, there is no direct enforcement of Belgian tax law because FPSF does not seek to recover any lost tax revenue.

This case is markedly similar to In re SKAT Tax Refund Scheme Litigation, in which Judge Kaplan, in a thorough opinion, denied the defendants' motion to dismiss almost identical claims brought by the corresponding Danish tax authority. 356 F. Supp. 3d 300, 308 (S.D.N.Y 2019). In SKAT, it was alleged that the defendants, several pension plans, committed fraud against Denmark by "submitting tax refund claims in which they falsely

---

[3] EC I was vacated and remanded to the Court of Appeals for the Second Circuit for reconsideration in light of the Supreme Court's decision in Pasquantino v. United States, 544 U.S. 349 (2005). See Eur. Cmty. v. RJR Nabisco, 544 U.S. 1012 (2005). On remand, the Court of Appeals explicitly reinstated its decision in EC I. EC II, 424 F.3d at 177 ("We have considered Pasquantino v. United States and the parties' letter briefs concerning its impact on EC I and reinstate our decision in EC I.").

claimed to own stocks in Danish companies that had paid dividends net of withholding tax." Id. at 307. The SKAT plaintiff alleged, just as FPSF has in this case, that "the defendants did not own those stocks and had had no taxes withheld from any dividends." Id. at 307-08.

Just as in SKAT, the defendants argue that FPSF's claims amount to direct enforcement of Belgian tax law because "the defendants allegedly caused [FPSF] to pay fraudulent tax refund claims that should not have been disbursed," and those "tax refunds amounted to lost tax revenue." Id. at 311. But that is not what FPSF alleges. Instead, FPSF alleges that no taxes were ever withheld from the defendants because the defendants never owned shares of Belgian companies and were never paid any dividends. Accordingly, there is no lost tax revenue to be recovered because FPSF never collected taxes from the defendants.

Instead, FPSF "seek[s] to recover for what amounted to theft" from the Belgian tax system. Id. FPSF alleges a simple fraud in which the victim happens to be the Belgian tax authority. See id. ("The defendants' attempt to frame [their claims] as seeking to recover lost tax revenues . . . because the defendants' alleged victim was the Danish tax authority[] is too clever by half."). But stealing from FPSF does not necessarily make this a case about lost tax revenue,

particularly where no taxes were collected from the defendants
in the first place. Moreover, "tax evasion is a crucial
ingredient in cases barred by the revenue rule in this circuit."
Id. However, FPSF has not alleged that the defendants evaded
Belgian taxes, but instead "alleges fraud, pure and simple." Id.
Although "the form of the action" is that of a claim involving
the Belgian tax authority, and ostensibly involving tax refunds,
"the substance of the claim" involves only an allegation of
simple fraud against the defendants for tax refunds fraudulently
obtained through alleged misrepresentations made on their refund
applications. Canada, 268 F.3d at 130-31. Accordingly, there is
no danger that Belgian tax law would be directly enforced by
entertaining FPSF's claim.

**B.**

There is also no concern that Belgian tax law will be
indirectly enforced in this case. Resolving FPSF's claim would
not require an interpretation of Belgian tax law. The only
question to be resolved is whether the plaintiff has proven that
the defendants made fraudulent tax refund claims to FPSF.
Although the case ostensibly involves a tax refund, the primary
issue is only whether the amounts paid by FPSF as "tax refunds"
were fraudulently obtained by the defendants. See id. at 130
("What matters is not the form of the action, but the substance
of the claim."). This case does not require the calculation of

14

Belgian tax, nor is it an effort by FPSF to recover taxes from the defendants, because the defendants are alleged to have never received any dividends and therefore no taxes were ever withheld on those dividends from the defendants. The only relevant amount in this case is the amount of money that the defendants are alleged to have stolen from Belgium.

The defendants argue that, although they are alleged not to have owned the shares at issue, resolving the question of whether they were the beneficial owners of the dividends would require an interpretation of Belgian law. However, FPSF does not allege that the defendants were not the beneficial owners of the dividends under Belgian law. Instead, FPSF alleges that the Pension Plan Defendants falsified and misrepresented their share ownership by lying on their tax refund applications because the Pension Plan Defendants never owned shares of Belgian companies. See SKAT, 356 F. Supp. 3d at 313 ("[T]he complaints draw no distinction between legal and beneficial ownership."); see also id. at 314 ("The complaints here allege that the entities did not own the shares that they claimed to own. The Court reads this allegation as an assertion that the defendants did not own the shares in any respect – beneficial, legal, or otherwise."). Accordingly, FPSF's claim differs significantly from the defendants' characterization of the claim as simply disputing the defendants' beneficial ownership. See id. at 313 ("[T]he

allegations in the complaints belie defendants' argument that
the issue before the Court is solely one of beneficial
ownership."). Resolving FPSF's claim would not require the Court
to resolve the issue of whether the defendants had beneficial
ownership of the shares at issue, and potentially interpret
Belgian tax law, because FPSF has not alleged that the
defendants beneficially owned those shares. Instead, it would
only require a determination as to whether FPSF has alleged
sufficient facts permitting the reasonable inference that the
defendants lied about owning dividend-paying shares of Belgian
companies to defraud the Belgian government.

