**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

KINGDOM OF BELGIUM,
FEDERAL PUBLIC SERVICE FINANCE
PENSION PLAN LITIGATION

Lead Case: No. 21 Civ. 6392 (JGK)

Member Cases:
    No. 21 Civ. 6399 (JGK)
    No. 21 Civ. 6402 (JGK)
    No. 21 Civ. 6404 (JGK)
    No. 21 Civ. 6405 (JGK)
    No. 21 Civ. 6407 (JGK)
    No. 21 Civ. 6408 (JGK)

**Oral Argument Requested**

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**
**ON STATUTE OF LIMITATIONS ISSUES**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

    A.    FPSF Paid Dividend Withholding Tax Refunds to the Plans ...................................2

    B.    By The End of 2015, FPSF Believed It Was the Victim of a Fraudulent Scheme Involving the Plans ...............................................................................5

    C.    From the Beginning of 2016 Through July 26, 2021, FPSF Persisted in Believing It Was the Victim of an Allegedly Fraudulent Scheme Involving the Plans .........10

    D.    Throughout 2018, FPSF Prepared to Litigate in Foreign Countries ....................12

    E.    The Federal Police Shared Information with FPSF Between October 2015 and July 2019 ................................................................................................15

LEGAL STANDARD .........................................................................................................17

ARGUMENT ....................................................................................................................17

    A.    Applicable Law ....................................................................................................18

    B.    FPSF's Claims Are Barred Under New York's Six-Year Accrual Rule ..............20

    C.    FPSF's Claims Are Barred Under New York's Two-Year Discovery Rule ........24

        1.    FPSF Was on Inquiry Notice of the Alleged Fraud in October 2015 ........24

        2.    FPSF Had Actual Knowledge of the Alleged Fraud by 2016 ...................26

        3.    Any Reasonable Investigation Would Have Uncovered Sufficient Knowledge Regarding the Alleged Fraud by 2016 ....................................33

CONCLUSION ..................................................................................................................38

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Adams v. Deutsche Bank AG & Deutsche Bank Sec., Inc.,*
  2012 WL 12884365 (S.D.N.Y. Sept. 24, 2012) ................................................................ 37

*Armstrong v. McAlpin,*
  699 F.2d 79 (2d Cir. 1983) ................................................................................... 20, 25

*Ayers v. Piaker & Lyons, P.C.,*
  748 Fed. App'x 368 (2d Cir. 2018) ................................................................................. 25

*Barry v. Royal Air Maroc,*
  2022 WL 3215050 (S.D.N.Y. July 8, 2022) ................................................................... 22

*Capruso v. Vill. of Kings Point,*
  23 N.Y.3d 631 (2014) ...................................................................................................... 20

*City of Syracuse v. Loomis Armored US, LLC,*
  900 F. Supp. 2d 274 (N.D.N.Y. 2012) ............................................................................ 25

*Covington v Walker,*
  3 N.Y.3d 287 (2004) ........................................................................................................ 21

*Dodds v. Cigna Sec., Inc.,*
  12 F.3d 346 (2d Cir. 1993) .............................................................................................. 20

*Eisenhauer v. Culinary Inst. of Am.,*
  84 F.4th 507 (2d Cir. 2023) ............................................................................................. 17

*Graham v. HSBC Mortg. Corp.,*
  2021 WL 4392522 (S.D.N.Y. Sept. 24, 2021) ..................................................... 29, 33, 37

*Grasso v. United Grp. of Cos.,*
  806 F. App'x 69 (2d Cir. 2020) ................................................................................. 18, 20

*Guilbert v. Gardner,*
  480 F.3d 140 (2d Cir. 2007) ............................................................................................ 25

*Gutkin v. Siegal,*
  926 N.Y.S.2d 485 (1st Dept 2011) .................................................................................. 37

*Henry v. Bank of Am.,*
  48 N.Y.S.3d 67 (1st Dept 2017) ...................................................................................... 21

*In re Integrated Res. Real Estate Sec. Litig.,*
  815 F. Supp. 620 (S.D.N.Y.1993) ................................................................................... 33

*In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*,
2021 WL 827190  (S.D.N.Y. Mar. 4, 2021) ........................................................ 37

*In re State St. Assocs.*,
323 B.R. 544 (Bankr. N.D.N.Y. 2005) ............................................................. 34

*Klein v. Bower*,
421 F.2d 338 (2d Cir. 1970) ........................................................................... 33

*Koch v. Christie's Intern. PLC*,
699 F.3d 141 (2d Cir. 2012) ........................................................................... 37

*LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*,
318 F.3d 148 (2d Cir. 2003) .............................................................. 20, 31, 33

*Loeb v. County of Suffolk*,
2023 WL 4163117 (E.D.N.Y. June 23, 2023) ................................................. 23

*Marketxt Holdings Corp. v. Engel & Reiman, P.C.*,
693 F. Supp. 2d 387 (S.D.N.Y. 2010)………………………………………..……17

*Natale v. Allied Aviation Servs., Inc.*,
2024 WL 3794615 (S.D.N.Y. Aug. 13, 2024) ................................................ 22

*Rajaratnam v. Motley Rice, LLC*,
449 F. Supp. 3d 45 (E.D.N.Y. 2020) .............................................................. 22

*Republic of Turkey v. Christie's Inc.*,
425 F. Supp. 3d 204 (S.D.N.Y. 2019) .............................................................. 3

*Robertson v. Seidman & Seidman*,
609 F.2d 583 (2d Cir. 1979) ........................................................................... 33

*Rothman v. Gregor*,
220 F.3d 81 (2d Cir. 2000) ............................................................................. 20

*Stuart v. Am. Cyanamid Co.*,
158 F.3d 622 (2d Cir. 1998) ........................................................................... 18

*Uzoigwe v. Charter Commc'ns, LLC*,
2024 WL 1311525 (E.D.N.Y. Mar. 18, 2024) ................................................ 22

## STATUTES

N.Y. C.P.L.R. § 202 ....................................................................................... 18
N.Y. C.P.L.R. § 213 ................................................................................... 18, 20
N.Y. Exec. Law § 29 ...................................................................................... 23

## FEDERAL RULES

Fed. R. Civ. P. 44.1 ................................................................................................ 4

Fed. R. Civ. P. 56 ................................................................................................. 17

## OTHER AUTHORITIES

*Convention Between the Government of the United States of America and the Government of the Kingdom of Belgium for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income,*

    U.S.-Belg., Nov. 27, 2006, S. Treaty Doc. No. 110 ............................................. 3

Executive Order [Cuomo] No. 202.8 ................................................................. 22, 23

Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed.) ..................................... 3

**PRELIMINARY STATEMENT**

Plaintiff's documents, responses to written discovery requests, and testimony by Plaintiff's designated witness establish indisputable facts which demonstrate that Plaintiff's claims are untimely.  *First*, virtually all the refunds of Belgian dividend withholding tax at issue in this litigation were indisputably paid more than six years before the complaints were filed. *Second*, by no later than 2016, Plaintiff was aware of its claims and knew all the information necessary to file the complaints that were eventually, belatedly filed years later.  Those complaints were not filed until July 27, 2021, *over five years* after Plaintiff possessed all the information it needed to assert its claims.  The complaints are untimely under the governing statute of limitations.

## STATEMENT OF FACTS

### A.    FPSF Paid Dividend Withholding Tax Refunds to the Plans[1]

The Plaintiff, Federal Public Service Finance ("FPSF"), is the agency of the Kingdom of Belgium responsible for the assessment and collection of Belgian taxes.  Am. Compl. ("Xiphias"), In re: Kingdom of Belgium, Federal Public Service Finance Pension Plan Litigation, No. 21 Civ. 6392 (JGK) (S.D.N.Y. Jan. 21, 2021), ECF No. 48, ¶1.[2]  FPSF collects a tax on dividends paid by Belgian corporations to their shareholders.  *See* Decl. of Bernard Peeters

---

[1] The "Plans" are Defendants 2321 Capital Pension Plan, Alden Investments Pension Plan, AOI Pension Plan, Azalea Pension Plan, Batavia Capital Pension Plan, Bernina Pension Plan Trust, Bowline Management Pension Plan, Calypso Investments Pension Plan, Carrick Holdings Pension Plan,  Clove Pension Plan, Davin Investments Pension Plan, Delvian LLC Pension Plan, DFL Investments Pension Plan, Ganesha Industries Pension Plan, Laegeler Asset Management Pension Plan, Mazagran Pension Plan, Michelle Investments LLC Pension Plan, Mill River Capital Management Pension Plan, Next Level Pension Plan Trust, Remece Investments LLC Pension Plan, Pleasant Lake Productions Pension Plan, Rajan Investments Pension Plan, RJM Capital Pension Plan, Spirit on the Water Pension Plan, Tarvos Pension Plan, Traden Investments Pension Plan, and Xiphias LLC Pension Plan, along with the John H. van Merkensteijn III IRA and the Richard J. Markowitz IRA.

[2] Except as otherwise indicated, the complaints filed in these cases do not differ in material ways relevant to the arguments presented in this motion.  Citations to the Xiphias Amended Complaint are accordingly meant to be exemplary, and the arguments apply equally to all of the amended complaints filed in these actions.

Pursuant to Fed. R. Civ. P. 44.1 dated Feb. 25, 2022 ("Peeters Decl."), ECF No. 82 ¶ 16.[3]  FPSF

collects that tax at source, meaning that the Belgian dividend-issuing company withholds the tax

from its dividend payments to shareholders and pays that tax over to FPSF.  Peeters Decl. ¶¶ 15–

16, 20.

