# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE:

KINGDOM OF BELGIUM,
FEDERAL PUBLIC SERVICE FINANCE
PENSION PLAN LITIGATION

Lead Case: No. 21 Civ. 6392 (JGK)

Member Cases:
No. 21 Civ. 6392 (JGK)
No. 21 Civ. 6399 (JGK)
No. 21 Civ. 6402 (JGK)
No. 21 Civ. 6404 (JGK)
No. 21 Civ. 6405 (JGK)
No. 21 Civ. 6407 (JGK)
No. 21 Civ. 6408 (JGK)

## MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jeff E. Butler
John P. Alexander
Julia C. Bruns
CLIFFORD CHANCE US LLP
Two Manhattan West
375 9th Avenue
New York, New York 10001

*Attorneys for Plaintiff Kingdom of
Belgium, Federal Public Service
Finance*

# TABLE OF CONTENTS

Page

Introduction ........................................................................................................................1

Factual Background ............................................................................................................2

    A.    FPSF Learns About Suspected Fraud. ...................................................2

    B.    Further Actions by FPSF. .......................................................................3

    C.    FPSF Obtains Access to the Police File. ...............................................5

    D.    FPSF Commences These Actions. ..........................................................6

Argument ............................................................................................................................6

I.    A SIGNIFICANT PORTION OF FPSF'S CLAIMS ARE TIMELY
UNDER THE SIX-YEAR ACCRUAL RULE. ........................................................7

II.    ALL OF FPSF'S CLAIMS ARE TIMELY UNDER THE TWO-YEAR
DISCOVERY RULE. ............................................................................................12

    A.    Legal Standard. .....................................................................................13

    B.    The Two-Year Period Did Not Start to Run Upon Inquiry Notice.......16

    C.    FPSF Did Not Learn Key Facts About the Fraud Until 2019. ..............17

    D.    A Reasonable Investigation Would Not Have Revealed the Fraud
Sooner. ..................................................................................................24

Conclusion ........................................................................................................................27

# TABLE OF AUTHORITIES

Page(s)

Cases

*10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*,
    21 F.4th 216 (2d Cir. 2021) ............................................................................... 10-11

*Accent Delight Int'l Ltd. v. Sotheby's*,
    No. 18 Civ. 9011 (JMF), 2023 WL 2307179 (S.D.N.Y. Mar. 1, 2023) ............................. 14, 19

*Baker v. 40 Wall St. Holdings Corp.*,
    74 Misc. 3d 381, 161 N.Y.S.3d 723 (N.Y. Sup. Ct. 2022) ........................................ 11

*Baker v. 40 Wall St. Holdings Corp.*,
    226 A.D.3d 637 (2d Dep't 2024) ................................................................. 11

*Barry v. Royal Air Maroc*,
    No. 21 Civ. 8481 (GHW)(BCM), 2022 WL 3215050 (S.D.N.Y. July 8, 2022) ..................... 11

*Brash v. Richards*,
    195 A.D.3d 582 (2d Dep't 2021) ......................................................... 8, 10, 12

*Capruso v. Vill. of Kings Point*,
    23 N.Y.3d 631 (2014) ........................................................................... 8

*Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*,
    444 F.3d 158 (2d Cir. 2006) .................................................................... 6

*Cohen v. S.A.C. Trading Corp.*,
    711 F.3d 353 (2d Cir. 2013) ......................................................... 15, 22, 24

*Cruz v. Guaba*,
    74 Misc. 3d 1207(A), 159 N.Y.S.3d 828 (N.Y. Sup. Ct. 2022) ................................. 11

*Cruz v. Guaba*,
    226 A.D.3d 964 (2d Dep't 2024) ............................................................ 9, 11

*CSAM Capital, Inc. v. Lauder*,
    67 A.D.3d 149 (1st Dep't 2009) ........................................................... 14, 23

*D'Amico v. N.Y.C.*,
    132 F.3d 145 (2d Cir. 1998) .................................................................... 6

*Dietrich v. Bauer*,
    76 F. Supp. 2d 312 (S.D.N.Y. 1999) ........................................................... 16

*Diffley v. Allied-Signal, Inc.,*
    921 F.2d 421 (2d Cir. 1990)...................................................................................... 7

*Erbe v. Lincoln Rochester Tr. Co.,*
    3 N.Y.2d 321 (1957) .............................................................................................. 13

*Favourite Ltd. v. Cico,*
    42 N.Y.3d 250 (2024) ........................................................................................ 8, 10

*Graham v. HSBC Mortgage Corp.,*
    No. 18 Civ. 4196 (KMK), 2021 WL 4392522 (S.D.N.Y. Sept. 24, 2021) .......................... 20-21

*Gutkin v. Siegal,*
    85 A.D.3d 687 (1st Dep't 2011) .............................................................................. 14

*In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litigation,*
    No. 18-md-2865 (LAK), 2024 WL 3937599 (S.D.N.Y. Aug. 26, 2024) .......................... *passim*

*In re Glob. Crossing, Ltd. Sec. Litig.,*
    313 F. Supp. 2d 189 (S.D.N.Y. 2003)..................................................................... 16-17

*In re JWP Inc. Sec. Litig.,*
    928 F. Supp. 1239 (S.D.N.Y. 1996)..................................................................... 17, 24

*In re Kingdom of Belgium, Fed. Pub. Serv. Fin. Pension Plan Litig.,*
    680 F. Supp. 3d 460 (S.D.N.Y. 2023)................................................................... 16, 26

*Ingrami v. Rovner,*
    45 A.D.3d 806 (2d Dep't 2007) ................................................................................ 7

*Koch v. Christie's Int'l PLC,*
    699 F.3d 141 (2d Cir. 2012)................................................................................ 12, 14

*Kronos, Inc. v. AVX Corp.,*
    81 N.Y.2d 90 (1993) ................................................................................................ 7

*Lentell v. Merrill Lynch & Co., Inc.,*
    396 F.3d 161 (2d Cir. 2005)................................................................................... 14

*McGuinness v. Standard Drywall Corp.,*
    193 A.D.2d 518 (1st Dep't 1993) ............................................................................ 22

*Meyer v. Seidel,*
    89 F.4th 117 (2d Cir. 2023) ............................................................................. 13, 23

*Murphy v. Harris*,
    210 A.D.3d 410 (1st Dep't 2022) ................................................................. 10, 12

*Natale v. Allied Aviation Servs., Inc.*,
    No. 23 Civ. 7260 (JPO), 2024 WL 3794615 (S.D.N.Y. Aug. 13, 2024) .......................... 10, 11

*Needham & Co., LLC v. Access Staffing, LLC*,
    No. 15 Civ. 2487 (NRB), 2016 WL 4399288 (S.D.N.Y. Aug. 12, 2016) ............................... 24

*Norddeutsche Landesbank Girozentrale v. Tilton*,
    149 A.D.3d 152 (1st Dep't 2017) ................................................................. 21

*Robertson v. Seidman & Seidman*,
    609 F.2d 583 (2d Cir. 1979) ................................................................. 15, 26

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000) ................................................................. 25

*Saphir Int'l, SA v. UBS PaineWebber Inc.*,
    25 A.D.3d 315 (1st Dep't 2006) ................................................................. 16

