**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE:

KINGDOM OF BELGIUM,
FEDERAL PUBLIC SERVICE FINANCE
PENSION PLAN LITIGATION

Lead Case: No. 21 Civ. 6392 (JGK)

Member Cases:
    No. 21 Civ. 6399 (JGK)
    No. 21 Civ. 6402 (JGK)
    No. 21 Civ. 6404 (JGK)
    No. 21 Civ. 6405 (JGK)
    No. 21 Civ. 6407 (JGK)
    No. 21 Civ. 6408 (JGK)

**Oral Argument Requested**

**DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**
**ON STATUTE OF LIMITATIONS ISSUES**

**TABLE OF CONTENTS**

I.    FPSF Had Actual Knowledge of the Alleged Fraud by 2016...............................2

      A.    FPSF Knew Sufficient Facts in 2016 to Trigger New York's Two-Year Discovery
            Rule ............................................................................................................2

      B.    FPSF's Knowledge Was More Than Mere Suspicion .............................................7

II.   A Reasonable Investigation Would Have Revealed the Necessary Information by 2016...8

      A.    FPSF's Investigation Was Deficient .........................................................8

      B.    FPSF's Deference to the Federal Police and Prosecutors Is Not a Basis for
            Excusing Late Filed Complaints............................................................13

      CONCLUSION...............................................................................17

# TABLE OF AUTHORITIES

## CASES                                                              Page(s)

*Clark v. New York City Hous. Auth.*,
    514 F. Supp. 3d 607 (S.D.N.Y. 2021) ................................................................. 8

*Davis v. Scottish Re Group Ltd.*,
    30 N.Y.3d 247 (2017) ...................................................................................... 17

*Graham v. HSBC Mortg. Corp.*,
    2021 WL 4392522 (S.D.N.Y. Sept. 24, 2021) ................................................... 8

*In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in
    Foreign Proceedings*,
    773 F.3d 456 (2d Cir. 2014) ............................................................................ 16

*In re Integrated Res. Real Estate Sec. Litig.*,
    815 F. Supp. 620 (S.D.N.Y. 1993) .................................................................... 3

*Klein v. Bower*,
    421 F.2d 338 (2d Cir. 1970) .............................................................................. 3

*Koch v. Christie's Int'l PLC*,
    699 F.3d 141 (2d Cir. 2012) ............................................................................ 10

*Kwasnik v. 160 Water St., Inc.*,
    2014 WL 7181171 (S.D.N.Y. Sept. 30, 2014) ............................................... 3, 6

*Poulard v. Delphin*,
    2024 WL 4504518 (S.D.N.Y. Oct. 16, 2024) .................................................... 7

*Ulrich v. Moody's Corp.*,
    2014 WL 4977562 (S.D.N.Y. Sept. 30, 2014) ................................................. 13

*United States v. Bilzerian*,
    926 F.2d 1285 (2d Cir. 1991) ............................................................................ 5

*Viele v. Ford Motor Co.*,
    201 F.3d 433 (2d Cir. 1999) ............................................................................ 12

## STATUTES

N.Y. C.P.L.R. § 202 ............................................................................................... 14

In their opening brief, Defendants demonstrated that Plaintiff Federal Public Service Finance ("FPSF") had actual knowledge of its fraud claims by 2016, or, at a minimum, knew facts from which any party in FPSF's position would have discovered the alleged fraud through reasonable investigation.  FPSF's response to Defendants' Motion (ECF No. 235) (the "Opposition") confirms both of those points.  FPSF argues it first learned certain details relating to its claims in 2019, but those details are not material to when FPSF understood the basis of its claims and believed it was the victim of fraud.  FPSF's claim that Belgian law prevented it from investigating its claims is a red herring: this claim is incorrect as a matter of Belgian law, which in any event has no force to extend New York's statute of limitations.  Nor did anything prevent FPSF from requesting assistance from other Belgian authorities much earlier than 2019. Accordingly, the statute of limitations expired long before FPSF filed these actions.[1]

---

[1] Because the parties agree that the majority of FPSF's claims are untimely under New York's six-year accrual rule, this Reply focuses on why all FPSF's claims are untimely under New York's two-year discovery rule.  With respect to the former, the only issue on which the parties disagree is whether New York executive orders during the pandemic tolled or merely suspended the statute of limitations.  Defendants submit that the better interpretation, for the reasons set out in Defendants' Motion, is that the orders merely suspended the statute.  *See* Motion at 21–23.  Accordingly, the Court should enter judgment in Defendants' favor as to all refunds paid prior to July 27, 2015, the date six years before FPSF belatedly filed its initial complaints.

