UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────

IN RE: KINGDOM OF BELGIUM,
FEDERAL PUBLIC SERVICE
FINANCE PENSION PLAN
LITIGATION
──────────────────────────────

21-cv-6392 (JGK)

<u>Memorandum
Opinion and Order</u>

**John G. Koeltl, District Judge:**

The plaintiff, the Kingdom of Belgium, Federal Public Service Finance ("FPSF" or "Belgium"), brought this consolidated action against the defendants, several purported pension plans (the "Pension Plan Defendants"), and individuals associated with those pension plans, including Richard Markowitz, Matthew Stein, John van Merkensteijn, Alicia Colodner, Stephen Wheeler, Adam LaRosa, Luke McGee, and Jerome L'Hote. The plaintiff alleges that the defendants falsified ownership of Belgian corporate dividends and fraudulently induced the plaintiff to pay tax refunds to the defendants based on those dividends. The Court previously denied the defendants' motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). <u>In re Kingdom of Belgium, Fed. Pub. Serv. Fin. Pension Plan Litig.</u>, 680 F. Supp. 3d 460 (S.D.N.Y. 2023) ("<u>Belgium I</u>").

The defendants now move for summary judgment pursuant to Federal Rule of Civil Procedure 56 dismissing the plaintiff's complaints on statute-of-limitations grounds. <u>See</u> Notice of Mot., ECF No. 219; Mem. of Law Supp. Mot. ("Br.") 1, ECF No. 223. For the reasons that follow, the defendants' motion is **denied**.

## I.

The following facts are taken from the parties' Local Rule 56.1 statements, counterstatements, and supporting papers and are undisputed unless otherwise noted. The Court assumes familiarity with the allegations underlying this litigation as detailed in Belgium I, 680 F. Supp. 3d at 464–67 and recites only those facts necessary to resolve the current motion.

## A.

The plaintiff, FPSF, is the agency of the Belgian government responsible for the assessment and collection of Belgian taxes and is the equivalent of the United States Treasury Department. Belgium I, 680 F. Supp. 3d at 465; Defs.' Local Rule 56.1 Statement ("Defs.' 56.1") ¶ 1, ECF No. 222. The Pension Plan Defendants are several purported pension plans recognized as United States tax residents by the Internal Revenue Service ("IRS"). Xiphias Complaint[1] ("Compl.") ¶¶ 2, 10–16, ECF No. 48.

Under Belgian law, the Belgian government taxes dividends paid by Belgian companies at a rate of 25% and collects these dividend taxes through a withholding system. Defs.' 56.1 ¶¶ 2, 4. When each dividend is paid, the Belgian company withholds 25% of the dividend payment and transfers that amount to FPSF before paying the remaining 75% of the dividend to its shareholders. Id. ¶¶ 2–3. Pursuant to a tax treaty between the United States

---

[1] The allegations in paragraphs 10 through 16 of the Xiphias Complaint refer only to seven of the pension plans represented in this case. The other pension plans are included in their own respective complaints, but the parties agree that the Xiphias Complaint may act as the operative complaint. See Br. 2 n.2.

and Belgium, certain tax-exempt residents of the United States, including pension plans, are entitled to a refund of the amount of tax withheld on dividend payments. Defs.' 56.1 ¶¶ 6–10. To receive this tax refund, a pension plan must submit an application to FPSF with proof of its tax-exempt status and proof of ownership of a dividend payment that was withheld. Id. ¶ 10. To qualify as a tax-exempt pension plan, the plan must be for the "exclusive benefit" of an entity's employees and must be funded by contributions from the employer or employees. Compl. ¶ 29.