The defendants have provided declarations and exhibits
purporting to demonstrate the Pension Plan Defendants' share
ownership by trade confirmations. SKAT "assume[d] the truth of
the complaints' allegations of lack of ownership, at least in
the absence of competent evidence to the contrary," and in that
case, the defendants "offered no evidence to the contrary." Id.
at 313-14. Here, the defendants have adduced purported evidence
of share ownership. However, the plaintiff has also alleged that
the defendants' proffered trade confirmations were falsified,
which allegations must be accepted as true on this motion to
dismiss. See J.S. ex rel. N.S., 386 F.3d at 110. Accordingly,
the defendants' proffer of evidence is not "competent evidence"
that dispels the allegation of the lack of share ownership.

16

SKAT, 356 F. Supp. 3d at 314. In any event, the plaintiff has alleged that the defendants falsified this evidence, and the Court could not determine that the documents are authentic on this motion todismiss.

It is also not clear that resolving possible questions of beneficial ownership would require the Court to interpret Belgian law. Canada recognized a distinction between "enforcement" and "recognition" of foreign tax law and clarified that the revenue rule bars only the former. 268 F.3d at 133-34; see also SKAT, 356 F. Supp. 3d at 316-18. However, the scope of this distinction is not clearly defined. See SKAT, 356 F. Supp. 3d at 316 ("[N]o binding authority has clarified the extent to which the revenue rule prohibits courts from recognizing or applying, as opposed to enforcing, foreign tax laws."). Although the revenue rule clearly bars indirect enforcement of foreign tax laws, "it is sometimes difficult to draw the line between an issue involving merely recognition of a foreign law and indirect enforcement of it." Pasquantino, 544 U.S. at 368. Well-reasoned decisions have concluded that the line between recognition and enforcement "depends on the extent to which the consideration of the foreign revenue law raises separation of powers and sovereignty concerns." See Colombia, 531 F. Supp. 2d at 388. Colombia understood this line to be "a continuum," where "the least problematic end" was "the mere recognition of a foreign

17

tax law," continuing to "the next point . . . [where] a court must apply such a foreign law," then "[n]ext, a claim [that] might require a court to rule on the validity of a foreign tax law," and finally, at the most problematic end, a claim that "might require a court to explicitly enforce a foreign revenue law." Id. at 388.

In this case, it is doubtful that evaluating beneficial ownership involves enforcement of foreign law. There is no need to "pass on the validity" of Belgian tax laws, beyond recognizing that such laws may exist which potentially govern beneficial ownership. See id. at 393; see also SKAT, 356 F. Supp. 3d at 317-18 ("The Court merely would recognize any relevant law and determine its effect."). There is also no danger of encroachment on "the executive branch's responsibility to decide when to aid other sovereigns in enforcing their tax laws" because "nothing in the complaints seeks enforcement of [Belgian] tax law." See SKAT, 356 F. Supp. 3d at 318. The claims, as pleaded, "are not ones for tax revenue but for money stolen from the plaintiff by fraud," creating no danger of explicit enforcement. Id. Thus, along Colombia's continuum analysis, resolving beneficial ownership would require, at most, recognition or application of Belgian law. See Colombia, 531 F. Supp. 2d at 388. But "[m]ere recognition or even application of foreign tax law is not the same as enforcement." SKAT, 356 F.

18

Supp. 3d at 318. Accordingly, the Court's subject-matter jurisdiction over this claim is not foreclosed by the revenue rule.

### C.

The defendants argue that SKAT is inapposite for several reasons, none of which are persuasive. First, the defendants claim that SKAT "proceeded from the erroneous premise that 'fraud' is an exception to the revenue rule." Defs.' Memo. at 22. This argument simply mischaracterizes SKAT. SKAT did not rely on the premise that fraud claims were an exception to the revenue rule, nor did it create such an exception. Instead, it found that the defendants' alleged actions amounted to "garden variety commercial fraud," and therefore were not within the scope of the revenue rule. SKAT, 356 F. Supp. 3d at 308. But this does not make fraud an exception to the revenue rule. It means only that the revenue rule did not apply to the specific claims at issue in SKAT. The revenue rule did not apply to the claims of fraud in SKAT because those claims did not involve claims for foreign tax collection, whether direct or indirect, not because fraud is categorically excepted from the revenue rule.

Like the SKAT defendants, the defendants in this case "mischaracterize[] the nature of" FPSF's claims "in an effort to bring them within the revenue rule." SKAT, 356 F. Supp. 3d at

311 (noting that the defendants characterized the plaintiff's claims as for tax evasion). The defendants argue that any alleged fraud in this case would amount to tax fraud. However, simple fraud does not become tax fraud just because it was committed against a taxing authority. The defendants mischaracterize the events of the alleged fraud by claiming that "[t]he pension plans submitted tax refund applications to FPSF, which FPSF approved after making a discretionary, technical judgment to refund the withheld tax." Defs.' Memo. at 23. But, in this case, FPSF never refunded any withheld tax because it alleges no taxes were ever initially withheld from the defendants for which they were entitled to a refund - an allegation of simple, "garden variety commercial fraud." SKAT, 356 F. Supp. 3d at 308.