       Under the double taxation treaty between Belgium and the United States, during the

relevant period, U.S. pension funds exempt from tax in the United States were subject to a 0%

withholding tax rate, rather than the standard 25%, on Belgian companies' dividends of which

the pension funds were the beneficial owners.  *See* Convention Between the Government of the

United States of America and the Government of the Kingdom of Belgium for the Avoidance of

Double Taxation and the Prevention of Fiscal Evasion with Respect to Taxes on Income, U.S.-

Belg., art. 10, ¶ 4(b), Nov. 27, 2006, S. Treaty Doc. No. 110 ("Treaty"); Peeters Decl. ¶ 18–20.

A U.S. pension fund wishing to be taxed at the Treaty rate (0%) rather than the standard Belgian

withholding rate (25%) would submit to FPSF an application for a refund of the withheld tax

with proof of its tax-exempt status and its beneficial ownership of a dividend.  Xiphias Am.

Compl. ¶¶ 27–28.  That application included a Form 276 Div., which required the applicant to,

among other things, provide a description of the income, including the name of the Belgian

company in which the applicant purchased shares, the issue date of the dividend, the payment

date of the dividend, the number of shares, and the total net dividend.  *See* Peeters Decl. ¶ 25;

Decl. of Daniel C. Davidson dated Aug. 30, 2024 ("Davidson Decl.") Ex. 2 at 26:4–21 (Tr. of

---

[3] The Court may consider evidence of foreign law in deciding a motion for summary

judgment.  *See Republic of Turkey v. Christie's Inc.*, 425 F. Supp. 3d 204, 214–17 (S.D.N.Y.

2019); Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed.).

Dirk Leukemans) (discussing Forms 276 Div. and explaining "the names of [the] pension plans

appear" on them).[4]  The Form 276 Div. also called for the applicant to provide the beneficial

owner's name, tax identification number, and address.  *See, e.g.*, Davidson Decl. Ex. 60 (Form

276 Div. listing the John H. van Merkensteijn III IRA's name, tax identification number, and

address).  An excerpt of the first page of that Form 276 Div. is reproduced below:



---

[4] Dirk Leukemans, director of FPSF's Center for Specific Matters, was FPSF's

designated corporate representative under Federal Rule of Civil Procedure 30(b)(6).

In addition to the Form 276 Div., a complete reclaim application would also include a Form 6166 from the IRS stating that the Plan was exempt from U.S. taxation, a power of attorney for the tax reclaim agent, a dividend credit advice document, and a cash equity confirmation document. *See, e.g.*, Davidson Decl. Ex. 61; *see also* Davidson Decl. Ex. 2 at 45:17–51:15 (walking through example reclaim application identifying individual defendants). Among other information, each reclaim application listed the names of each Plan's trustee, authorized representative, and a witness. *Id.* Across the reclaims at issue here, every Defendant's name appeared in applications submitted to FPSF. *Id.*

The Plans applied for and obtained dividend withholding tax refunds from FPSF. Xiphias Am. Compl. ¶¶ 31, 40. FPSF paid the first refunds at issue in this case in 2013, and all were paid to the Plans on or before July 26, 2015 (except potentially three of the refunds). [5] Defs.' 56.1 Statement ¶¶ 21–24; Davidson Decl. Ex. 5 (chart of refunds at issue in this litigation).

### B.    By The End of 2015, FPSF Believed It Was the Victim of a Fraudulent Scheme Involving the Plans

FPSF received an email on October 19, 2015, from the Belgian Federal Police (the "Federal Police"), flagged as "VERY URGENT" in the subject line and informing FPSF that they were "currently collecting information on a significant international system of fraud regarding the refund of withholding tax on dividends, which has already caused a significant

---

[5] Two reclaims appear to have been paid in August 2015, and one other was paid on an unknown date. Davidson Decl. Ex. 50. The Plan that submitted the undated reclaim paid on an unknown date submitted subsequent reclaim applications, all of which were paid before July 26, 2015. *Id.*; Defs.' 56.1 Statement ¶ 24.

disadvantage to several EU Member States (e.g. Germany and Denmark)." Davidson Decl. Ex. 6 at 7. The Federal Police sent this email to "the email address of the team [responsible for] the refunds" at FPSF. Davidson Decl. Ex. 2 at 34:15–24. The Federal Police explained how the alleged fraud operated:

> natural and legal persons . . . impersonate the actual owners of shares on which, with the dividend payment, withholding tax was withheld in the parent country. By submitting false documents, they demonstrate that in their country of residence a withholding tax is also withheld, and they request a refund of the withholding tax in the parent country, in the execution of a Treaty to prevent double taxation. Applicants support their share ownership and payment of a withholding task on the basis of false documents, or proceed to a short-term share loan or share purchase and sale, with the sole purpose of obtaining the unlawful refund of the withholding tax.

Davidson Decl. Ex. 6 at 7. In a follow-up email on October 27, 2015, the Federal Police informed FPSF that "chances are that this concerns a fraudulent act" if a reclaim application involved any of Sanjay Shah, Solo Capital Partners LLP ("Solo"), Old Park Lane Capital PLC ("Old Park Lane"), Telesto, or Westpoint. *Id.* at 5; *see also* Davidson Decl. Ex. 2 at 29:13–25 (the "police gave us information at the beginning" regarding Shah and Solo). Solo and the related entities were custodians who provided the Plans with dividend credit advice documents "stat[ing] that their clients, the pension funds, have received dividend[s]." Davidson Decl. Ex. 2 at 29:4–11.

The Federal Police told FPSF on November 9, 2015, that Solo's "UK bank account . . . was credited by bank transfers of ACUPAY SYSTEM LLPP (sic) in Belgium, for a total amount from 59,116,381.43 EUR. We suspect that this may concern unlawful refunds of Belgian withholding tax. All ACUPAY declarations may have to be checked manually to determine whether they relate to the parties involved . . . ." Davidson Decl. Ex. 6 at 3–4. Acupay System LLC ("Acupay") is a tax reclaim agent that, among other things, submitted Forms 276 Div. for U.S. resident pension plans seeking a refund of Belgian tax. *See* Xiphias Am. Compl. ¶¶ 38–40.

Goal Taxback Ltd. ("Goal") is another tax reclaim agent that provided similar services.  *See id*.
The "declarations" the Federal Police referred to were the Forms 276 Div. and supporting
documentation in the reclaim applications.  Davidson Decl. Ex. 2 at 86:15–87:5.

FPSF swiftly moved to stop refund payments to Acupay and Goal.  FPSF suspended
those payments sometime between November 10 and 12, 2015.  *See* Davidson Decl. Exs. 9–10.
The Federal Police initiated a formal criminal investigation of the alleged fraud on or about
November 23, 2015.  *See* Davidson Decl. Ex. 9.  This formal investigation and accompanying
police file began at the request of the public prosecutor.  Davidson Decl. Ex. 2 at 86:10–13.  As
the "aggrieved party," FPSF could access the investigation file with permission of the
prosecutor.  *Id.* at 109:7–13.

After suspending refund payments to Acupay and Goal, FPSF gathered additional
information about the alleged fraud.  On November 16, 2015, employees in FPSF's division
responsible for reclaim applications discussed an article about dividend withholding tax fraud
allegations in Denmark.  *See* Davidson Decl. Ex. 11 (describing the Danish tax administration's
view that "a large network of companies abroad have apparently applied to have their dividend
taxes refunded for fictional share holdings, based on falsified documents").  On November 20,
2015, FPSF received additional "information from Great Britain that . . . some companies may
be fraudulently abusing the . . . withholding tax repayment system," in connection to Solo,
Westpoint, Telesto, and Old Park Lane.  Davidson Decl. Ex. 6 at 1; *see also* Davidson Decl. Ex.
2 at 53:23–54:20 ("It is a fraud.  She said there are companies that are in this exchange of
information.  Solo Capital is in it, yes.").

A November 25, 2015, memorandum (the "Nov. 25, 2015, Memo") sets forth what FPSF
believed at that time about the alleged fraud.  Prepared by Koen Verheye, the supervisor

overseeing FPSF's audit and litigation teams, the Nov. 25, 2015, Memo explains that FPSF believed "foreign beneficiar[ies]" were fraudulently obtaining dividend withholding tax refunds using "false or incorrect documents[.]"  Davidson Decl. Ex. 10 at 2.  FPSF believed the alleged fraud involved "packages of shares chang[ing] ownership several times on the day of dividend payment between companies, in such a way that a document can be generated that shows the possession of these shares."  *Id.*  The allegedly fraudulent reclaim applications were submitted through Acupay and Goal, and FPSF therefore "put all files in which these intermediaries act on hold."  *Id.*

The Nov. 25, 2015, Memo concludes by referencing two attached Excel spreadsheets: one containing information about 478 reclaim applications submitted by Goal between November 21, 2012, and October 22, 2015, and the other containing information about 265 reclaim applications submitted by Acupay between April 23, 2014, and May 22, 2015.  Column H in these spreadsheets is entitled "Beneficiary."  Between the two spreadsheets, the name of every Plan sued in this litigation appears in the Beneficiary column.  *See* Davidson Decl. Ex. 16; Davidson Decl. Ex. 17.  Below are examples of two rows from those spreadsheets, containing the names of two defendants in this litigation, John van Merkensteijn and Richard J. Markowitz:

| Decision_date | Decision_number | Amount_in_EURO | BBAN | IBAN | BIC | Account_in_the_name_of | Beneficiary | Notification | Payable_day |
|---|---|---|---|---|---|---|---|---|---|
| 4/23/2013 | 305500 | 550000.00 | | GB30NWBK60720434014942 | NWBKGB2L | GOAL TAXBACK LIMITED | RICHARD J MARKOWTZ INDIVIDUAL RETIREMENT ACCO | 000be4 | 5/3/2012 |

| Decision_date | Decision_number | Amount_in_EURO | BBAN | IBAN | BIC | Account_in_the_name_of | Beneficiary | Notification | Payable_day |
|---|---|---|---|---|---|---|---|---|---|
| 11/21/2012 | 211543 | 292500.00 | | GB30NWBK60720434014942 | NWBKGB2L | GOAL TAXBACK LDT | JOHN H VAN MERKENSTEIJN III IRA | 000 be 6 | 5/31/2012 |