*Sargiss v. Magarelli*,
    12 N.Y.3d 527 (2009) ................................................................. 13

*State v. Williams*,
    224 A.D.3d 1356 (4th Dep't 2024) ................................................................. 9, 12

*Topps Co. v. Cadbury Stani S.A.I.C.*,
    380 F. Supp. 2d 250 (S.D.N.Y. 2005) ................................................................. 15, 21

*Trepuk v. Frank*,
    44 N.Y.2d 723 (1978) ................................................................. 13

*Triangle Underwriters, Inc. v. Honeywell, Inc.*,
    604 F.2d 737 (2d Cir. 1979) ................................................................. 7

*V.S. v. Muhammad*,
    595 F.3d 426 (2d Cir. 2010) ................................................................. 11

Statutes and Rules

Executive Law § 29-a ................................................................. 11, 12

Fed. R. Civ. P. 15 ................................................................. 6

Fed. R. Civ. P. 56 ........................................................................................................... 6

N.Y. C.P.L.R. 213 ..................................................................................................... 7, 12


Regulations

9 NYCRR 8.202.8 .......................................................................................................... 8

9 NYCRR 8.202.72 ........................................................................................................ 8


Other Authorities

NEW OXFORD AM. DICTIONARY (3d ed. 2010) ............................................................ 18

Plaintiff Kingdom of Belgium, Federal Public Service Finance ("FPSF") submits this Memorandum of Law in opposition to Defendants' motion for summary judgment.  This opposition is also supported by the accompanying Declaration of Yannic Hulot dated October 18, 2024 ("Hulot Decl."), Declaration of Dirk Leukemans dated October 18, 2024 ("Leukemans Decl."), Declaration of Edouard Struyven dated October 16, 2024 ("Struyven Decl."), Declaration of Eline Tristmans dated October 18, 2024 ("Tristmans Decl.") and the Declaration of Koen Verheye dated October 17, 2024 ("Verheye Decl.").

## Introduction

In this consolidated proceeding, FPSF alleges fraud with respect to more than 330 individual refund claims that resulted in payments totaling approximately €124 million.  The key allegations of fraud for each refund claim are that (1) the refund claimant did not own the Belgian company shares it claimed to own (and therefore did not receive a dividend with respect to those shares) and (2) the refund claimant was not a qualified pension plan with tax-exempt status.  For statute of limitations purposes, each refund claim and payment must be analyzed as though it were a separate cause of action.

Defendants argue that almost all of FPSF's claims are untimely based on the six-year statute of limitations for fraud.  That is incorrect.  When COVID tolling of 228 days is added to the six-year limitations period, claims based on payments made after December 10, 2014 are timely.  Here, 134 refund claims, resulting in payments totaling more than €47 million, are timely under this expanded six-year limitations period.  Thus, a substantial portion of FPSF's claims are timely regardless of whether they may also be timely based on the two-year discovery rule.

Defendants also argue that FPSF's claims are untimely because the fraud was discovered, or should have been discovered, more than two years before these cases were filed.  Again,

COVID tolling comes into play.  With the additional 228 days of COVID tolling, the relevant date for discovery of the fraud is December 10, 2018.

Defendants claim that facts from which the fraud can be inferred were known to FPSF in 2016 or, at the latest, in 2018.  Although some information about the fraud was known as early as October 2015, FPSF did not possess facts from which the key allegations of fraud could be inferred.  Specifically, FPSF did not know, for any individual refund claim, whether the refund claimant owned the shares it claimed to own, or whether the refund claimant was a qualified pension plan under US law.  These facts were revealed to FPSF only in 2019 through access to certain investigative reports prepared by the Belgian police.  Accordingly, all of FPSF's claims are timely under the two-year discovery rule.

### Factual Background

FPSF is the government agency responsible for collecting taxes in Belgium.  One such tax is a corporate dividend withholding tax, which applies to dividends paid by Belgian companies.  Pursuant to a double taxation treaty between Belgium and the United States, US pension plans are exempt from this tax.  Accordingly, FPSF has a procedure for US pension plans to request a refund of the withholding tax on any Belgian company dividend paid to the pension plan.  This type of request is often referred to as a "refund claim" or "reclaim."

### A.    FPSF Learns About Suspected Fraud.

On October 19, 2015, the Belgian Federal Police contacted FPSF concerning an investigation of an international system of fraud that had already caused significant harm in Germany and Denmark.  (Verheye Decl. ¶ 2; Davidson Decl. Ex. 6.)  The police described the suspected fraud in general terms, saying that it involved the submission of false documents in dividend withholding tax refund claims in order to obtain unwarranted payments.  (*See* Davidson Decl. Ex. 6.)  The police informed FPSF that suspicious refund claims may have been submitted

by certain tax intermediaries, including Acupay and Goal Taxback.  The police suggested that FPSF block any pending refund claims from these entities.  (*Id.*)

Following the initial communication, FPSF personnel exchanged numerous emails with the police and participated in meetings with the police.  FPSF quickly determined that substantial payments had been made in 2014 and 2015 in response to refund claims from Acupay and Goal Taxback.  (Verheye Decl. ¶ 3.)  Pending refund claims from these intermediaries were placed on hold.  (*Id.*)

**B.    Further Actions by FPSF.**

In November 2015, Yannic Hulot of FPSF's Special Tax Inspectorate performed a data analysis of all refund claims received from June 2012 to October 2015.  He observed that there had been a surge in refund claims made from Acupay and Goal Taxback in 2014 and 2015, and that these claims were much larger, on average, than typical refund claims.  This analysis is reflected in various charts prepared by Mr. Hulot, which identified the suspicious claims from Acupay and Goal Taxback as "FRAUD yes" and all other claims as "FRAUD No."  (*See* Hulot Decl. ¶¶ 3-5 & Ex. A; Struyven Decl. ¶ 4; Davidson Decl. Exs. 18, 22.)

The Special Tax Inspectorate's analysis is set forth in an internal report dated December 13, 2015.  (Hulot Decl. ¶¶ 6-7; Davidson Decl. Ex. 22.)  On the basis of this report, a letter was prepared from the head of FPSF, Philippe Jacquij, to the Public Prosecutor, Xavier de Paepe.  (*See id.* Ex. 24.)  A draft of this letter requests that FPSF be made a "civil party" (*partie civile*) in the criminal proceeding.  (*See id.* Ex. 21.)  However, on the advice of internal legal counsel, this was changed in the final version, and FPSF instead requested the status of an "injured party" (*partie lésée*) in the criminal proceeding.  (*See id.* Exs. 14, 20; Struyven Decl. ¶¶ 6-7.)  Although the letter states definitively that FPSF has been the victim of an international fraud, at this point FPSF had only limited information about the suspected fraud.  (*See* Struyven

Decl. ¶ 8.)  For this reason, the letter expressly requests that FPSF be kept informed about the outcome of the criminal investigation.  (*See* Davidson Decl. Ex. 14.)