I.      **FPSF Had Actual Knowledge of the Alleged Fraud by 2016**

A.      **FPSF Knew Sufficient Facts in 2016 to Trigger New York's Two-Year Discovery Rule**

Defendants' motion and accompanying Rule 56.1 Statement set out in detail the facts that FPSF knew and when it knew them.  *See, e.g.,* Motion at pp. 26–28 (listing uncontroverted facts).  As FPSF acknowledges, its employees, as early as *December 2015*, wrote a letter that "states definitively that FPSF has been the victim of an international fraud."  Opp. at 3.  FPSF argues that, although it believed it was the victim of fraud, it "did not know, for any individual refund claim, whether the refund claimant owned the shares it claimed to own, or whether the refund claimant was a qualified pension plan under US law."  *Id.* at 2.  This argument fails on both the facts and the law.

FPSF contends that reports of the Belgian Federal Police (the "Federal Police") from 2019 first informed FPSF that Defendants did not own the shares they claimed to own, but this is contradicted by substantial record evidence.  The Federal Police had informed FPSF in 2015 that the alleged fraud worked through entities who were not "the actual owners of shares" submitting reclaim applications.  Decl. of Daniel C. Davidson ("Davidson Decl."), ECF No. 221, Ex. 6 at 7.  FPSF knew before 2019 that the alleged fraud worked through the submission of "false or incorrect documents."  *Id.*, Ex. 10 at 2; *see also id.*, Ex. 11 at 5 (discussing theory that plans file reclaim applications "for fictional share holdings, based on falsified documents").  In a memorandum attached to a March 20, 2016, email, FPSF reiterated its view that "[t]he fraud therefore lies in the undue repayment of the withholding tax through the use of falsified documents."  *Id.*, Ex. 32 at 3.  That same email attached a list that contains all of the names of

the Plans at issue here. [2] *See id.*, Ex. 33.  FPSF also identified the specific reclaims at issue here. *See, e.g.*, *id.*, Ex. 44 (PwC report dated May 30, 2016, listing reclaims as "fraudulent"). [3]

The further details that FPSF alleges regarding trading loops were not necessary for FPSF to bring its claims.  *See Kwasnik v. 160 Water St., Inc.*, 2014 WL 7181171, at *3 (S.D.N.Y. Sept. 30, 2014) ("Plaintiff misses the point of the statute of limitations. Whether or not the diagnosis was correct as a substantive matter, the fact of the diagnosis was obviously sufficient to put the plaintiff on notice regarding his injury. The law does not require that a plaintiff resolve all factual uncertainties before proceeding with litigation."); *In re Integrated Res. Real Estate Sec. Litig.*, 815 F. Supp. 620, 637 (S.D.N.Y. 1993) (The "statute is not tolled for a plaintiff's 'leisurely discovery of the full details of the alleged scheme.'") (quoting *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir. 1970)).  Indeed, the words "loop" and "circular" do not appear even a single time in FPSF's complaints.  Given that FPSF brought its claims without even mentioning trading loops, FPSF's argument that they were somehow crucial to discovering the alleged fraud fails.

---

[2] The "Plans" are the Defendants listed in Defendants' Motion at 2 n.1.

[3] The Opposition mentions Solo Capital only once, and Sanjay Shah not at all.  FPSF knew from the very beginning, however, that Shah and Solo Capital were involved in the alleged fraud, and it was, in part, through connection to Solo Capital that FPSF was able to identify the reclaim applications at issue here as allegedly fraudulent.  *See, e.g.*, Davidson Decl., Ex. 6 at 5 (Federal Police email informing FPSF "chances are that this concerns a fraudulent act" if a reclaim application involved Sanjay Shah or related entities).

The lack of a genuine issue for trial is further underscored by FPSF's evolving story on when it learned what it knew.  Initially, FPSF alleged that in "late 2020" it "was given access to portions of the confidential investigation file of the Belgian Federal Police" that allowed it "to conclude, for the first time, that refund claims made by the Refund Claimants were fraudulent." Am. Compl. ("Xiphias"), ECF No. 48, ¶ 56.  Later, FPSF's designee testified that the information it learned in late 2020 was additional details regarding "the scheme of the fraud," specifically, the alleged use of "naked shorts."  *See* Davidson Decl. Ex. 2 at 257:24–259:7 (transcript of deposition of Dirk Leukemans).  The various explanations for what FPSF learned, perhaps in 2019 or perhaps in 2020, are not even consistent with one another.  Like "trading loops," "naked shorts" are not referenced anywhere in FPSF's complaints.  FPSF is grasping at straws to find some purportedly material information it did not know years earlier.