The plaintiff alleges that, beginning in 2012, certain individual defendants "participated in a scheme to submit fraudulent tax refund claims to FPSF Belgium." Id. ¶ 31. The scheme allegedly "involved the registration of U.S. tax residents that would pose as qualified U.S. pension plans," and those plans would "represent to FPSF Belgium that they were tax-exempt pension plans and, using misleading documentation, would represent that they owned shares in and received dividends from Belgian companies." Id. These plans would then seek a tax refund from FPSF for amounts allegedly withheld from their purported dividend payments. Id. FPSF alleges that the Pension Plans Defendants were participants in this scheme and, in reality, those plans "were not associated with any legitimate employer," "were not funded by employer or employee contributions," and "do not exist for the exclusive benefit of employees and their beneficiaries." Id. ¶ 32.

FPSF alleges that, from 2012 to 2015, the defendants "carried out their scheme to defraud FPSF Belgium" by submitting false tax refunds. Id. ¶ 40.

3

Each refund claim by the Pension Plan Defendants represented that the pension plans owned shares in a Belgian company and received dividends as a result of their share ownership, and identified specifically "the Belgian company in which the [pension plan] supposedly owned shares, state[d] the number of shares and state[d] the net dividend that each [pension plan] supposedly received." Id. ¶ 48. Relying on the defendants' alleged misrepresentations, FPSF alleges that it paid the requested refund amounts to each pension plan. Id. ¶ 52. The payments "generally were made several months after the relevant refund request." Id. FPSF alleges that the payments received by the Pension Plan Defendants were "promptly distributed to other participants in the [alleged] fraud." Id. ¶ 53. FPSF alleges that this scheme continued until at least November 2015. Id. ¶ 54.

In October 2015, the Belgian Federal Police informed FPSF of an international criminal investigation concerning fraud associated with refunds of purportedly withheld dividends. Defs.' 56.1 ¶ 25. The police told FPSF that the alleged fraud involved the submission of false documents in dividend withholding refund claims. Id. ¶¶ 26–27. FPSF personnel continued to communicate with the Belgian Federal Police, who informed FPSF that suspicious refund claims had been submitted by certain tax refund agents, including Acupay and Goal Taxback. Ex. 6 to Declaration of Daniel C. Davidson ("Davidson Decl."), ECF No. 221-6.

In November 2015, FPSF's Special Tax Inspectorate analyzed refund claims received from June 2012 through October 2015 and observed a surge

in refund claims made by Acupay and Goal Taxback in 2014 and 2015. Declaration of Yannic Hulot ("Hulot Decl.") ¶¶ 3–5, ECF No. 233. The analysis also observed that the claims submitted by Acupay and Goal Taxback were, on average, much larger than typical refund claims. Id. ¶ 3. Based on the Inspectorate's report, FPSF considered asking Belgium's Public Prosecutor to make FPSF a "civil party" in the pending criminal proceeding. Defs.' 56.1 ¶¶ 62–63. However, based on the advice of internal legal counsel, FPSF instead requested to be considered an "injured party" in the criminal proceeding. Id. ¶¶ 67–68. In a letter to the Public Prosecutor, FPSF stated that it had been the victim of an international fraud and requested that it be kept informed about the outcome of the criminal investigation. Ex. 14 to Davidson Decl., ECF No. 221-14.

The Special Tax Inspectorate continued to research the scope of the potential fraud. However, FPSF only obtained access to the Belgian Federal Police's criminal file as an injured party on July 22, 2019. Exs. 58 & 59 to Davidson Decl., ECF Nos. 221-58 and 221-59. From the police file, FPSF became aware of key facts surrounding the fraud. For example, the police report explained how certain refund claimants engaged in complex "trading loops" to create the appearance of share ownership. Declaration of Dirk Leukemans ("Leukemans Decl.") ¶ 21, ECF No. 229. The report also showed that certain refund claimants engaged in transactions that were inconsistent with those of a legitimate pension plan. Id. ¶ 20.

FPSF filed the original complaints in this action on July 27, 2021, and filed amended complaints on January 21, 2022. The amended complaints allege fraud with respect to more than 330 individual refund claimants. On July 5, 2023, the Court denied the defendants' motion to dismiss the amended complaints pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). See generally Belgium I, 680 F. Supp. 3d 460. The defendants now move pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing the amended complaints on statute-of-limitations grounds.