Second, the defendants argue that "FPSF's claims are an attempt to recover tax revenue" because "[t]here is no functional difference between the collection of an under-withheld tax amount and the recovery of an incorrect withholding tax refund." Defs.' Memo. at 23-24. But this also mischaracterizes FPSF's claims. FPSF does not allege that the amount of the tax refund requested by any of the pension plans was either under-calculated or otherwise incorrect. Rather, FPSF alleges that the tax refund requests were fraudulent because no money was actually withheld and no money should have been paid

20

out to the Pension Plan Defendants. The defendants argue that,
in any event, the revenue rule bars all "claims by foreign
sovereigns that [a]re premised on violations of foreign tax
laws." Id. at 24 (quoting EC I, 355 F.3d at 129). But FPSF does
not allege that the defendants violated Belgian tax law.
Instead, FPSF alleges that the defendants committed fraud by
submitting fraudulent tax refund claims. The mere fact that the
fraud involved tax refund claims does not make this case about
Belgian tax law.

Third, the defendants again mischaracterize SKAT by
claiming that it erroneously required the SKAT defendants to
"offer evidence that the plans were beneficial owners or put the
fact of ownership in dispute," and that the defendants in this
case have provided such evidence. Defs.' Memo. at 25. But the
issue of beneficial ownership was a "red herring" in SKAT
because it "ignore[d] the allegations of the complaints," which
"dr[e]w no distinction between legal and beneficial ownership"
and instead simply alleged that "the claimants did not own the
shares that they claimed to own." SKAT, 356 F. Supp. 3d at 313,
319. The issue of beneficial ownership is similarly a red
herring in this case.[4] Moreover, the defendants' provision of

---

[4] For the same reasons, it is irrelevant whether the
question of beneficial ownership is governed by Belgian tax law
or some other body of Belgian law.

documents purportedly proving that the Pension Plan Defendants owned shares of Belgian companies is unavailing precisely because FPSF alleges that the documents were falsified. Because those allegations must be accepted as true, it would make no sense to credit those documents as reliable proof of ownership. In any event, such a determination would be a question of fact unsuitable for resolution at the pleadings stage.

Finally, the defendants argue that SKAT enforced Danish tax law because it "rul[ed] that the plans were not entitled to the refunds and . . . [gave] that ruling legal effect through a money judgment," and that a similar decision in this case would likewise enforce Belgian tax law. Defs.' Memo. at 26. But any damages awarded in this case would only be for the amounts by which the defendants are alleged to have defrauded Belgium, unlike in Canada and EC I/EC II where the plaintiffs sought to collect damages for lost tax revenue as a result of alleged tax evasion. See Canada, 268 F.3d at 106 ("Canada seeks revenue that it lost from the evasion of tobacco duties and taxes[.]"); EC II, 424 F.3d at 178 ("The complaints all sought to recover treble damages . . . for duties and taxes not paid on [smuggled] cigarettes."). FPSF's claim requires only a determination of the amount of the alleged fraud and the return of those funds fraudulently obtained. It does not require the calculation of any Belgian tax or the return or collection of any unpaid taxes.

Accordingly, there is no danger that an award of damages in this case would enforce Belgian tax law.

### D.

The defendants also argue that the principal concerns animating the revenue rule, "including respect for sovereignty, concern for judicial role and competence, and separation of powers," support the revenue rule's application to FPSF's claims. Canada, 268 F.3d at 109. In particular, the defendants argue that considering FPSF's claim would encroach on the role of the Executive Branch and offend separation of powers principles.

The revenue rule is animated by separation of powers concerns because "the conduct of foreign relations is primarily the realm of the legislative and executive branches," and "judicial examination and enforcement of foreign tax laws at the behest of foreign nations may . . . create the risk that the judiciary will be drawn into issues and disputes of foreign relations policy." EC I, 355 F.3d at 131. However, this case does not involve the "judicial examination and enforcement of foreign tax laws at the behest of foreign nations," because there is no danger of either direct or indirect enforcement of Belgian tax law, and therefore does not violate the separation of powers. See id.

The defendants argue that the Executive has not consented to this litigation, and that because "[i]n our system of government, the Executive is the sole organ of the federal government in the field of international relations," Pasquantino, 544 U.S. at 369, the revenue rule bars FPSF's claims. The defendants suggest that because the Executive did not "submit[] a statement from the State Department or fil[e] an amicus brief," it has not consented to this case. EC I, 355 F.3d at 132. However, the Executive's consent is not necessary for this litigation to proceed. In Pasquantino, the defendants were convicted of wire fraud for carrying out a scheme to smuggle liquor into Canada from the United States. 544 U.S. at 353. The Court found that "by electing to bring this prosecution, the Executive has assessed this prosecution's impact on this Nation's relationship with Canada, and concluded that it poses little danger of causing internal friction." Id. at 369. Accordingly, the government's active participation in the litigation lessened separation of powers concerns. However, although Pasquantino found that "the direct participation of the political branches" "alleviated" separations of powers concerns, it did not go further to say that such participation was required. See EC II, 424 F.3d at 180-82. In this case, there is no need for the Executive to consent to the litigation because FPSF's claim, on its face, does not implicate the revenue rule.

In any event, the Executive is free to submit an amicus brief at any point during this litigation if it believes that FPSF's claim should not be heard in a court of the United States. The Court would respectfully consider any such submission. None has been forthcoming.