By December 11, 2015, FPSF's administration of the Special Tax Inspectorate (also known as "BBI") was investigating the alleged fraud, under the supervision of FPSF employee Yannic Hulot.  Davidson Decl. Ex. 19.  The Special Tax Inspectorate is a part of FPSF responsible for investigating fraud allegations.  Davidson Decl. Ex. 2 at 99:17–19, 102:23–103:20.  Around this time, FPSF also contemplated submitting a complaint to the public

prosecutor as a civil party. *Id.* at 107:22–108:15. A December 15, 2015 internal FPSF email attached a draft letter from Phillipe Jacquij, FPSF's "Administrateur Général," to Xavier de Paepe, the Crown Prosecutor at the Brussels Public Prosecutor's Office, that concludes by stating, "I hereby also confirm that the FPS Finances wishes to bring a civil lawsuit in this case." Davidson Decl. Ex. 21. But in an internal FPSF email chain, Edouard Struyven, a general advisor to the auditor general of finance, stated that FPSF's legal department had advised against filing a complaint. Struyven was the "contact person between operational services" and "upper management" who "monitored" the investigation of the alleged refund fraud. Davidson Decl. Ex. 2 at 90:8–91:10. The legal department, Struyven wrote, was "of the opinion that filing a civil case [was] still premature [because] . . . the case [was] being examined by the Prosecutor who currently has the freedom of investigation and initiative."[6] Davidson Decl. Ex. 20 at 1; *see also* Davidson Decl. Ex. 2 at 110:4–6. Further, "the Prosecutor would see [such] initiative as an act of distrust." Davidson Decl. Ex. 20 at 1. The preferred alternative was "to communicate to the Crown Prosecutor that [FPSF was] the victim . . . and that [they] thus request to be kept abreast on how the investigation is going." *Id.* FPSF determined that it was "sufficient" for it to act as the aggrieved party in the criminal investigation rather than as a separate civil party. Davidson Decl. Ex. 2 at 108:24–114:25. At a "later stage," FPSF could "file a civil case before the relevant court." Davidson Decl. Ex. 20 at 2. FPSF therefore revised the letter, the final

---

[6] Also in this email chain from December 15, 2015, Satoko Nakayama, the manager of FPSF's Small and Medium Enterprises division, emailed other FPSF employees that FPSF "has been the victim of fraud in connection with the repayment of foreign withholding tax to foreign beneficiaries."

version of which, sent on December 17, 2015, stated: "FPS Finances . . . has been the victim of international fraud concerning claims for the repayment of withholding tax to non-resident beneficiaries," and "wish[ed] to bring a lawsuit as injured party in this case, and to be kept informed on the outcomes of this investigation."  Davidson Decl. Ex. 14 at 2.

As part of the criminal investigation, the prosecutor ordered seizure of reclaim application documents submitted by Acupay and Goal.  Davidson Decl. Ex. 25.  In December 2015, the Federal Police seized documents relating to applications for which FPSF had already paid refunds, and in March 2016 the Federal Police seized documents relating to applications that had not yet been paid.  *Id.*; *see also* Davidson Decl. Ex. 2 at 118:8–120:4 (discussing Federal Police's seizures of documents).  Philip Vermoote of the Federal Police explained that the March seizure would "relieve[]" FPSF of rendering decisions on those applications—"since you no longer have the documents, you can no longer make a decision and no further refunds will ensue"—and stated that "thus, the documents are not intended to be copied by your service." Davidson Decl. Ex. 25 at 3.  FPSF did not retain copies of all documents seized by the Federal Police.  Davidson Decl. Ex. 2 at 122:14–25.

### C.    From the Beginning of 2016 Through July 26, 2021, FPSF Persisted in Believing It Was the Victim of an Allegedly Fraudulent Scheme Involving the Plans

Yannic Hulot's investigation into alleged dividend withholding tax fraud continued in 2016.  Part of this investigation entailed conducting internet searches to find "open source information about [the] pension plans" at issue.  *Id*. at 101:6–24.  On March 10, 2016, Hulot wrote a memorandum (the "March 10, 2016, Memorandum") titled "Report on the withholding tax fraud repaid to foreigners" to his superior, Frank Philipsen, the General Administrator of FPSF's Special Tax Inspectorate.  Davidson Decl. Ex. 30 at 1.  In the March 10, 2016, Memorandum, Hulot described the alleged fraud as involving "dummy companies" presenting

themselves as U.S. pension funds. *Id*. Hulot wrote that Sanjay Shah, "apparently a refugee in Dubai," "seems increasingly to be the potential organizer of the fraud." *Id*. The alleged fraud also apparently targeted "many other countries," with whom Mr. Hulot had been in contact. *Id*. at 2.

A March 18, 2016, memorandum from Yves Cappelier, an FPSF internal auditor, to Philippe Jacquij, summarized the "modus operandi" of the alleged fraud:

> The fraud RV[7] occurs in this case in the circumstances where a Belgian company pays a dividend to a foreign shareholder. This dividend is deducted in Belgium RV. The share that entitles the dividend is traded several times on the day of the dividend payment between different foreign companies and funds of the fraudster. That way, all those companies can say that they held the share for a short time on that day . . . . However, all companies that have held the share for a short time on the day of the dividend payment wrongly request the recovery of the RV. In this way, the tax authorities wrongly pay back the relevant RV several times (partially or integrally).

Davidson Decl. Ex. 27 at 1–2. The alleged fraud, Cappelier wrote, affected "other countries, including Denmark, the United Kingdom, Italy, Sweden [and] Finland," and FPSF's Special Tax Inspectorate had "already conducted international bilateral discussions with other affected European administrations." *Id*. at 3.

Yet another internal FPSF memorandum, attached to a March 20, 2016, email, explains FPSF's view at that time that

> [t]he withholding tax fraud originates from a loophole in the withholding tax repayment mechanism. When submitting their claim, the fraudsters rely on false assertions according to which they hold shares for which the withholding tax was collected and paid over to the Belgian Treasury, while, according to double taxation agreement, they are exempted from it. The fraud therefore lies in the undue repayment of the withholding tax through the use of falsified documents.

---

[7] FPSF employees sometimes refer to dividend withholding tax as "RV." Davidson Decl. Ex. 2 at 167:19–23.

Davidson Decl. Ex. 32 at 2.  The memorandum goes on to describe the "Beneficiaries" in the alleged fraud as "generally pension funds, most often shell companies."  *Id.* at 4.

In preparation for a meeting between FPSF and Belgian law enforcement that took place on or about March 21, 2016, FPSF employees exchanged by email lists of the names and addresses of Beneficiaries allegedly involved in the suspected fraud.  The names and addresses of every single Plan at issue in this litigation are contained in these lists.  Davidson Decl. Exs. 33–34; *see also* Davidson Decl. Ex. 2 at 142:11–14, 149:23–154:9, 254:21–256:7, 262:6–10 (discussing names of Plans and their appearance in these lists).  Below are examples of rows from these March 2016 lists, identifying the names and New York addresses of defendants John H. van Merkensteijn and Richard J. Markowitz:

| Certificateurs | Bénéficiaires |
|---|---|
| | JOHN H VAN MERKENSTEIJN III IRA |

| Certificateurs | Bénéficiaires |
|---|---|
| | RICHARD J MARKOWITZ INDIVIDUAL RETIREMENT ACCO |

| NOM_CONTRIB | EIN | Address | |
|---|---|---|---|
| JOHN H VAN MERKENSTEIJN III IRA | 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 | 211 Central Park West Apt 2G – New York NY 10024 (Tel 212 769-4055 Fax 212 873-1212) | 1811 Silverside Road – City of Wilmington – Delaware 19810 – USA |

| NOM_CONTRIB | EIN | Address | |
|---|---|---|---|
| RICHARD J MARKOWITZ INDIVIDUAL RETIREMENT | 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 | 1010 Fifth Avenue Apt 1D - New York NY10028 | 1811 Silverside Road – City of Wilmington – Delaware 19810 – USA |

**D.    Throughout 2018, FPSF Prepared to Litigate in Foreign Countries**

By the end of 2017, Belgian authorities recognized that FPSF risked losing its ability to recoup allegedly fraudulent payouts unless it initiated litigation abroad.  In a November 14, 2017 letter, Olivier Coene of the Public Prosecutor's Office alerted the Attorney General that "civil proceedings" would soon begin in Germany through which "assets seized" related to the alleged fraud would be "allocated" to "the victims."  Davidson Decl. Ex. 29 at 1.  "SKAT, the Danish

tax ministry, is very active in these proceedings," Coene wrote, which put Belgium's interests "at risk" if they did not act "with some urgency" to "appoint[] a lawyer who can defend Belgium's interests" in Germany.  *Id.*  FPSF received a copy of that letter.  Davidson Decl. Ex. 2 at 166:6–21.