In the ensuing months, Mr. Hulot continued to do research to establish the full scope of the suspected fraud and to develop measures to prevent potential future fraud.  From information in the refund claim files, he compiled lists of the beneficiaries (*i.e.*, the putative pension plans) involved in suspicious refund claims.  (*See* Davidson Decl. Exs. 33, 34.)  He also searched the internet and other public records for information about these beneficiaries and, in most cases, found nothing.  From these negative search results, Mr. Hulot concluded that the beneficiaries were "empty shells" (*coquilles vides*).  (*See* Hulot Decl. ¶ 9.)  This is reflected in a report from Mr. Hulot dated March 10, 2016.  (*See* Davidson Decl. Ex. 30.)  Other documents prepared around this time describe the public records searches and the "empty shells" conclusion.  (*See id.* Ex. 32; *see also id.* Ex. 35; Leukemans Decl. ¶¶ 9, 12.)

In early 2018, FPSF was asked to assist a criminal investigation in the United Kingdom by providing certain witness statements.  (*See* Leukemans Decl. ¶ 13.)  FPSF also was invited to participate in a settlement with a German bank called North Channel Bank ("NCB"), which had been involved in suspected withholding tax fraud in Denmark and Belgium.  (*Id.* ¶ 14.)  To coordinate these activities, FPSF retained a Belgian lawyer named Bernard Derveaux.  (*Id.*)  Mr. Derveaux also advised FPSF on the possibility of filing a civil lawsuit in Belgium, which to date FPSF has not pursued.  (*Id.* ¶ 15.)

Notwithstanding these activities, by the end of 2018, FPSF still had relatively little information about the suspected fraud under investigation by the Federal Police.  FPSF certainly knew generally that refund claims involving Acupay and Goal Taxback were suspicious and were under investigation by the Federal Police.  However, FPSF did not possess facts allowing it

to infer, for any individual refund claim, that (1) the refund claimant did not own the shares of a Belgian company that it claimed to own or (2) the refund claimant was not a qualified pension plan with tax-exempt status.  FPSF knew that the police were investigating these facts and was waiting for the outcome of the police investigation.  (*See* Leukemans Decl. ¶¶ 10-12, 16.)

### C.    FPSF Obtains Access to the Police File.

Around May 2019, the police informed FPSF that an interesting report concerning "trading loops" was being finalized and would become part of the police file.  (*See* Leukemans Decl. ¶ 17.)  FPSF was interested in reviewing this information.  In internal correspondence, FPSF personnel indicated that "it is important that we have access to the official reports on 'trade loopholes,' as this allows us to make the fraud more concrete."  (Davidson Decl. Ex. 56.)  FPSF also believed that this would allow their Belgian attorney to further consider a potential civil lawsuit.  (*See id.* Exs. 56, 57.)

 On July 10, 2019, FPSF submitted a letter to the Public Prosecutor, requesting access to the criminal file as an injured party (*partie lésée*).  (*See* Davidson Decl. Ex. 58.)  On July 22, 2019, the Public Prosecutor granted the request.  (*See* Davidson Decl. Ex. 59.)

Eventually, this access to the police file enabled FPSF to learn the key facts supporting the claims in this proceeding.  For example, a November 2019 police report analyzed trading data from Solo Capital and disclosed that the refund claimants sued in this proceeding did not own the shares they claimed to own.  The report explained that these refund claimants had engaged in sophisticated "trading loops" to create the appearance of share ownership.  (*See* Leukemans Decl. ¶ 21 & Ex. 4.)  Similarly, an October 2019 police report showed that, based on an analysis of banking records obtained by the police, Xiphias was engaged in transactions wholly inconsistent with that of a legitimate pension plan.  (*See* Leukemans Decl. ¶ 20 & Ex. 3.)

D.      **FPSF Commences These Actions.**

On July 27, 2021, FPSF filed the original complaints in these consolidated actions. Amended Complaints were filed on January 21, 2022. The Amended Complaints allege fraud with respect to more than 330 individual refund claims. As to each refund claim, FPSF alleges that false statements had been made because (1) the refund claimants did not own the Belgian company shares they claimed to own and (2) the refund claimants were not qualified pension plans.[1]

### <u>Argument</u>

"[S]ummary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *D'Amico v. N.Y.C.*, 132 F.3d 145, 149 (2d Cir. 1998); Fed. R. Civ. P. 56(a). Courts do not "weigh the evidence," but rather "view[] the facts in the light most favorable to the [nonmoving party] and resolv[e] all factual ambiguities in [its] favor . . . to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006). "A genuine issue of fact for trial exists when there is sufficient evidence on

---

[1] The Amended Complaints asserted claims against some refund claimants that were not previously named as Defendants. These additional refund claimants are purported pension plans controlled by individuals who were already named as Defendants in these proceedings. In a footnote, Defendants assert that the claims against these parties are "even more untimely." (Defs.' Br. 21 n.14.) This is wrong. Because the claims arise out of the same conduct, transactions, or occurrences, they relate back to the date of the original pleadings. *See* Fed. R. Civ. P. 15(c). Thus, the same statute of limitations analysis applies to all claims.

which a jury could reasonably find for the plaintiff." *Id.* (citation omitted).

## I.    A SIGNIFICANT PORTION OF FPSF'S CLAIMS ARE TIMELY UNDER THE SIX-YEAR ACCRUAL RULE.

The parties agree that New York law governs the timeliness of FPSF's claims. *See Diffley v. Allied-Signal, Inc.*, 921 F.2d 421, 423 (2d Cir. 1990) ("In diversity cases, state statutes of limitations govern the timeliness of state law claims, and state law determines the related questions of what events serve to commence an action and to toll the statute of limitations." (internal quotation marks omitted)).[2]

Under New York law, a fraud claim must be brought within the greater of six years from the date the cause of action accrued, or two years from the time the plaintiff discovered the fraud, or could with reasonable diligence have discovered it.  N.Y. C.P.L.R. 213(8).  As discussed below, many of FPSF's claims are timely under the six-year accrual rule.

A claim accrues when "the claim becomes enforceable, *i.e.*, when all elements of the tort can be truthfully alleged in a complaint." *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993).  If damages are an essential element of the claim, then the claim is "not enforceable until damages are sustained." *Id.; see also Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 748 (2d Cir. 1979) (noting that, under New York law, a fraud claim accrues when the

---

[2] In a footnote, Defendants suggest that, under New York's borrowing statute, FPSF's claims may be untimely under Belgian law.  (Defs.' Br. 19 n.12.)  This is incorrect.  Defendants' own expert explains that a plaintiff has five years from discovery to bring claims.  (*See* Davidson Decl. Ex. 7, ¶¶ 21-22.)  In addition, the limitation period statute is extended during the pendency of a criminal investigation.  (*See id.* ¶¶ 30-31.)  The Belgian criminal investigation in this matter remains ongoing.  (*See* Leukemans Decl. ¶ 23; Tristmans Decl. ¶¶ 55-56.)

plaintiff has "suffered damage"); *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (2d Dep't 2007) (holding that the statute of limitations in a fraud case began to accrue when the plaintiff suffered the injury, not when the defendant made the misrepresentations themselves). Here, damages form an essential element of FPSF's claims for fraud, so each claim accrued no earlier than the time FPSF made a payment based on a fraudulent refund claim. For purposes of applying the limitations period, each payment represents a separate claim. *See Capruso v. Vill. of Kings Point*, 23 N.Y.3d 631, 639 (2014) ("[R]epeated offenses are treated as separate rights of action and the limitations period begins to run as to each upon its commission." (internal quotation marks omitted)).