FPSF's argument that it learned that "the refund claimant was not a qualified pension plan with tax-exempt status" fails for the same reasons.  First of all, the Plans accurately

represented themselves as tax-exempt entities.[4]  But FPSF already believed otherwise in March

2016, when it described the Plans as "dummy companies" that had fraudulently claimed refunds

to which they were not entitled.  *See, e.g.*, Davidson Decl. Ex. 30 at 2 (discussing "highly

suspicious requests . . .  submitted by 4 intermediaries in London for approximately 170

companies presented as US pension funds but which are in fact dummy companies"); Ex. 32 at 2

("Fraud committed by making use of schemes aimed at unduly claiming the repayment of

withholding tax by means of setting up dummy companies and using forgeries."); Ex. 35 at 2

(notes of April 12, 2016, FPSF meeting reflecting the "important finding" the "[b]eneficiaries

were empty boxes, had no identity, or a small change in name").

No new information emerged in 2019 that let FPSF newly conclude that the Plans were

not legitimate tax-exempt entities.  FPSF purportedly learned in 2019 only that "Xiphias was

---

[4] FPSF claims it was difficult to determine that the Plans were not qualified pension plans

because "an IRS document submitted with each refund claim appeared to confirm that the

claimant was a legitimate, tax-exempt entity."  Opp. at 20.  This argument is disingenuous.

FPSF inquired with the IRS by 2018 regarding the IRS's tax-exempt status and has asserted

privilege over those communications.  *See* Decl. of Maxwell W. Brown dated Nov. 8, 2024

("Brown Decl."), Ex. 1.  The Opposition, however, puts those communications squarely at issue.

*Cf. United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[T]he attorney-client

privilege cannot at once be used as a shield and a sword. . . . A [party] may not use the privilege

to prejudice his opponent's case or to disclose some selected communications for self-serving

purposes.").  The mere fact of those communications undermines FPSF's claims that it did not

suspect the status of the Plans and that it did not have the means to investigate them.

engaged in transactions wholly inconsistent with that of a legitimate pension plan" and then concluded "the refund claimant was not a qualified pension plan with tax-exempt status." Opp. at 5; *see also id.* at 17 ("[A]n October 2019 police report showed that at least *one refund claimant* was engaged in transactions wholly inconsistent with that of a legitimate pension plan." (emphasis added)). FPSF appears to have used the singular phrase "refund claimant was" here deliberately. That is, FPSF identifies a single Plan that allegedly engaged in certain transactions and suggests that this somehow allowed FPSF to conclude in 2019 that none of the Plans were tax-exempt entities. But in 2016, FPSF had already identified that the Plans, plural, had submitted reclaim applications that it believed to be fraudulent. Furthermore, the theory that the Plans were not truly tax-exempt was not necessary for FPSF to bring its claims, as FPSF has understood since 2015 that the essence of the alleged fraud is entities claiming refunds to which they are not entitled. *See Kwasnik*, 2014 WL 7181171, at *3.

The example of SKAT, the Danish tax authority, is informative on these points and stands in stark contrast to the approach of FPSF. By February 2018, at the latest, FPSF understood "that the UK authorities," with whom it was cooperating to investigate the alleged fraud at issue here, "believed Denmark and Belgium were the main victims of the fraudulent activities." Decl. of Edouard Struyven, ECF No. 230, ¶ 13. SKAT filed suit in this District in May 2018, and FPSF knew about SKAT's allegations. Decl. of Dirk Leukemans, ECF No. 229, ¶ 16 ("During 2018, we learned that the Danish tax authority—known as 'SKAT'—had commenced legal proceedings in the US against persons involved in withholding tax fraud related to Denmark."). After filing its initial complaints, SKAT continued to develop its understanding of its claims, and in April 2020 SKAT amended its complaints to add allegations that a pension plan at issue there was "itself . . . a fraudulent entity." Opp. at 23. FPSF cites this