## II.

The standard for granting summary judgment is well established. "The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[2] Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

issue of material fact." Celotex, 477 U.S. at 323. The substantive law govern-ing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).

### III.

The defendants contend that they are entitled to summary judgment dismissing the plaintiff's claims because those claims are time-barred. The parties agree that, under New York law, the action must be timely pursuant to both New York and Belgian statutes of limitations for fraud claims because the plaintiff, FPSF, is a non-New York resident suing on a cause of action that accrued outside of New York. See N.Y. C.P.L.R. § 202. The defendants rely only on the New York statute of limitations to argue the claim is un-timely. See Br. 19 & n.12. The defendants represent that Belgium's statute of limitations for fraud claims is five years from the date of discovery. Id. n.12.

7

Because FPSF's claims are untimely if barred by either New York's or Belgium's statutes of limitations, if the action is untimely under New York's statute of limitations, it must be dismissed. Therefore, the defendants argue that FPSF's claim is time-barred under New York law, and they do not argue separately that the claims are untimely under the Belgian statute of limitations.

The relevant New York statute of limitations provides that actions for fraud must be brought within the greater of: (1) six years from the date the cause of action accrued, or (2) two years from the date the plaintiff discovered, or with reasonable diligence could have discovered, the alleged fraud. Grasso v. United Grp. of Cos., Inc., 806 F. App'x 69, 71 (2d Cir. 2020); N.Y. C.P.L.R. § 213(8). Claims for aiding and abetting fraud are also subject to New York's statute of limitations for fraud claims. See Marketxt Holdings v. Engel & Reiman P.C., 693 F. Supp. 2d 387, 393–94 (S.D.N.Y. 2010). The parties agree that, with respect to the six-year rule, the claims accrued when FPSF made a payment based on an allegedly fraudulent refund claim. See Br. 20; Mem. of Law Opp. Mot. ("Opp.") 7–8, ECF No. 235.

With respect to the two-year discovery rule, the "duty of inquiry results in the imputation of knowledge of a fraud in two different ways, depending on whether the [injured party] undertakes some inquiry. If the [injured party] makes no inquiry once the duty arises, knowledge will be imputed as of the date the duty arose." LC Cap. Partners, LP v. Frontier Ins. Grp., Inc., 318 F.3d 148, 154 (2d Cir. 2003). If the injured party makes an inquiry once the

duty arises, a court then imputes knowledge of what the injured party in the exercise of reasonable diligence should have discovered, with the limitations period running "from the date such inquiry should have revealed the fraud." Id.

### A.

In response to the COVID-19 pandemic, New York's Governor issued executive orders tolling all statutes of limitations for 228 days, from March 20, 2020, until November 3, 2020. See N.Y. Comp. Codes R. & Regs. tit. 9, §§ 8.202.8, 8.202.72. The parties disagree on the effect of the executive orders on the timeliness of FPSF's claims. The defendants argue that the executive orders suspended—but did not extend—the statute of limitations. See Br. 21–23. In other words, the defendants contend that any claim that would have otherwise expired between March 20, 2020, and November 3, 2020, instead expired on November 4, 2020. See id. at 23. In contrast, FPSF argues that the executive orders tolled, or extended, the statute of limitations by 228 days. See Opp. 8–12.