The defendants also identify a separate tax treaty between the United States and Japan (the "Japan Treaty") which provides a mechanism for collection assistance relating to fraudulent refund claims, such as the ones alleged in this case, and which was not considered in SKAT. No similar treaty exists between the United States and Belgium. EC I explained that "treaties between the United States and the sovereigns at issue [that] provide for broad, reciprocal tax enforcement assistance" can indicate Executive consent. 355 F.3d at 132. The defendants cite the Japan Treaty by analogy to support their argument that the Executive Branch is the only branch of government which can "negotiat[e] for bilateral collections assistance," and also that the Executive Branch understands "a fraudulent claim for refund" as "a revenue claim." Defs.' Memo. at 19. The defendants argue that, because no treaty between the United States and Belgium exists, hearing FPSF's claim would "improperly hamstring the executive branch" from negotiating the terms of "reciprocal assurance" from Belgium. Id. at 20.

However, allowing FPSF's claim to proceed would not "ignor[e] and undermin[e] the treaty negotiation process and the clearly expressed views of the political branches" in this case, Canada, 268 F.3d at 122, because there is no such "treat[y] between the United States and the sovereign[] at issue" to be undermined. EC I, 268 F.3d at 132. The fact that the United States has entered into an unrelated tax treaty with Japan in no way indicates that a lawsuit brought by Belgium should not be considered. Because there is no similar treaty between the United States and Belgium, the Japan Treaty has no bearing on this lawsuit. Moreover, allowing FPSF's claim would not impede the United States' ability to negotiate any future treaties with Belgium. Accordingly, the defendants' motion to dismiss FPSF's claims pursuant to the revenue rule is **denied**.

## IV.

The defendants next move to dismiss the plaintiff's claims pursuant to Rule 12(b)(6). In deciding a motion to dismiss pursuant to Rule 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiff's favor. See McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754

26

F.2d 1059, 1067 (2d Cir. 1985). The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

### A.

Under New York law[5], "[t]he elements of a cause of action for fraud require a material misrepresentation of a fact,

_____

[5] New York law applies to this claim because both parties cite to New York cases and neither party has contested the applicability of New York law. The parties' "implied consent is

knowledge of its falsity, an intent to induce reliance,
justifiable reliance by the plaintiff[,] and damages." Eurycleia
Partners, LP v. Seward & Kissel, LLP, 910 N.E.2d 976, 979 (N.Y.
2009). Claims of fraud are subject to a heightened pleading
standard, and parties alleging fraud "must state with
particularity the circumstances constituting fraud." Fed. R.
Civ. P. 9(b).

There is largely no dispute that FPSF has adequately
pleaded its claim for fraud under the heightened pleading
standard of Rule 9(b). FPSF alleges that the Pension Plan
Defendants made material misrepresentations of fact by
submitting false tax refund claims to the Belgian government,
with intent to induce FPSF to rely on those misrepresentations,
and that FPSF relied on those misrepresentations when it
refunded to the Pension Plan Defendants the claimed amounts.
Moreover, FPSF has pleaded specifically the contours and
mechanics of the allegedly fraudulent scheme. These allegations
are sufficient to plead a claim for fraud under New York law.

However, the defendants argue that FPSF has not pleaded
with sufficient particularity a claim for fraud against
individual defendant Alicia Colodner. To satisfy Rule 9(b), "the
complaint must: (1) specify the statements that the plaintiff

---

sufficient to establish choice of law." Krumme v. WestPoint
Stevens, Inc., 238 F.3d 133, 138 (2d. Cir 2000).[5]

contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir. 2006). The plaintiff must "allege facts that give rise to a strong inference of fraudulent intent," which can be shown by "alleging facts to show that defendants had both motive and opportunity to commit fraud," or "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Id. at 290-91.

Colodner, a "business associate of Markowitz and Van Merkensteijn," allegedly was an employee of Argre, a "financial services firm" founded by Markowitz and Van Merkensteijn. Delvian Am. Compl. ¶¶ 12, 26. FPSF alleges that Colodner, along with Markowitz and Van Merkensteijn, "created the appearance" that Delvian and DFL, two of the Pension Plan Defendants, were "bona fide U.S. pension plans that owned shares in one or more Belgian companies for which dividends had been paid and dividend taxes had been withheld," and "caused Delvian and DFL to request refunds in connection with those purportedly withheld dividend taxes." Id. ¶ 5. Colodner is alleged to have participated in this scheme by signing powers of attorney for both Delvian and DFL, id. ¶ 30, and is specifically alleged to have signed the power of attorney for Delvian in her capacity as a trustee of Delvian, id. ¶ 31. The signed powers of attorney authorized

certain tax reclaim agents to "request[] and collect[] tax refunds from foreign tax authorities on behalf of" Delvian and DFL and ultimately submit Delvian's and DFL's allegedly fraudulent refund claim paperwork to FPSF. Id. ¶¶ 30-31. Moreover, DFL's listed business address was "the residential address of a home owned at the time by Colodner." Id. ¶ 27.