An internal FPSF PowerPoint presentation prepared sometime between December 2017 and February 2018 shows that, in addition to the proceedings in Germany, FPSF was by that time contemplating participation in proceedings in the United Kingdom and initiation of a civil action in Belgium.  Davidson Decl. Exs. 41 & 2 at 175:25–177:10.  In a February 8, 2018, email, Struyven requested that the Federal Police and Public Prosecutor's office "confirm to [him] asap that the civil proceedings may be initiated at the current stage of the procedure[.]"  Davidson Decl. Ex. 42 at 1.  Struyven explained that, on the one hand, he did "not wish to interfere negatively in your investigation," but on the other hand, "these civil proceedings are equally necessary to obtain further data from [the United Kingdom's National Crime Agency ("NCA")]."  *Id.*  FPSF also learned in 2018 from the Federal Police that the United Kingdom was conducting a criminal investigation into dividend withholding fraud, and representatives of FPSF were asked to provide witness statements.  Davidson Decl. Ex. 2 at 168:13–19, 191:25–192:17 (explaining four representatives of FPSF provided witness statements to the NCA).

On May 2, 2018, Struyven requested information about "a law firm asap to initiate civil proceedings in the [Netherlands]."  Davidson Decl. Ex. 45 at 1; *see also* Davidson Decl. Ex. 2 at 174:5–22 (discussing conversations with Belgian lawyer).  FPSF knew that SKAT was already engaged in such proceedings.  Davidson Decl. Ex. 46 at 2.  Also in May 2018, SKAT filed civil lawsuits against nearly three hundred U.S. pension plans and related parties in the United States,

including Defendants Adam LaRosa and the Raubritter LLC Pension Plan.[8]  Compl., *SKAT v. Raubritter LLC Pension Plan & Adam LaRosa*, No. 1:18-cv-04833-LAK (S.D.N.Y. May 31, 2018), ECF No. 1.  FPSF, meanwhile, was in the process of seeking information about the Plans from the Internal Revenue Service.  Davidson Decl. Ex. 2 at 184:17–186:5.

By the fall of 2018, Struyven was "put[ting] together a file for [FPSF's] lawyer" containing "all available information that can be used in the civil proceeding."  Davidson Decl. Ex. 49 at 1.  On November 6, 2018, Hulot circulated to his colleagues a response to Struyven's request for information, which included a copy of testimony he provided in U.K. proceedings and an Excel spreadsheet detailing information for the overwhelming majority of tax refunds at

---

[8] In February 2019, SKAT filed suit in this Court against the following parties who are also Defendants in these actions: Azalea Pension Plan, Batavia Capital Pension Plan, Bernina Pension Plan, Calypso Investments Pension Plan, John van Merkensteijn, Laegeler Asset Management Pension Plan, Michelle Investments Pension Plan, Remece Investments LLC Pension Plan, Richard Markowitz, RJM Capital Pension Plan, Tarvos Pension Plan, and Xiphias LLC Pension Plan.  *See generally In Re: Customs and Tax Administration of the Kingdom of Denmark (Skatteforvaltningen) Tax Refund Scheme Litigation*, No. 1:18-md-2865-LAK (S.D.N.Y. 2018).  The Court can take judicial notice of the SKAT filings. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents, in deciding whether so-called 'storm warnings' were adequate to trigger inquiry notice as well as other matters.").

issue in this case.  Davidson Decl. Exs. 8 & 2 at 202:4–7 (confirming "this is the list of reclaim application[s] that Mr. Hulot had identified as relevant for the civil proceeding").

E.    **The Federal Police Shared Information with FPSF Between October 2015 and July 2019**

Beginning with the Federal Police's outreach to FPSF on October 19, 2015, the two Belgian governmental entities exchanged information about the alleged fraud, and FPSF periodically received Federal Police files.  An internal FPSF email dated January 25, 2018, for example, attaches a November 20, 2017, Federal Police report describing cash flows into and out of the Solo custodians.  *See* Davidson Decl. Exs. 28–29.  Also in March 2018, internal FPSF emails attached a PwC report dated May 30, 2016, that the Belgian Public Prosecutor's Office had asked PwC to prepare in connection with an audit.  Davidson Decl. Ex. 43.  The report categorized reclaim applications that FPSF had received as "normal" or "fraudulent."  Davidson Decl. Ex. 44.  The Federal Police also prepared a report compiled from publicly available sources of information, dated May 9, 2016, that contained the names of Defendants LaRosa, Markowitz, van Merkensteijn, Colodner, Lhôte, and Stein.[9]  Davidson Decl. Ex. 62.

FPSF may not have reviewed those reports until 2018 or later because between 2016 and 2018 the Federal Police and FPSF exchanged relatively little information.  FPSF's representative testified that he did not know whether Hulot, who was leading FPSF's investigation, took any steps between 2016 and 2018 "to increase his knowledge about this alleged fraud."  Davidson Decl. Ex. 2 at 179:1–9.  Similarly, he did not "remember that someone had [in 2016] close collaboration or collaboration at all with the police."  *Id.* at 217:14–16.  He also testified that it

---

[9] FPSF may not have seen this report until 2019 after requesting access to the court file. *See* Davidson Decl. Ex. 2 at 238:25–247:8.

"was up to the police to do this investigation, and that was our position all the time." *Id.* at 260:9–10.

On July 5, 2019, Leukemans wrote to Struyven that he had that morning reviewed Federal Police files regarding the alleged fraud. The files contained the names "of the American pension funds[.]" Davidson Decl. Ex. 57. Five days later, Struyven wrote to Olivier Coene requesting "access to the court file" in FPSF's "capacity as injured party in the aforementioned fraud case." Davidson Decl. Ex. 58 at 1. Coene replied by letter dated July 22, 2019, granting "permission to access and copy the criminal file relating to Sanjay SHAH and SOLO CAPITAL PARTNERS" for an "undetermined period of time[.]" Davidson Decl. Ex. 59 at 1; *see also* Davidson Decl. Ex. 2 at 224:9–225:8 (discussing FPSF's access to the investigation file). FPSF alleged in its complaints that in "late 2020" it "was given access to portions of the confidential investigation file of the Federal Police" that allowed it to conclude, for the first time, that refund claims made by the Refund Claimants were fraudulent." Xiphias Am. Compl. ¶ 56. The information that FPSF learned in late 2020 was that the alleged fraud involved "naked shorts," "forward contracts," and "hedging contracts." Davidson Decl. Ex. 2 at 257:24–259:4.

FPSF retained Clifford Chance, its counsel in these actions, sometime at the end of 2020 or beginning of 2021. *See id.* at 238:12–22. FPSF filed its original complaints in these actions on

July 27, 2021.  ECF No. 1.  FPSF amended its complaints on January 21, 2022, adding new Defendants whom FPSF had not named in its original complaints.  *See* ECF Nos. 48–54.[10]

## LEGAL STANDARD

A party is entitled to summary judgment when it shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  There is no genuine factual issue for trial if a "reasonable jury" could not "return a verdict for the nonmoving party."  *Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 515 (2d Cir. 2023) (internal quotation marks omitted).

## ARGUMENT

The facts of this case point inexorably to one conclusion:  FPSF's claims are barred by New York's statute of limitations for fraud claims.[11]  Plaintiffs must file their complaint within the longer of (1) six years from the date the cause of action accrued, or (2) two years from the

---

[10] Those Defendants are 2321 Capital Pension Plan, Alden Investments Pension Plan, Azalea Pension Plan, Batavia Capital Pension Plan, Bernina Pension Plan Trust, Bowline Management Pension Plan, Calypso Investments Pension Plan, Carrick Holdings Pension Plan, Clove Pension Plan, Davin Investments Pension Plan, DFL Investments Pension Plan, Laegeler Asset Management Pension Plan, Mazagran Pension Plan, Mill River Capital Management Pension Plan, Next Level Pension Plan Trust, Pleasant Lake Productions Pension Plan, Rajan Investments LLC Pension Plan, Raubritter LLC Pension Plan, Remece Investments LLC Pension Plan, RJM Capital Pension Plan, Spirit on the Water Pension Plan, and Tarvos Pension Plan.

[11] New York's statute of limitations for fraud also applies to FPSF's aiding and abetting claims.  *Marketxt Holdings Corp. v. Engel & Reiman, P.C.*, 693 F. Supp. 2d 387, 394 n.58 (S.D.N.Y. 2010).

date the plaintiff discovered, or "with reasonable diligence" could have discovered, the alleged fraud.  N.Y. C.P.L.R. § 213(8); *see also Grasso v. United Grp. of Cos.*, 806 F. App'x 69, 71 (2d Cir. 2020) (affirming dismissal of fraud claims as untimely where "Appellants' claims accrued at the moment of their investments, all of which were outside of the general six-year limitations period").  FPSF's claims accrued more than six years prior to FPSF filing suit in July 2021. Accordingly, FPSF's claims are untimely under the six-year accrual rule.  FPSF was on at least inquiry notice of the alleged fraud in 2015, and the record demonstrates that FPSF could have brought this lawsuit in 2016, if not earlier, but consciously chose not to.  As a result, FPSF's claims are also untimely under the two-year discovery rule.  By all measures, the limitations period has expired, requiring dismissal of FPSF's claims.