In response to the COVID pandemic, New York's Governor issued executive orders that tolled all statutes of limitations from March 20, 2020 until November 3, 2020. *See* 9 NYCRR 8.202.8 (providing that "any specific time limit for the commencement, filing, or service of any legal action" is "hereby tolled" from March 20, 2020); 9 NYCRR 8.202.72 (ending the tolling period as of November 4, 2020); *see also Favourite Ltd. v. Cico*, 42 N.Y.3d 250, 260 (2024) ("On March 20, 2020, Executive Order 202.8 was enacted and tolled all filing periods until November 3, 2020."). As a result, this 228-day period must be excluded from the running of any limitations period. *See Favourite*, 42 N.Y.3d at 260-61 (noting that the COVID executive orders require "[s]ubtracting the tolling period"); *Brash v. Richards*, 195 A.D.3d 582 (2d Dep't 2021) (explaining that "the period of the toll is excluded from the calculation of the relevant time period" (internal quotation marks and alterations omitted)). For claims expiring after March 20, 2020, this has the effect of extending the applicable limitation period by 228 days.

FPSF commenced these actions on July 27, 2021. Taking into account the COVID tolling period, a claim is timely if it relates to a payment made after December 10, 2014—*i.e.*, six

years and 228 days before the filing date. This is true for many of FPSF's claims, including at least one claim against each refund claimant. In all, there are 134 such claims, involving a total of €47,241,523 in damages. (*See* Leukemans Decl. ¶ 5 & Ex. 1.)[3]

For instance, one of FPSF's claims concerns a €1.32 million payment to Michelle Investments on March 27, 2015. (*See id.*) When COVID tolling began on March 20, 2020, there was a little over one year remaining in the six-year limitations period. The clock then stopped running for 228 days. When the COVID toll ended on November 4, 2020, FPSF still had a little over a year to file suit. Thus, the commencement of this action on July 27, 2021 was well within the six-year-plus-228-day period. *See, e.g., State v. Williams*, 224 A.D.3d 1356, 1357-58 (4th Dep't 2024) ("[H]ere, the statute of limitations was tolled from March 20, 2020, at which time 289 days remained in the limitations period, until November 3, 2020, and thereafter the statute of limitations began to run again, expiring on August 19, 2021." (internal quotation marks and alterations omitted)); *Cruz v. Guaba*, 226 A.D.3d 964, 965-66 (2d Dep't 2024) (finding claim timely because plaintiff had 10 months left to sue in March 2020 and "[t]his remaining period started to run after the toll was lifted on November 4, 2020" (internal quotation marks omitted)).

Defendants argue that the COVID executive orders should be interpreted only as suspending, and not tolling, the statute of limitations. In other words, Defendants contend that the executive orders only prevented limitation periods from *expiring* during the 228 days and that

---

[3] Two of the claims relate to payments made on August 27, 2015 and are therefore timely even without factoring in the COVID toll. (*See* Leukemans Decl. ¶ 5 & Ex. 1 (payments to AOI Pension Plan and Traden Investments Pension Plan).)

any affected limitation period then expired immediately on November 4, 2020.  (*See* Defs.'
Br. 22-23.)  This is wrong as a matter of well-settled New York law.

      The COVID executive orders expressly stated that they "tolled" the statute of limitations.
*See Brash*, 195 A.D.3d at 582-84 (noting that the original order "expressly and plainly provided
that the subject time limits were 'hereby tolled,' and two of the subsequent executive orders
referred to the temporary alternation of the subject time limits as a 'toll.'" (internal quotation
marks and citations omitted)).  Consistent with this, the New York Court of Appeals has treated
the orders as tolling the statute of limitations.  *See Favourite*, 42 N.Y.3d at 260-61 (describing
the executive orders as having "tolled" the statute of limitations, and that this requires
"[s]ubtracting the tolling period").  Moreover, New York's Appellate Division has repeatedly
rejected the argument advanced by Defendants here.  *See, e.g., Murphy v. Harris*, 210 A.D.3d
410, 411 (1st Dep't 2022) (ruling that that "[t]he subject executive orders constituted a toll of the
applicable statute of limitations," and rejecting argument that they "constituted only a
suspension"); *Brash*, 195 A.D.3d at 582-84 (same).  Several federal courts in this District have
reached the same conclusion.  *See, e.g., Natale v. Allied Aviation Servs., Inc.*, No. 23 Civ. 7260
(JPO), 2024 WL 3794615, at *5 (S.D.N.Y. Aug. 13, 2024) ("Based on the decisions of the New
York Appellate Division and other courts in this district, along with the plain text of Executive
Order 202.8, the Court concludes that the orders effected a 228-day toll of the ERISA
Section 515 claim." (collecting authority)).

      Tellingly, Defendants do not cite any state-level case law in support of their position.
Instead, they point only to a handful of federal district court cases.  (Defs.' Br. 22-23.)  These
cases should not be followed here.  As an initial matter, New York's appellate authority controls
on this issue of New York law.  *See 10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216,

221 (2d Cir. 2021) ("In construing New York law, we are bound by the law of New York as interpreted by the New York Court of Appeals, and we consider the language of state intermediate appellate courts to be helpful indicators of how the state's highest court would rule." (internal quotation marks and alterations omitted)); *V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010) ("This Court is bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion.").  The court in *Natale* made this point expressly.  *See Natale*, 2024 WL 3794615, at *5 ("The Court is unpersuaded that the intermediate appellate courts have it wrong").

Moreover, the federal cases cited by Defendants are distinguishable.  Some of the cases involved federal claims as to which New York tolling rules did not apply in the first place.  *See, e.g., Barry v. Royal Air Maroc*, No. 21 Civ. 8481 (GHW)(BCM), 2022 WL 3215050, at *4 (S.D.N.Y. July 8, 2022) (noting that because the claim arose under a treaty it "is therefore not subject to tolling").  In addition, in reaching their conclusion, the cited cases relied on New York trial court decisions that have since been overturned.  For example, the *Barry* decision cited *Cruz v. Guaba*, 74 Misc. 3d 1207(A), 159 N.Y.S.3d 828 (N.Y. Sup. Ct. 2022) and *Baker v. 40 Wall St. Holdings Corp.*, 74 Misc. 3d 381, 382, 161 N.Y.S.3d 723, 724 (N.Y. Sup. Ct. 2022)).  Those decisions were later overturned on appeal.  *See Cruz*, 226 A.D.3d at 965; *Baker v. 40 Wall St. Holdings Corp.*, 226 A.D.3d 637, 638 (2d Dep't 2024).

Defendants also contend that New York's Governor lacked the authority to enact a toll.  This is incorrect.  The Governor issued the COVID executive orders pursuant to Executive Law § 29-a, which states that the Governor may "temporarily suspend" statutes in the case of a disaster emergency.  The statute explains that such a suspension may include the "alteration or

modification of the requirements of such statute, local law, ordinance, order, rule or regulation suspended, and may include other terms and conditions."  N.Y. Exec. Law § 29-a(2)(d).  Tolling the statute of limitations easily falls within this broad language.  *See Brash*, 195 A.D.3d at 584 ("This language in Executive Law § 29-a(2)(d) indicates that the Governor is authorized to do more than just 'suspend' statutes during a state disaster emergency; he or she may alter or modify the requirements of a statute, and a tolling of time limitations contained in such statute is within that authority." (internal quotation marks and alterations omitted)); *see also Murphy*, 210 A.D.3d at 411 (same).