amendment by SKAT to argue that there were limits to the information it could have learned from SKAT's case.  FPSF misses the forest for the trees: the more important fact is that SKAT was able to file its initial complaints *without* raising that allegation.  The theory that the Plans were not legitimate tax-exempt entities was not essential to SKAT bringing its action, just as it was not essential for FPSF to discover or bring its claims here.  SKAT's case thus demonstrates that allegations of withholding tax fraud could be filed before working out all details and theories of the claims, which could be added to the case later.  *See also Poulard v. Delphin*, 2024 WL 4504518, at *7 (S.D.N.Y. Oct. 16, 2024) ("[T]he statute of limitations for a § 213(8) cause of action begins running when the plaintiff was possessed of knowledge of facts from which [the fraud] could be reasonably inferred . . . and not, as [plaintiff] argues, when [plaintiff] possessed adequate information to plead a claim for fraud.") (internal citation and quotation marks omitted).

The information FPSF purportedly learned in 2019 did not enable it to newly discover its claims; rather, this information was simply part of the process of FPSF developing its existing understanding of its claims and theories.  New York's statute of limitations provides two years— or more, if the six-year accrual rule applies—for parties to go through this process after discovering the basis of their claims and before filing suit.  And even after filing suit, a plaintiff can amend its complaint, as FPSF has.  FPSF, however, did not take two years before filing suit: it took more than *five* years.  Accordingly, FPSF's claims are untimely under the two-year discovery rule.

### B.    FPSF's Knowledge Was More Than Mere Suspicion

FPSF relies heavily on the notion that it had no more than suspicions that failed to rise to the level of knowledge prior to 2019.  As described above, this is contradicted by the contemporaneous evidence, including the December 2015 letter that "definitively" stated FPSF

was the victim of fraud.  Further, as FPSF acknowledges, the two-year discovery rule is also triggered when a plaintiff "had knowledge of facts from which the fraud could reasonably be inferred."  Opp. at 13.  Again, Defendants' opening brief and Rule 56.1 Statement show that FPSF had knowledge of such facts, including the specific reclaim applications at issue and the specific Defendants who made them, as early as 2016, and certainly by 2018.

Thus, FPSF's argument that it merely suspected fraud is both incorrect and irrelevant, because a reasonable party in FPSF's position would have inferred fraud from the facts available to it (as even FPSF demonstrably did).  *See, e.g.*, *Clark v. New York City Hous. Auth.*, 514 F. Supp. 3d 607, 612 (S.D.N.Y. 2021) (finding fraudulent concealment claim untimely where plaintiff "possessed knowledge of facts from which [she] could reasonably have inferred the fraud").  Furthermore, even today FPSF does not *know* it was the victim of fraud.  Rather, FPSF believes this to be the case, just as FPSF believed it back in 2016.  Based on its belief, FPSF has made allegations that Defendants vigorously dispute, with ample evidence reflecting that they did not commit fraud.

In short, in 2016 FPSF knew facts that led it to believe it was the victim of fraud perpetrated by Defendants, yet FPSF delayed more than five years before bringing its claims.

## II.    A Reasonable Investigation Would Have Revealed the Necessary Information by 2016

### A.    FPSF's Investigation Was Deficient

As discussed above and in Defendants' Motion, FPSF had actual knowledge in 2016 sufficient to trigger New York's two-year discovery rule.  Even if that were not the case, a reasonably diligent party in FPSF's position would have uncovered sufficient information at that time, not to mention by 2018.  *See Graham v. HSBC Mortg. Corp.*, 2021 WL 4392522, at *5 (S.D.N.Y. Sept. 24, 2021) (complaint untimely where plaintiffs "failed to establish that even if

they had exercised reasonable diligence, they could not have discovered the basis for their fraud

claim"). This conclusion is demonstrated by the record in this case, as well as by SKAT's ability

to file suit more than three years before FPSF.

FPSF emphasizes that "the quality of the plaintiff's actual investigation is not

determinative" of when an alleged fraud should have been discovered because "[w]hat matters is

whether a reasonably diligent investigation, had one been performed, would have revealed the

facts necessary to infer fraud." Opp. at 15. That is the correct standard, but FPSF misapplies it.

FPSF is compelled to argue that a more diligent investigation would have been futile because

FPSF cannot deny that its own investigation was lacking. The record, however, overwhelmingly

indicates that a diligent investigation would have revealed information more than sufficient for

FPSF to infer fraud.