As FPSF points out in its opposition papers, id., New York courts have consistently rejected the defendants' argument and treated the executive orders as tolling, rather than suspending, the statute of limitations for 228 days. See, e.g., Murphy v. Harris, 177 N.Y.S.3d 559, 561 (App. Div. 2022) ("Plaintiffs' wrongful death claim was tolled on March 20, 2020 and had a remaining limitations period of six months and 10 days, which started to run

9

again after November 3, 2020."); <u>Brash v. Richards</u>, 149 N.Y.S.3d 582, 585 (App. Div. 2021) (noting that "the subject executive orders tolled the time limitation" contained in the statute of limitation); <u>see also</u> <u>Natale v. Allied Aviation Servs., Inc.</u>, No. 23-cv-7260, 2024 WL 3794615, at *5 (S.D.N.Y. Aug. 13, 2024) (concluding "[b]ased on the decisions of the New York Appelate Division and other courts in this district, along with the plain text of Executive Order 202.8, … that the orders effected a 228-day toll").[3]

The relevant statute of limitations for FPSF's claims is therefore the greater of: (1) six years, plus 228 days, from the date the claim accrued; or (2) two years, plus 228 days, from the date that FPSF discovered, or with reasonable diligence could have discovered, the alleged fraud.

## B.

The defendants first contend that "a significant portion" of FPSF's claims are time-barred under the six-year statute of limitations for fraud claims. Br. 7. The plaintiff filed this action on July 27, 2021. ECF No. 1. Therefore, any claims that accrued after December 10, 2014 (or, six years plus 228 days before July 27, 2021) are timely. Thus, at least 134 of FPSF's claims are timely. <u>See</u> Leukemans Decl. ¶ 5; Ex. 1 to Leukemans Decl., ECF No. 229–1.

_____

[3] The defendants offer no meaningful response to these cases in their reply brief. <u>See</u> Reply Mem. of Law in Supp. of Mot. ("Reply") 1 n.1, ECF No. 236.

## C.

With respect to the remainder of FPSF's claims, although they accrued before December 10, 2014, they may still be timely under the two-year discovery rule. Including the 228-day COVID-19 tolling period, the relevant date of discovery is December 10, 2018. This means that any claim that accrued before December 10, 2014, may still be timely if FPSF did not discover the alleged fraud until after December 10, 2018, or, because FPSF conducted an investigation, the subsequent date on which with reasonable diligence FPSF could have discovered sufficient facts to bring this action. On the other hand, if FPSF could have discovered the fraud before December 10, 2018, any claims that accrued before December 10, 2014, would be untimely.

## 1.

The defendants first contend that FPSF had actual knowledge of the alleged fraud by 2016. Br. 26. Actual knowledge of fraud under New York law requires knowledge of facts from which the fraud could reasonably be inferred, and "mere suspicion will not constitute a sufficient substitute." Erbe v. Lincoln Rochester Tr. Co., 144 N.E.2d 78, 81 (N.Y. 1957). Whether fraud reasonably can be inferred from a set of facts is an objective test. See CSAM Cap., Inc. v. Lauder, 885 N.Y.S.2d 473, 478 (App. Div. 2009). In support of their motion, the defendants point to the following facts that they argue show that, by 2016, FPSF had information sufficient to plead a claim for fraud:

- By October 19, 2015, FPSF knew that tax authorities were allegedly defrauded in connection with withholding refunds. Ex. 6. to Davidson Decl., ECF No. 221-6.

- By October 27, 2015, FPSF knew that the alleged fraud involved included certain of the defendants in this action. Ex. 6 to Davidson Decl.

- By November 9, 2015, FPSF knew that Acupay and Goal Taxback were allegedly involved in the fraud. Ex. 6 to Davidson Decl.

- By November 26, 2015, FPSF knew the mechanism of the alleged fraud. Ex. 10 to Davidson Decl., ECF No. 221-10.

- By December 4, 2015, FPSF calculated the alleged fraud at nearly 296 million euros for repayments made between 2013 and 2015. Ex. 18 to Davidson Decl., ECF No. 221-18.

- On December 15, 2015, FPSF acknowledged that it "has been the victim of international fraud" and that it would "therefore like to bring a complaint before the Public Prosecutor's office and file a civil lawsuit." Ex. 20 to Davidson Decl., ECF No. 221-20.