FPSF also alleges that Colodner obtained a Form 6166 for each of Delvian and DFL by providing the IRS with "false and misleading information." Id. ¶ 37. Form 6166 is a form issued by the IRS verifying qualified U.S. pension plans, and is an essential component of a tax refund request. Id. The tax refund requests submitted to FPSF by the tax reclaim agents, which Colodner authorized by signing the powers of attorney, included the allegedly fraudulently obtained forms. Id.

FPSF has satisfied the heightened pleading standard of Rule 9(b) by alleging facts against Colodner which "give rise to a strong inference of fraudulent intent." Lerner, 459 F.3d at 290. FPSF's allegations suggest that Delvian and DFL were not legitimate pension plans, and in fact, were "fictitious entities" which "did not exist at all." Pl.'s Opp., ECF No. 87, at 29. Despite this, Colodner signed powers of attorney, as a trustee for Delvian and as a witness for DFL, authorizing tax reclaim agents to file their fraudulent refund claims with FPSF. In each event, Colodner's signing of the power of attorney was

alleged to be an essential part of the allegedly fraudulent
scheme. In addition to signing these powers of attorney,
Colodner also allegedly made false statements to the IRS to
procure a Form 6166 for each of Delvian and DFL despite knowing
that Delvian and DFL were not legitimate pension plans. It is
reasonable to infer that Colodner, Delvian's trustee, knew that
Delvian was not a legitimate pension plan, and therefore that it
was fraudulent to represent that Delvian was a legitimate
pension plan entitled to tax refunds from FPSF. See Great W.
Ins. Co. v. Graham, No. 18-cv-6249, 2020 WL 3415026, at *23
(S.D.N.Y. June 22, 2020) ("It is reasonable to infer that [a
director] knew the value of a trust solely owned by him."). This
conclusion is buttressed by FPSF's allegation that DFL listed a
residential address for a home belonging to Colodner's in-laws[6]
as its business address.[7] Colodner must have known that DFL, a
pension plan based at her relative's residential home, was not a
legitimate pension plan, and therefore that her witnessing a

---

[6] Although the Delvian Complaint alleges that the home was
owned by Colodner, FPSF has since provided a letter to the Court
correcting the allegation to allege that the home was owned by
Colodner's husband's parents, and Colodner has consented to this
correction. ECF No. 85.
[7] In addition, Delvian's listed business address was the
same business address given for Argre, the financial services
firm which employed Colodner and which was founded by Markowitz
and Van Merkensteijn. Delvian Compl. ¶ 26.

power of attorney for DFL authorizing the refund claims to be
submitted was fraudulent.

Moreover, FPSF alleges that Delvian and DFL distributed the
proceeds from the fraudulent scheme to participants in the
fraud, including Colodner, and argues that this provided
Colodner with a motive to participate in the fraud. See Novak v.
Kasaks, 216 F.3d 300, 307-08 (2d Cir. 2000) (alleging motive for
fraud can be done by showing that the "defendants benefitted in
some concrete and personal way from the purported fraud");
Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 325
(2007) ("[P]ersonal financial gain [on the part of a defendant]
may weigh heavily in favor of a scienter inference."). FPSF has
identified the specific statements made by Colodner alleged to
be fraudulent, identified the context in which the statements
were made, explained why the statements were fraudulent, and
altogether alleged facts that give rise to a strong inference of
fraudulent intent on the part of Colodner. Taken together,
FPSF's allegations plead sufficiently that Colodner knowingly
participated in a scheme to defraud FPSF.

**B.**

The defendants also dispute that FPSF has sufficiently
pleaded a claim for aiding and abetting fraud against Colodner,
FGC Securities, and Stephen Wheeler. To state a claim for aiding
and abetting fraud under New York law, FPSF must allege: "(1)

32

the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co., 883 N.Y.S.2d 486, 489 (App. Div. 2009). "Substantial assistance exists where (1) a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated." Id. Substantial assistance can be rendered even through "clerical" or "ministerial" actions, if those actions make a "substantial contribution" to the fraud. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 652 F. Supp. 2d 495, 510-11 (S.D.N.Y. 2009). Claims for aiding and abetting fraud are subject to Rule 9(b). Armstrong v. McAlpin, 699 F.2d 79, 92-93 (2d Cir. 1983).

At the outset, FPSF has already pleaded the existence of an underlying fraud which could be aided and abetted. FPSF's allegations that Colodner participated in the underlying fraud as a principal on behalf of Delvian and DFL are also sufficient to plead an aiding and abetting claim against Colodner.[8] Colodner

---

[8] The defendants argue that the allegations in the Delvian Amended Complaint cannot be considered on this motion to dismiss because they are not referred to in the Xiphias Complaint. However, the pleadings in this case have been consolidated, and

allegedly rendered substantial assistance to the fraudulent
scheme by signing powers of attorney for several Pension Plan
Defendants, the majority of which as a witness and, for Delvian,
as a trustee, authorizing tax reclaim agents to submit tax
refund claims on each Pension Plan Defendants' behalf. See
Xiphias Compl. ¶ 30-31. Despite being a substantively clerical
task, Colodner's conduct constituted substantial assistance
because it formed an essential part of the fraudulent scheme.
Without her serving as a witness, the tax refund claims could
not have been submitted. See SKAT, 356 F. Supp. 3d at 324;
Pension Comm. of Univ of Montreal, 652 F. Supp. 2d at 511;
Xiphias Compl. ¶ 40. Colodner's alleged conduct "proximately
caused the harm on which the primary liability is predicated"
because serving as a witness was necessary for the proper
submission of the fraudulent tax refund claims. Rosner v. Bank
of China, 528 F. Supp. 2d 419, 426 (S.D.N.Y. 2007). Accordingly,
Colodner "made a substantial contribution to the perpetration of
the fraud" by "assisting in the transactions at the core of the