### A.    Applicable Law

New York law governs the timeliness of FPSF's claims.  A New York federal court sitting in diversity jurisdiction "must apply the New York choice-of-law rules and statutes of limitations."  *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998).  "New York courts generally apply New York's statutes of limitations, even when the injury giving rise to the action occurred outside New York," with the "traditional statutory exception [of] New York's 'borrowing' statute, C.P.L.R. § 202."  *Id.* at 627.  That statute provides that "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued."  N.Y. C.P.L.R. § 202; *see also* Op. and Order Den. Defs.' Mots. to Dismiss, ECF No. 120 at 38 ("The parties agree that, under New York law, the action must be timely pursuant to both New York and Belgian statutes of limitations for fraud claims because the plaintiff, FPSF, is a non-New York resident suing on a cause of action that accrued outside of New York.").  Accordingly, under the borrowing statute, the statute with the shorter limitations

period is the relevant one.  A foreign claimant cannot rely on a longer statute of limitations in New York's courts than they could in their home jurisdiction.

The "claims at issue in this action accrued in Belgium."  Pl.'s Mem. of L. in Opp. to Defs.' Mots. to Dismiss, ECF No. 87, at 25.  Accordingly, under New York's borrowing statute, FPSF must satisfy both the applicable New York and Belgian limitations periods.  In other words, FPSF's action is limited by the shorter of New York's and Belgium's statutes of limitations.  If the action is untimely under New York's statute of limitations, it must be dismissed, regardless of whether it is timely under Belgian law.[12]

New York law requires that a plaintiff sue for fraud within the longer of (1) "six years from the date the cause of action accrued" or (2) "two years from the time the plaintiff . . . discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. § 213(8); *see also Grasso*, 806 F. App'x at 71 (affirming dismissal of claims where "duty of

---

[12] Belgian law requires a plaintiff suing for noncontractual tort liability, including FPSF's fraud claims, to sue within "five years from the day after the prejudiced party becomes aware of: (i) the prejudice or its aggravation, and (ii) the identity of the party causing the prejudice."  *See* Decl. of Patrick Waeterinckx ("Waeterinckx Decl."), ECF No. 83, ¶¶ 18–22 (discussing Code Civil, Art. 2262bis (Belg.)).  FPSF has argued that this limitations period is akin to New York's two-year discovery rule in that it does not begin to run from the date the cause of action accrued. *See* ECF No. 87 at 26.  Recent legislation may have changed the relevant Belgian limitations period.  Because the borrowing statute requires that the claims be timely in both jurisdictions and FPSF's claims are untimely under New York law, the Court need not consider whether FPSF's claims are timely under Belgian law.

inquiry was triggered" more than two years before filing of claim). Regarding the two-year discovery rule, the "duty of inquiry results in the imputation of knowledge of a fraud in two different ways, depending on whether the [injured party] undertakes some inquiry. If the [injured party] makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." *LC Capital Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (citing *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993) and *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)). If the injured party does make an inquiry "once the duty arises," a court must then "impute knowledge" of what the injured party "should have discovered" "in the exercise of reasonable diligence," with the limitations period running "from the date such inquiry should have revealed the fraud." *Id.* (citing *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000)).

Thus, under New York law, a party has at least six years from the accrual of the cause of action to bring suit, but where (as here) the party had earlier notice about the alleged fraud, six years is the outer limit for the party to bring its claims.

### B.    FPSF's Claims Are Barred Under New York's Six-Year Accrual Rule

New York's six-year accrual rule straightforwardly bars virtually all FPSF's claims. As FPSF has recognized, each of its claims accrued when FPSF paid the relevant refund. *See* ECF No. 87 at 24; *see also id.* at 23–25 (arguing FPSF's claims "may" be timely because the "Amended Complaints do not allege the date of payment associated with each successful refund claim"). Under New York law, the limitations period is assessed separately with respect to each refund paid by FPSF. *See Capruso v. Vill. of Kings Point*, 23 N.Y.3d 631, 639 (2014) ("[R]epeated offenses are treated as separate rights of action and the limitations period begins to run as to each upon its commission.") (quoting *Covington v Walker*, 3 N.Y.3d 287, 292 (2004), *cert. denied* 545 U.S. 1131 (2005)). This rule operates to "save all claims for recovery of

20

damages but only to the extent of wrongs committed within the applicable statute of limitations."
*Henry v. Bank of Am.*, 48 N.Y.S.3d 67, 70 (1st Dept 2017).  Only FPSF's claims related to reclaim payments made within the limitations period can be heard by the Court.

   The only facts needed for adjudication of this issue are (i) the date on which FPSF filed suit and (ii) the dates on which FPSF made payment for each refund claim at issue.  Those dates are all known and indisputable, and they show that FPSF's claims are untimely as to all but potentially three of the reclaim applications at issue.[13]

   FPSF initially filed suit on July 27, 2021, so any claims relating to any refunds paid prior to July 27, 2015, are untimely under the six-year accrual rule.[14]  The evidence shows that FPSF paid the first refunds at issue in 2013, and FPSF paid all of the refunds at issue, except possibly three, prior to July 27, 2015.  New York's six-year accrual rule conclusively bars FPSF's claims as to all of the other reclaim applications.  *See* Defs.' Rule 56.1 Statement ¶ 21; Davidson Decl. Ex. 50 (listing each reclaim application and the date it was paid).

   FPSF may try to save more of its claims by arguing that the governor of New York issued executive orders that tolled the statute of limitations during the COVID-19 pandemic between

---

   [13] Two of those appear to have been paid in August 2015, and the other was paid on a date that currently is unknown; accordingly, that claim may be untimely as well.  *See* Davidson Decl. Exs. 5 & 50; *see also* Defs.' Rule 56.1 Statement ¶¶ 22–24 (discussing these reclaim applications).

   [14] FPSF named other Defendants for the first time only in amended complaints filed January 21, 2022; accordingly, FPSF's claims against those Defendants are even more untimely, under both the six-year accrual rule and the two-year discovery rule, discussed below.

March 20 and November 3, 2020, a total of 228 days.[15]  But FPSF cannot meet its burden of

proving that tolling applies to its claims.  *See Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d

45, 85 (E.D.N.Y. 2020) (holding plaintiff bears the burden to prove tolling applies).  While New

York State courts have found that those executive orders tolled the statutes, multiple federal

courts have found that the executive orders merely suspended the statute of limitations.  Federal

courts in New York "have found that EO [Executive Order] 202.8 and subsequent EOs *only*

applied to limitations periods for claims that would have otherwise expired during the time when

these EOs were in effect, between March 20, 2020, and November 3, 2020."  *Uzoigwe v. Charter

Commc'ns, LLC*, 2024 WL 1311525, at *5 (E.D.N.Y. Mar. 18, 2024), *report and

recommendation adopted*, 2024 WL 1756503 (E.D.N.Y. Apr. 24, 2024) (emphasis in original);

*Barry v. Royal Air Maroc*, 2022 WL 3215050, at *4 (S.D.N.Y. July 8, 2022), *report and

recommendation adopted*, 2022 WL 3214928 (S.D.N.Y. Aug. 9, 2022); *but see Natale v. Allied

Aviation Servs., Inc.*, 2024 WL 3794615, at *5 (S.D.N.Y. Aug. 13, 2024) ("The Court is

unpersuaded that the intermediate appellate courts have it wrong.  Many federal district courts—

though not all—have held that Executive Order 202.8 effected a tolling of relevant

statutes of limitations, rather than a mere suspension.").  The executive orders in question did use

the term "tolled," but the titles of the executive orders more accurately referred to a "temporary

suspension."  *See, e.g.*, New York State Executive Order No. 202.8.  Indeed, tolling the statute of

limitations would exceed the governor's authority, as Executive Law § 29-a authorizes New

---

[15] Even if this theory were correct—and it is not—it would only save a small percentage

of the claims asserted by FPSF, as the vast majority of these claims were asserted more than 6

years and 228 days after payment was made by FPSF.  *See* Davidson Decl. Ex. 50.

York's governor to "*temporarily suspend* . . . any statute . . . if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster or if necessary to assist or aid in coping with such disaster." N.Y. Exec. Law § 29-a(1) (emphasis added).  If New York's legislature meant "toll," it would have said so.  Moreover, holding that the executive orders tolled the statute of limitations would be "contrary to the spirit of the Executive Order" and "provide an unwarranted windfall to litigants . . . who had claims that did not expire during the emergency period covered by the Executive orders."  *Loeb v. County of Suffolk*, 2023 WL 4163117, at *3 (E.D.N.Y. June 23, 2023).  The executive orders responded to the emergency conditions of the pandemic to protect litigants whose "claims would expire because of an inability to access the courthouse to file their claims."  *Id.*[16]  Granting all litigants an additional 228 days to file suit after the executive orders expired would be detached from the statutory requirement of "cop[ing] with" the pandemic.  The governor extended the temporary suspension multiple times and could have extended it further were doing so necessary to cope with the emergency conditions.

Accordingly, the better interpretation of the executive orders is that they did not—and could not—add time to the statutes of limitations, but simply delayed expiration of the time periods until the end date of the suspension, November 3, 2020.  Because FPSF did not file its complaints until July 27, 2021, the suspension of the limitations period does not rescue any of FPSF's claims.  The only claims that potentially survive the six-year accrual rule are the three exceptions noted above.

---

[16] Unlike New York State courthouses, this Courthouse did not close during the pandemic.

C.    **FPSF's Claims Are Barred Under New York's Two-Year Discovery Rule**

Application of New York's two-year discovery rule yields the same clear result, but with no exceptions: every single one of FPSF's claims is untimely.  FPSF undeniably was on inquiry notice as of October 2015 when it was contacted by the Federal Police regarding the alleged fraud.  Discovery in this litigation has made clear that FPSF had *actual* knowledge of the relevant information by 2016, well more than two years before it filed suit in July 2021.  Even if it were true that FPSF lacked *some* information, FPSF would have discovered this information in the course of any reasonable investigation far more than two years before FPSF filed its initial complaints.