Finally, there would be nothing unfair about applying the COVID toll in these cases.  The toll was implemented because pandemic-related shutdowns effectively deprived litigants of the opportunity to investigate and develop potential claims.  *See Williams*, 224 A.D.3d at 1358 ("A toll operates to compensate a claimant for the shortening of the statutory period in which it must commence an action, irrespective of whether the stay has actually deprived the claimant of *any* opportunity to do so." (emphasis in original; internal quotation marks and alterations omitted)).  FPSF, which was developing the claims in this case when the pandemic began, plainly falls within the category of litigants the toll was intended to benefit.

## II.    ALL OF FPSF'S CLAIMS ARE TIMELY UNDER THE TWO-YEAR DISCOVERY RULE.

A fraud claim also is timely if brought within two years from the time the plaintiff "discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. 213(8); *see also Koch v. Christie's Int'l PLC*, 699 F.3d 141, 154 (2d Cir. 2012).  The discovery rule operates to expand the time to bring suit so that the statute of limitations does not "precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims."

*Meyer v. Seidel*, 89 F.4th 117, 135 (2d Cir. 2023) (internal citations and quotation marks omitted); *see also In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litigation, ("In re SKAT")*, No. 18-md-2865 (LAK), 2024 WL 3937599, at *9 (S.D.N.Y. Aug. 26, 2024) (noting that this is a "core rationale" of the discovery rule).

FPSF filed these lawsuits on July 27, 2021.  Taking into account the COVID tolling period, the relevant date for application of the discovery rule is December 10, 2018—two years and 228 days prior to the filing date.  (*See* Defs.' Br. 32 n.22.)  As set forth herein, Defendants have not presented evidence that would allow the Court to conclude, as a matter of law, that FPSF discovered, or could with reasonable diligence have discovered, the fraud prior to this date. For this reason, Defendants' motion should be denied.

### A.    Legal Standard.

Under New York law, discovery of the fraud—or "actual knowledge"—requires knowledge of facts from which the fraud reasonably could be inferred.  To resolve this issue by motion, the evidence of a plaintiff's knowledge must be conclusive.  *See Trepuk v. Frank*, 44 N.Y.2d 723, 725 (1978) ("Where it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts.").  Importantly, mere suspicion of fraud is not sufficient.  *See Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009) ("Generally, knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute." (quoting *Erbe v. Lincoln Rochester Tr. Co.*, 3 N.Y.2d 321, 326 (1957)));  *see also Meyer*, 89 F.4th at 135 ("Knowledge of the facts which aroused plaintiff's suspicions as to the defendant's honesty is not necessarily knowledge of facts from which the alleged fraud might be reasonably inferred." (internal citations, quotation marks and alterations omitted)).  Moreover, although a plaintiff need not know all the details of the fraud, it must have knowledge

of "facts from which it could infer both the specific defendant's involvement and the specific nature of the fraud he perpetrated." *In re SKAT*, 2024 WL 3937599, at *9.

Courts apply an objective standard to determine whether fraud reasonably can be inferred from a set of facts. *See CSAM Capital, Inc. v. Lauder*, 67 A.D.3d 149, 155 (1st Dep't 2009) ("Even were we to assume that the appellants in this case are particularly sophisticated investors, the standard is an objective one based on a person of ordinary intelligence."). Consistent with this, a plaintiff cannot be charged with actual knowledge when the known facts merely suggest, but do not require, an inference of fraud. *See In SKAT*, 2024 WL 3937599, at *7 ("Facts might suggest something that cannot be inferred reasonably because the latter, unlike the former, necessarily relies upon known facts or evidence assumed to be true."); *Accent Delight Int'l Ltd. v. Sotheby's*, No. 18 Civ. 9011 (JMF), 2023 WL 2307179, at *15 (S.D.N.Y. Mar. 1, 2023) ("[T]he discovery rule is not triggered where the plaintiff has knowledge only of facts that could reasonably be consistent with non-fraudulent activities.").

In addition, New York law recognizes that "a plaintiff may be put on inquiry notice, which can trigger the running of the statute of limitations if the plaintiff does not pursue a reasonable investigation." *Koch*, 699 F.3d at 155 (citing *Gutkin v. Siegal*, 85 A.D.3d 687, 688 (1st Dep't 2011)). If, on the other hand, some inquiry is made, the two-year period begins to run only when the plaintiff actually discovers the necessary facts or when a reasonably diligent investigation would have revealed them. *See Koch*, 699 F.3d at 153; *see also Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005) (discussing inquiry notice as applied to the statute of limitations for securities fraud, and noting that plaintiffs need not file suit "before they can discover with the exercise of reasonable diligence the necessary facts to support their claims" (internal quotation marks omitted)).

Whether reasonable diligence would have revealed the fraud is governed by an objective standard. *See Topps Co. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 258 (S.D.N.Y. 2005) ("The test employed by the courts to determine whether the fraud should have been discovered is an objective one." (collecting cases)). The determination is also highly fact-specific. *See id.* ("There is no general rule as to the number or nature of facts which should trigger such an investigation. Rather, each case presents a universe of unique facts which must be evaluated in order to determine whether the alleged fraud should have been discovered."). Moreover, the quality of the plaintiff's actual investigation is not determinative. What matters is whether a reasonably diligent investigation, had one been performed, would have revealed the facts necessary to infer fraud. *See Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 362–63 (2d Cir. 2013) (noting that even if reasonable diligence "required [plaintiff] to do more than she did, there is no adequate reason on this record to conclude that such further reasonable diligence would have revealed" the facts).

On a summary judgment motion, the movant has the burden of showing that there are no genuine disputed issues of fact concerning these issues of knowledge and constructive knowledge. Courts have recognized that this is a difficult burden to meet. *See Robertson v. Seidman & Seidman*, 609 F.2d 583, 591 (2d Cir. 1979) (explaining that "[i]ssues of due diligence and constructive knowledge depend on inferences drawn from the facts of each particular case similar to the type of inferences that must be drawn in determining intent and good faith," and that "the party seeking summary judgment has the burden of establishing that there is no dispute regarding these issues); *Topps*, 380 F. Supp. 2d at 259 (noting that a summary judgment movant "faces considerable hurdles" on this "intensive and fact-specific" issue, and "the Second Circuit has held that it ordinarily should not be disposed of by summary disposition." (internal quotation

marks omitted)); *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 345–46 (S.D.N.Y. 1999) ("[E]ven in the

context of a summary judgment motion, this Court has noted the care that must be taken in

deciding such a motion, because the question of whether a plaintiff exercised reasonable

diligence is usually a question of fact for the jury to decide." (collecting cases)); *Saphir Int'l, SA*

*v. UBS PaineWebber Inc.*, 25 A.D.3d 315, 316 (1st Dep't 2006) ("[W]hether a person had

sufficient knowledge to discover a fraud necessarily involves a dispute over state of mind and

conflicting interpretations of perceived events." (internal quotation marks and alterations

omitted)).