FPSF's own papers show that additional information was available to and known by

FPSF before 2019. For instance, the October 2019 Federal Police report that FPSF cites to

suggest it did not uncover details about the transactions until that year references a 2017 Federal

Police report that provided those details, and FPSF had that earlier report by January 25, 2018, at

the latest. *Compare* ECF No. 229-3 at 2 (official report no. 106991/2019 to Public Prosecutor's

Office of Brussels) (referring to report No. 304155/2017 as having provided an "overview . . . of

the moneys received by the American pension funds" and "the findings regarding cash flows to

SOLO CAPITAL PARTNERS and the American pension funds"), *with* Davidson Decl. Exs. 28–

29 (email dated January 25, 2018, attaching Report No. 304155/2017). FPSF also submitted

with its Opposition a Federal Police report from May 2019 that likewise relied on a report from

2017 "regarding the Danish findings regarding the trading loops." ECF No. 229-2 at 2. These

reports contradict FPSF's position that information regarding the alleged trading loops was

unavailable before 2019.[5]  Just as FPSF's complaints were the product of information FPSF

obtained years earlier, the Federal Police reports FPSF cites from 2019 were based on analysis of

information the Federal Police had received years earlier.

A reasonable investigation would have obtained that and similar information from

the Federal Police—or through FPSF's own efforts—prior to 2019.  FPSF's protestations

that it could not have done so are contradicted by the fact that FPSF *did* receive

information from the Federal Police before 2019, starting with the notification of alleged

fraud in October 2015 and continuing from there.  *See, e.g.*, Opp. at 16 ("In this case,

FPSF was informed in October 2015 that the Belgian police were investigating a

potential fraud relating to dividend withholding tax refund claims.  There is no dispute

that this constituted inquiry notice of the fraud."); Davidson Decl. Ex. 28 (email dated

January 25, 2018, attaching Federal Police report describing cash flows into and out of

the Solo custodians).[6]  This information sharing reflects FPSF's ability to obtain further

information from the Federal Police.

FPSF suggests that it did not request access to the Federal Police's files prior to July 2019

because it feared the request might have been denied by the Belgian prosecutor, which would

---

[5] By discussing the Danish findings, FPSF also contradicts its position that it did not

benefit from SKAT's investigation.

[6] *See also Koch v. Christie's Int'l PLC*, 699 F.3d 141, 148 (2d Cir. 2012) (affirming

dismissal of RICO claims because "clock begins to run when the plaintiff has 'inquiry notice' of

his injury").

have required FPSF to wait three months before renewing the request.[7]  Opp. at 25.  That

argument strains credulity.  Apart from this being pure speculation on FPSF's part, all evidence

shows that the Belgian prosecutor would have approved an earlier request from FPSF.  FPSF was

not merely the party injured by alleged wrongdoing; FPSF was an instrumentality of the Belgian

government cooperating in the investigation.  Additionally, the Belgian prosecutor, like the

Federal Police, had already shared information with FPSF.  *See, e.g.*, Davidson Decl. Ex. 43

(internal FPSF email dated March 20, 2018, attaching PwC report dated May 30, 2016,

commissioned by the Belgian Public Prosecutor's Office).  And when FPSF did finally request

access to the file, the prosecutor promptly approved the request.  *See* Rule 56.1 Statement, ECF

No. 222, ¶¶ 123–24.  Accordingly, the only plausible inference is that FPSF unreasonably

delayed requesting access to the police files.[8]

The example of SKAT is again informative and shows that FPSF could have filed suit

earlier.  FPSF repeatedly relies on the SKAT case in its Opposition, but this reliance is

misplaced, most obviously because SKAT filed suit *more than three years prior to* FPSF, despite

being notified about alleged fraud around the same time as FPSF.  "On June 15, 2015, SKAT

---

[7] If FPSF had requested the file in 2016 or 2017 and been denied, they could have

repeated the request numerous times before 2019.  It does not make sense to wait years out of

fear of hypothetically having to wait months.