- By March 20, 2016, FPSF had in its possession list of pension plans suspected of wrongdoing, including all of the Pension Plan Defendants. Exs. 33–34 to Davidson Decl., ECF Nos. 221-33 and 221-34; Defs.' 56.1 ¶¶ 80-84.

- By May 11, 2016, FPSF received a diagram outlining the process by which the alleged beneficiaries of the fraud obtained refunds. Ex. 37 to Davidson Decl., ECF No. 221-37; Defs.' 56.1 ¶ 87.

The defendants argue that FPSF gained additional information relevant to its claims in 2017 and 2018. For example, on March 20, 2018, FPSF received an audit report prepared by PwC that categorized tens of thousands of refund applications as either normal or fraudulent. Ex. 44 to Davidson Decl., ECF No. 221-44; Defs.' 56.1 ¶¶ 99-100. Also in 2018, FPSF learned that the Customs and Tax Administration of the Kingdom of Denmark ("SKAT") filed lawsuits alleging the same theory of fraud against many of the same defendants. See Defs.' 56.1 ¶¶ 88–89, 101–04. Finally, the defendants point to internal communications at FPSF purporting to show that FPSF personnel were preparing to litigate many of the refunds at issue in this case. Exs. 8, 49, 50 to Davidson Decl., ECF Nos. 221-8, 221-49, 221-50. Thus, according to the defendants, by at least November 2018, FPSF had enough information to start the two-year statute-of-limitations clock. See Br. 32.

In response, FPSF argues that it could not reasonably infer fraud until "facts indicated which statements contained in individual refund claims were false or misleading," which it could not do until 2019. Opp. 17. FPSF contends that the "key allegations of fraud are that, for each refund claim: (1) the refund claimant did not own the Belgian company shares it claimed to own and (2) the refund claimant was not a qualified pension plan." Id. According to FPSF, it did not possess these facts until 2019, when it obtained

13

access to the Belgian Federal Police file. Id.; Leukemans Decl. ¶¶ 17–22. Moreover, with respect to the facts that FPSF knew before May 2016, FPSF argues that these facts were sufficient only to raise a suspicion of fraud, but not to establish actual knowledge. For example, FPSF points out that in 2016: (1) while it knew there were potentially fraudulent claims submitted by Acupay and Goal Taxback, FPSF did not know the specific false statements contained in those refund requests and (2) that while FPSF knew certain defendants were associated with suspicious claims, it did not know those defendants had actually committed fraud. Opp. 19–20. FPSF also points out that it initially incorrectly believed that the suspected fraud was committed by engaging in complicated purchases and sales of Belgian companies, whereas in reality, the refund claimants never actually owned shares of Belgian companies. Id. at 20.

FPSF also takes issue with the defendants' arguments as to its post-2016 knowledge of the alleged fraud. With respect to the 2018 PwC report, FPSF points out that the report does not include "key facts" about share ownership and pension plan status and that the report does not conclude that any fraud actually occurred. Id. at 21. FPSF also argues that the complaints brought by SKAT do not contain allegations regarding fraud against Belgian companies Id. at 22–23. Finally, FPSF responds that internal communications discussing litigation based on a potential fraud merely show that FPSF suspected it had been defrauded, not that it actually possessed the facts to commence litigation. Id. at 23–24.

Based on the current record, it cannot be determined that, as a matter of law, FPSF had sufficient facts to discover the fraud by December 10, 2018. The defendants contend that FPSF was aware of sufficient facts to plead fraud as of 2016, or, alternatively, 2018. FPSF, in contrast, argues that it did not know certain facts integral to its Complaint, such as which entities did not own shares in Belgian companies and were not qualified pension plans, see, e.g., Compl. ¶¶ 31, 40, 46, 51, until it received the Belgian Federal Police file in 2019. Thus, according to FPSF, the facts it possessed prior to 2019 could give rise at most to a mere suspicion of fraud, not actual knowledge. Plainly, there are issues of fact with respect to when FPSF can be said to have had actual knowledge, rather than mere suspicion, of the alleged fraud, and those issues are best determined by the trier of fact. See, e.g., Trepuk v. Frank, 376 N.E.2d 924, 926 (N.Y. 1978) ("Where it does not conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts."); In re Customs and Tax Admin. of the Kingdom of Denmark ("SKAT") Tax Refund Litig., No. 18-cv-7824, 2024 WL 3937599, at *6 (S.D.N.Y. Aug. 26, 2024) (denying summary judgment where the plaintiff "suspected, but did not know" that a given defendant had submitted fraudulent refund claims (emphasis omitted)).