---

the defendants' motion to dismiss in this consolidated case also
seeks dismissal of the Delvian Amended Complaint. Accordingly,
the Delvian Amended Complaint forms part of the pleadings in
this consolidated case. See also McCullough v. World Wrestling
Ent., Inc., Nos. 15-cv-1074, 15-cv-994, 2017 WL 4400749, at *4
(D. Conn. Sept. 29, 2017) ("Due to the related claims in the
consolidated cases, and the fact that the same counsel was
involved in the filing of each consolidated case, the
allegations put forward in the consolidated cases . . . is
relevant to the Court's decision [on the motion to dismiss].").

fraudulent scheme." See JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 257, 259 (S.D.N.Y. 2005).

As for FGC and Wheeler, FPSF alleges that these two defendants provided substantial assistance to the underlying fraud by "creating false and misleading documentation in connection with the refund claims." Xiphias Compl. ¶ 7. Specifically, FPSF alleges that FGC provided "cash equity confirmations" documenting share purchases which did not actually occur, because the Pension Plan Defendants "did not purchase or own the shares in question." Id. ¶¶ 49, 51. Wheeler, FGC's head of operations, signed the share confirmations. Id. ¶ 49. These "cash equity confirmations" formed part of the tax refund claims submitted to FPSF. Each refund claim represented that a Pension Plan Defendant "owned shares in a Belgian company," "identifie[d] the Belgian company in which" the shares were owned, "state[d] the number of shares and state[d] the net dividend that each [Pension Plan Defendant] supposedly received," and included "documentation from one or more brokers" confirming the share purchases. Id. ¶¶ 47-49. FGC is alleged to have provided documentation confirming the allegedly fictitious share purchases for these Pension Plan Defendants: Xiphias, Traden, RJM Capital, Remece, Bernina, Next Level, and Spirit on the Water. Id. ¶ 65.

FGC protests that providing share confirmations could not have constituted substantial assistance because it was required to do so pursuant to certain rules and regulations, and therefore that it was merely following its routine business practice. However, "[t]he critical test is not . . . whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud." JP Morgan, 406 F. Supp. 2d at 257. In this case, providing documentation confirming as real allegedly fictitious share purchases was essential to the perpetration of the underlying fraudulent scheme because a complete tax refund application submitted to FPSF required the inclusion of such confirmations. FGC and Wheeler also argue that the "cash-equity confirmations are required by law" and are "routine and ministerial." FGC Reply, ECF No. 92, at 4. However, "clerical" or "ministerial" actions may still constitute substantial assistance if those actions make a "substantial contribution" to the underlying fraud. Pension Comm. of Univ. of Montreal, 652 F. Supp. 2d at 510-11. In any event, there is no duty to document a fictitious transaction, and any attempt by FGC to articulate such a duty would not cure the trade confirmations of their fraudulent nature. See In re Adler, Coleman Clearing Corp., No. 95-8203, 1998 WL 160039, at *5 (Bankr. S.D.N.Y. Apr. 3, 1998)

36

(providing "confirmations for completely fictitious transactions" as part of an underlying securities fraud).

FGC and Wheeler also argue that FPSF has not pleaded with particularity actual knowledge of the underlying fraud. A claim of aiding and abetting fraud requires that the plaintiff demonstrate "actual knowledge" on the part of the aider and abettor. Lerner, 459 F.3d at 292. In this case, FPSF has alleged that FGC provided confirmations, signed by Wheeler, documenting the Pension Plan Defendants' allegedly fictitious trades. Based on FPSF's allegations that these trades did not take place, FGC could not have documented these trades, believing in good faith that they represented legitimate transactions.[9] By alleging that FGC and Wheeler documented transactions that did not actually occur, FPSF has pleaded adequately their substantial involvement in the underlying fraud which also suffices to plead their actual knowledge of that fraud. See also SKAT, 356 F. Supp. 3d at 325 (denying a motion to dismiss claims for aiding and abetting fraud because "the plaintiff has alleged that the defendants acted in concert to carry out the scheme and each

---

[9] FGC argues that it was required by law to issue trade confirmations. However, there is no rule in place that requires a broker to confirm a fictitious transaction, and FINRA Rule 2020 provides that "[n]o member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."

directly contributed to the alleged fraud"). Accordingly, the claim for aiding and abetting fraud against FGC and Wheeler survives.