1.    **FPSF Was on Inquiry Notice of the Alleged Fraud in October 2015**

There can be no genuine dispute that FPSF had a duty to "pursue a reasonable investigation" by, at the latest, October 2015, when the Federal Police informed FPSF in an "URGENT" email that they were "currently collecting information on a significant international system of fraud regarding the refund of withholding tax on dividends."[17]  Davidson Decl. Ex. 6 at 7.  Indeed, this Court has already recognized that FPSF had a "duty of inquiry when it received notice of the Belgian Federal Police's investigation."  ECF No. 120 at 43.

The law in the Second Circuit and common sense both support this Court's finding that notification of potential fraud put FSFP on inquiry notice regarding its claims.  *See Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007) ("Where the circumstances are such as to suggest to a

---

[17] Prior to 2015, FPSF may have had information sufficient to put it on inquiry notice regarding its claims, but the Court need not consider that issue because the evidence establishing inquiry notice in 2015 is so compelling, and FPSF's claims remain untimely with that start date, or even a later start date, to the inquiry notice clock.

person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises . . . .") (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)); *see also, e.g.*, *Ayers v. Piaker & Lyons, P.C.*, 748 Fed. App'x 368, 371 (2d Cir. 2018) ("We agree with the District Court that in these circumstances knowledge of the fraud could be imputed to plaintiffs . . . when the SEC announced its enforcement action . . . ."). Contact by law enforcement gives a party at least inquiry notice, if not actual knowledge of its claims. *See City of Syracuse v. Loomis Armored US, LLC*, 900 F. Supp. 2d 274, 292 (N.D.N.Y. 2012) ("In the present matter, Plaintiff has adequately pled that it did not and could not have discovered the alleged fraud until November 2009 when the FBI informed one of its employees of Mr. McGuigan's criminal activity.").

In this litigation, FPSF admits that, after the Federal Police contacted FPSF about a "VERY URGENT" matter, it actively "cooperated with an investigation underway by the Federal Police" and "suspended payments for refund requests made by Acupay and Goal Taxback in November 2015." Xiphias Am. Compl. ¶¶ 54–55; *see also* ECF No. 87 at 20, 24 (discussing those allegations). Additionally, FPSF employees on December 4, 2015, prepared a report for Belgium's Minister of Finance titled "International Fraud – Foreign Withholding Tax." Davidson Decl. Ex. 18. And on December 15, 2015, Satoko Nakayama, the manager of FPSF's Small and Medium Enterprises division, emailed other FPSF employees that FPSF "*has been the victim of fraud* in connection with the repayment of foreign withholding tax to foreign beneficiaries." Davidson Decl. Ex. 20 (emphasis added). Thus, FPSF's own actions illustrate that it recognized it had a duty of inquiry in 2015.

## 2.    FPSF Had Actual Knowledge of the Alleged Fraud by 2016

FPSF had actual knowledge of the alleged fraud sufficient to trigger the two-year

limitations period in 2016, if not late 2015.  Indeed, FPSF could have filed its complaints years

earlier.  Regarding the sufficiency of FPSF's allegations, this Court stated:

> There is largely no dispute that FPSF has adequately pleaded its claim for fraud
> under the heightened pleading standard of Rule 9(b).  FPSF alleges that the Pension
> Plan Defendants made material misrepresentations of fact by submitting false tax
> refund claims to the Belgian government, with intent to induce FPSF to rely on
> those misrepresentations, and that FPSF relied on those misrepresentations when it
> refunded to the Pension Plan Defendants the claimed amounts.  Moreover, FPSF
> has pleaded specifically the contours and mechanics of the allegedly fraudulent
> scheme.  These allegations are sufficient to plead a claim for fraud under New York
> law.

ECF No. 120 at 28.  The following table—which summarizes just a portion of what FPSF knew

and when FPSF knew it— shows that FPSF knew all that information "sufficient to plead a claim

for fraud under New York law," including the identities of Defendants, the reclaims at issue, and

"the contours and mechanics of the allegedly fraudulent scheme," by 2016, or even earlier.  *Id*.

| Information or Action | Date | Source |
|---|---|---|
| FPSF knew that tax authorities were allegedly defrauded in connection with dividend tax withholding.  *See* Xiphias Am. Compl. ¶¶ 2–7 (discussing alleged fraud). | October 19, 2015 | Davidson Decl. Ex. 6 |
| FPSF knew that the alleged fraud involved "Sanjay SHAH . . .; SOLO CAPITAL PARTNERS LLP; OLD PARK LANE CAPITAL PLC; TELESTO; WESTPOINT."  *See* Xiphias Am. Compl. ¶¶ 37, 50 (discussing alleged role of Solo Capital). | October 27, 2015 | Davidson Decl. Ex. 6 |
| FPSF knew that Acupay and Goal—the reclaim agents involved in Defendants' transactions—were allegedly involved in fraud.  *See* Xiphias Am. Compl. ¶¶ 38– | November 9, 2015 | Davidson Decl. Ex. 6 |

| Information or Action | Date | Source |
|---|---|---|
| 40 (discussing alleged role of Acupay and Goal). | | |
| FPSF put on hold all files involving Acupay and Goal. *See* Xiphias Am. Compl. ¶ 54 (discussing suspension of payments to Acupay and Goal). | November 12, 2015 | Davidson Decl. Ex. 10 |
| FPSF possessed documents reflecting "what refunds were made" and the "contacts that existed with the tax reclaim agents, with the custodians involved, and the beneficial owners." *See* Xiphias Am. Compl. Exs. A–L (listing refunds at issue). | November 23, 2015[18] | Davidson Decl. Ex. 9; Davidson Decl. Ex. 2 at 67:24–68:2 ("Q: And FPSF at that time [November 2015] did have data about reclaims that had been submitted by Goal Taxback and Acupay, correct? A: Yes.") |
| FPSF knew that the "mechanism [of the alleged fraud] consists of obtaining a refund based on false or incorrect documents by a foreign beneficiary of withholding tax withheld by the Belgian dividend paying company. The foreign beneficiary provides the required certificates (276 DIV attested by foreign tax administration regarding residence abroad, credit message, proof owner of the dividends on the date of payment)." *See* Xiphias Am. Compl. ¶¶ 40–42 (discussing role of allegedly false documents). | November 25, 2015 | Davidson Decl. Ex. 10 |
| FPSF knew that (i) between November 21, 2012, and October 22, 2015, FPSF received 478 reclaim applications from Goal and (ii) between April 23, 2014, and May 22, 2015, FPSF received 265 reclaim applications from Acupay. These reclaims included as a beneficiary every single Plan that is a Defendant in | November 25, 2015 | Davidson Decl. Ex. 10 |

[18] This is the date that the Federal Police emailed FPSF regarding collecting this information from FPSF. The underlying documents and information were already in FPSF's possession from the dates that the reclaim applications were made and the refunds paid.

| Information or Action | Date | Source |
|---|---|---|
| this litigation. *See* Xiphias Am. Compl. Exs. A–L (listing refunds and Plans at issue). | | |
| FPSF calculated the alleged fraud "at nearly 296 million euros for repayments made between 2013 and 2015, for 702 claims for repayment or via requests." *See* Xiphias Am. Compl. ¶ 52 (discussing amount paid to each plan). | December 4, 2015 | Davidson Decl. Ex. 18 |
| FPSF stated it "has been the victim of international fraud in connection with the repayment of Foreign withholding tax to foreign beneficiaries and would "therefore like to bring a complaint before the Public Prosecutor's office and *file a civil lawsuit*."  (Emphasis added.) | December 15, 2015 | Davidson Decl. Ex. 20 |
| FPSF knew that "since late 2012, 3,356 highly suspicious requests have been identified for a total amount of 523.7 million euros," of which "201.5 million has been repaid and 322.2 million is currently suspended."  FPSF also knew that "the requests were submitted by 4 intermediaries in London for approximately 170 companies presented as US pension funds but which are in fact dummy companies" and that Sanjay Shah "seems increasingly to be the potential organizer of the fraud."  *See* Xiphias Am. Compl. ¶¶ 37, 50 (discussing alleged role of Solo Capital). | March 10, 2016 | Davidson Decl. Ex. 30 |
| FPSF possessed lists of pension plans that it suspected of wrongdoing that contained the names and addresses of **all** the Plans at issue in this litigation. *See* Xiphias Am. Compl. ¶¶ 10–23 (discussing Defendants). | March 20, 2016 | Davidson Decl. Exs. 33–34 |
| FPSF received a diagram outlining the alleged process by which the beneficiaries at issue obtained a refund. *See* Xiphias Am. Compl. ¶¶ 47–51 (allegations concerning refund process). | May 11, 2016 | Davidson Decl. Ex. 37 |

Thus, in May 2016, more than 5 years before FPSF filed its initial complaints, FPSF already knew:

1. the defendants named in these lawsuits;
2. the reclaim agents who submitted the reclaim applications at issue;
3. the custodians at issue;
4. the specific refunds at issue; and
5. the mechanics and contours of the alleged fraud.[19]

FPSF paid the first refund at issue in July 2013, and FPSF paid all refunds by July 26, 2015 (except potentially three of the refunds), more than six years before FPSF filed its initial complaints in July 2021.  *See* Davidson Decl. Exs. 5 & 50.  The information outlined above and discussed further in Defendants' Rule 56.1 Statement is more than sufficient to start the two-year clock in 2015 and certainly no later than 2016.  *See Graham v. HSBC Mortg. Corp.*, 2021 WL 4392522, at *5 (S.D.N.Y. Sept. 24, 2021) (complaint untimely where plaintiffs "failed to establish that even if they had exercised reasonable diligence, they could not have discovered *the*

---

[19] FPSF knew the identities of individual Defendants van Merkensteijn and Markowitz because they prominently appeared on the Forms 276 Div. for their IRAs.  *See* Davidson Decl. Exs. 60 & 64; *see also* Davidson Decl. Ex. 2 at 25:10–13 ("I saw their names . . . for Markowitz and for Merkensteijn, appear as a kind of pension fund plan.").  The names of other individual Defendants were easily discoverable and appeared in reclaim applications that FPSF had identified as suspicious.  A Federal Police report dated May 9, 2016, compiled publicly available information about Defendants LaRosa, Markowitz, van Merkensteijn, Colodner, Lhôte, and Stein.  *See* Davidson Decl. Ex. 62; *see also* Davidson Decl. Ex. 2 at 239–47 (discussing Federal Police report).