### B.    The Two-Year Period Did Not Start to Run Upon Inquiry Notice.

In this case, FPSF was informed in October 2015 that the Belgian police were

investigating a potential fraud relating to dividend withholding tax refund claims.  There is no

dispute that this constituted inquiry notice of the fraud.  In reaction, FPSF took a number of steps

to learn more about the potential fraud.  For example, FPSF's Special Tax Inspectorate analyzed

data available within FPSF to determine the full scope of FPSF's losses.  (*See* Hulot Decl.

¶¶ 3-8; Struyven Decl. ¶¶ 4-5, 9; Davidson Decl. Exs. 22, 30 & 32.)  FPSF also requested the

status of an "injured party" in the criminal proceeding, and asked to be kept informed about

developments in the criminal investigation.  (*See* Struyven Decl. ¶ 6; Davidson Decl. Ex. 14.)  In

addition to these steps, FPSF reasonably relied on the Belgian police to thoroughly investigate

the fraud, and expected to learn all relevant facts upon completion of the criminal investigation.

Indeed, under the "*una via*" principle, FPSF was *required* to defer to the investigation of the

Federal Police.  (*See* Tristmans Decl. ¶¶ 25-34.)

Because FPSF engaged in a reasonable inquiry and did not "shut its eyes" to the fraud,

the two-year period did not start to run upon inquiry notice.  *See In re Kingdom of Belgium, Fed.*

*Pub. Serv. Fin. Pension Plan Litig.*, 680 F. Supp. 3d 460, 481 (S.D.N.Y. 2023) ("[B]ecause

FPSF conducted an investigation, the limitations period begins to run from the date such inquiry should have revealed the fraud." (internal quotation marks omitted)); *see also In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 203 (S.D.N.Y. 2003) (noting that the limitations period did not run from the date of inquiry notice because "the plaintiffs here began to investigate at a minimum within a few months after inquiry notice arose"); *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1250 (S.D.N.Y. 1996) (same). Defendants do not claim otherwise. Therefore, the relevant questions on this motion are (1) whether FPSF had actual knowledge of facts from which the fraud could be inferred before December 10, 2018 and (2) whether a hypothetical reasonably diligent investigation would have revealed such facts before that date.

### C.    FPSF Did Not Learn Key Facts About the Fraud Until 2019.

Defendants argue that FPSF obtained actual knowledge of the fraud by 2016. However, there is substantial evidence that FPSF did not possess facts from which fraud could be inferred until 2019. Such evidence should preclude any ruling as a matter of law that FPSF had adequate knowledge of the fraud before December 10, 2018.

FPSF could not reasonably infer fraud until the facts indicated which statements contained in individual refund claims were false or misleading. Here, the key allegations of fraud are that, for each refund claim: (1) the refund claimant did not own the Belgian company shares it claimed to own and (2) the refund claimant was not a qualified pension plan. FPSF did not possess these facts until 2019, after obtaining access to the police file. (*See* Leukemans Decl. ¶¶ 17-22; *see also* Struyven Decl. ¶¶ 8-9.) For instance, a November 2019 police report explained that the refund claimants participated in "trading loops" to create the appearance of share ownership when in fact none existed. (*See* Leukemans Decl. ¶ 21 & Ex. 4.) Also, an October 2019 police report showed that at least one refund claimant was engaged in transactions wholly inconsistent with that of a legitimate pension plan. (*See* Leukemans Decl. ¶ 20 & Ex. 3.)

These facts allowed FPSF to identify, for the first time, specific false statements made in individual refund claims.

Defendants argue that FPSF had actual knowledge in 2016 because FPSF already knew some of the facts that were included in the complaints filed in 2021. Specifically, they contend that FPSF knew in 2016 which refund claims were fraudulent, the identity of the Defendants and the "contours and mechanics" of the fraud. (Defs.' Br. 26.) This argument improperly conflates FPSF's *suspicion* of fraud with actual knowledge of fraud. Moreover, the argument ignores that FPSF did not have facts to establish which statements, if any, were false or misleading in the collection of documents submitted with any individual refund claim.

For example, Defendants point to a December 2015 letter in which FPSF called itself a "victim" of fraud. (*See, e.g.*, Davidson Decl. Ex. 14.) This reflects a subjective belief, not knowledge of facts. Indeed, the letter itself refers to the refund claims as being "*highly suspicious*." (*See id.* (emphasis added); *see also id.* Ex. 30 (describing "highly suspicious requests").) A suspicion may result from subjective belief,[4] but it does not establish knowledge of facts. Without the requisite objective facts, however, mere suspicion cannot trigger the two-year period. *See, e.g., In re SKAT*, 2024 WL 3937599, at *6 (denying summary judgment because even if SKAT "suspected, *but did not know*, th[at] [defendant] was involved in fraudulent refund claims . . . , the Court cannot hold as a matter of law that SKAT knew about

---

[4] This is confirmed by well-recognized dictionary definitions of "suspicion." *See, e.g.*, NEW OXFORD AM. DICTIONARY (3d ed. 2010) ("a *feeling or thought* that something is possible, likely, or true" or a "*feeling or belief* that someone is guilty of an illegal, dishonest, or unpleasant action" (emphasis added)).

the fraud alleged in the 2021 Complaint because mere suspicion falls short of actual knowledge" (emphasis in original)); *Accent Delight*, 2023 WL 2307179, at *15 (same, because even though plaintiff was told by a third party that the fraud "could stretch" to the "upper ranks" of defendant, this was "mere suspicion" and "[did] not mean that Plaintiffs had knowledge of [defendant's] allegedly fraudulent acts").

As to the limited facts FPSF knew in 2016, these did not provide a reasonable basis to infer fraud with respect to any individual refund claim. For example, FPSF knew that the police suspected refund claims submitted by Acupay and Goal Taxback. On that basis, FPSF was able to identify the roughly 700 claims submitted by these entities. (*See* Hulot Decl. ¶¶ 3-5; Struyven Decl. ¶¶ 4-5; Verheye Decl. ¶¶ 2-3; Davidson Decl. Ex. 22.) This does not imply that FPSF possessed facts identifying the specific false statements within these claims. It merely means that FPSF knew that these refund requests were among those under suspicion by the police.

Likewise, by identifying the refund claims submitted by Acupay and Goal Taxback, FPSF was able to tabulate the names of refund claimants, and some of the persons associated with those claims. Again, this only means FPSF knew that these persons were associated with suspicious claims, not that those persons had in fact committed fraud.

Defendants also present documents in which FPSF personnel referred to refund claimants as *coquilles vides* (translated as "shell companies" or "dummy companies"). This description—colorful though it may be—does not indicate actual knowledge that the refund claimants were not qualified pension plans. Rather, it reflects a subjective belief arising from certain internet and database searches that did not yield any results for those entities. (*See* Hulot Decl. ¶ 9; Struyven Decl. ¶ 9; Davidson Decl. Ex. 32.) Applying an objective standard, however, the absence of public records concerning a pension plan does not warrant the inference that the

pension plan does not exist.  This is especially true given that an IRS document submitted with each refund claim appeared to confirm that the claimant was a legitimate, tax-exempt entity. (*See* Leukemans Decl. ¶¶ 9, 12.)