[8] The Court need not decide what motivated FPSF to delay its request, but a more likely

explanation is that FPSF felt the request was unnecessary because (i) it had already received

reports from the Federal Police and prosecutor and (ii) as detailed in the Motion, much of the

information in the Federal Police file originated with FPSF itself.  *See* Mot. at 10, 30, 36.

received information indicating that certain claimants may have submitted fraudulent tax refund claims," and SKAT brought suit in this District on May 31, 2018, less than three years later (1081 days). Davidson Decl., Ex. 38 ("Raubritter Complaint"), ¶ 6. In contrast, "FPSF was informed [on] October [19,] 2015 that the Belgian police were investigating a potential fraud relating to divided withholding tax refund claims," Opp. at 16, but FPSF did not bring suit until July 27, 2021, more than five years later (2108 days). That delay was even more unreasonable given the overlap between FPSF's claims and SKAT's, and FPSF's opportunity to benefit from the latter. For instance, SKAT also named some of the same Defendants at issue here and also alleged the same fraud. *Compare* Raubritter Compl., ¶¶ 3–4 ("The essence of the fraudulent scheme is that . . . entities pretended to own shares" and made reclaim "applications [that] were fraudulent because the claimants did not own the shares that they claimed to own, they did not earn the dividends they claimed to have earned, and they were not entitled to the tax refunds they claimed."), *with* Xiphias Am. Compl ¶¶ 2–6 ("fraudulent scheme" involved "mislead[ing] FPSF Belgium into paying out 'refunds' of taxes that were never paid," as Plans "did not own the shares they claimed to own and they did not earn the dividends they claimed to have earned"); *see also* Davidson Decl. Ex. 30 at 3 (FPSF memorandum dated March 10, 2016, explaining FPSF had been in contact "many other countries" that had been "victims of the *same fraud*" (emphasis added)).

FPSF thus had multiple means at its disposal to obtain more information about the alleged fraud, but it failed to use them in a timely manner, or at all. Based on what FPSF already knew in early 2016, no reasonable jury would conclude that the Belgian government required more than five years to discover the purportedly missing information. *See, e.g.*, *Viele v. Ford Motor Co.*, 201 F.3d 433 (2d Cir. 1999) (affirming grant of summary judgment and dismissal of

complaint where "[t]his inaction cannot extend the statute of limitations past the six-year period

provided for under New York law").[9]

### B.    FPSF's Deference to the Federal Police and Prosecutors Is Not a Basis for Excusing Late Filed Complaints

FPSF's attempt to excuse the four-year delay in investigating its claims as a matter of

deference to the Federal Police does not withstand scrutiny.  In the Opposition, for the first time,

FPSF claims that it was constrained by *una via*, which purportedly required it to defer to the

Federal Police's investigation.[10]  This interpretation is wrong as a matter of Belgian law, most

fundamentally in that the *una via* principle did not (and does not) *require* deference.  *See* Decl.

---

[9] *See also* Decl. of Koen Verheye, ECF No. 232, ¶ 4 (explaining "*in late 2015*" "[i]t was

*obvious* . . . that any fraud in this context would involve the submission of false or misleading

documents" and "[i]t also made sense that a fraudulent claimant must either falsely claim to own

Belgian company shares (and so falsely claim to have received a dividend) or falsely claim to

have tax-exempt status" (emphasis added)).

[10] When the parties briefed statute of limitations issues at the motion to dismiss stage,

more than two years ago, FPSF said nothing about *una via*, seriously undermining its new claim

that FPSF relied on this principle in deferring to the Federal Police.  Furthermore, FPSF's

invocation of *una via* now at the summary judgment stage is untimely under Rule 44.1, as FPSF

has not provided reasonable notice that would have allowed Defendants to fully brief this issue

in their motion to dismiss and summary judgment motions.  *See, e.g.*, *Ulrich v. Moody's Corp.*,

2014 WL 4977562, at *15 (S.D.N.Y. Sept. 30, 2014) (finding at motion to dismiss stage plaintiff

"did not give sufficient notice of his intention to raise a choice-of-law issue regarding foreign

law" under Rule 44.1 and collecting cases).

of Dirk Libotte dated Nov. 8, 2024 ("Libotte Decl."), ¶ 7.  The *una via* law introduced in

Belgium in 2012 explicitly provided that it had no impact on the validity of administrative

actions to establish or recover tax debt; rather, the law simply suspended FPSF's ability to claim

administrative sanctions if FPSF did not participate in an *una via* consultation with the Federal

Police and prosecutor.  Such a consultation would not have prevented FPSF from conducting its

own investigation, and the record shows that FPSF did conduct its own, albeit deficient,

investigation.  Moreover, on April 3, 2014, the Belgian Constitutional Court *annulled* the

provisions of the *una via* law limiting FPSF's ability to claim tax fines or increases.  *Id.* ¶ 20.

"Accordingly, at no time relevant to this matter was there legislation in force that prevented

FPSF from investigating the tax reclaims at issue in this matter."  *Id*. ¶ 21.