15

**2.**

The defendants further argue that FPSF's claims are untimely because any reasonably diligent investigation would have uncovered the alleged fraud before December 10, 2018. Br. 33. Whether reasonable diligence would have revealed the fraud in question is also an objective test. See Topps Co. v. Cadbury Stani S.A.I.C., 380 F. Supp. 2d 250, 258 (S.D.N.Y. 2005).

The defendants take issue with several aspects of FPSF's investigation into the alleged fraud, which the defendants characterize as "leisurely." Br. 33. First, the defendants argue that FPSF could have discovered the alleged fraud by 2018 by consulting its own records and taking steps to acquire any missing information. See id. at 33–34. However, as FPSF points out, the defendants do not explain how a reasonable investigation into the information in FPSF's possession in 2016 would have revealed (1) that a particular refund claimant did not own the shares it claimed to own, or (2) that any given claimant was not a qualified pension plan, both of which FPSF argues were necessary for it to plead fraud. See, e.g., Compl. ¶¶ 31, 40, 46, 51.

The defendants also argue that FPSF should have requested access to the Belgian Federal Police file, which FPSF contends was necessary to have knowledge of the fraud, before July 2019. Br. 35–37. In response, FPSF contends that a request made that early would have likely been denied and that FPSF was prudent to wait until 2019, when it was informed that the relevant files were available. See Opp. 25; Leukemans Decl. ¶¶ 17–18. FPSF further contends that gaining access to the police file before 2019 would not have

given FPSF knowledge of the alleged fraud, because the Belgian Federal Police themselves did not develop the "key facts" of the fraud until that time. Opp. 25–26.

Like with the question of when FPSF had knowledge of the fraud, there are disputes of fact as to the thoroughness of FPSF's investigation and whether a reasonably diligent investigation would have uncovered the fraud before December 10, 2018—particularly, whether FPSF acted with due diligence in investigating the alleged fraud and when FPSF should have requested access to the Belgian Federal Police file. But, like with the questions of FPSF's actual knowledge of the fraud, these issues are best resolved by the trier of fact. See, e.g., Needham & Co., LLC v. Access Staffing, LLC, No. 15-cv-1487, 2016 WL 4399288, at *12 (S.D.N.Y. Aug. 12, 2016) (denying summary judgment despite "serious deficiencies" in a fraud investigation because the issue could not be resolved as a matter of law); In re JWP Inc. Sec. Litig., 928 F. Supp. 1239, 1250–51 (S.D.N.Y. 1996) (denying summary judgment where the court could not hold, as a matter of law, that the plaintiffs were not reasonably diligent under the circumstances in investigating the fraud).

*    *    *

Any claims that accrued after December 10, 2014, are timely. As for those claims that accrued before December 10, 2014, there is a genuine dispute of material fact with respect to when FPSF discovered or could with reasonable diligence have discovered the defendants' alleged fraud. The

17

defendants' motion for summary judgment based on the statute of limitations is **denied**.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed, the arguments are moot or without merit. For the foregoing reasons, the defendants' motion for summary judgment is **denied**.

The Clerk is respectfully requested to close ECF Nos. 219 and 220.[4]

**SO ORDERED.**

Dated:    New York, New York
          May 20, 2026

_____
John G. Koeltl
United States District Judge

---

[4] The defendants' request for oral argument (ECF No. 220) is **denied** as moot.