### c.

Finally, the defendants argue that FPSF's claims must be dismissed because the statute of limitations has expired for the claims. The parties agree that, under New York law, the action must be timely pursuant to both New York and Belgian statutes of limitations for fraud claims because the plaintiff, FPSF, is a non-New York resident suing on a cause of action that accrued outside of New York. See N.Y. C.P.L.R. § 202.[10] The relevant New York statute of limitations provides that actions for fraud must be brought within the greater of: (1) six years from the date the cause of action accrued, or (2) two years from the date the plaintiff discovered, or with reasonable diligence could have discovered, the alleged fraud. Grasso v. United Grp. of Cos., Inc., 806 F. App'x 69, 71 (2d Cir. 2020); N.Y. C.P.L.R. § 213(8). Claims for aiding and abetting fraud are also subject to New York's statute of limitations for fraud claims. See Martext

---

[10] The defendants rely only on the New York statute of limitations to argue that the claim is untimely. The defendants represent that Belgium's statute of limitations for fraud claims is five years. See Defs.' Memo. at 29 n.17. Because the defendants argue that FPSF's claim is time-barred under the longer six-year statute of limitations provided by New York law, they do not argue separately that the claims are untimely under the shorter statute of limitations provided by Belgian law.

Holdings Corp v. Engel & Reiman, P.C., 693 F. Supp. 2d 387, 393-94 (S.D.N.Y. 2010).

The complaints in these consolidated actions were filed on July 27, 2021. See, e.g., ECF No. 1. The defendants argue that FPSF's claims are time-barred under the six-year statute of limitations because the cause of action accrued on the date that the last refund claim was paid by FPSF, which the defendants claim was over six years from the date the action was filed. However, FPSF has not alleged the exact date that it paid out its last refund claim. Instead, FPSF alleges only that the refund payments "generally were made several months after the relevant refund request." See, e.g., Xiphias Compl. ¶ 52. The last refund claim was submitted on November 13, 2014, for the Traden Pension Plan. See id., Ex. B. Based on FPSF's allegation that refund payments were made within several months of the request, the defendants argue that the last refund claim in this case could not have been paid out after July 27, 2015, six years before the date on which this action was filed.

A "statute of limitations is ordinarily an affirmative defense that must be raised in the answer." Ellul v. Congregation of Christian Bros., 774 F.3d 791, 798 n.12 (2d Cir. 2014). However, "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." Id. In this case, FPSF has not pleaded the date

39

on which the last payment was made, and the defendants also have
not provided such a date.[11] Accordingly, the exact date on which
the final refund payment was made is unclear, and, on the face
of the complaint, it "cannot be determined" whether the final
refund payment was made before July 27, 2015.[12] See Espire Ads
LLC v. TAPP Influencers Corp., Nos. 21-cv-10623, 21-cv-11068,
2023 WL 1968025, at *19 (S.D.N.Y. Feb. 13, 2023). The parties'
factual dispute as to the exact date that the cause of action
for fraud accrued is unsuitable for resolution on this motion to
dismiss. Because the exact date is unclear, it is plausible that
some of the claims may have accrued after July 27, 2015.[13]

---

[11] Because the Pension Plan Defendants were the entities
that received the refund payments, it is reasonable to infer
that the defendants should know the dates that the refund
payments were issued. However, the defendants also have not
disclosed these dates. In any event, the nondisclosure of the
final payment date does not change the analysis of whether
FPSF's claim is timely under New York's statute of limitations.

[12] FPSF also alleges that, in November 2015, it "suspended
payment of refund requests involving" Acupay and Global Taxback,
two of the reclaim agents which the Pension Plan Defendants used
to submit their refund requests. Xiphias Compl. ¶ 54. In its
initial complaint, FPSF also alleged that "[t]he scheme to
defraud FPSF . . . continued until at least November 2015, when
FPSF . . . suspended payments on refund claims involving Solo
Capital." ECF No. 1, ¶ 44.

[13] During the COVID-19 pandemic, the Governor of New York
issued executive orders which "purported to extend [statutes of]
limitations periods from March 20, 2020 until November 3, 2020."
Defs.' Memo. at 31. The parties dispute whether, during this
time period, the statutes of limitations were suspended or
tolled. Compare Reynolds-Sitzer v. EISAI, Inc., 586 F. Supp. 3d
123, 132 (N.D.N.Y. 2022) (noting that "there is some
disagreement as to whether [the] executive orders 'tolled' or
'suspended' statutes of limitations," and concluding that the

Accordingly, it cannot be concluded that all of FPSF's claims
are time-barred under New York's six-year statute of limitations
for fraud claims.

The defendants also argue that FPSF's claim is time-barred
under the two-year "discovery rule," the second prong of New
York's statute of limitations. See N.Y. State Workers' Comp. Bd.
v. Consol. Risk Servs., Inc., 4 N.Y.S.3d 680, 686 (App. Div.
2015). The discovery rule provides that an action for fraud must
be commenced within "two years from the time the plaintiff . . .
discovered the fraud, or could with reasonable diligence have
discovered it." N.Y. C.P.L.R. § 213(8). Under the discovery
rule, the plaintiff "will be held to have discovered the fraud[]
when the plaintiff has knowledge of facts from which the fraud
could be reasonably inferred." Cusimano v. Schnurr, 27 N.Y.S.3d
135, 140 (App. Div. 2016). "Generally, knowledge of the
fraudulent act is required and mere suspicion will not
constitute a sufficient substitute." Erbe v. Lincoln Rochester
Tr. Co., 144 N.E.2d 78, 81 (N.Y. 1957). "Where it does not
conclusively appear that a plaintiff had knowledge of facts from

---

"statutes of limitations are . . . tolled"), with Baker v. 40
Wall St. Holdings Corp., 161 N.Y.S.3d 723, 724 (Sup. Ct. 2022)
("[T]he Governor did not toll all statutes of limitation, but
only suspended them."). However, whether the executive orders
suspended or tolled the statutes of limitations does not need to
be resolved here because the issue would not affect the
timeliness analysis in this case.

which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts." Sargiss v. Magarelli, 909 N.E.2d 573, 532 (N.Y. 2009).