*basis* for their fraud claim") (emphasis added) (internal quotation marks and brackets omitted).

Here, the information FPSF had in 2015 and 2016 far exceeds merely the *basis* for its fraud

claims; that information comprised everything the Court subsequently considered in finding

FPSF "adequately pleaded its claim for fraud under the heightened pleading standard of Rule

9(b)." ECF No. 120 at 28.

FPSF gained still more information about the alleged fraud in 2017 and 2018. For

instance, in March 2018, FPSF received a report dated May 30, 2016, prepared by PwC after the

Belgian Public Prosecutor's Office asked it to conduct an audit.[20]  Davidson Decl. Ex. 43.  The

report categorized tens of thousands of reclaim applications as either "normal" or "fraudulent,"

with the latter category including the reclaims at issue in this litigation.  Davidson Decl. Ex. 44.

Significantly, the information in the report was based on "a list from the IT department of the

FPS Finance with all applications between 2012 and 2014."  *Id.* at 30.  That is, the information

underlying this report had been in FPSF's possession for years—it came from FPSF's own

computer systems.  Moreover, the report's conclusions supported those already reached by FPSF

in 2015 and 2016 in suspending payment on reclaim applications associated with Goal and

Acupay and in calculating the amount of allegedly fraudulent refunds at issue.  And in May

---

[20] Whether March 2018 is the first time FPSF saw this report is immaterial.  Even without

this report, FPSF had sufficient information to start the limitations period, and even if the

limitations period started in March 2018, FPSF's July 2021 complaints remain untimely under

New York's two-year discovery rule.  As discussed above, the six-year accrual period expired

prior to FPSF's July 2021 complaints except possibly as to three of the reclaim applications.

2018, FPSF learned that SKAT filed lawsuits in this very Court alleging the very same theory of

fraud against some of the very same Defendants.  *See* Defs.' Rule 56.1 Statement ¶¶ 88–89, 101–

04; *see also, e.g.*, *LC Capital*, 318 F.3d at 155 (affirming dismissal where press article and

lawsuit triggered inquiry notice).[21]

Also during the 2017–2018 period, FPSF employees increasingly expressed that FPSF

should bring civil claims, and yet FPSF continued to delay doing so for years.  On January 25,

2018, members of FPSF received an email and attached letter from the Public Prosecutor's

Office explaining that FPSF should become involved "with some urgency" in proceedings in

Germany regarding the same alleged fraud involving the Solo Custodians, lest by Belgium's

"inaction . . . all available funds will be sent to Denmark."  Davidson Decl. Ex. 29.  In February

2018, FPSF had discussions regarding initiating a civil action to seek compensation related to the

alleged reclaim fraud and appointed a lawyer to do so.  *See* Defs.' Rule 56.1 Statement ¶¶ 93–98.

In the following months, FPSF employees also discussed potential proceedings in other

countries.  *See* Defs.' Rule 56.1 Statement ¶¶ 101–11.  On October 26, 2018, Edouard

Struyven—a general advisor to the auditor general of finance—emailed Yannic Hulot—leader of

---

[21] Defendants van Merkensteijn and Markowitz were added to SKAT's lawsuits in

February 2019, still more than two years prior to FPSF's July 2021 complaints.  SKAT's

amendments also demonstrate that a party need not possess all details of an alleged fraud before

filing suit.  Moreover, as discussed herein, the two-year discovery period runs from when a party

discovered or should have discovered the basis for their claims of fraud, not all details regarding

the alleged fraud.

the Special Tax Inspectorate responsible for FPSF's investigation—to request information for "a file for our lawyer" that would contain "all available evidence that can be used in the civil proceeding." Davidson Decl. Ex. 49. Hulot responded on November 6, 2018, with attachments that included "a scan of [his] testimony" and an Excel spreadsheet providing details for allegedly fraudulent reclaim applications, including the overwhelming majority of refunds at issue in this litigation. *See* Davidson Decl. Exs. 8 & 50. That is, FPSF did not merely know that it had claims based on specific allegedly fraudulent reclaim applications, it had already amassed evidence it would rely on to try to prove those claims.

In sum, the information that FPSF possessed in November 2018—and years earlier—was more than sufficient to trigger the two-year limitations period, but FPSF continued to delay more than two and a half years before filing its initial complaints. All the way back in March 2016, more than five years before those complaints, FPSF had already identified many details of the alleged fraud, the entities and people involved, and the specific reclaim applications that were "highly suspicious." Accordingly, starting the two-year limitations period in November 2018 would seriously strain the facts and law in FPSF's favor, and yet all FPSF's claims would *still* be untimely under the two-year discovery rule. FPSF did not file its initial complaints until July 27, 2021, which is two years and 263 days after November 6, 2018.[22] On any plausible start date to the limitations period, all of FPSF's claims are untimely under the two-year discovery rule.

---

[22] Even if the governor's executive orders tolled the statutes of limitations for 228 days (and they did not), FPSF's claims would still be untimely in their entirety under the two-year discovery rule. Two years and 228 days before July 27, 2021, was December 11, 2018.

### 3.   Any Reasonable Investigation Would Have Uncovered Sufficient Knowledge Regarding the Alleged Fraud by 2016

The facts are clear that FPSF had sufficient actual knowledge more than two years before filing suit.  But even assuming that was not the case, FPSF's claims would still be untimely because any reasonably diligent party would have discovered any missing information sooner than FPSF did and more than two years before FPSF filed its initial complaints.

FPSF will likely argue that it did not have all of the information it needed to sue until 2020, but that argument fails as both a factual and legal matter.  As discussed above, FPSF did possess the relevant information years earlier.  But FPSF's argument also fails because the limitations period starts when FPSF "should have discovered the general fraudulent scheme."  *In re Integrated Res. Real Estate Sec. Litig.*, 815 F. Supp. 620, 637 (S.D.N.Y.1993) (quoting *Robertson v. Seidman & Seidman,* 609 F.2d 583, 587 (2d Cir. 1979)).  The "statute is not tolled for a plaintiff's 'leisurely discovery of the full details of the alleged scheme.'"  *Id.* (quoting *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir. 1970)).  The case law is clear and consistent on that point: where the plaintiff conducts an investigation, the two-year limitations period runs from when, by an objective standard, the investigation "should have revealed the fraud."  *LC Capital*, 318 F.3d at 154; *see also Graham*, 2021 WL 4392522, at *5 (complaint untimely where plaintiffs "failed to establish that even if they had exercised reasonable diligence, they could not have discovered *the basis* for their fraud claim") (emphasis added) (internal quotation marks and brackets omitted).  The statute is not tolled for plaintiffs who erroneously believe they require more details before filing suit, or for plaintiffs who otherwise sit on their hands.

In this case, the discovery process has revealed just how leisurely FPSF was in pursuing its claims.  All of the information the Court deemed essential to plead fraud claims was readily available to FPSF by 2018 or earlier by consulting its own records, communicating with the

Federal Police, and reviewing publicly available news stories and court filings. Already in May 2016, the Federal Police had identified Defendants LaRosa, Markowitz, van Merkensteijn, Colodner, Lhôte, and Stein through FPSF's records and publicly available information. *See* Davidson Decl. Ex. 62; *see also* Davidson Decl. Ex. 2 at 239–47 (discussing police report and its publicly available sources of information). To the extent FPSF was missing any relevant information, a reasonable party would have acquired it far more than two years before FPSF filed its initial complaints. As an illustration, the court in *In re State Street Associates* found that "with due diligence, the Debtors could have discovered the fraud at a much earlier time," but they unnecessarily delayed in making a request under New York's Freedom of Information law that would have revealed the alleged fraud. *In re State St. Assocs.*, 323 B.R. 544, 555 (Bankr. N.D.N.Y. 2005). In comparison, FPSF had far more means and opportunity to obtain relevant information. As the "agency of the government of the Kingdom of Belgium . . . responsible for, among other things, the assessment and collection of Belgian taxes," Xiphias Am. Compl. ¶ 1, FPSF has the "power to audit all of the taxpayer's books and records" and the "power to demand any information, verbally or in writing, from the taxpayer for the purpose of examining their tax situation," Waeterinckx Decl. ¶ 14, ECF No. 83. Thus, FPSF could also have obtained relevant records from Defendants or third parties, like reclaim agents or financial institutions. *See id.* Yet there is scant evidence of FPSF exercising its investigative powers for years after being put on inquiry notice of its claims. Prior to FPSF's filing its complaints in this litigation, Defendants

did not receive any requests for information from FPSF.[23]  In any event, FPSF did not need to exercise its investigative powers because it already possessed the information it needed to bring its claims.