Moreover, although FPSF suspected fraud in connection with Acupay and Goal Taxback claims, it did not actually know which statements were fraudulent in any particular refund claim. (*See* Struyven Decl. ¶ 8.)  For example, FPSF documents state that the fraud involved "false or incorrect documents."  (*See* Davidson Decl. Ex. 10.)  This generic observation is true of any document-based fraud and cannot be equated with actual knowledge.  In addition, FPSF initially believed that the fraud was committed by engaging in multiple share purchases and sales on the day before the dividend was paid.  (*See* Leukemans Decl. ¶ 11; Struyven Decl. ¶ 10; Verheye Decl. ¶ 5; Davidson Decl. Exs. 6, 10 & 27.)  However, this belief turned out to be mistaken.  As it turned out, the refund claimants never owned Belgian company shares at all.  FPSF cannot be charged with knowledge of "facts" that were merely incorrect assumptions at the time.

Defendants assert that FPSF knew enough about the "basis" for its claim, and that the details of "how" the refund claimants owned the shares are not essential.  (Defs.' Br. 29-30, 35.) This misconstrues the issue.  FPSF needed to know *whether*—not how—the refund claimants owned the shares in question.  Without this information, FPSF had only suspicions, not facts, and so could not reasonably infer the fraud.  Defendants cite *Graham v. HSBC Mortgage Corp.*, No. 18 Civ. 4196 (KMK), 2021 WL 4392522 (S.D.N.Y. Sept. 24, 2021), but that case involved a very different situation.  In *Graham*, the plaintiffs alleged that the defendant defrauded them by misrepresenting the zoning status of a building.  *Id.* at *4.  The court ruled that the two-year discovery period began to run when the town told plaintiffs about the correct zoning status.  *Id.* at *5-6.  At that time, the plaintiffs had actual knowledge of facts from which the fraud could be

inferred even if they did not, as a practical matter, reach that conclusion.  *Id.* at *6 n.4.  Here, by contrast, FPSF did not yet know that any particular statement in a refund claim was false and, therefore, lacked knowledge from which the fraud could reasonably be inferred.

For the foregoing reasons, the Court should not rule as a matter of law that FPSF had actual knowledge of the fraud in 2016.  *See, e.g., SKAT*, 2024 WL 3937599, at *7 (denying summary judgment because "SKAT's knowledge of the connections between the Schedule B Plans and Schedule A Plans and [defendant's] participation in the former did not *require* SKAT to infer [defendant's] participation in the latter" (emphasis in original); *Topps*, 380 F. Supp. 2d at 258 (same, because although plaintiff knew that defendant used some of its Topps Technology, this did not mean plaintiff knew the extent of the use, and "determining what constitutes Topps Technology is a fact-intensive inquiry"); *Norddeutsche Landesbank Girozentrale v. Tilton*, 149 A.D.3d 152, 161–62 (1st Dep't 2017) ("We merely determine, at this early stage of the litigation, that the evidence presented by defendants can be interpreted in a myriad of ways and does not facially clash with plaintiffs' position that, even having some knowledge that the Funds had an equity component to them, they could not have known before the SEC proceeding the extent to which defendants used plaintiffs' investment to acquire and control the Portfolio Companies, or otherwise had an obligation, based on that evidence, to further investigate.").

Defendants also argue, in the alternative, that FPSF obtained actual knowledge by 2018. However, the evidence presented by Defendants does not support such a conclusion.

Defendants contend that, in 2018, FPSF saw a report from PWC that listed various reclaim applications (including the ones at issue here) as "fraudulent."  (Defs.' Br. 30 (citing Davidson Decl. Ex. 44, at 30).)  However, the report did not disclose the key facts from which the fraud could reasonably be inferred.  PWC prepared this report in 2016 in order to identify

weaknesses in FPSF's procedures and controls and the "possible causes of the above suspected fraud." (Davidson Decl. Ex. 44; *see also* Verheye Decl. ¶ 8.)  The report does not include any determination that fraud had actually occurred, much less disclose the key facts about share ownership and pension plan status as to any particular refund claim.  Rather, the report simply reflects the general suspicion in 2016 that refund claims involving Acupay and Goal Taxback were fraudulent.  For instance, the report explains that PWC had received a "list from the police of all applications that could be linked to the above suspected fraud." (*Id.* at 31.)  This correlates with the list of suspicious refund claim already prepared by FPSF around the same time. (*See* Struyven Decl. ¶¶ 4-5 & Ex. 1.)  These suspicions do not equate to factual knowledge.  Notably, the PWC report also reflects the mistaken view in 2016 that refund claimants had based their claims of ownership on multiple share purchases in a single day. (*See* Davidson Decl. Ex. 44 (explaining that the "suspected fraud presumably" involved such transactions).)  Again, this incorrect assumption does not equate to knowledge of fraud.

Defendants also argue that on May 31, 2018, the Danish tax authority, SKAT, filed lawsuits in the Southern District of New York relating to dividend withholding tax refund fraud by some of the Defendants here.  *See* Davidson Decl. Ex. 38 ("SKAT Raubritter Complaint"). However, Defendants point to no evidence that FPSF was immediately aware of this lawsuit. *See Cohen*, 711 F.3d at 362-63 ("[I]t does not follow that reasonable diligence will in all circumstances result in discovery of any lawsuit."); *McGuinness v. Standard Drywall Corp.*, 193 A.D.2d 518, 518 (1st Dep't 1993) (noting that "the failure of plaintiffs to ascertain the truth by inspecting public records is not determinative").  In any event, the SKAT Raubritter Complaint does not contain any facts concerning refund claims in Belgium.  It alleges only that Raubritter submitted refund claims in Denmark that falsely represented ownership of dividends

from Danish listed companies.  (Davidson Decl. Ex. 38, ¶ 36.)  Importantly, the SKAT Raubritter Complaint does *not* allege that Raubritter itself was a fraudulent entity.  That allegation was made for the first time in the SKAT litigation almost two years later, in an amended complaint filed on April 27, 2020.[5]  Thus, the original SKAT Raubritter Complaint did not provide enough information for FPSF Belgium to conclude that *all* refund claims made by Raubritter, much less other Defendants SKAT had not sued, were fraudulent.  *See Meyer*, 89 F.4th at 135 (noting that even where a plaintiff knows of a public document, "the triggering data must be such that it relates *directly* to the misrepresentations and omissions the Plaintiffs later allege in their action *against the defendants*" (emphasis in original)).[6]

Finally, Defendants suggest that FPSF must have known about the fraud in 2018 because it was actively discussing the potential to bring legal proceedings in Europe.  (Defs.' Br. 31-32.)  This does not follow.  As discussed above, FPSF certainly suspected that it had been defrauded,

---

[5] The fact that SKAT did not allege this until 2020 further indicates that FPSF could not reasonably have learned about it sooner.  *See CSAM*, 67 A.D.3d at 158 ("Because even those parties who exhibited 'reasonable diligence' and commenced arbitration proceedings did not learn of the fraudulent misrepresentation of the directors' expertise until November 7, 2006, it is apparent that the appellants could not have discovered this information prior to that date.").