But the parties' dispute over the implications of *una via* is immaterial.  Even if Belgian

law did require deference, there is no authority in New York, nor does FPSF point to any, that

would allow a foreign principle like *una via* to toll the New York statute of limitations.  Doing so

would render a nullity New York's borrowing statute, which requires FPSF's claims to be timely

in *both* Belgium and New York.  N.Y. C.P.L.R. § 202 ("An action based upon a cause of action

accruing without the state cannot be commenced after the expiration of the time limited by the

laws of either the state or the place without the state where the cause of action accrued . . . .").  If

provisions extending the Belgian limitations period could also extend the New York period, it

would mean that FPSF's claims only had to be timely in *either* Belgium *or* New York.  That is not the law.[11]

FPSF's excessive reliance on the Federal Police was also misplaced because the criminal investigation is focused on entities and transactions not at issue here and implicates different legal standards and consequences.  Moreover, the criminal investigation "remains ongoing." Opp. at 7 n.2.  FPSF claims it "was waiting for the outcome of the police investigation," *id.* at 5, and "relied on the Belgian police to thoroughly investigate the fraud . . . to learn all relevant facts upon completion of the criminal investigation," *id.* at 22.  But clearly in July 2021, when FPSF filed suit, it (belatedly) stopped waiting.  If *una via* did require deference during the pendency of the investigation, this litigation would itself be a violation.  By suing prior to the completion of the criminal investigation, FPSF has implicitly recognized that that investigation and Belgian law cannot toll the New York statute of limitations.

---

[11] FPSF's position on *una via* also cannot be squared with its position that the misconduct it alleges is not a case of tax evasion or other tax fraud.  *Una via* served to ensure that offending parties would not be subject to duplicative sanctions from criminal and tax authorities.  *See* Libotte Decl. ¶ 8; Decl. of Eline Tritsmans, ECF No. 231, ¶ 27 ("The Una Via Law aimed to: – provide a solution to the non bis in idem problem that could arise *in tax matters* due to the overlap of administrative and criminal sanctions for the same facts." (emphasis added)).  If FPSF is correct that the misconduct it alleges is not a tax offense, as it argued in opposition to Defendants' motion to dismiss based on the Revenue Rule, *see* ECF No. 87 at 7–15, then there was no risk of tax penalties from FPSF, and no need for *una via* to protect against overlapping sanctions.

Besides *una via,* FPSF offers a variety of other excuses for why it could not make a more diligent investigation.  FPSF speculates that its investigative powers may not extend to the transactions or foreign parties at issue here.  *See* Opp. at 26 ("It is not clear that these procedures would apply here . . . .").  What is clear is that FPSF did not attempt to use those powers.  And, in any event, nothing prevented FPSF from making its own investigation not backed by compulsory process of the Belgian government, as FPSF did when it researched the Plans through "the internet and other public records."  Opp. at 4.[12]  FPSF also suggests that it refrained from seeking information from Defendants because FPSF thought they would not cooperate with an investigation.  *Id.* at 26–27.  That is an odd suggestion: authorities in this District, and elsewhere, routinely obtain information by subpoena from subjects of criminal investigations.  In some cases, there may be reason to keep an investigation secret, but it was no secret that governments were investigating alleged withholding tax fraud.  Moreover, Defendants' actions showed that they intended to comply with the law.  For instance, when Defendants received a duplicative refund, they returned it, unprompted by FPSF.  *See* Brown Decl., Ex. 2 (March 7, 2016, email chain between Acupay and Adam LaRosa discussing return of refund).

---

[12] Another avenue of discovering information available to FPSF was "28 U.S.C. § 1782, which authorizes federal courts to order document production for use in certain foreign proceedings" and "applies to a foreign criminal investigation involving an investigating magistrate seeking documents in the United States."  *In re Application for an Order Pursuant to 28 U.S.C. 1782 to Conduct Discovery for Use in Foreign Proceedings*, 773 F.3d 456, 457–58 (2d Cir. 2014).

In short, even if Belgian law required FPSF to defer to the Federal Police—which it did not—the rule in New York is different: You snooze, you lose. *Davis v. Scottish Re Group Ltd.*, 30 N.Y.3d 247, 256 (2017) ("[A] statute of limitations forecloses a plaintiff who sleeps on its rights from obtaining a remedy.").  Given the information FPSF knew and had available to it in early 2016, it was unreasonable for FPSF to sit on its hands and wait more than five years before filing suit on July 27, 2021.