The defendants argue that FPSF had inquiry notice of the fraud beginning in November 2015, when FPSF discovered that "Belgian Federal Police were investigating possible fraud with respect to refund requests made to FPSF," and that FPSF did not adequately investigate the alleged fraud. Xiphias Compl. ¶ 55. A plaintiff who is on inquiry notice of an alleged fraud "can trigger the running of the statute of limitations if the plaintiff does not pursue a reasonable investigation." Koch v. Christie's Int'l PLC, 699 F.3d 141, 155 (2d Cir. 2012). However, upon discovering the Belgian Federal Police's investigation, FPSF alleges that it "acted with reasonable diligence to investigate the facts, including by cooperating with the investigation by the Belgian Federal Police, providing extensive files to the Belgian Federal Police and liaising with the Belgian Federal Police concerning the investigation on a regular basis." Xiphias Compl. ¶ 55. FPSF also "suspended payment of refund requests involving" the reclaim agents under investigation, namely Acupay and Global Taxback. Id. ¶ 54. Although, at this time, FPSF was aware that the Belgian Federal Police's investigation involved Acupay and Global Taxback, which

aroused its suspicion to a possible fraud, "knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute." Erbe, 144 N.E.2d at 81. Instead, FPSF alleges that it "was aware that it may have been defrauded by some tax refund claimants, but it did not know which specific transactions were fraudulent or which claimants or individuals were involved." Id. ¶ 55.

The Court could not determine on a motion to dismiss that FPSF failed to satisfy its duty of inquiry when it received notice of the Belgian Federal Police's investigation. This is not a case where FPSF declined to inquire "when it would have developed the truth, and shut[] [its] eyes to the facts which call for the investigation," such that "knowledge of the fraud" can be imputed to FPSF. Higgins v. Crouse, 42 N.E. 6, 7 (N.Y. 1895). Instead, because FPSF conducted an investigation, "the limitations period begins to run from the date such inquiry should have revealed the fraud." Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005). In this case, FPSF alleges that its investigation only developed sufficient knowledge to bring the claims by "late 2020," after the Belgian Federal Police provided FPSF with "access to portions of the confidential investigation file," and that only by analyzing these confidential records was it able to arrive at this conclusion. Xiphias Compl. ¶ 56. The defendants dispute that

FPSF's investigation only developed sufficient knowledge by that date, and argue several ways in which FPSF could have taken a more active role in investigating possible fraud and developing knowledge sooner. See Defs.' Memo. at 35-36.[14] But resolving the issue of when FPSF's investigation produced sufficient facts to bring a claim for fraud requires a fact-intensive inquiry unsuitable for a motion to dismiss. See Kaufman v. Cohen, 760 N.Y.S.2d 157, 163 (App. Div. 2003); see also Erbe, 144 N.E.2d at 80-81 ("Ordinarily such an inquiry presents a mixed question of law and fact.").[15]

Accordingly, "it is unclear from the record when [FPSF] should have been aware of the possible fraud." Pericon v. Ruck, 868 N.Y.S.2d 118, 120 (App. Div. 2008). The record reflects only that, by "late 2020," FPSF developed knowledge of the alleged

---

[14] The defendants also argue that FPSF should have known of the alleged fraud by May 31, 2018, when the SKAT lawsuit was brought. However, because "a statute of limitations defense may be decided on a Rule 12(b)(6) motion [only] if the defense appears on the face of the complaint," it would be inappropriate on this motion to consider any facts beyond those alleged in the complaint. Ellul, 774 F.3d at 798 n.12. In any event, "it does not follow that reasonable diligence will in all circumstances result in discovery of any lawsuit." Cohen v. S.A.C. Trading Corp., 711 F.3d 353, 363 (2d Cir. 2013).

[15] Although the complaints in this consolidated action do not detail the nature of FPSF's investigation, including any particular steps FPSF took to investigate, this is a factual question inappropriate for resolution on a motion to dismiss. In any event, FPSF represents that "if necessary, FPSF . . . can and will provide additional detail concerning its investigation at the appropriate time in this proceeding." Pl.'s Opp. at 22.

fraud, and commenced this action on July 27, 2021, within two years of developing that knowledge. Xiphias Compl. ¶ 56; ECF No. 1. The timeliness of the action therefore cannot be determined on a motion to dismiss because FPSF has not "plead[ed] itself out of court." St. John's Univ., N.Y. v. Bolton, 757 F. Supp. 2d 144, 157 (E.D.N.Y. 2010).

The defendants' motion to dismiss pursuant to Rule 12(b)(6) is therefore **denied**.

## CONCLUSION

The Court has considered all the arguments of the parties. To the extent no specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the defendants' motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and (12)(b)(6) are **denied**. The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated:    **New York, New York**
           **July 5, 2023**

                            **John G. Koeltl**
                     **United States District Judge**