FPSF alleges that in "late 2020" it "was given access to portions of the confidential investigation file of the Federal Police" that allowed it to conclude, for the first time, that refund claims made by the Refund Claimants were fraudulent."  Xiphias Am. Compl. ¶ 56.  This assertion is unsupported by the facts.  First and foremost, FPSF had sufficient knowledge of its claims years before 2020.  The information that FPSF purportedly first learned in late 2020 merely involved additional details about "the scheme of the fraud," specifically, the alleged use of "naked shorts."  *See* Davidson Decl. Ex. 2 at 257:24–259:7.  Information about how the underlying trades resulted in the pension funds becoming beneficial owners of Belgian shares is not significant information for purposes of bringing a lawsuit; indeed, the word "short" does not appear even a single time in FPSF's complaints.  In contrast, FPSF knew by 2016 the information that it *did* allege in its complaints: the mechanics of the alleged scheme, the reclaims at issue, and the Plans and individuals involved.  *See supra* at 26–29.

Even assuming FPSF's assertion regarding the investigation file were true—inappropriate at this summary judgment stage—it would be of no moment because nothing prevented FPSF

---

[23] FPSF cannot plausibly suggest it declined to request information from Defendants so as not to alert them to an investigation.  Defendants were alerted in 2015 that FPSF had suspended processing reclaim applications involving the custodians and reclaim agents involved in Defendants' transactions, and it was well publicized that other jurisdictions, such as Germany and Denmark, were scrutinizing their transactions.

from receiving this "confidential" information much earlier than late 2020. As the "aggrieved party" in the alleged fraud, FPSF could access "the police files," unless prevented by the prosecutor. Davidson Decl. Ex. 2 at 109:7–13. FPSF's corporate representative testified, however, that its "first request was in July 2019" for the investigation files of the Federal Police and prosecutor. *Id.* at 195:7–9, 217:14–16. When FPSF belatedly made that request, the Belgian prosecutor's office promptly approved it within a matter of days. Davidson Decl. Ex. 59. A reasonable party would have requested access to these files sooner, but FPSF was content to leave the investigation of the alleged fraud to the police: "This was up to the police to do this investigation, and that was our position all the time." Davidson Decl. Ex. 2 at 260:9–10; *see also id.* at 179:1–9 (explaining Leukemans did not know whether Hulot, who was leading FPSF's investigation, took any steps between 2016 and 2018 "to increase his knowledge about this alleged fraud"); 217:14–16 ("I don't remember that someone had at that moment [in 2016] close collaboration *or collaboration at all* with the police. That's later on.") (emphasis added).

Moreover, FPSF's attempt to divest itself of responsibility to investigate ignores the actual flow of information. The evidence shows the Federal Police obtaining information and documents *from FPSF* in 2015. *See, e.g.*, *id.* at 118:8–123:19, 198:18–199:19 (discussing Federal Police's seizure of tax reclaim documents from FPSF in 2015). FPSF's own documents and information identified the reclaim applications and parties. As an illustration of how much FPSF deferred to the police, Leukemans' testimony and other evidence reflects that FPSF did not even retain copies of all the documents it gave to the Federal Police. *See* Davidson Decl. Ex. 2 at 122:14–25; Davidson Decl. Ex. 26 at 1. That is precisely what a plaintiff cannot do when on inquiry notice. Just as a plaintiff cannot "shut [its] eyes to the facts which call for investigation," a plaintiff cannot tie its hands in a way that hinders or prevents its investigation, or "knowledge

of the fraud will be imputed to [it]." *Koch v. Christie's Intern. PLC*, 699 F.3d 141, 155 (2d Cir. 2012) (quoting *Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (1st Dept 2011)).  A reasonable investigation by FPSF would, of course, entail analyzing its own records.  In short, FPSF's protestation about lacking access to police files is nothing but a transparent and futile attempt to avoid the statute of limitations.

The evidence also shows that FPSF delayed bringing these claims not for want of information but out of deference to the Federal Police and prosecutors.  As early as December 2015, FPSF considered submitting a complaint to the public prosecutor as a civil party. Davidson Decl. Exs. 20–21.  However, FPSF's legal department advised against filing a complaint at that time because "the case [was] being examined by the Prosecutor who currently has the freedom of investigation and initiative" and "the Prosecutor would see" bringing a civil action "as an act of 'distrust.'"  Davidson Decl. Ex. 20 at 1.  FPSF heeded this advice and removed the reference to filing a civil lawsuit from a letter that it sent to the Brussels Public Prosecutor's Office in December 2015.  Davidson Decl. Ex. 14.  In the following years, FPSF continued to act on this advice and delayed bringing civil cases.  FPSF's conscious decision to defer to a prosecutor is not a basis for tolling the statute of limitations.  *See In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *9 (S.D.N.Y. Mar. 4, 2021) (plaintiffs "could not just sit back and let the class actions run their course . . .; nor could they let the Government do the work for them" and then sue); *see also Graham*, 2021 WL 4392522, at *6 n.4 (The "discovery rule does not stop the statute of limitations and permit a party to wait until a claim is served up on a silver platter.") (quoting *Adams v. Deutsche Bank AG & Deutsche Bank Sec., Inc.*, 2012 WL 12884365, at *4 (S.D.N.Y. Sept. 24, 2012)).

FPSF knew everything it needed to file suit earlier, but it delayed until after the limitations period had expired under both the six-year accrual rule and the two-year discovery rule.

## CONCLUSION

For the reasons set forth above, the Court should enter judgment in Defendants' favor on the claims asserted in Plaintiffs' complaints in these cases, except as to refunds FPSF paid after July 26, 2015.

Dated:  New York, NY
        August 30, 2024

Respectfully submitted,

/s/ Alan E. Schoenfeld
Alan E. Schoenfeld
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Alan.Schoenfeld@wilmerhale.com

Andrew S. Dulberg
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6352
Andrew.Dulberg@wilmerhale.com

*Attorneys for Defendants Batavia Capital Pension Plan, Calypso Investments Pension Plan, Richard Markowitz, DFL Investments Pension Plan, and RJM Capital Pension Plan*

/s/ Sharon L. McCarthy
Sharon L. McCarthy
Maxwell W. Brown
KOSTELANETZ LLP
7 World Trade Center
250 Greenwich Street
34th Floor
New York, NY 10007
(212) 808-8100
smccarthy@kostelanetz.com
mbrown@kostelanetz.com

Nicholas S. Bahnsen
Daniel C. Davidson
KOSTELANETZ LLP
601 New Jersey Avenue, NW
Suite 260
Washington, DC 20001
(202) 875-8000
nbahnsen@kostelanetz.com
ddavidson@kostelanetz.com

*Attorneys for Defendants Azalea Pension Plan, Bernina Pension Plan Trust, John van Merkensteijn, Michelle Investments LLC Pension Plan, Remece Investments LLC Pension Plan, Tarvos Pension Plan, and Xiphias LLC Pension Plan*

/s/ David Gopstein
_____
David Gopstein
Julie E. Fink
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel. (212) 763-0883
dgopstein@heckerfink.com
jfink@heckerfink.com

*Attorneys for Defendants Matthew Stein, Jerome Lhôte, Alden Investments Pension Plan, AOI Pension Plan, Carrick Holdings Pension Plan, Davin Investments Pension Plan, Ganesha Industries Pension Plan, Mazagran Pension Plan, Pleasant Lake Productions Pension Plan, and Rajan Investments Pension Plan*

/s/ Richard D. Weinberg
Edward M. Spiro
Richard D. Weinberg
MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
Tel. (212) 856-9600
espiro@maglaw.com
rweinberg@maglaw.com

*Attorneys for Defendants Adam
LaRosa, Alicia Colodner, Delvian
Pension Plan, Traden Investments
Pension Plan, Mill River Capital
Management Pension Plan, and
Clove Pension Plan*

/s/ Robert H. Pees
Robert H. Pees
AKIN GUMP STRAUSS HAUER
& FELD LLP
One Bryant Park
New York, NY 10036
Tel. (212) 872-1000
Fax: (212) 872-1002
rpees@akingump.com

*Attorney for Defendants 2321
Capital Pension Plan and Bowline
Management Pension Plan*

41

/s/ David R. Wright
Natalie A. Napierala
Michael L. Yaeger
David R. Wright
CARLTON FIELDS, P.A.
405 Lexington Avenue, 36th Floor
New York, NY 10174
Tel. (212) 785-2577
nnapierala@carltonfields.com
myaeger@carltonfields.com
dwright@carltonfields.com

*Attorneys for Defendants FGC*
*Securities, LLC and Stephen Wheeler*


/s/Paul S. Hugel
Paul S. Hugel
CLAYMAN ROSENBERG KIRSHNER &
LINDER LLP
305 Madison Avenue- Ste 650
New York, New York 10165
Tel. (212) 922.1080
hugel@clayro.com

*Attorneys for Defendant Laegeler*
*Asset Management Pension Plan*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations in Your Honor's Individual Rules of Practice.  Exclusive of the exempted portions of the brief, the brief contains 11,135 words.  The brief has been prepared in proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font.  The undersigned has relied on the word-count feature of this word-processing system in preparing this certificate.

/s/ Daniel C. Davidson_____
KOSTELANETZ LLP
By: Daniel C. Davidson

August 30, 2024