[6] Although the Court in *Meyer* was addressing inquiry notice, "the same principle applies" to the question of actual knowledge.  *In re SKAT*, 2024 WL 3937599, at *9 n.79.  As Judge Kaplan noted, "it would be illogical to impose a higher threshold for a duty to investigate a potential fraud than to find that a plaintiff could have inferred the fraud after making a thorough investigation." *Id.*

and so was looking for ways to develop potential claims. However, Defendants do not identify any fact that FPSF learned in 2018 that would warrant a reasonable inference of fraud for any individual refund claimant. Indeed, FPSF ultimately did not bring claims at this time in part because it lacked knowledge of the key facts. (*See* Leukemans Decl. ¶ 15.)

> **D.    A Reasonable Investigation Would Not Have Revealed the Fraud Sooner.**

Defendants argue that, regardless of when FPSF actually discovered the fraud, it should have done so earlier. This argument should be rejected.

As discussed above, FPSF undertook an internal inquiry upon learning about a potential fraud and reasonably relied on the police to conduct a thorough investigation of the fraud. When the police investigation reached an advanced stage in 2019, FPSF obtained access to the police file. It was only then that FPSF possessed facts from which fraud in specific cases could be reasonably inferred.

Defendants criticize FPSF's investigation as "leisurely," and suggest that FPSF "erroneously" sought more information than was necessary. (Defs.' Br. 33.) This is contradicted by the record discussed above and, in any event, should not be decided against FPSF as a matter of law. *See Needham & Co., LLC v. Access Staffing, LLC*, No. 15 Civ. 2487 (NRB), 2016 WL 4399288, at *12 (S.D.N.Y. Aug. 12, 2016) (even though court found "serious deficiencies" in investigation, summary judgment was inappropriate because the issue "cannot be resolved as a matter of law"); *In re JWP*, 928 F. Supp. at 1250–51 (denying summary judgment because plaintiffs "took some steps to investigate" and the court could not "hold, as a matter of law, that the [] plaintiffs were not reasonably diligent under the circumstances").

Regardless of how diligent FPSF may have been, Defendants must show that a reasonable investigation actually would have revealed the necessary facts before December 2018. *See Cohen*, 711 F.3d at 363 ("While hindsight shows that the fraud *could* have been

discovered, that fact does not support the conclusion that, on reasonable inquiry, the fraud *would* have been discovered.").  Defendants fail to meet this burden.

For instance, Defendants argue that FPSF could have obtained additional information by consulting its own records or reviewing public information.  (Defs.' Br. 33-34.)  However, Defendants do not explain how such a review would have revealed that a particular refund claimant did not own the shares it claimed to own or was not a qualified pension plan.  Even assuming FPSF could have learned some additional information before obtaining access to the police file, there is no basis to conclude that this information would have been sufficient to infer fraud.  *See Rothman v. Gregor*, 220 F.3d 81, 97–98 (2d Cir. 2000) (finding issue of fact where plaintiffs did not bring suit until after obtaining a report that was "customized for them, costly to obtain, and not readily accessible to the public" (internal quotation marks omitted)).

Defendants also argue that FPSF could have obtained access to the police file earlier than it did.  (Defs.' Br. 35-36.)  This is pure speculation.  A civil party to criminal proceedings is not automatically entitled to police file access.  The investigating authorities have discretion over this decision, and requests made early in an investigation are frequently denied.  (Tristmans Decl. ¶¶ 41, 47-52.)  If access is denied, an applicant must wait three months before asking again.  (*Id.* ¶ 52.)  Here, FPSF requested access to the police file when it was informed that relevant files would be made available.  (*See* Leukemans Decl. ¶¶ 17-18.)  Defendants present no evidence to suggest an earlier request would have been granted by the Public Prosecutor.  Thus, there is no basis to conclude as a matter of law that a reasonable person would have made an earlier request, or that such a request would have been granted.

Even if, in theory, FPSF could have sought and obtained access to the police file before 2019, it does not follow that this would have revealed the key facts supporting allegations of

fraud in this case.  As noted, the most important police reports were not even prepared until late 2019.  Therefore, obtaining access before this time would not have given FPSF knowledge of the key facts.  Moreover, the fact that the Belgian criminal authorities did not themselves develop this evidence until late 2019 also suggests that a reasonably diligent plaintiff could not have done so earlier on its own.  *See Robertson*, 609 F.2d at 592 ("If the SEC with its commendable expertise and specialized investigative teams was unable to discover the complicity of these accountants until shortly before its Opinion and Order of September 1, 1976 was released, it cannot be said as a matter of law that appellant should have discovered their participation any earlier.").

Finally, Defendants contend that FPSF could have issued its own requests for information to Defendants or third parties.  (Defs.' Br. 34 (citing Davidson Decl. Ex. 7, ¶ 14).)  FPSF has certain statutory rights under Belgian law to request information from taxpayers.  (*See* Tristmans Decl. ¶¶ 13-15.)  However, this does not warrant a conclusion as a matter of law that FPSF could have used these rights effectively.  *First*, the Belgian criminal authorities were already conducting their own investigation of the matter.  Under well-established Belgian law, FPSF was required to defer to the criminal authorities and could not conduct its own parallel investigation that might have interfered with their efforts.  (Leukemans Decl. ¶ 6; Tristmans Decl. ¶ 25-34.)  *Second*, the referenced investigative powers apply in the context of assessing and collecting Belgian taxes.  (Tristmans Decl. ¶¶ 16-22.)  It is not clear that these procedures would apply here, where Defendants are not Belgian taxpayers and FPSF is not seeking to collect taxes but to recover for garden variety fraud.  *See generally In re Kingdom of Belgium*, 680 F. Supp. 3d at 469-74.  *Third*, the relevant provisions can be exercised only in the territory of Belgium.  (Tristmans Decl. ¶¶ 23-24.)  *Fourth*, it cannot be assumed that Defendants would have

cooperated with any investigation or provided the key facts of their own fraud. (*See* Leukemans Decl. ¶ 6; Tristmans Decl. ¶ 35.) For all these reasons, Defendants have not shown that the exercise of these statutory powers would have revealed the fraud.

## <u>Conclusion</u>

For the reasons set forth herein, Defendants' motion for summary judgment should be denied.

Dated: October 18, 2024
     New York, New York

                                   Respectfully submitted,

                                  s/ Jeff E. Butler

                                 Jeff E. Butler
                                 John P. Alexander
                                 Julia C. Bruns
                                 CLIFFORD CHANCE US LLP
                                 Two Manhattan West
                                 375 9th Avenue
                                 New York, New York 10001
                                 Telephone: (212) 878-8000
                                 Jeff.butler@cliffordchance.com

                                 *Attorneys for Plaintiff Kingdom of Belgium,*
                                 *Federal Public Service Finance*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the word-count limit and formatting rules in Your Honor's Individual Practices, as modified by the Court's August 29, 2024 Order. This brief contains 8,567 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Your Honor's Individual Practices.

Dated: October 18, 2024

 s/ Jeff E. Butler
Jeff E. Butler