## CONCLUSION

For the reasons set forth above and in Defendants' Motion, the Court should enter judgment in Defendants' favor on the claims asserted in Plaintiffs' complaints in these cases, except as to refunds FPSF paid after July 26, 2015.

Dated: New York, NY
        November 8, 2024

Respectfully submitted,

/s/ Alan E. Shoenfeld
Alan E. Schoenfeld
WILMER CUTLER PICKERING
  HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800
Alan.Schoenfeld@wilmerhale.com

Andrew S. Dulberg
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6352
Andrew.Dulberg@wilmerhale.com

*Attorneys for Defendants Batavia
Capital Pension Plan, Calypso
Investments Pension Plan,
Richard Markowitz, DFL
Investments Pension Plan, and
RJM Capital Pension Plan*

/s/ Sharon L. McCarthy
Sharon L. McCarthy
Maxwell W. Brown
KOSTELANETZ LLP
7 World Trade Center
250 Greenwich Street
34th Floor
New York, NY 10007
(212) 808-8100
smccarthy@kostelanetz.com

Nicholas S. Bahnsen
Daniel C. Davidson
KOSTELANETZ LLP
601 New Jersey Avenue, NW
Suite 260
Washington, DC 20001
(202) 875-8000
nbahnsen@kostelanetz.com

18

ddavidson@kostelanetz.com

*Attorneys for Defendants Azalea Pension Plan, Bernina Pension Plan Trust, John van Merkensteijn, Michelle Investments LLC Pension Plan, Remece Investments LLC Pension Plan, Tarvos Pension Plan, and Xiphias LLC Pension Plan*

/s/ David Gopstein

David Gopstein
Julie E. Fink
HECKER FINK LLP
350 Fifth Avenue, 63rd Floor
New York, NY 10118
Tel. (212) 763-0883
dgopstein@heckerfink.com
jfink@heckerfink.com

*Attorneys for Defendants Matthew Stein, Jerome Lhôte, Alden Investments Pension Plan, AOI Pension Plan, Carrick Holdings Pension Plan, Davin Investments Pension Plan, Ganesha Industries Pension Plan, Mazagran Pension Plan, Pleasant Lake Productions Pension Plan, and Rajan Investments Pension Plan*

/s/ Richard D. Weinberg

Edward M. Spiro
Richard D. Weinberg
MORVILLO ABRAMOWITZ
GRAND IASON & ANELLO P.C.
565 Fifth Avenue
New York, NY 10017
Tel. (212) 856-9600
espiro@maglaw.com
rweinberg@maglaw.com

*Attorneys for Defendants Adam
LaRosa, Alicia Colodner, Delvian
Pension Plan, Traden Investments
Pension Plan, Mill River Capital
Management Pension Plan, and
Clove Pension Plan*

/s/ Robert H. Pees
Robert H. Pees
AKIN GUMP STRAUSS HAUER
& FELD LLP
One Bryant Park
New York, NY 10036
Tel. (212) 872-1000
Fax: (212) 872-1002
rpees@akingump.com

*Attorney for Defendants 2321
Capital Pension Plan and Bowline
Management Pension Plan*

/s/ David R. Wright
Natalie A. Napierala
Michael L. Yaeger
David R. Wright
CARLTON FIELDS, P.A.
405 Lexington Avenue, 36th Floor
New York, NY 10174
Tel. (212) 785-2577
nnapierala@carltonfields.com
myaeger@carltonfields.com
dwright@carltonfields.com

*Attorneys for Defendants FGC
Securities, LLC and Stephen Wheeler*

/s/ Paul S. Hugel
Paul S. Hugel
Clayman Rosenberg Kirshner &
Linder LLP
305 Madison Avenue- Ste 650
New York, New York 10165
Tel. (212) 922.1080
hugel@clayro.com

*Attorneys for Defendant Laegeler*
*Asset Management Pension Plan*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this brief complies with the type-volume limitations in Your Honor's Individual Rules of Practice, as modified by the Order dated August 29, 2024 (ECF No. 217). Exclusive of the exempted portions of the brief, the brief contains 4,997 words. The brief has been prepared in proportionally spaced typeface using Microsoft Word in 12-point Times New Roman font. The undersigned has relied on the word-count feature of this word-processing system in preparing this certificate.

/s/ Maxwell W. Brown
KOSTELANETZ LLP
By: Maxwell W. Brown

November 8, 2024